1          REPORTER'S RECORD
          VOLUME 2 OF 5 VOLUMES
2     TRIAL COURT CAUSE NO. B13-637
     COURT OF APPEALS NUMBER 04-14-00560-CR
3

4  THE STATE OF TEXAS          )  IN THE DISTRICT COURT
                                )
5                               )
   VS.                          )  KERR COUNTY, TEXAS
6                               )
                                )
7  VERNON LEE TRAVIS, III       )  198TH JUDICIAL DISTRICT

8

9

10            ***********************

11            TRIAL ON THE MERITS

12            ***********************

13

14

15

16          On May 6, 2014, the following proceedings came on

17  to be heard in the above-entitled and numbered cause before a

18  jury and the Honorable Stephen B. Ables, Judge presiding, 198th

19  District Court, held in Kerrville, County of Kerr, Texas;.

20          Proceedings reported by machine shorthand.

21

22

23

24

25

1                        A P P E A R A N C E S

2


3     ATTORNEY FOR THE STATE OF TEXAS
          Mr. Scott Monroe
4         SBOT NO. 14272700
               DISTRICT ATTORNEY
5                    and
          Ms. Donnie Coleman, Assistant District Attorney
6         SBOT: 04558600
               402 Clearwater Paseo, Suite 500
7              Kerrville, Texas 78028
               Telephone:  (830) 315-2460
8              Facsimile:  (830) 315-2461

9

      ATTORNEY FOR THE DEFENDANT
10        Mr. Shawn C. Brown
          SBOT NO. 24003613
11             and
          Mr. Brian Orihel
12        SBOT NO. 24079087
               LAW OFFICE OF SHAWN C. BROWN
13             540 S. St. Mary's Street
               San Antonio, Texas 78205
14             Telephone:  (210) 224-8200
               Facsimile:  (210) 224-8214

15

16

17

18

19

20

21

22

23

24

25

CHRONOLOGICAL INDEX
VOLUME 2
TRIAL ON THE MERITS

MAY 6, 2014                                          PAGE   VOL

PROCEEDINGS
                                                       7     2

VOIR DIRE-JURY QUALIFICATION
  THE COURT                                            7     2

  PROSPECTIVE JUROR NUMBER 69                          11    2

  PROSPECTIVE JUROR NUMBER 47                          12    2

  PROSPECTIVE JUROR NUMBER 65                          13    2

  PROSPECTIVE JUROR NUMBER 62                          15    2

  PROSPECTIVE JUROR NUMBER 28                          16    2

VOIR DIRE EXAMINATION
  THE COURT                                            20    2

VOIR DIRE EXAMINATION
  MR. MONROE                                           24    2

VOIR DIRE EXAMINATION
  MR. BROWN                                            57    2

  PROSPECTIVE JUROR NUMBER 18                          84    2

  PROSPECTIVE JUROR NUMBER 3                           85    2

  PROSPECTIVE JUROR NUMBER 19                          91    2

  PROSPECTIVE JUROR NUMBER 24                          92    2

  PROSPECTIVE JUROR NUMBER 34                          94    2

  PROSPECTIVE JUROR NUMBER 26                          97    2

  PROSPECTIVE JUROR NUMBER 31                          99    2

  PROSPECTIVE JUROR NUMBER 29                          101   2

  PROSPECTIVE JUROR NUMBER 23                          102   2

CHRONOLOGICAL INDEX
VOLUME 2
TRIAL ON THE MERITS
(CONTINUED)

MAY 6, 2014                                    PAGE    VOL

PROSPECTIVE JUROR NUMBER 8                       104     2

PROSPECTIVE JUROR NUMBER 15                      106     2

PROSPECTIVE JUROR NUMBER 6                       109     2

PROSPECTIVE JUROR NUMBER 21                      110     2

CHALLENGES FOR CAUSE                             113     2

SELECTION OF THE JURY                            117     2

OATH TO THE JURY                                 120     2

INSTRUCTIONS TO THE JURY                         120     2

INDICTMENT READ TO THE DEFENDANT                 124     2

DEFENDANT'S PLEA OF GUILTY                       124     2

OPENING STATEMENT
  MR. MONROE                                     126     2

OPENING STATEMENT
  MR. BROWN                                      128     2

| WITNESSES | DIRECT | VD | CROSS | REDIRECT | RECROSS | VOL |
|---|---|---|---|---|---|---|
| OFFICER CAROL TWISS | | | | | | |
| BY MR. MONROE | 131 | | | | | 2 |

|  | PAGE | VOL |
|---|---|---|
| THE WITNESS IDENTIFIED THE DEFENDANT | 167 | 2 |
| REPORTER'S CERTIFICATE | 178 | 2 |

1                         EXHIBIT INDEX
                            VOLUME 2
2                      TRIAL ON THE MERITS

| NO. | STATE'S | | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|---|
| 1 | PHOTOGRAPH | | 150 | 150 | 2 |
| 2 | PHOTOGRAPH | | 150 | 150 | 2 |
| 3 | PHOTOGRAPH | | 150 | 150 | 2 |
| 4 | PHOTOGRAPH | | 150 | 150 | 2 |
| 5 | PHOTOGRAPH | | 150 | 150 | 2 |
| 6 | PHOTOGRAPH | | 150 | 150 | 2 |
| 7 | PHOTOGRAPH | | 150 | 150 | 2 |
| 8 | PHOTOGRAPH | | 150 | 150 | 2 |
| 9 | PHOTOGRAPH | | 150 | 150 | 2 |
| 10 | PHOTOGRAPH | | 150 | 150 | 2 |
| 11 | PHOTOGRAPH | | 150 | 150 | 2 |
| 12 | PHOTOGRAPH | | 150 | 150 | 2 |
| 13 | PHOTOGRAPH | | 150 | 150 | 2 |
| 14 | PHOTOGRAPH | | 150 | 150 | 2 |
| 15 | PHOTOGRAPH | | 150 | 150 | 2 |
| 16 | PHOTOGRAPH | | 150 | 150 | 2 |
| 17 | PHOTOGRAPH | | 150 | 150 | 2 |
| 18 | PHOTOGRAPH | | 150 | 150 | 2 |
| 19 | PHOTOGRAPH | | 150 | 150 | 2 |
| 20 | PHOTOGRAPH | | 150 | 150 | 2 |
| 21 | PHOTOGRAPH | | 150 | 150 | 2 |

EXHIBIT INDEX
VOLUME 2
TRIAL ON THE MERITS
(CONTINUED)

| NO. | STATE'S | OFFERED | ADMITTED | VOL |
|-----|---------|---------|----------|-----|
| 22 | PHOTOGRAPH | 150 | 150 | 2 |
| 23 | PHOTOGRAPH | 150 | 150 | 2 |
| 24 | FLOOR PLAN OF THE HOUSE | 150 | 150 | 2 |
| 25 | PHOTOGRAPH | 158 | 158 | 2 |
| 26 | EVIDENCE BAG AND BODY VEST | 162 | 163 | 2 |
| 27 | 9 MILLIMETER RUGER GUN | 164 | 164 | 2 |
| 28 | GLOCK GUN | 164 | 164 | 2 |
| 29 | ENTIRE VIDEO INTERVIEW | 169 | | 2 |
| 30 | REDACTED VIDEO INTERVIEW | 169 | | 2 |

P R O C E E D I N G S

THE BAILIFF:  All rise.

THE COURT:  Will you please stand for the Pledge
of Allegiance.

(All stand).

THE COURT:  Welcome to jury duty.  My name is
Steve Ables and I'm a retired District Judge of the 216th
District Court.  Judge Emerson, the Judge of the 198th District
Court generally would be here, but he's in Austin participating
in an advance judicial studies program that is an excellent
program that he's been invited to participate in, so I'm
covering for him this week while he takes part in that program.

VOIR DIRE-JURY QUALIFICATION

THE COURT:  You've been summoned today as a
prospective juror in a criminal case.  It's the State of Texas
versus Vernon Lee Travis, III.  We're going to be picking 12 of
you to help us with this case.  We're probably looking at a two
day trial, today and tomorrow.  It's possible that it could go
into the morning of Thursday, but probably it's today and
tomorrow.  That's my best guess.

So the first thing I need to do is swear you in
and then we're going to be asking you some questions.  Would
all of you perspective jurors, would you raise your right
hand.

(All prospective jurors sworn).

1          THE COURT:  If you can answer in the affirmative,

2    you'll say I will.

3          PROSPECTIVE JURORS:  I will.

4          THE COURT:  Thank you.

08:56:58AM 5          Let me quickly go through your general

6    qualifications and exemptions.  These are on your juror card

7    that summoned you, but it's important we make sure that you're

8    qualified.

9          To be qualified to serve as a juror here in Kerr

08:57:14AM 10   County, you have to be a resident of this county.  You have to

11   be qualified to vote.  You don't necessarily have to be

12   registered to vote, but you have to be qualified to vote here

13   if you want to register.  You have to be able to read and write

14   the English language.  You have to be a citizen in the United

08:57:28AM 15   States.  You cannot have a felony conviction on your record or

16   a theft conviction on your record or you cannot be under

17   accusation for a felony or a theft, and you have to be of sound

18   mind and good moral character.  And I'm sure that's not an

19   issue for any of y'all, but of sound mind and good moral

08:57:44AM 20   character.

21          So keep that in mind and in a few minutes, I'm

22   going to ask for people that want to present excuses.  If you

23   think there is a question about your qualifications, come up

24   here and tell me, especially if you've had some run-in with the

08:57:58AM 25   law in the past.  I don't want to embarrass you in front of the

          1    whole group.  If you've had a conviction that you need to share

          2    with me, I would like for you to do that at the bench instead

          3    of in front of everybody else.

          4              There are exemptions that you may claim.  You

08:58:14AM  5    don't have to claim these exemptions, but if you want to claim

          6    any of these exemptions, you have an absolute right to do so.

          7              If any of you are over the age of 70, you may

          8    claim an exemption.  If you have the custody of a child who is

          9    ten years of age or younger and it would be a hardship for you

08:58:28AM 10    for you to serve, you may claim an exemption because you have a

         11    child age ten years or younger.

         12              If you're a student, high school or college

         13    student, you may claim an exemption.  Do we have any high

         14    school students on the panel?  Sometimes about this time of the

08:58:44AM 15    year, we'll have somebody show up because they turned 18 and

         16    their name got into the driver's license list and they show up

         17    for jury duty.  And now I've been doing this almost for 27

         18    years and I've never had a high school student want to get out

         19    of jury duty to go to class.  So I'm still waiting for that

08:59:00AM 20    first high school student.  But college students who have to

         21    pay for it sometimes do want to go back to class.  Do we have

         22    any college students amongst us today?

         23              If you are an officer, employee of the Senate,

         24    the House of Representatives, or any kind of a branch of state

08:59:16AM 25    government, you may claim an exemption.  If you're a primary

caretaker of somebody who needs your help, if you have
somebody that's sick, that you're caring for, you may claim an
exemption from jury service.

        And some of you may have something very
important.  You have a doctor's appointment or you have to go
pick up your grandchildren at the airport, something really
significant that you need to tell me about, and so I'm going
to allow you to do that in just a few minutes.

        If you want to be exempt because of economic
reasons because you don't want to miss work or you don't feel
like you can miss work, the statute is very specific that I
can't excuse you for strictly economic reasons unless the
attorneys all agree to let you go.  So if somebody has an
economic reason for not serving and they want to present that
to me, I may have you step back and I'll visit with the
attorneys to see if they'll agree to let you go.  But if it's
missing work and you don't want to miss work, I probably can't
let you off, but maybe the attorneys will have some milk of
human kindness on this thing.

        So what we're going to do is -- and I'll tell you
right now, the defendant will be here a little bit later.  As
we do these jury selection things, if you go to San Antonio or
Dallas, usually you're in a big hall and there is 700 people
in there and you don't have any defendants and you kind of
send panels out so the defendant doesn't have to be here.

1    He'll be here a little bit later, and I'll introduce you to

2    Mr. Travis as soon as he's here.

3            So what we're going to do now -- we have our

4    bailiffs that are helping us out -- if you feel like you have a

09:00:56AM 5    qualification issue and would like to claim an exemption, or

6    have an excuse that you would like to present to the Court as

7    to why you can't serve here in the next couple of days, I'm

8    going to have you line up in the middle aisle at the swinging

9    door and come up to the bench one at a time.  And I'll invite

09:01:14AM 10    the attorneys if you'd like to come up here and listen, you're

11    welcome to come up and listen to the matters that are presented

12    to the Court.

13            So anyone that would like to present anything, if

14    you can line up and come up one at a time.

09:01:24AM 15                    PROSPECTIVE JUROR NUMBER 69

16            THE COURT:  Good morning.

17            PROSPECTIVE JUROR:  Susan Lemeilleur.  To

18    pronounce it is easier than to understand.

19            THE COURT:  Let me get your number and put that on

09:01:54AM 20    the record.

21            PROSPECTIVE JUROR:  69.

22            THE COURT:  So this is Juror 69.  Your name is

23    Susan Lemeilleur?

24            PROSPECTIVE JUROR:  Yes.

09:02:02AM 25            THE COURT:  And Ms. Lemeilleur you have a note.

So you have some philosophical issues?

PROSPECTIVE JUROR:  Conscientious --

THE COURT:  Conscientious-type issues about being a juror.  You put in here about the death penalty.  Of course, this is a first degree felony and the range of punishment may be from probation to 99 years, but the death penalty is not involved.

You do talk about having migraines, which at times could incapacitate you; is that correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And if we get into a stress situation, does that have an impact on your migraines?

PROSPECTIVE JUROR:  Yes, it makes it worse.

THE COURT:  Without saying anything, without really getting into the conscientious issues, I'm going to go ahead and excuse you for medical reasons because of the migraines.  And I think if you'll just step over here to these ladies, they'll take care of you.

PROSPECTIVE JUROR:  Thank you.

PROSPECTIVE JUROR NUMBER 47

THE COURT:  Yes, sir.  Good morning.

PROSPECTIVE JUROR:  How are you doing?

THE COURT:  I need something with your number on it.  Do you have your summons?

Thank you.  This is Juror Number 47.  And it's

1   Antonio Caseres?

2               PROSPECTIVE JUROR:  Yes.

3               THE COURT:  And what did you want to tell me, Mr.

4   Caseres?

09:03:40AM 5               PROSPECTIVE JUROR:  Okay.  Last night, I got a

6   call from a friend of mine whose wife had to have surgery, and

7   I'm a minister with Jehovah's Witnesses and I wasn't able to

8   get down there and I really needed to get down there and visit

9   with them.  That's the -- other than that, you know -- other

09:03:56AM 10   than that, that's that.

11               THE COURT:  We have a very small line --

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  -- and I think we've got over 60

14   people, so I'm going to let you go comfort that family.

09:04:08AM 15               PROSPECTIVE JUROR:  Thank you, sir.

16                  PROSPECTIVE JUROR NUMBER 65

17               THE COURT:  All right.  Good morning.  Do you have

18   something with your juror number on it?

19               PROSPECTIVE JUROR:  Yes, sir.

09:04:24AM 20               THE COURT:  This is Juror Number 65, Joseph

21   Vorhes?

22               PROSPECTIVE JUROR:  Yes, sir.

23               THE COURT:  And Mr. Vorhes, what did you want to

24   tell me?

09:04:32AM 25               PROSPECTIVE JUROR:  My only thing is I had neck

surgery within the last year or so and depending on the
duration, the day, sitting in one position, I may wiggle around
a bunch or that sort of thing.  I have a hard time sitting in
one position is the only thing there is.

09:04:52AM 5          THE COURT:  Well, I'll kind of tell you how we
usually do this and see if you think it's a problem.  We're
kind of a nine to five operation.  We usually take a break
mid-morning and then mid-afternoon.

                      PROSPECTIVE JUROR:  That would probably be all
09:05:04AM 10 right.

                      THE COURT:  Take about an hour and 15 minutes for
lunch.  And the only time that we really get into extended
periods of time is if you were to go back to the jury room and
start deliberating and y'all stayed in there for a long time.
09:05:16AM 15 I kind of leave that up to the jury how long they will stay.

                      PROSPECTIVE JUROR:  Okay.

                      THE COURT:  But generally speaking, about nine to
five.  I really don't have a problem if a juror needs to stand
up just a second, even while testimony is going on, if they
09:05:28AM 20 just kind of need to stand up to feel more comfortable.

                      PROSPECTIVE JUROR:  Okay.

                      THE COURT:  Do you think you can do it?

                      PROSPECTIVE JUROR:  I think that will be fine,
yeah.

09:05:32AM 25         THE COURT:  Okay.  Then we'll leave you on here.

1              PROSPECTIVE JUROR:  Okey-doke.

2              THE COURT:  You know, if you get uncomfortable

3    during the day, let me know --

4              PROSPECTIVE JUROR:  Okay.

09:05:38AM 5   THE COURT:  -- while we're doing the jury

6    selection, let me know.

7              PROSPECTIVE JUROR:  Thank you, sir.

8                 PROSPECTIVE JUROR NUMBER 62

9              PROSPECTIVE JUROR:  How are you doing, sir?

09:05:52AM 10  THE COURT:  This is Juror Number 62 and it's Bruce

11   Sandefur.  And what did you want to tell me?

12             PROSPECTIVE JUROR:  I got a P.I. a long time ago.

13   I don't know if that's something that's -- I don't know.  This

14   is my first time, so I don't know if that's supposed to affect

09:06:14AM 15  anything.

16             THE COURT:  I'm glad you came up here and told me.

17   It's not going to disqualify you.  It's not a felony.  It's not

18   a theft or moral type of deal, so you're okay.  But they're

19   going to make note of it and if for some reason they need to

09:06:30AM 20  ask you about it, I would like for you to -- have you come up

21   where you don't talk about it in front of the jury panel.  This

22   is the way to do it.  It doesn't disqualify you.

23             PROSPECTIVE JUROR:  Okay.  I just didn't know the

24   rules.

09:06:40AM 25  THE COURT:  I'm glad you told us.  Thank you.  You

1    can go back to your seat.

2                    PROSPECTIVE JUROR NUMBER 28

3              THE COURT:  Good morning.  Let me get your number

4    off of that.  This is Juror Number 28 and what is your name,

09:06:54AM 5  sir?

6              PROSPECTIVE JUROR:  Allan Slagle, A-L-L-A-N,

7    Slagle S-L-A-G-L-E.

8              THE COURT:  And what did you want to tell me, Mr.

9    Slagle?

09:07:04AM 10            PROSPECTIVE JUROR:  This is a little economic a

11   little bit.  I'm self-employed dental laboratory.  I cleared

12   out my schedule for today, but the fact that you are saying

13   maybe two days, I will have to probably get ahold of my doctors

14   and they will have to move patients also.

09:07:20AM 15            THE COURT:  So you have a lab?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  I was going to ask anyways

19   just in case, but if you can't I will --

09:07:26AM 20            THE COURT:  If you'll kind of walk back there kind

21   of five or six paces?

22             PROSPECTIVE JUROR:  Yes.

23             (Bench conference).

24             THE COURT:  Do we keep him?

09:07:34AM 25            MR. MONROE:  We have plenty.

1              THE COURT:  Do you have a problem letting him go?

2              MR. BROWN:  I don't have a problem with letting

3    him go, Judge.

4              (Bench conference ended).

09:07:40AM 5              THE COURT:  All right.  All right.  We're going to

6    let you go.

7              PROSPECTIVE JUROR:  All right.

8              THE COURT:  We've got a good group of people here

9    today so you take care of the lab.

09:07:50AM 10              PROSPECTIVE JUROR:  Thank you.

11              THE COURT:  You're welcome.

12              Right over here, Mr. Slagle.  Right over here.

13              Anyone else?

14              (Bench conference).

09:08:00AM 15              THE COURT:  So we have one, two, three, four --

16    we had 61 show up.

17              CLERK:  62 minus three.

18              THE COURT:  We have 59.  I don't think we need to

19    keep 59.  How many would you like to keep?

09:08:16AM 20              MR. BROWN:  Forty-five.

21              MR. MONROE:  Forty-five would be good.

22              THE COURT:  Let's keep 45 folks.  Do you want to

23    take a look at this panel to see if you want to shuffle or not?

24              MR. BROWN:  Can I have just a second, Judge?

09:08:36AM 25              THE COURT:  Yeah.

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | MR. BROWN:  Thank you.  The jury expert says we                          |
| 2     | need to do a shuffle.                                                     |
| 3     | THE COURT:  Okay.  We'll do a shuffle.  We'll pull                       |
| 4     | 45 names and then we'll seat them for you.  Let's go ahead and           |
| 09:09:30AM 5 | do 30 minutes.  So in 30 -- let's say 10 or 9:40, we'll have       |
| 6     | one through 45, so be ready to go.                                        |
| 7     | MR. BROWN:  My client didn't sign those documents.                      |
| 8     | I still need to do that.                                                  |
| 9     | THE COURT:  Well, you do that and hopefully he'll                        |
| 09:09:52AM 10 | be here.                                                            |
| 11    | MR. BROWN:  And also we need to see the video.                          |
| 12    | THE COURT:  Well, the video, you can see that                           |
| 13    | after you get the jury picked maybe during the lunch break              |
| 14    | before we start putting on evidence.  You know, let's kind of           |
| 09:10:04AM 15 | plan on that and we'll break for lunch after we get the jury      |
| 16    | picked, okay?                                                            |
| 17    | MR. BROWN:  All right.  Okay.  Thank you, Judge.                        |
| 18    | (Bench conference ended).                                                |
| 19    | THE COURT:  Okay.  Folks, what we're going to do                        |
| 09:10:14AM 20 | is we're going to take 45 of you -- we have almost 60 of you      |
| 21    | who appeared today and thank you for that, but we probably              |
| 22    | don't need much more than 45 folks in order to do our                   |
| 23    | questioning.  So this is where you start crossing your fingers          |
| 24    | in case you don't want to be on jury duty.  The clerk has a             |
| 09:10:34AM 25 | computer program, she's going to go out and shuffle your names.   |

1    She's going to come up with a list of 45 of you and then she

2    also needs to make copies of each one of your little

3    information cards in order to give the attorneys to look at

4    while they're doing their jury selection.  It takes about 30

09:10:50AM 5    minutes to do this.  So we're going to have a 30-minute recess.

6    The bailiffs will be kind of watching for you, probably will

7    put you back in the back of the courtroom and we'll be seating

8    you 1 through 45 up here on the front rows.  But Scott will be

9    taking care of you, Scott and Charlie our bailiffs; Scott Van

09:11:10AM 10    Klaveren and Charlie Witt, our bailiffs.  If you have any

11    questions, they will take care of your questions.  So 30

12    minutes, get a cup of coffee or something.  And then we'll come

13    back in here and we'll see who the lucky 45 are.

14              All right.  You may be excused.

09:11:30AM 15              (Recess).

16              THE COURT:  Kimberly Chambers, Number 1, I never

17    know if you should buy a lottery ticket or should not buy a

18    lottery ticket.

19              PROSPECTIVE JUROR:  Been thinking about it.

09:47:09AM 20              MR. BROWN:  May we approach?

21              THE COURT:  Yes.

22              (Discussion off the record).

23              THE COURT:  For you folks who were not drawn, the

24    luck of the draw, you couldn't make this panel, thank you so

09:48:33AM 25    much for appearing today.  I believe the clerk already has

1    given you your money.  It's not hardly enough to buy a happy

2    meal, so let me add my thanks to you coming today.  But if you

3    weren't part of the 45 and you were not drawn, you may be

4    excused.  You can leave the courtroom at this time.  Thank you

09:48:49AM  5    very much.

6                    (Partial panel members dismissed).

7                    Let me see, Deborah Bessey, I think you came in a

8    little bit late.  I didn't swear you in.  Let me give you this

9    oath.  Would you raise your right hand?

09:49:32AM 10                    (Prospective juror sworn).

11            THE COURT:  All right.  Thank you.  So we have

12    everybody sworn in now.  We're doing just a little bit of

13    bookkeeping up here at the bench.

14                         VOIR DIRE EXAMINATION

09:49:40AM 15            THE COURT:  The portion of the trial that we're

16    about to go into is called voir dire.  That's the technical

17    word for it.  It's jury selection.  The attorneys are going to

18    be able to talk to you, do a little -- some inquiries into your

19    background.  They are entitled to be educated a little bit

09:49:59AM 20    about you before they decide who they want to strike.

21                    Jury selection is all about who remains more than

22    it's who they select.  After these attorneys talk to you for a

23    while, and I've given them some time limits, they're going to

24    go back in the back room and they're going to strike ten of

09:50:18AM 25    you.  Each of them will get to strike ten of you for whatever

1    reason they want to.  The technical word for that is a

2    periphery strike.

3             After they each make ten strikes, then we're going

4    to take this list and the first 12 people on the list that

09:50:33AM 5    don't have a strike will be our jury.  If you're quick at math

6    and we need 12 jurors, then we've got 10 plus 10, and 20 plus

7    12, 32, so if you're sitting there at Number 33 or 34, anything

8    past 32, right now you're not going to be on this jury.  But

9    the reason we have 45 of you is sometimes during jury

09:50:54AM 10   selection, we'll have some people that will fall out, so we'll

11   make sure that we have enough folks to make a jury.

12             I hope that you'll be forthcoming.  If you were

13   on a jury, you would want to make sure that you know a little

14   bit about the people that were going to sit in judgment of

09:51:11AM 15   you.  We're not going to get very, real personal.  The items

16   that you filled out on your card, the attorneys already have

17   that so they don't have to go over that again unless it has a

18   red flag.  But we'll try to work our way through that.

19             The State is represented by the District

09:51:30AM 20   Attorney, Mr. Scott Monroe.

21             MR. MONROE:  Good morning.

22             THE COURT:  And his assistant, Assistant District

23   Attorney, Donnie Coleman.

24             MS. COLEMAN:  Good morning.

09:51:37AM 25             THE COURT:  And they have their investigator with

1    them and they'll probably have a former Texas Ranger with them

2    during the day.  Todd is not an attorney but he's entitled to

3    sit at the counsel table, just like the defense wants to have

4    an investigator or a secretary come in.  But Mr. Monroe and Ms.

09:51:53AM 5    Coleman will be presenting the State's case today.

6            I would like to introduce to you our defendant in

7    today's case, Vernon Lee Travis, III.  Mr. Travis, will you

8    stand up, please?  He's the defendant in this case and he's

9    represented by Mr. Shawn Brown.

09:52:09AM 10            MR. BROWN:  Good morning, Ladies and Gentlemen.

11            THE COURT:  And Mr. Brown is going to be assisted

12    by Mr. Brian Orihel.

13            MR. ORIHEL:  Good morning.

14            THE COURT:  And Mr. Brown and Mr. Orihel are from

09:52:17AM 15    San Antonio, and they'll be telling you just a little bit more

16    about theirselves in just a few minutes.

17            Thank you and have a seat, please.

18            The way our system works is the State goes first

19    and there is a reason the State goes first and there is a

09:52:29AM 20    reason they also get to go last.  The State gets the first word

21    and the last word and the reason is because the State must

22    prove that a defendant is guilty beyond a reasonable doubt.

23    They -- it's -- in legal parlance, we call that the burden of

24    proof.  They have the responsibility or the burden to prove

09:52:43AM 25    that the defendant is guilty beyond a reasonable doubt.

                    Mr. Travis sits before you today as an innocent

man.  He is presumed to be innocent unless the State can prove

he is guilty beyond a reasonable doubt.  The fact that he's

been indicted is not to be considered by you and the fact that

09:53:00AM 5  he's in court today is not to be a consideration of guilt.

The only thing you're supposed to base your verdict on is if

the State can prove beyond a reasonable doubt that he is

guilty of the offense with which he's charged.

                    Is there anybody in this panel that disagrees

09:53:16AM 10  with that?  That's a basic premise of law in this country that

a person is presumed innocent until proven guilty beyond a

reasonable doubt.  Is there anybody that takes issue with

that?  Because that's kind of the bedrock of our whole system,

that the State has to prove a person is guilty beyond a

09:53:34AM 15  reasonable doubt.  But that's the reason why the State goes

first and if somebody wants to say, well, why does the State

get the first word and the last word?  Because the State has

the responsibility to prove a person guilty beyond a

reasonable doubt.

09:53:46AM 20             You may be interested in all the facts of this

case, but we try not to get too much into the facts of the

case during voir dire.  We're looking into kind of big

philosophical issues.  If you get picked, then we get down

into the specific facts of this case.  So I don't want you to

09:54:04AM 25  try to prejudge this case just by what goes on in voir dire.

 1   When people are placed under oath and they are on the witness

 2   stand, that's when we get down to whether or not a person is

 3   guilty.

 4           But with that kind of lead-in for everything, I'm

09:54:18AM 5   going to let either Mr. Monroe -- are you going to go first,

 6   Mr. Monroe?

 7           MR. MONROE:  Yes, sir.

 8           THE COURT:  Our District Attorney, Mr. Scott

 9   Monroe, is going to lead off and then we'll hear from Mr.

09:54:27AM 10   Travis' attorneys.  Mr. Monroe.

11           MR. MONROE:  Thank you, Your Honor.

12                   VOIR DIRE EXAMINATION

13           MR. MONROE:  May it please the Court and opposing

14   counsel.

09:54:32AM 15           Good morning, Ladies and Gentlemen.

16           PROSPECTIVE JURORS:  Good morning.

17           MR. MONROE:  I never know whether to say thank you

18   for being here.  I always wonder whether or not someone that is

19   summoned to be here for jury duty wants to be picked or not.

09:54:47AM 20   I'm sure each of you have other things you would rather be

21   doing.  I never know whether to say congratulations or I'm so

22   sorry.  Let me suffice it to say, thank you.

23           I remember one time being on vacation and I was

24   at a Bingo game, which would probably tell you a little bit

09:55:07AM 25   about my vacation that I play Bingo, and they have one game

1   where as the number got called it was a reversed process.  And

2   so the last person standing absolutely had the worse Bingo

3   card in the room.  And I feel like maybe that's how some of

4   you feel this morning, is you had the worse Bingo card in the

09:55:29AM 5   room and you got stuck in the first 45.  I wonder how many of

6   the last group went out and bought a lottery ticket.  They're

7   fortunate of not being in the front.

8             Another thing I want to mention to you, too, one

9   thing I enjoy about coming over here and trying the case is

09:55:48AM 10   one thing Judge Ables mentioned, our system is such that when

11   the State brings charges against anyone, the State has the

12   burden of proof.  But the way it's done procedurally is the

13   State has to open the proceeding, open the argument, and the

14   State also gets to have the final word.

09:56:07AM 15             I want to ask how many of you men out there get

16   those privileges at home where you get the final word.  I

17   certainly don't, so it's a rare treat for me to come up here

18   and be able to do that.

19             The case today is the State of Texas versus

09:56:23AM 20   Vernon Travis, and I want to talk with you a little bit about

21   jury service.  And before I begin, I know it's on your card

22   that you filled out and you'll see us up here taking notes and

23   writing things down.  We try not to be repetitious,

24   occasionally we are, but let me just ask you real quickly, how

09:56:44AM 25   many of you have been on jury service before?  Raise your

1  hand.

2           All right.  Quite a few of you.  Again, it's

3  marked on your cards.  And how many of you of the people who

4  raised your hand actually have been on a criminal jury as

09:56:58AM 5  opposed to a civil jury?

6           All right.  Well, you, the 7 or 8 or 10 of you,

7  you guys know how the system works and you know how it goes,

8  and so as we go through this, a lot of the things I'm going to

9  be talking about are going to be things that you people have

09:57:15AM 10  heard before.  And so some of the things will be for the

11  benefit of you who have never been on a jury or have never been

12  on a criminal jury.

13           Let me just start off by telling you first of

14  all, there are no right or wrong answers in here.  There is

09:57:30AM 15  no -- you get the black buzzard if you say something this way

16  or a giant hook comes from the back and yanks you out of the

17  courtroom.  That's not -- that's not the case at all.  We're

18  just here trying to figure out a little bit about you and

19  whether or not this is an appropriate case for you to be

09:57:52AM 20  serving on a jury for, and that's kind of feeling our way

21  through there.

22           As the Judge told you, we're not going to talk

23  about the facts of this case in front of you at this time.

24  Whichever 12 of you end up, as the Judge said, by process of

09:58:10AM 25  elimination really end up in the jury box, we'll talk about

the facts of the case to them; but with you guys, we're really going to be talking about generics.  I'm going to talk about in general terms, trying to get a feel of the way through that.  And it's done for a purpose.  It's done so it doesn't

09:58:28AM  come across where we're trying to get a juror to pre-commit to a particular outcome which would be patently unfair.  So that's why we do it that way.

        And occasionally, I'll have someone who is on a panel say, why don't you just get to the point?  Tell us what

09:58:43AM  happened.  Well, it's not quite that simple.  We have to be a little more careful than that.  The legislature has told us there is a certain way to do things and if we don't like that way, the courtroom is not the forum to change it.  We have to go through the legislature.  We don't know who our next

09:59:03AM  legislatures are going to be, and you maybe are not happy and you can certainly take that up with whoever prevails in the election of getting something like that changed.

        But you see the responsibility of jury service and I can't emphasize that enough.  Our system is designed

09:59:19AM  that a person who is accused of a crime is entitled that his guilt or innocence be determined by a jury of his peers.  And although it may well be an inconvenience for some of you to be here and I respect that, it's vitally important that the system works.  All of you have read in the newspaper about

09:59:43AM  different countries and their justice system and how they do

1    it and I doubt very seriously that there is a system out there

2    that's flawless.  But I think our system is probably all

3    things considered about as fair as it can get.

4           But the success of our system begins and ends

10:00:06AM 5    with the jurors.  Does anybody have any thoughts about why

6    it's so important that a jury system be in place?  Anybody

7    have any thoughts about that?  If you do, stick your hand up

8    there.  Again, no right or wrong answers.  Anybody have any

9    thoughts about that?

10:00:29AM 10           I want you to put up the next slide.  We're on a

11   criminal case here.  You guys all live in Kerr County.  Can

12   you see the significance of any of these things?  How does a

13   jury verdict function in the community?  What purpose does it

14   serve?  Anybody have any thoughts?  You know, I don't see

10:00:57AM 15   everybody hopping up to raise their hand on this and I

16   understand that.  What are you thinking there?  You know, it

17   didn't happen to you, didn't happen to a member of your

18   family.  Yes, ma'am.

19           PROSPECTIVE JUROR:  To be objective.

10:01:13AM 20           MR. MONROE:  Yes, exactly right.  Somebody to be

21   objective.  Anybody else?  Somebody else?

22           What responsibility do you have to the community

23   if you're sitting on the jury?  Do you have a responsibility?

24   Do we agree that you have a responsibility here?  You're the

10:01:31AM 25   voice, are you not?

1          I see Mr. Seymour.  You're nodding your head.

2    Tell me what you're thinking.

3          PROSPECTIVE JUROR:  We have a responsibility to

4    look after one another.

10:01:41AM 5          MR. MONROE:  You're right.  You're right.  Have a

6    responsibility to look out for one another.  You're chosen

7    randomly.  The State didn't get to go hand pick 50 people they

8    wanted up here and the defense didn't get to go hand pick 50

9    people they wanted up here.  You're chosen randomly and so the

10:02:02AM 10   likelihood you're going to get selected is slim, but you are

11   the voice.

12          Why should you care?  Because you're -- yes,

13   ma'am.

14          PROSPECTIVE JUROR:  It affects our lives and our

10:02:17AM 15   community that we live in.

16          MR. MONROE:  Absolutely.  It affects your lives

17   and your community that you live in.  Anybody else have any

18   more thoughts?

19          Great answer.  Thank you for that very much.  I

10:02:26AM 20   appreciate that.  Any other thoughts on it?

21          It's vitally important.  You know, you don't know

22   anybody.  I assume nobody knows Mr. Travis.  Does anybody know

23   Mr. Travis?  I didn't think so.  Okay.

24          Why should you care?  It's our responsibility.

10:02:44AM 25   Do we agree with that, that we have that role?  The jury has

1    that function of setting those parameters.  We don't get to

2    pick who comes in here like I talked about, selected randomly,

3    but the twelve of you that are ultimately picked, the

4    responsibility falls on your shoulders.  Is everybody with me

10:03:07AM 5    so far on that?  Anybody disagree with me on that?

6            Okay.  Let's go to the burden of proof.  I'm not

7    going to go into this a whole lot and I'll explain in a minute

8    why.  There are a whole bunch of different burdens of proof.

9    It's a great law school final exam question that all of us saw

10:03:29AM 10    when we went to law school.  In civil cases, it's primarily

11    about the preponderance of the evidence and people will do the

12    tipping of the scales, blind justice and you've seen the

13    statute before, and we were taught all these great little

14    sayings in law school, you know, just the tail feather of a

10:03:48AM 15    hummingbird tipping the scale.  Remember, all of that is out

16    the window in a criminal case.

17            In a criminal case, it's beyond a reasonable

18    doubt.  It's a little difficult for a lot of people to

19    conceptualize that and I'm not going to begin to hammer that

10:04:03AM 20    too hard, but what analogy that I come to try to use, have any

21    of you in here ever tried to put together a jigsaw puzzle when

22    you did not have the picture of what the puzzle looked like

23    before you started?  Have any of you ever done that?  I've

24    done it once or twice, it's really pretty interesting, but if

10:04:28AM 25    you can envision taking the picture of a jigsaw puzzle and you

do not have the photograph of what it looks like and you begin

putting things together and you start with large shapes.  You

can tell the pieces of all that one shade.  All the colors,

the sky is blue.  You know, there is no -- and you begin

10:04:45AM putting things together.  And there is a point in that process

when you get enough of those pieces and you may not have them

all.  For some, it might even take the entire puzzle but there

is a point generally when you can tell what the picture is.

You know what it is and you don't have to put all the pieces

10:05:04AM in there to know it.  You know that's a basic prize or that is

a Lichtenstein Castle or whatever it is you know that.  That's

kind of what beyond a reasonable doubt is.

MR. BROWN:  Judge, I'm going to object.  He's

defining beyond a reasonable doubt and trying to really lessen

10:05:35AM the burden and he's trying to define it for this jury.

THE COURT:  We used to have a definition for

beyond a reasonable doubt or what constitutes reasonable doubt

and we've done away with it, our Supreme Court, our Court of

Criminal Appeals and our legislature.  We've decided not to

10:05:43AM give you a definition.

I do allow the attorneys though to kind of

comment and kind of give their ideas on reasonable doubt, but

you're going to have to make up your own mind when you get

this whether or not you've been satisfied beyond a reasonable

10:05:58AM doubt and there is no definition.  But I'm going to overrule

1   the objection and I'll give you a little leeway to kind of

2   comment on what you would think about if you're in there

3   trying to do this.

4                MR. MONROE:  Thank you, Your Honor.

10:06:10AM 5              Anyway and like I said, I don't want to belabor

6   the point too much.  It is the State's burden to show you

7   enough pieces of the puzzle put together where you believe you

8   know what the picture of the puzzle is.  That's a gross

9   oversimplification, but it's the best idea and that might vary

10:06:31AM 10  from person to person as to how many puzzle pieces that

11  requires.  One person may need just about every one of them,

12  somebody else might need less, it's just required that you

13  agree what the picture is and that's our burden.

14               I'll tell you that occasionally you have cases

10:06:49AM 15  where a defendant will plead guilty.  That's the call that the

16  defendant makes with his lawyer; but even in those cases, the

17  State still has to put on what we call a prima facie case.  We

18  still have to come forward and give you the basic elements of

19  the offense in the form of some sort of evidence in order for

10:07:08AM 20  you to do that.

21               Okay.  Let's move on.

22               The charge that you're dealing with here today is

23  the charge of burglary of a habitation and you can see the

24  definition up there.  This is out of the penal code.  A person

10:07:27AM 25  commits an offense if, without the effective consent of the

owner, the person enters a habitation with intent to commit a

felony, theft or assault, or enters a building or habitation

and commits or attempts to commit a felony, theft or assault.

I point that out to you because most of all, the people will

10:07:50AM  picture burglary as you walk into a house and steal something

and it doesn't necessarily have to be that you broke in the

house to steal something.  You can break into a house to

assault someone and that can be a burglary because you broke

in to commit another offense.

10:08:08AM          A rape, we don't call it rape anymore, we call it

sexual assault.  That's another example.  So is everybody with

me that you enter a habitation without effective consent of

the owner with the intent to commit a felony theft or assault,

or you actually commit one.  So you can either go in there in

10:08:29AM  an attempt or you can do it either way.  Sometimes you might

go in -- a person might enter a building and not intend to

commit anything when they walk in there but when some

potentially get in there, they commit one.  That will get you

there too.  You don't necessarily have to have had the intent

10:08:44AM  when you go in the building.  You can by your actions fall

into that trap.

All right, Todd.  Now, I think we may have

skipped one in there.

If the offense that a person commits when they

10:09:05AM  enter a building is assault, enter a habitation without the

effective consent of the owner, with the intent to commit an

assault, here is what an assault is:  A person commits an

offense if the person intentionally or knowingly threatens

another with imminent bodily injury.  You don't actually have

10:09:27AM  to do it.  You don't actually have to injure them.  Threatening

them is sufficient.  All right.

        Aggravated assault, our assault statutes are

stair steppers.  A simple assault is one offense.  Then you

begin adding layers to that, the offense becomes more severe,

10:09:50AM  so you have aggravated assault with a deadly weapon.  A person

commits an offense if he enters the building without the -- a

habitation without the effective consent of the owner with the

intent to commit aggravated assault with a deadly weapon.  The

State must prove entering the building without the effective

10:10:12AM  consent of the owner.  A habitation, that is saying a building

is a habitation.  The intent to commit aggravated assault, we

would have to show you that the person commits an offense,

that the person commits an assault as we previously defined it

and uses or exhibits a deadly weapon with intention of

10:10:34AM  assault.  You go into a habitation without the effective

consent of the owner and you use your exhibit, a gun or a

knife or a baseball bat or a crowbar or whatever it may be.

        All right, Todd.

        Firearm, you would be surprised how many people

10:10:55AM  get hung up on that.  But if the State is alleging that the

1  deadly weapon is a firearm, then there is a definition of a

2  firearm.  Anything manifestly designed, or made, or adapted

3  for the purpose of inflicting death or serious bodily injury

4  or anything in the manner of which it is intended is capable

10:11:12AM 5  of causing death or serious bodily injury.  There is the

6  definition of a deadly weapon.

7          All right.  So enter a habitation without the

8  effective consent of the owner, with the intent to commit

9  aggravated assault with a deadly weapon.  Back to the

10:11:31AM 10  definition of aggravated assault.  I mean back to simple

11  assault, you will add in the use or the exhibit of a deadly

12  weapon, you have aggravated assault with a deadly weapon, and

13  that combined with entering a habitation without the effective

14  consent of the owner, you have burglary.  Is everybody with me

10:11:53AM 15  about how you get to the burglary charge?  Because we don't

16  care about getting.  You don't have to steal anything, you

17  don't have to take anything.  We don't have to show that.

18  That could be a form of burglary, but that's not what's

19  alleged here.

10:12:07AM 20          Anybody -- let me stop right there -- have an

21  issue with the way the State has defined burglary as it

22  applies to this case?  Anybody that disagrees or doesn't

23  understand it, you want me to talk about it again, please

24  raise your card.

10:12:23AM 25          You wonder sometimes why we have those cards and

I don't know if Judge Ables explained it, but when we're writing down trying to get responses, rather than just trying to go through the list that has your name on it and check back and see who is Number 70 and who is Number 51, they ask you to hold up those cards.  And so what we'll do is say, okay, I'll ask the question, and seven or eight people raise your hand, all of a sudden Number 12, Number 15, Number 21 and Number 22 and that's how we keep track.  That's why you hold up your cards for those of you who have not been in here before.

All right.  Everybody is okay with the burglary of habitation?  You understand what we're talking about?  All right.

Now, offense of this section is felony of first degree.  The premises are a habitation, and the party to the offense entered the habitation with intent to commit a felony other than a felony theft, or committed or attempted to commit a felony other than a felony theft.  We are alleging aggravated assault with a deadly weapon.  That would make this a first degree felony.

Now, the legislature over the years has defined our criminal categories, and as you all may or may not know as District Attorney, I only prosecute felony cases.  Misdemeanor cases are prosecuted in the county attorney's office.  A felony case is a case in which one is subject to being sentenced to the penitentiary as opposed to the county jail.

1  That's the difference.  We have state jail felonies, which is

2  the least of our felonies, and then third-degree felonies,

3  second-degree felonies, first degree felonies and then we have

4  the highest one which is capital murder which doesn't apply

10:14:25AM 5  here.  But a first degree felony other than a capital murder

6  is the most serious offense that the State of Texas

7  recognizes, so the State has categorized burglary of a

8  habitation with the intent to commit aggravated assault with a

9  deadly weapon as a first degree felony.  Is everybody with me

10:14:45AM 10  on that?  If anybody has any questions, let me stop and go

11  back through it.

12            All right.  Go to the next one.

13            If the State gets through the guilt or innocence

14  phase of a trial, a criminal case is actually conducted in two

10:15:04AM 15  parts.  The first part is the guilt or innocence phase, which

16  is what we would start off with here; and then once the

17  evidence is presented, the jury will go out and determine

18  whether or not the State has met its burden of proof and given

19  you enough evidence to find the defendant guilty beyond a

10:15:24AM 20  reasonable doubt of the offense.

21            In the event that a defendant has pled guilty,

22  the State would still put on some evidence.  The jury would

23  actually be instructed to go out and find the defendant

24  guilty.  And if either one of those two things occurs, then

10:15:39AM 25  the next phase of trial is called the punishment phase.  That

is where then that same jury would determine what the

appropriate punishment for that particular defendant is.

Now, let me stop right here and what we'll do

when I ask some of these questions and I ask you to raise your

cards, I'm not going to quiz you in front of the entire panel

on some of this stuff.  I don't know what your answers might

be and Mr. Brown, I'm sure would do the same courtesy.  We may

ask you to approach the bench and discuss some of the stuff

privately with the judge.  And I want to say right now if

there is anyone in here that does not feel that they could

play that role and determine someone else's punishment, just

don't think that's for them, morally they can't do it, I've

never had a panel that didn't have at least one person that

felt that way.  So if you do, we understand it, we respect it

but we do need to know it.  Both sides need to know that.

So is there anyone that feels that way, hold your

card up and I'll write down your number and you'll come up to

the bench and we'll talk about it.  Anybody feels that way,

that they really do not feel like they could assess punishment

for another individual?  All right.

MR. BROWN:  We have one.

THE COURT:  Do you have a card?

MR. MONROE:  Yes, sir.  Do you have your card?

Number 31, all right.

Anybody else?

1          Thank you very much for telling me that.  26.

2    Anyone else?

3          Again, no right or wrong answers in here.  You

4    know, I've heard people say maybe a thing for a juror to

10:17:47AM 5    examine is would you want somebody like yourself sitting on a

6    jury of your own trial?  And you're the only person that knows

7    your heart.  So again, Mr. Brown and I will I'm sure concur, if

8    you've got misgivings about this, please tell us about it.  If

9    during the course of this you decide you should have raised

10:18:13AM 10   your card and didn't, please let us know.  You're not precluded

11   forever if you didn't say anything.

12         Additionally in the criminal case, first of all,

13   you can consider all of the evidence that you heard in guilt

14   or innocence.  So it's not necessary if someone comes up and

10:18:33AM 15   tells you what happened in the offense on a guilt or innocence

16   phase.  That -- you bring them back again in the punishment

17   phase and have them tell you again the same thing they told

18   you before.  So you're allowed to consider everything you

19   heard in the first one and then anything additional within the

10:18:52AM 20   rules of evidence that the State or the defense decides that

21   is important for you to hear.  And unlike the guilt or

22   innocence phase, there is really no burden of proof.

23   Everybody is going to have opinions as to what punishment

24   should be, but there is no burden of proof that you have to

10:19:10AM 25   meet a certain standard for this many years and you have to

1    prove that for this.  There is no burden of proof.  It is

2    whatever you decide.

3              So really as far as burden, the pressure is off

4    of the attorneys but absolutely on you and I apologize for

10:19:30AM  5    that, but that's the way our system is and that's the way it's

6    going to be.

7              Let's go to the next one, Todd.

8              First degree felony, let me back up.  A defendant

9    in any criminal case has the choice if he is found guilty to

10:19:58AM 10    have his punishment determined by either the Judge or by the

11    jury.  That is a defendant's election solely within the

12    province of the defendant and his counsel for whatever reasons

13    they choose.  And in this case, the defendant has elected to

14    have the jury assess his punishment.  And like I told you, we

10:20:21AM 15    have state jail felonies, third, second, first, capital

16    murder.  The punishment range for a first degree felony and

17    it's a range, and it's a broad range, imprisonment in the

18    Texas Department of Criminal Justice for life or for any term

19    of not more than 99 years or less than 5 years.  The way we

10:20:49AM 20    say it a little more quickly is, 5 to 99 or life, any point in

21    between there.

22              I tell you this to inquire a little bit further

23    and explain a little bit more, that it's a huge range and it's

24    done that way purposely because depending on what the facts of

10:21:16AM 25    a case are, any given juror may feel differently about what

the appropriate punishment should be.  Again, we can't tell
you about the facts of this case and say what do you think
about that, how do you feel about that, that's not
appropriate, and so we won't do that.  So I'm having to make
up examples here of different situations where you might see a
different range of punishment or might feel differently about
one; and again, the law is not what punishment to be on the
jury what you would give, but in order to be on the jury, you
must be able to consider the entire range of punishment.  You
know nothing about the case and so you cannot be as you sit
there today precluded from one extreme to the other.  There
will never be a case ever where I could ever give 99 years or
life.  That could not happen.  I would not do it.  You can
give me all the examples all day long, I would never do it.
If you felt that way, that would preclude you from being on
this jury.  You're entitled to that opinion and there is
nothing wrong with it that would preclude you from being on
the jury, or the same thing for the other extreme.  I would
never give more than the minimum; I could never give more than
5; anything 5 years or one day higher, I would never do it.
Under any circumstances, you could not give me a scenario, I
could not hear facts from that stand that would make me
entertain anything more than the absolute minimum.  The same
rule applies.  You're entitled to that opinion.  It would
preclude you from sitting on the jury.  Not that you're wrong,

but that you cannot consider the entire range of punishment.

And consider it maybe, okay, I thought about it, I'm not interested in that.  I heard the facts of the case, I'm not interested in that.  That's okay, but as you're sitting there right now knowing nothing else about the case, you're already eliminating a part of this punishment range.

So let me come back and say again, and show your cards, is there anyone in here that could not consider the entire range of punishment?  Do you have any hesitancies about that, raise your card?

Number 24.  Thank you.  I appreciate your honesty.  I'm going to write all these down.  24, 34, anybody else?

Please, now is the time because we really do want a group of people -- well, let me back up.  You know, we hear all the time, well, lawyers would throw these phrases out like that.  Everybody talks about this at home and I get reminded every day that regular people don't talk like this.  We throw these phrases out and we say them so easily and just slide off the tongue about, oh, we don't want anybody with any biases or prejudices.  There is nobody out there that doesn't have some. We have feelings about some in one way or another, but we don't live in a vacuum.  So there is nothing wrong with having strong ideas.  There is nothing wrong with it at all.  It may well be on a particular case, you got real strong ideas on that case

but on that case over there, you may be a great juror.  So when
we're asking you this again, we're not trying to embarrass
anybody.  We're not trying to trip anybody up.  We're not
trying to pull a fast one.  We're trying to give you an
opportunity if you have misgivings.  If you don't feel like
this is the case for you, let me do a different one that -- I
want to give you the opportunity to express that opinion,
that's what we're doing.

So back again, anybody other than the two that
have raised their cards already does not feel like they can
consider the entire range of punishment?

Okay.  Thank you.  Thank you very much.

There is an additional punishment that's
absolutely discretionary with the jury that the jury does have
the authority in addition to whatever prison sentence they
assess to assess a fine.  That's totally within the province
of the jury.  I've seen jurors do it.  I've seen jurors not do
it.  I've never understood when they do it and when they
don't.  So that's -- that's their call.

Go ahead, Todd.

Here we go.  Consider the full range of
punishment.  I bring it one more time.  So if you have thought
about it, you can tell me.

All right, go ahead.  Go ahead, one more.  Keep
going.

1          All right.  I'm not going to talk about this.

2    The Judge already talked about it.  Everybody has heard this.

3    Normally I say it's not like you see on TV, it's generally

4    not; but that's one thing that it is, the Fifth Amendment is

10:26:51AM 5    absolutely the defendant's right to testify or not testify.

6    His call.  He's presumed innocent as we sit here today.  Mr.

7    Travis is innocent, but a juror cannot consider it.  And so

8    I'll just say, if you've got an issue with that, you're

9    entitled to your opinion, but you cannot sit on the jury.  So

10:27:11AM 10    I just want real quickly, anybody have an issue with the Fifth

11    Amendment?  If you do, now is the time.  I have no idea what

12    will happen here.  It's not my call.

13          All right.  Let's talk about this.  You now know

14    that the range of punishment, the low end, 5 years

10:27:31AM 15    incarceration, high end 99 years or life incarceration.  Let's

16    talk about incarceration and I really would like you guys to

17    talk about this, so I'm listening.

18          Why do we put people in jail?  Why do we send

19    them to prison?  Anybody -- I wrote some things up here.  You

10:27:52AM 20    see, I have punishment, protecting the victim, protecting the

21    societies, send a message.  So let's start off, how many of

22    you just adhere to the old you commit a crime, we're going to

23    punish you?  We're going to punish you.  We don't have any

24    other pretenses about it.  Anybody feel that way?  Raise your

10:28:17AM 25    hand.  Raise your cards if you feel that way.

1       I see Number 8.  You raised your card, 18, 31,

2   19, 32, 35, 44, 4 and 5, anybody else?  It's just punishment.

3   It's kind of like you do with a child; they break the rules,

4   they get punishment.  It's going to vary from rule to rule.

10:28:37AM 5   They're going to get punished.  There's going to be a negative

6   consequence.  What about protection of the victim?  You may

7   have a situation where maybe there is an ongoing risk with a

8   particular victim, that you feel like you need to punish to

9   protect that victim.

10:28:52AM 10       How about protecting the victim?  Number 19.

11   Anybody else to protect the victim?  35, 31, Number 5.  Let me

12   just do it -- hold your cards up and let me walk down and we'll

13   write down these numbers.  5, 8, 9, 10, 15, 18, 19, 24, 25, 28,

14   29, 30, 17, 31, 35, 23, 38, 43, 44.  If I didn't call your

10:29:24AM 15   number, if you raised it and I didn't see it, stick it up

16   again.  33, thank you.  Sometimes I can't see over the people

17   in front of you, so -- okay.

18       Okay.  The third one, protect society.  Not just

19   protecting the victim, you're protecting anybody else out

10:29:43AM 20   there.  How many of you think that might be a purpose for

21   incarceration, protecting the society as a whole and in

22   particularly you're in Kerr County.  Kerr County.  1, 3, 4, 5,

23   6, 7, 8, 9, 10, 11, 12 -- well let me just reverse that.  I

24   think it's just about all of you.  How many of you feel like

10:30:06AM 25   protecting the society is not a factor?  Let me simplify that,

1    that shouldn't be a purpose of incarceration?  Raise your

2    cards if you feel like that way about it because I don't know

3    if I saw a card that wasn't raised.  I don't see any.

4             The bottom one, send a message.  How many of you

10:30:30AM 5  feel like part of the purpose for incarceration is to send a

6    message about what behavior will be tolerated and what

7    behavior will not be tolerated?  How many of you feel like

8    send a message is part of the purposes of incarceration?

9    Raise your cards.  8, 9, 10, 11, 12, 17, 18, 19, 20, 28, 29,

10:31:00AM 10  30, 31, 35, 42, 43, 44, 31.  Anybody else?  16.

11            Again, does anybody feel like with respect to

12   sending a message that that should not be a purpose of

13   incarceration?  33.

14            Anybody else?  Number 5, Number 45, Number 38,

10:31:42AM 15  Number 41.  Okay.  Anybody else that that should not be a part

16   of the consideration that a juror entertains when they

17   determine punishment?  That sending a message is not going to

18   be in that equation, it's not something -- it's not a fact you

19   can consider?  24.  Again, no right or wrong answers, just

10:32:02AM 20  trying to figure out where everybody kind of feels about this.

21            All right.  I don't know what kind of pretrial

22   publicity has happened in this case, but does any of you

23   without telling me what you think you may have read about it,

24   any of you think you've read anything about this case in the

10:32:29AM 25  paper?  All right.  I don't know that it's gotten a lot of

1   attention here in Kerr County, but in the event that you were

2   to start hearing evidence and realize that you may have heard

3   something about this, does everybody understand that if that

4   happens, you're going to have to disregard what you may have

10:32:49AM 5   read and only govern by what you hear sitting in that box.

6   And so if you read something and it didn't come in here, you

7   cannot consider what you read.  Pretrial publicity and having

8   read pretrial publicity does not in and of itself disqualify

9   somebody from being on the jury panel but you have to be able

10:33:12AM 10   to tell us that you can set it aside and be guided by only

11   what you hear here.  And sometimes depending on the

12   circumstances if you've read something just horrendous and it

13   didn't come out here, that may be difficult to do.  So

14   everybody is comfortable with the pretrial publicity issue

10:33:30AM 15   that nobody has a problem with it?  All right.

16           Trial distractions, I like to tell jurors about

17   this, but law schools teach classes on procedure and they're

18   very similar a lot of times between civil trials and criminal

19   trials.  But if a case goes up on appeal -- well, let me back

10:33:53AM 20   up.

21           This lady right here in front of me is the court

22   reporter and she is literally taking down every single word

23   that's said in here.  And we call that making a record, but

24   every word that's spoken, every response that one of you gives,

10:34:13AM 25   she's writing it down.  Because when a case goes up on appeal,

1   if it goes up on appeal, the appellate court must make their

2   decisions based on what's in that record and the court

3   reporters type it up.  And I've been involved in cases before

4   where the court reporters record was literally thousands of

10:34:37AM 5   pages.  But if it isn't in the record, guess what?  You didn't

6   preserve it.  The appellate court is not going to consider it

7   because it's not in there.  So that's why it's important for

8   Mr. Brown and I to make the record clean.  And the last thing

9   an attorney, any attorney wants to hear at the appellate court

10:34:59AM 10   level is this word called "waiver."  You didn't object, you

11   waived it.  You should have said something at the time, you

12   waived it.  Oh, it's just a nightmare word for lawyers.  You

13   don't want to have waivers, so we make objections.  You guys,

14   this may come as a shock to you, Mr. Brown and I may not agree

10:35:24AM 15   on everything that happens in this case.  And so he or I will

16   make objections.  That's what the trial process involves and

17   that's how it works.  We must do that in order to maintain the

18   record and avoid that waiver word.  I tell you that.  I know

19   it's frustrating and I know it's irritating, but that's why we

10:35:51AM 20   do it.

21            Sometimes we approach the bench and the reason we

22   do that is to not articulate out loud what our particular

23   objection may be or our reasons for the objection.  And I'll

24   throw out an example.  If we're going to argue over whether or

10:36:15AM 25   not a particular piece of evidence is admissible or not, we

```
  1    obviously don't want to do that in a manner in which you guys

  2    hear the particular piece of evidence that we're arguing about

  3    because we just told you what it was that somebody doesn't

  4    think is appropriate.  So a lot of times we'll approach the

10:36:37AM  5    bench and we'll have those conferences with the judge.  And I

  6    still see jurors leaning over there trying to tune in to what

  7    kind of objection it is and that's why we do it.  And

  8    occasionally if it's not efficient to have a whisper

  9    conference at the bench, the Judge will ask the jury to step

10:36:58AM 10    back in the jury room for a few minutes while we hash it out

 11    in the courtroom and then he'll make a ruling.  I point these

 12    things out to you to apologize to you.  It's actually going to

 13    happen.  It's going to happen in this case.  It's inevitable.

 14    That's what Mr. Brown and I do.  We're advocates for our

10:37:18AM 15    positions, and so I apologize in advance.  Please, blame that

 16    on the lawyers, blame it on me, and we're offering you to do

 17    that, but I'll ask you to try not to let it affect your

 18    attention and your deliberations.  Fair enough?

 19              All right, Todd.

10:37:35AM 20              Okay.  Just some additional questions.  I asked if

 21    anybody knew Mr. Travis and nobody knew him?  Does anybody know

 22    Mr. Brown?  I think he is from San Antonio; well, he is from

 23    San Antonio.  I do know that.  I'm not aware where he was born

 24    and raised, but does anybody know Mr. Brown?

10:37:49AM 25              All right.  Any of you know other people on the
```

1   panel that's sitting here today?  That doesn't disqualify you.

2   I just want to know if there are other relationships on here.

3   Number 1, you know somebody else on the panel?  All right.

4   Anybody else know somebody on the panel?  All right.  Number

10:38:11AM 5   1, Number 9, Number 30, 35, and 40.  And are you holding up

6   your hand?  Number 13.  Sorry, I didn't see you.  Some people

7   are more subtle than others as to how they hold their cards

8   up.  Some people have them way up in the air.

9          PROSPECTIVE JUROR:  Can I ask you, does that also

10:38:29AM 10  mean recognize?

11         MR. MONROE:  Well, where I'm going to go with this

12  and this I think will answer your question, is does you knowing

13  somebody else on here, is that going to affect how you would

14  deliberate?  In other words, are you going to base your

10:38:43AM 15  decision on what Number 14's opinion is or -- do you see where

16  I am going?  So I don't think I'm including that, but if it's

17  somebody you recognize and you think it would affect you, then

18  yeah, that's what I want to know about.

19         Now let me ask you generically of those who

10:39:01AM 20  raised your -- their cards, would -- and I'm not going to ask

21  you in front of anybody who it is you know -- but would

22  whoever it is you know, is that going to influence you one way

23  or another?  Is that going to be a problem with you?  I don't

24  want this person to see how I vote.  I don't want to be in a

10:39:20AM 25  jury room with this person?  I'm not comfortable.  We don't

1    get along very well.  We had a falling out at work.  You never

2    can tell.  So if it would be a problem, you've got a hesitancy

3    about it being a problem, raise your card one more time and we

4    will address that at the bench and not out loud.  Anybody with

10:39:41AM 5    your knowledge of another juror be a problem for you?  All

6    right.  You never know what's going to happen.

7              Do any of you have any strong feelings about

8    psychologists?  Believe everything they say, don't believe

9    everything they say?  Do you have any thoughts on

10:40:02AM 10   psychologists?  Everybody -- go ahead.  Do they serve a useful

11   function?  Anybody think they're a bunch of quacks?  Normally I

12   get a card on that, but that's okay.  They're human beings,

13   right?  Psychology is not an exact science, do we agree with

14   that?  It's not an exact science.  It's educated guesses at

10:40:22AM 15   best.  Anybody have an issue with that.

16             Some people have experience with psychologists or

17   counselors that haven't been good.  Anybody had a bad

18   experience with a psychologist or a counselor?  Does anybody

19   believe that they have a crystal ball and can predict the

10:40:40AM 20   future?  All right.

21             Who has any knowledge or experience in

22   post-traumatic stress disorder?  Anybody have knowledge -- let

23   me write this down.  Number 3, Number 12, Number 5, 22, 23, 24,

24   10, 14, 33, 38.  Out of you people who have expressed some

10:41:24AM 25   knowledge about this, I want to ask a little bit further of any

1    of you either feel like either you or a loved one is suffering

2    from post-traumatic stress disorder?  How many of you have that

3    situation?  Number 14.  Anybody else?  23.  All right.

4              So the rest of you is it fair to say that you just

10:41:53AM 5   have some general knowledge about it because you read about it?

6    Is that it?  Okay.  Number 3.

7              PROSPECTIVE JUROR:  A friend of mine.

8              MR. MONROE:  You have a friend of yours.  All

9    right.  Your number again?  38.  And Juror Number 3, I see

10:42:08AM 10  you're shaking your head.  I'm not trying to embarrass you.

11             PROSPECTIVE JUROR:  No, I'm a veteran myself.  I'm

12   a veterans service officer for Legion and I've dealt with a lot

13   of vets.

14             MR. MONROE:  All right.  Fair enough.  Appreciate

10:42:22AM 15  that.  Number 19.

16             PROSPECTIVE JUROR:  I know the definition of it.

17             MR. MONROE:   Beg your pardon?

18             PROSPECTIVE JUROR:  I know the definition of it.

19             MR. MONROE:  All right.  Know the definition of

10:42:28AM 20  it.  And I feel like that both of you apply.  You know the

21   definition of it and you know it exist but really don't want to

22   know about it.  Number 33.

23             PROSPECTIVE JUROR:  A friend.

24             MR. MONROE:  A friend, all right.  Number 5?

10:42:38AM 25  PROSPECTIVE JUROR:  I would rather talk about it

in private.

MR. MONROE:  You bet.  That's not a problem.
Thank you for pointing that out.  Anyone else?  Number 23?

PROSPECTIVE JUROR:  My husband had it.

MR. MONROE:  Do any of you that expressed some
knowledge of that feel like your knowledge of that would
somehow preclude you from being on the jury?  I don't know if
that will ever come up or not, but if you do, let me know.

Number 24.  Anyone else?  Thank you for being
honest.  We recognize -- we're not insensitive.  Some of these
questions are personal and that's why you see I kind of dance
around them a little bit.  We're not trying to embarrass
anybody by doing that.

We talked about incarceration.  Let me -- let me
before I get to law enforcement.  How many of you in here are
either a veteran or your spouse is a veteran?  2, 3, 4, 5.

PROSPECTIVE JUROR:  Mine is deceased but he was a
veteran.

MR. MONROE:  Well, I'm not talking about
necessarily right now.  Of course, I think a veteran is a
veteran.  Once you serve, you're a veteran for life.  You
always have that title and that honor.

17, back -- I think I got 4 and 5, 31, 35, 14.
All right.

Law enforcement, any of you had or had a family

1   member had a bad experience with law enforcement?  I'm not

2   going to ask you details about it out loud in front of the

3   panel, but you just -- either you or somebody you know didn't

4   get treated well or you didn't think they did anyway, please

10:45:02AM 5   let me know.  29, 31.

6                   Thank you for being up front about it.  I got --

7   you know, the longer you live and I'm starting to understand a

8   little bit more.  I just turned 60 this year, so I'm not sure

9   that that's not one of those things that ultimately happens to

10:45:27AM 10   everyone at some point in time.

11                  What about minimization, what does that mean to

12   you?  Minimize, any idea?  Any thoughts about what minimizing

13   mean?  Any of you heard of that phrase?  Any of you ever heard

14   the phrase he's minimizing or she's minimizing?  Somebody that

10:45:49AM 15   is characterizing their issue or responsibility in the most

16   favorable least responsible way, minimizing.  Have you ever

17   heard of that?  Has anybody -- have any of you ever heard of

18   minimizing?  Raise your card if you've heard of it.  Okay,

19   just about all of you have heard of it.  All right.

10:46:16AM 20                  What's the next one?

21                  Now, I'm going to conclude here pretty quickly.

22   Mr. Brown is going to come up here and ask you some questions.

23   And a lot of the times since the State goes first, I covered

24   things that if I didn't talk about them, he would talk about

10:46:41AM 25   them so his may be a little bit shorter than mine.

                    I'm going to ask a generic question.  Some of you

we've written your numbers down for other reasons, but this

generic question is going to be, again, one more time, I'll

get your numbers and we'll approach the bench.  Having heard

10:47:01AM  what you've heard, we've talked about the punishment range,

the offense, burglary of a habitation with intent to commit

aggravated assault with a deadly weapon, parameters of what

you'll be asked to do, decisions you'll be asked to make, just

don't feel like this is an appropriate jury for you to sit on,

10:47:27AM  just don't think you should be here today, not comfortable,

anybody feel that way?  This is I won't say your last chance,

but certainly if you feel that way, please let us know.

                    Ladies and gentlemen, I thank you very much for

your attention, your time.  I would ask you that you've been

10:47:45AM  very courteous to me, please show Mr. Brown the same courtesy

and respect that you've shown to me.  Thank you very much.

                    THE COURT:  We're going to go into the defense's

voir dire, but why don't y'all stand up and stretch your legs

just a second before we sit down.

10:48:00AM  I was over in Fredericksburg years back and we had

a husband and wife that were on a panel just like you are and

the wife was sitting on the front row and the husband was about

three rows back and that same question was asked, do you think

y'all could be on the same jury.  Would that be a problem if

10:48:14AM  y'all were on the same jury.  I think that the attorneys were

10:48:34AM

trying to get one of them to admit they needed to get off.  And the woman, it could have been the man but the woman looked up and said, he has never told me what to do and he never will.  And she was adamant that they could both be on that jury, but I think he got cut.

So everybody kind of stretch their legs a little bit.  Why don't you have a seat.  All right.

10:48:52AM

All right.  We've got a little bit of a restroom break.  I tell you what, Mr. Monroe actually gave us five minutes back there.  He didn't quite get to his time limit.  I give them an hour a piece and he used 55 minutes.  Thank you, Mr. Monroe.  So let's take a quick five-minute break in case anybody needs to go out and -- so let's get back in our seats in about five minutes.

10:49:09AM

(Recess).

THE COURT:  And I didn't introduce to you our reporter.  Teri Nunley is reporting for us today and a renown court reporter and we're glad to have her.  Everything you say, she has to take down so be sure and speak up where Teri can

10:56:29AM

hear everything you say.

Are we all ready to go, Scott?  Is everybody here?  Just two more.  Just a little bit longer, Mr. Brown.

THE COURT:  Okay.  We're ready to go according to Scott.

10:57:04AM

MR. BROWN:  Thank you, Your Honor.  May I proceed?

1          THE COURT:  You may proceed.

2              VOIR DIRE EXAMINATION

3          MR. BROWN:  Good morning, Ladies and Gentlemen.

4    As the Judge introduced me, my name is Shawn Brown and I'm from

10:57:13AM 5    San Antonio.  I'm proud to be here with Vernon Travis, Brian

6    and I both are.  I'm very fortunate; I get to represent people

7    throughout the State of Texas.  Whether it's San Antonio, Del

8    Rio, Laredo, Seguin, it doesn't matter.  I'm very fortunate.  I

9    get to come across people from all over the state.

10:57:35AM 10          Because I'm not here from Kerrville or Kerr

11   County, is anybody going to hold that against me or hold that

12   against Vernon?  Anybody from a community in San Antonio and

13   south of here, you're going to treat us okay?

14          Brian is also from San Antonio.  He was born and

10:57:51AM 15   raised there.  Vernon is actually from the Dallas area at this

16   point in time.  Because we're not from here, everybody agree

17   that you won't hold that against us?

18          Now, the Judge said that he would give y'all an

19   opportunity if you have some income earning issues and so

10:58:08AM 20   forth, and he said if the attorneys agreed to let you off,

21   that y'all would potentially get off and I was going to let

22   y'all get off, so y'all may have missed the boat on the last

23   opportunity to get out of here.

24          All right.  So with that being said, what I want

10:58:23AM 25   to get into is there are some things that the prosecution has

already talked about.  Obviously he goes first, so he's going

to touch on a lot of the things that I'm going to touch on.  A

few other things, I'm going to go into a little bit more

detail that he touched on or maybe didn't talk about.

10:58:40AM       First and foremost, this is really the only

opportunity that we're going to get to talk to y'all in this

manner.  We're not going to, if we see you in the hallway

going on a restroom break or something of that nature, neither

one of us or none of the attorneys are going to stop y'all,

10:58:54AM hey, how are you doing, where are you from, what's your name

because that gives a sign of impropriety, like giving the

benefit to one side or the other.  It's not that either one of

us are being rude, it's just that we can't do it.  And I'm

going to apologize up front because I like to talk to people.

10:59:09AM I enjoy talking to people and getting to meet people, but

while this is going on, we're not going to be able to do that.

So don't hold it against me or Scott or anybody else for that

matter.  Does everybody agree to do that?  Okay.

       There has been a lot of talk about the right

10:59:24AM people to sit on this type of a jury and based on your past

experiences, your life experiences, maybe this might not be

the typical or the best jury for you to sit on.  Maybe a theft

case at a Target might be the best case for you or maybe it

won't be.  And I like to use the example, I have to park my

10:59:46AM truck in front of the house because the driveway is too small

1    for me to get my truck into the driveway.  And then I parked

2    on the street in front of the house and about two weeks ago,

3    somebody came in and smashed out my window.  And I had my bag

4    sitting in my truck, which I shouldn't have done but I did,

11:00:00AM 5    and I guess they were looking for a computer but there was

6    nothing in it and they took my bag.  So the next morning, if I

7    had come in and I was a juror on a particular case on a

8    burglary of a vehicle for that matter, right -- it just

9    happened to me the night before and I'm coming in and I'm

11:00:15AM 10   sitting on a jury panel and they tell me, hey, this is

11   involving a case where someone has been accused of breaking

12   into a car.  So that next morning, I'm probably not going to

13   be the best person to be sitting on a panel of somebody that's

14   being accused of breaking into a car.  Does everybody agree

11:00:31AM 15   with that?  And then that's what I am talking about, past life

16   experiences, things that maybe have happened in your life that

17   may not make you a suitable juror for this particular case but

18   you may be perfect for another.

19          And I'm going to follow-up that with, has

11:00:46AM 20   anybody -- we've heard the prosecution gone into it of a

21   burglary of a habitation.  Has anybody ever been a victim of a

22   burglary of a habitation.  If you would raise your card so I

23   can write down your numbers please.  Number 8, Number 15,

24   Number 18, Number 21, Number 24, Number 29, 31, 42, 44.  Thank

11:01:09AM 25   you very much.

1          Now, I ask specifically if you have been.  Now,

2     have you or I'm going to open it up just a little bit more.

3     Has anybody, a family member or a loved one, a brother or a

4     sister or something of that nature been affected by a burglary

11:01:25AM  5     of a habitation?  If you would raise your card if you didn't

6     raise it the first time.  3, 4, 11, 26, 28, 29, 35, 36, 38, 42

7     and 43.  Thank you.

8          Now, as the prosecution talked about, there is

9     two types of trials or two sections of a trial.  One is the

11:01:53AM 10     guilt/innocence where the prosecution always has the burden of

11     proof.  They have to prove beyond a reasonable doubt that an

12     individual that they're charging a crime with committed the

13     crime, beyond a reasonable doubt, and he kind of went into

14     that burden of proof.  And in the event that a jury would find

11:02:11AM 15     somebody guilty of what they're charged with, then it would go

16     to a punishment phase.  And the punishment phase, there is a

17     lot of evidence that comes in; not only the facts of the case

18     but the people involved, whether it be the people's house

19     maybe, police officers, more about the person that's being

11:02:32AM 20     charged with the crime or something of that nature.

21          And now on a punishment aspect of the case, it can

22     get there two ways.  One, if you're 12 people sitting in this

23     box, you can listen to the evidence and potentially find

24     somebody guilty of a crime.  That's one way and the prosecution

11:02:55AM 25     talked about that.

1          Another is somebody that states, I'm guilty of a

2     crime.  I'm guilty of it and I want a jury of my peers to

3     decide what my punishment would be.  Everybody understand

4     that?  Okay.

11:03:09AM 5          Is there anybody that could not sit on just the

6     punishment aspect of the case?  That they would want to have

7     to find him guilty or not guilty and then assess punishment in

8     the event that they found him guilty?  Is there anybody that

9     says I have to sit on the whole thing?  I could just not do

11:03:31AM 10    punishment of another.  And I think 31 mentioned it earlier,

11    Number 11, Number 24, Number 3.

12          And there was some talk again from the

13    prosecution about how would you determine a particular

14    punishment in a particular case?  And he brought up some

11:03:56AM 15   things on his slide, but I want to ask you as individuals,

16    Juror Number 6, tell me in the event that somebody either pled

17    guilty or you found him guilty, what would you -- what factors

18    would you look at to consider somebody's punishment?

19          PROSPECTIVE JUROR:  I would probably consider how

11:04:18AM 20   it was committed, the crime, if it was malicious, if it was

21    accidental.  I would take those things into account.  The

22    intent of the crime would determine how harsh --

23          MR. BROWN:  Okay, okay, okay.  Juror Number 23,

24    what factors would you look at in determining somebody's

11:04:40AM 25   punishment?

1          PROSPECTIVE JUROR:  Something about the evidence

2    that was presented, I would make sure that it was pointing

3    exactly to him.  There might have been something else that was

4    not presented.

11:05:05AM  5          Also, if he -- make sure he was -- the intent

6    that he went in there to do, if he was --

7          MR. BROWN:  Okay.  Juror Number 10.

8          PROSPECTIVE JUROR:  If this is his first offense

9    or if this is something that is a pattern.

11:05:31AM 10          MR. BROWN:  Okay.  A pattern of offenses that is

11    similar to this.  Okay.

12          Juror Number 12.

13          PROSPECTIVE JUROR:  Same thing, pattern of

14    offense, whether or not under the influence of any chemicals or

11:05:44AM 15    any substances at the time and the intent when the crime was

16    committed.

17          MR. BROWN:  Okay.  Juror Number 15, would you

18    treat somebody differently that accepts responsibility versus

19    somebody who says, it wasn't me and then you found enough

11:06:04AM 20    evidence to believe that they have committed the crime?

21    Somebody that accepts responsibility that says I did it, I'm

22    sorry.

23          PROSPECTIVE JUROR:  I think that would be a

24    consideration.

11:06:15AM 25          MR. BROWN:  Who agrees with Juror 15 that would be

1  a consideration, raise your card for me?  If somebody accepts

2  responsibility versus, you know, evidence of a crime being

3  committed and exercising the right, they have a right to make

4  the prosecution do that, but saying I'm not going to do that,

11:06:36AM 5  I'm going to accept my responsibility.  Does everybody agree

6  that's a factor that needs to be considered?  Anybody disagree

7  with that?  44 disagrees that that should not be considered.

8  Anybody agree with 44?  26, 6, 20.  Anyone else that says that

9  they accept responsibility, that's not something that should be

11:06:57AM 10  considered in punishment?

11              Now, we talked or the prosecution talked about

12  the range of punishment in this particular case.  They

13  mentioned that the range of punishment is 5 to 99 or life.

14  And obviously on a particular case, the prosecution is going

11:07:25AM 15  to want to come up here and have y'all at the high end based

16  upon whatever the facts they argue and the defense is going to

17  want the low end or whatever the case may be.  Y'all have

18  heard the type of case that this is.  They've told you that it

19  is burglary of a habitation with intent or attempted attempt

11:07:45AM 20  to commit aggravated assault with a deadly weapon.  Based upon

21  hearing that alone, who says -- based on just what they're

22  alleging, there is no way that I could consider 5 years?

23  Anybody?  Anybody that says just based on what they're

24  alleging, haven't heard any of the evidence yet, that I could

11:08:07AM 25  not consider the low -- I couldn't consider 5 years?  Maybe

1    25, maybe 40, but I could not consider 5 years.  If you feel

2    that way, please raise your card.  Okay.  Number 21, Number

3    44.  Anybody else on this side, did I miss anyone?

4              Who thinks someone charged with a crime like

11:08:34AM 5    this, if they're found guilty should automatically get the

6    max?  Who feels that way, they should get the max?  Anyone?

7              Anybody have an idea why there is a range?  And

8    the prosecution talked a little bit about it, but -- Juror 19?

9              PROSPECTIVE JUROR:  Well, I would say that I would

11:08:59AM 10   believe the range would affect the mental state and mind of the

11   person who was committing the crime at the time, the

12   circumstances surrounding the crime, and if he intended to do

13   that, the forethought and just with malice or --

14             MR. BROWN:  Okay.

11:09:18AM 15   PROSPECTIVE JUROR:  That type of thing.

16             MR. BROWN:  Everybody agree that one size doesn't

17   fit all?  I mean, there are going to be different facts and

18   different factors on this case versus somebody who may have

19   committed the same crime in another case?  Everybody agree with

11:09:34AM 20   that?  So there is a range of punishment, so one size doesn't

21   fit all.  Does everybody agree with that?

22             PROSPECTIVE JUROR:  Yes.

23             MR. BROWN:  Does anybody disagree?  If you would

24   raise your card, I know that the prosecution asked this, who

11:10:02AM 25   here has served in the military or currently are serving in the

1    military?  Okay.  I think Juror Number 3, you mentioned that

2    you are familiar with PTSD; is that right?

3                    PROSPECTIVE JUROR:  Yes.

4                    MR. BROWN:  Do you know what that stands for?

11:10:20AM  5        PROSPECTIVE JUROR:  Post-traumatic stress

6    disorder.

7                    MR. BROWN:  And you sound pretty familiar with it,

8    give me just what your definition or what that means to you.

9                    PROSPECTIVE JUROR:  Well, it's not limited to just

11:10:28AM 10   veterans but veterans are the largest category of people who

11   are likely to experience it.  It is an individual who have

12   faced a trauma beyond their mind's ability to easily deal with.

13   It doesn't necessarily mean that they've killed or had their

14   leg blown off or whatever.  It could be a car accident.  It

11:10:50AM 15   could be your dog got run over.  Anything that takes your brain

16   beyond its ability to cope or deal with a situation may cause

17   ongoing secondary psychological issues.  So if you're a battle

18   field veteran, a door slamming might sound like a gunshot and

19   you might suddenly be back in the sand box.  Any room full of

11:11:19AM 20   children, this could be a bad thing.

21                   If your dog got run over, you see someone abusing

22   a pet, you may go over and soundly thrash them as my English

23   friends would say.

24                   Post-traumatic stress is what it sounds like.

11:11:38AM 25   Something serious happened in your life and the event takes

you out of the every day situation you may be in and puts you

somewhere that you were and did not want to be.

MR. BROWN:  Okay.

PROSPECTIVE JUROR:  That's simple plain English

terms.  Not a psychologist.  I don't care for their definition

but in a real street sense, that's what it is.

MR. BROWN:  Okay.  And is it readily apparent,

like if I was suffering from it and you saw me walking down the

street, could you tell just by looking at me externally I think

that guy is suffering from PTSD?

PROSPECTIVE JUROR:  Your wife would know, your

parents would know, but your best friend might not know.  So a

guy walking down the street, no.  Obviously people left

untreated, uncared about, can evolve into a state that you know

something is seriously wrong but you wouldn't necessarily know

that it was PTSD at the root.

MR. BROWN:  Now you said somebody left uncared

for, what do you mean by that?

PROSPECTIVE JUROR:  It's a condition brought about

by events, but it still affects your emotional and mental

state.  So as veterans, we help veterans because we've been

there.  We know the kinds of events we've been through, so we

talk to each other.  We help each other make sense of the

events in our lives.  If you don't have that outlet, if nobody

around you understands you, that's one of the reasons veterans

1    are so active trying to help veterans.

2              If you are left in that condition and you are not

3    supported would be the best way to say that, it isolates you,

4    makes you feel alone.  It leads to secondary conditions,

11:13:42AM 5  depression, possibly alcoholism, substance abuse.  There is a

6    lot of ways it can go wrong.

7              MR. BROWN:  Is that -- are those normal side

8    effects of PTSD, somebody who suffers depression or --

9              PROSPECTIVE JUROR:  Normal is --

11:13:56AM 10            MR. BROWN:  -- alcoholism or drugs or is that some

11   things you see from people who are suffering that?

12             PROSPECTIVE JUROR:  There is probably a slightly

13   higher incidence, but normal is like saying the fact that you

14   get two red ties and a black tie is a normal tie.  It affects

11:14:15AM 15  everybody in a different way and it depends on what the event

16   was that happened.  That's why it's so hard to get appropriate

17   treatment for every individual who may suffer from it.  It's a

18   very strange thing.  It affects you based on what happened to

19   you, the individual.

11:14:31AM 20            MR. BROWN:  Okay.  And do you see that people are

21   released from the military without ever being diagnosed and put

22   out on the streets without the proper care from the military?

23             PROSPECTIVE JUROR:  That has happened.

24             MR. BROWN:  Okay.  I mean, this isn't just some

11:14:48AM 25  made up phenomena PTSD that doesn't really exist?

1          PROSPECTIVE JUROR:  Again, it's not just the

2    military.  It can be anything.  Your brain couldn't cope with

3    the situation.  So while the bullet perception is it's a

4    veteran disease, that's not necessarily true.  We get a bad rap

11:15:06AM  5    sometimes, but the truth is we put ourselves in positions so

6    everybody else doesn't have to.

7          MR. BROWN:  Sure.

8          PROSPECTIVE JUROR:  And, yeah, we need -- we need

9    to help the people who have been there and done that for us.

11:15:24AM 10          MR. BROWN:  Sure.  Juror 14, you were kind of

11    shaking your head.  Tell me what your thoughts are on that.

12          PROSPECTIVE JUROR:  Exactly what he's saying, it's

13    true.  Everything.

14          MR. BROWN:  Do you have personal experience with

11:15:38AM 15    PTSD?  I mean do you know somebody?

16          PROSPECTIVE JUROR:  Yes.  Yes, I was diagnosed in

17    the early nineties, but I've been suffering for 47 years.

18          MR. BROWN:  Prior to being diagnosed?

19          PROSPECTIVE JUROR:  Yes.  I'm 100 percent.

11:15:51AM 20          MR. BROWN:  Okay.  So how long were you suffering

21    from it before you were diagnosed?

22          PROSPECTIVE JUROR:  The day I left the jungle, 47

23    years ago.

24          MR. BROWN:  So it took 47 years for somebody to

11:16:03AM 25    figure out that you were suffering from this?

1          PROSPECTIVE JUROR:  Up until the 1990s that we

2    suddenly had a diagnosis for it.  Before we were just, it was

3    there, is something wrong with you.

4          PROSPECTIVE JUROR:  Mental fatigue.

11:16:19AM  5          PROSPECTIVE JUROR:  And we went from booze, drugs,

6    anything.  I mean that's how I put myself to sleep for 47 years

7    was booze.  I mean that's the only way I could sleep and then

8    drugs but, you know, things have changed and I've gotten the

9    help that I've needed and I'm still getting it today.

11:16:38AM 10          MR. BROWN:  It's an everyday battle I guess?

11          PROSPECTIVE JUROR:  Oh, yeah, absolutely.

12    Everyday.  Everyday I think the enemy is going to jump out of

13    this bush or that bush.  It happens.  It's that way because I

14    was a combat marine in Vietnam as a machine gunner, so

11:16:55AM 15    naturally, I see the enemy behind every bush.

16          MR. BROWN:  Okay.  Yes, sir, 31.  You raised your

17    card.

18          PROSPECTIVE JUROR:  I was just wondering if he

19    knows which branch of the service is most affected.

11:17:09AM 20          PROSPECTIVE JUROR:  No, sir.  The Army, the

21    Marines, the Navy, the Air Force.  The military is not an easy

22    life.  When combat is going and people are shooting at

23    Americans, we all stand up.  I don't think there is a

24    particular service that's more likely or less likely.  I don't

11:17:37AM 25    think there is a particular position that's more or less likely

to suffer from PTSD in the military.  There are people who are
not necessarily having bullets come toward them personally, but
they're dealing with issues because they wired that bomb, or
they flew the plane that dropped it, or they provided the
ammunition for the village that had to go down.  It's -- there
is no one thing that causes PTSD.  There is no one event that
you can say, aha, if we can stop that from ever happening, we
won't have this problem.  It's literally a failure of your own
heritage, upbringing, life experience to accept a situation
that goes -- it just -- the situation goes beyond anything you
were prepared to deal with.

          MR. BROWN:  Juror 14, you said that you
experienced it for quite some time.  Did that cause you to do
things that maybe you wouldn't have normally done?

          PROSPECTIVE JUROR:  Oh, yeah.

          MR. BROWN:  Excuse me?  Yes?

          PROSPECTIVE JUROR:  Yes.

          MR. BROWN:  Okay.  Tell me a little bit about
that.

          PROSPECTIVE JUROR:  There are a lot of times in my
life that I wish I could take back but I can't.  When booze and
drugs weren't satisfying me, I'd get on my motorcycle and go
100 miles an hour.  Then there are women that go along with
that.  It's -- you know, it's everything.  I just didn't -- I
just didn't care.  I had to be all and be everywhere.

                    MR. BROWN:   Sure.   Do you think it changes

somebody's I guess personal make-up or personal characteristics

when they're suffering from that?

                    PROSPECTIVE JUROR:   Oh, yeah, yes.   Without

11:19:37AM  medication, at any minute I could be a flaming mad man and the

medication keeps me and allows me to think first what I am

going to do instead of jumping right into it.

                    MR. BROWN:   Does anybody disagree with that, that

maybe thinks maybe PTSD wouldn't affect you internally or your

11:19:58AM  thought process or something of that nature like Juror 14

explains?   Does anybody disagree with that?   Anyone?   Okay.

                    There has been a big push across the State of

Texas and the U.S. for that matter and I'm sure y'all have

probably seen or heard on TV or radios about drug intervention

11:20:24AM  courts, DWI courts, driving while intoxicated courts, and now a

big push on veteran courts.   Has anybody heard of the big push

of veterans courts?   Nobody has.

                    PROSPECTIVE JUROR:   No.

                    MR. BROWN:   Okay.   What a veteran court is, it's a

11:20:39AM  system that's being set up through various counties throughout

the State of Texas to address issues that veterans who get

arrested for various crimes.   It could be anything from a theft

case, or an assault case, or a drug case, or a drinking case,

or whatever the case may be and they put them into this

11:20:58AM  veterans court to monitor them, to assess them, to find out

what's going on, to see if there is an issue.

Does anybody have any idea why we would be
creating courts like these?  Juror Number 14, you're shaking
your head.  Why do you think we're creating courts like these?

PROSPECTIVE JUROR:  Once you're a veteran like
that, you've got a good chance that you're still in your
formative years.  You've got a certain sense of order, a
certain sense of place and the way the world should work.

PROSPECTIVE JUROR:  Absolutely.

PROSPECTIVE JUROR:  And the civilian world is
right with this order and not the way things should work.  And
that especially if you've got added issues regardless of what
those issues may be, be it PTSD or if you've lost your leg, you
don't look at the world quite the same say.  It would be my
understanding that something minor, say a bar room contest of
endurance, what we call a bar fight between the Navy and the
Marine Corps, we would look at a lot of different things
differently than a civilian would.  Somebody taking a shot to
the nose is somebody just taking a shot to the nose.  It's not
an assault.  It's not some intent.  It's not, you shouldn't
have said that thing about my wife or my mom or my brother or
that marine in the corner or whatever, and you deserved a shot
to the nose and you took it and that's pretty okay for most of
the vets that I've ever dealt with.

MR. BROWN:  Let me stop you right there with that

comment.  Who dis -- or who agrees with that comment?  Does

everybody agree with that; that if you say something, you do

something and they punch you in the nose or they whack you

upside the head because you did something you're not supposed

to do, maybe that assault was justified in the bar room or

where ever else that would be?  Who agrees with that?  Juror

Number 33, 21, Number 11, 9.  8, you're a little bit?

             PROSPECTIVE JUROR:  I think we're back to

circumstances again.  If they agree that it was all right to

get hit in the nose, I'm perfectly happy with that.  If not,

it's a different question and you'll have to tell me what the

circumstances are.

             MR. BROWN:  Sure.  Okay.

             PROSPECTIVE JUROR:  That's a little bit different

of what I said as well, since we're making a record.  In the

mind of a veteran, that situation as I said was minor and that

would not enter anyone's mind if that was an assault if we're

all a bunch of veterans in the bar.  That's a discussion.

             MR. BROWN:  Sure.

             PROSPECTIVE JUROR:  We're having a bit of a

disagreement between the people and we need to get it on the

same page.

             MR. BROWN:  Sure.

             PROSPECTIVE JUROR:  That's a simple matter of two

people working something out so that they can come to an

agreement.  One of the things that was discussed here today was
with a deadly weapon.  We're a unique category of people as
veterans.  We've been trained, no matter what our service was.
In boot camp, we start -- even in the Navy, we shoot pistols,
we shoot rifles, we establish markmanship scores, in the Army
and the Marine Corps.  In the Marine Corps, every man is a
rifle man.  We're all very good with weapons.  Especially in
the civilian market, most veterans will make sure they don't
have weapons because you're not in where you were.  You're out
in the civilian world I call it, the real world some of the old
vets call it.  You're back out in the life.  And so we -- we
stay away from weapons as much as possible, not that we don't
have them, not that we can't go down to the range and shoot
them, but you won't see a lot of vets walking in or out of a
bar worrying about where do we put my concealed weapons.  We
pretty much don't bother with that.  There is no reason to have
that.  If we need it, we'll take it off the guy holding it.

        MR. BROWN:  And I appreciate your comments.  Thank
you very much.  I know it's probably hard at times to talk
about stuff like that.  So thank you.

        Juror Number 21 --

        PROSPECTIVE JUROR:  Yes, sir.

        MR. BROWN:  -- do you think that somebody who has
a mental issue that commits a crime should be treated the same
way as somebody who does not?  Do you think that should be

1    taken into consideration?

2              PROSPECTIVE JUROR:  Should be taken into

3    consideration?

4              MR. BROWN:  Yes, sir.

11:25:45AM 5              PROSPECTIVE JUROR:  Plus the degree of the crime,

6    there is a range of consideration that I would look at.

7              MR. BROWN:  Okay.  But is that something that you

8    would take into consideration in assessing somebody's

9    punishment?

11:26:00AM 10              PROSPECTIVE JUROR:  Yes, sir.

11              MR. BROWN:  Okay.  Who disagrees with Juror Number

12    21?  Who says I'm not going to consider a mental issue, mental

13    disability, PTSD or whatever the case may be?  Who says that's

14    not going to come into consideration for me?  Number 44.

11:26:17AM 15    Anyone else?

16              And I think I have already asked this and I'm

17    going to ask it one more time just because it came up again in

18    my notes.  And I did ask it, but I'm going to ask it again

19    just to make sure.  Anybody here that's been a victim or had

11:26:52AM 20    their house broken into or a burglary of a habitation?  Can

21    you raise your cards one more time so I can write it down in

22    my notes?  Okay.  8, 15, 18, 21, 24, 29, 31, 21, 44, 42.

23    Thank you.

24              Now, the prosecution brought it up a little bit.

11:27:21AM 25    It's been brought to my attention that sometimes articles can

1    come out in the newspaper here in Kerrville and it's a fairly

2    small community, I understand that.  I think there is one

3    newspaper here.  I'm not sure how often it's published, but if

4    you are selected as a juror, you're going to sit here.  That's

11:27:39AM 5    one thing that the Judge is going to instruct that you not do;

6    that you not talk to others about the case, whether it be your

7    husband, wives, kids, not read the newspaper concerning any

8    issues or facts about this case, not go and do your own

9    investigation because you're going to hear -- the Judge is

11:27:57AM 10   going to give you the law and the law is going to say that the

11   only evidence you are to consider is what's here in this

12   courtroom and what you see and hear from the witness stand.

13   Does everybody agree that they'll do that if they are

14   selected?  Everybody agree to that, that they will not do

11:28:15AM 15   their own investigation or talk to anybody else about it?

16              There was some mention about the Fifth Amendment

17   right to remain silent.  The prosecution talked about it just

18   a little bit.  It's an absolute right.  Somebody has the

19   absolute right to testify or not to testify.  Somebody give me

11:28:42AM 20   some reasons why somebody might choose not to testify.

21   Juror 18.

22              PROSPECTIVE JUROR:  I don't know.  I can't --

23              MR. BROWN:  Right there.  Are you nervous, having

24   to speak in front of people?

11:29:02AM 25              PROSPECTIVE JUROR:  Yeah.

1          MR. BROWN:  Everybody see that, that right there.

2    I'm not picking on you, but that might be a reason why somebody

3    may choose not to testify because they may not be able to speak

4    and talk and say what they want to when they're put on the spot

11:29:16AM 5    and it makes them nervous.  Maybe -- Juror 17, give me another

6    reason why do you think somebody might not testify.

7          PROSPECTIVE JUROR:  Maybe a very good reason that

8    they are nervous and I don't know.  That's the best reason I

9    can think of.

11:29:33AM 10          MR. BROWN:  Okay.  What about advice of their

11    attorney?

12          PROSPECTIVE JUROR:  Advice of their attorney.

13          MR. BROWN:  Yeah.  So say, you don't need to

14    testify.  You don't need to testify, whatever the case may be.

11:29:45AM 15    Now that's the law and the Fifth Amendment says he has an

16    absolute right not to testify in these proceedings.  Who in

17    here says, you know what, I know that's the law and I know

18    that's what the Judge told us, I know that the prosecutor told

19    us that.  Man, if I don't hear from Vernon or I don't hear from

11:30:04AM 20    the person, then I can't go with that.  I have to hear from him

21    in this case or I'm going to hold it against him.  If you feel

22    that way, that's fine.  But you would raise your card if you

23    feel that way, I've got to hear from him one way or another.

24    Anyone?  No?  Thank you.

11:30:18AM 25          Judge, how much time do I have left?

1          THE COURT:  You have about 20 minutes.

2          MR. BROWN:  Witnesses:  In the guilt/innocence

3    portion of the case as well as the punishment aspect of the

4    case, you as the 12 jurors are going to sit here and you're

11:30:38AM 5    going to listen to witnesses testify.  And the Judge is going

6    to tell you, I'm going to give you the law that you're the sole

7    determiner of the credibility of those witnesses.  You get to

8    listen to them, you get to decide who is credible, who is

9    telling the truth, who is maybe not telling you the whole

11:30:55AM 10   story, whatever the case may be.  You get to listen to the

11   testimony and make that decision.  Y'all are going to be the

12   sole determiners of the credibility of the witnesses.  Does

13   anybody have a problem with that?  I can't do that.  I can't

14   sit in judgment of others.  I can't make that determination.

11:31:12AM 15          Does anybody say, you know what, who here is

16   either law enforcement themselves or has a family member that's

17   law enforcement?

18          Juror 43, I think you're a DPS investigator.

19          PROSPECTIVE JUROR:  Yes, sir, retired.

11:31:29AM 20          MR. BROWN:  Yes, sir.  A long line of police work;

21   is that right?

22          PROSPECTIVE JUROR:  Yes, sir.

23          MR. BROWN:  Because of your position, would you

24   say because an officer walks in here and walks to that stand

11:31:42AM 25   versus a layperson, somebody who walks out of the crowd and

1  comes up here and testifies, would you give I guess more

2  benefit or more credibility to the officer versus the

3  layperson?

4              PROSPECTIVE JUROR:  No, sir.  I try to weigh the

11:31:58AM 5  evidence what a person says.

6              MR. BROWN:  Everybody hear that?  Here is an

7  officer that says, hey, I'm not going to give the police

8  officer more credibility.  I'm going to listen to what they

9  have to say before I make that determination.  Does everybody

11:32:11AM 10  agree they can do that?  Yes.  Anybody feel like they can't

11  based on relationship with a police officer or positions that

12  they've held?  Anybody feel that way?

13              Juror Number 6, tell me some things that you

14  would look at to make a determination as to whether or not

11:32:29AM 15  somebody would be credible or telling the truth.

16              PROSPECTIVE JUROR:  I would say probably sincerity

17  in their response and how are they physically able to handle

18  themselves.  Are they twitching or -- because of the field I

19  work in, we have to take into consideration that people aren't

11:32:49AM 20  -- they're being forthcoming and they're being honest in their

21  answers, not because they want their answers to be what

22  everyone wants it to be.  I don't know if you saw what I did.

23              MR. BROWN:  I don't have that in front of me, what

24  do you do?

11:33:02AM 25              PROSPECTIVE JUROR:  I'm a transplant assistant

1    coordinator for a living donor.

2                MR. BROWN:  Wow, okay.

3                PROSPECTIVE JUROR:  So we have people come in that

4    want to give a kidney and it's coercion.  It's family coercion

11:33:15AM 5 and we have to be able to sit down and look through it and get

6    to if you really should be here.  Are you in a situation that

7    should be --

8                MR. BROWN:  Are you freely and voluntarily --

9                PROSPECTIVE JUROR:  You have to read people and be

11:33:29AM 10 able to understand.  Let them know it's open.  You don't have

11   to say something just to get people's approval.  You need to be

12   honest because you can't go back.

13               MR. BROWN:  So look at how they respond, the

14   mannerisms, what they're telling you and following up and stuff

11:33:46AM 15 like that?  Juror Number 4?

16               PROSPECTIVE JUROR:  Uh-huh, keeping their story

17   straight.

18               MR. BROWN:  Keep them telling you the same thing.

19               Juror Number 4, what would be some things that you

11:33:55AM 20 look at at credibility of the witness?

21               PROSPECTIVE JUROR:  Well as a retired educator, I

22   looked at the decisions every day and looking at children and

23   trying to find out the basis of what happened on the

24   playground.

11:34:08AM 25              MR. BROWN:  Sure.

 1            PROSPECTIVE JUROR:  You have to look at what they

 2 say and their eye contact and just the circumstances.

 3            MR. BROWN:  Okay.  What type -- Juror Number 2,

 4 what type of witnesses would you expect to hear in a case like

11:34:22AM 5 this?

 6            PROSPECTIVE JUROR:  Eyewitness.

 7            MR. BROWN:  Eyewitnesses, okay.

 8            PROSPECTIVE JUROR:  There may not be an

 9 eyewitness, but that would be powerful for a jury.

11:34:32AM 10            MR. BROWN:  Okay.  What else?

11            PROSPECTIVE JUROR:  Professionals.

12            MR. BROWN:  What do you mean by professionals?

13            PROSPECTIVE JUROR:  Law enforcement.

14            MR. BROWN:  Okay.

11:34:43AM 15            PROSPECTIVE JUROR:  If we are talking about

16 post-traumatic disorder, then there will be psychologists or

17 psychiatrists.

18            MR. BROWN:  Okay.  You would want to hear from

19 somebody like that that says, I've met with them and this is

11:34:56AM 20 what I saw and this is --

21            PROSPECTIVE JUROR:  I would expect for them to

22 show up.

23            MR. BROWN:  Yes, sir.  Okay.  Juror Number 1, who

24 would you expect to hear or see or what type of evidence would

11:35:09AM 25 you expect to see in this type of case?

1          PROSPECTIVE JUROR:  I would expect to see some

2     sort of physical evidence.

3          MR. BROWN:  Give me some examples.

4          PROSPECTIVE JUROR:  Evidence that was found on the

11:35:20AM 5   scene or evidence of what happened when -- if there was a

6     break-in, that sort of evidence, witnesses if there were any,

7     accomplices if there were any.

8          MR. BROWN:  Okay.  Juror Number I think it's 13,

9     what type of evidence would you expect to see?

11:35:55AM 10         PROSPECTIVE JUROR:  Basically the same, evidence

11    that's surrounding -- if there is evidence of the break-in, any

12    kind of accomplices like what she said.

13         MR. BROWN:  I asked this question just a second

14    ago and I spoke to Juror Number 43 real quick, but if you would

11:36:23AM 15  please raise your card again if you or a family member are

16    involved in law enforcement.  I didn't go through everybody's

17    cards.  1, 3, 13, 14, 16, 27, 28, 35, 36, 38, 41 and 43.  Thank

18    you.

19         There was a lot of questions asked if you knew me

11:36:46AM 20  or had any interaction with me or Vernon or Brian.  I'm going

21    to turn around and ask the same questions, does anybody know

22    anybody sitting at this table, any of the prosecutors or the

23    investigator here?  Does anybody know them from the community

24    or have had past dealings or prior dealings with them?

11:37:08AM 25         Juror Number 43?

PROSPECTIVE JUROR:  On what level?  I mean Scott here, he just ran for election not that long ago.  He spoke at the Legion Hall and he wandered all over the place.  I've seen him around a lot, but I wouldn't say I know him.

11:37:25AM  MR. BROWN:  Well, because of that experience, would you say that he stands -- he's ahead because of that experience with him?

PROSPECTIVE JUROR:  Well, if he's trying to get elected to office, that puts him in the politician category, 11:37:37AM that should do it.

MR. MONROE:  Fair enough.

MR. BROWN:  I might say I agree.

Does anybody work at the District Attorney's office here in town or have a family member who does?  No.  11:37:51AM Okay.

I know this question was asked, but I didn't get everybody's number.  Who here has served on a criminal jury before, if you would raise your card?

4, 5, 8, 9, 16, 17, 18, 21, 22 -- 20, 21, 22, 25, 11:38:22AM 31, 35, 37, 41.

Okay.  Out of those people, who has sat on a criminal jury two times, if you would raise your card?  Anybody serve -- this is everybody's second time?  Okay.

Give me one second.  I think I may be done.  I 11:38:41AM just want to make sure I didn't miss any questions.

1          Thank y'all for your time and attention.  I know

2    this can be difficult.  It's long and everybody wants to know

3    what's going on.  I appreciate all your candid responses to

4    both sides and again, thank you for your time.

11:39:12AM 5          THE COURT:  There are a few people that we may

6    have to call up to the bench and so I ask that y'all be patient

7    with us as we interview a few people at the bench.

8          Counsel, can you come up here right now?

9          (Bench conference).

11:39:42AM 10          THE COURT:  Before we get into some of the

11   substantive reasons, Juror 18 told the bailiff during the break

12   that her back is really starting to bother her.  She has back

13   pain and she's not sure she can sit here.  Of course, these are

14   the worst seats in the world out there, but I thought I would

11:40:02AM 15   call her up real quickly to see how bad her back is.

16          (Bench conference ended).

17          Juror 18, can you come up please?

18          PROSPECTIVE JUROR NUMBER 18

19          THE COURT:  It's still good morning, I guess.

11:40:34AM 20   Let's see, ma'am, you are Patricia Hannum and you told the

21   bailiff your back is starting to bother you; is that correct?

22          PROSPECTIVE JUROR:  Yeah.  I thought it would be

23   okay but it really started bothering me just sitting there.

24   And it's a little better right now.  I don't -- I want to

11:40:55AM 25   serve, but I just don't know if I can physically.

TERI THOMAS, CSR, RPR, CMRS

THE COURT:  Okay.  The -- those are horrible seats
out there that you're sitting in.  They've got that one little
railing deal.  The good news is we have pretty comfortable
seats in the jury box, but I'm going to -- you need to kind of
11:41:13AM tell me, if you think you can do it, we'll leave you on here,
but if you think it will be an impediment, I'm going to let you
go.

PROSPECTIVE JUROR:  I think it's going to be an
impediment.  I'm worse the more I stand.

11:41:27AM THE COURT:  It's very sweet of you to come up here
and be with us today but we don't want you to have to suffer
through this.  I'm going to let you go.  If you'll step right
over here.

PROSPECTIVE JUROR:  Thank you.

11:41:37AM THE COURT:  Well, the clerks are gone.  Scott
will take care of you, ma'am.

Okay.  The State I guess always gets to go first.
Is there anybody you want to bring up here and talk to them?

MR. MONROE:  I would like to start with Juror
11:42:04AM Number 3.

THE COURT:  Okay.  Mr. Burns, Lee Burns, can you
come up, please?

PROSPECTIVE JUROR NUMBER 3

THE COURT:  This is Juror Number 3, Lee Burns.
11:42:28AM And they need to ask you a couple of questions at the bench.

1              PROSPECTIVE JUROR:  All right.

2              MR. MONROE:  Mr. Burns, first of all, thank you

3    for your response and your input out there.  I appreciate that

4    and appreciate the services you have.  I want to ask just a

11:42:45AM  5    couple of questions trying to get some brutal honesty here and

6    not that you would want to do anything but that here.

7              PROSPECTIVE JUROR:  I take an oath that is very

8    serious.

9              MR. MONROE:  If you have a situation where you

11:42:59AM 10    were presented with evidence of PTSD, could you ever entertain

11    a sentence of 99 years?

12              PROSPECTIVE JUROR:  No, sir.

13              MR. BROWN:  Judge, I'm going to object.  That's

14    improper commitment in this case.  There is no evidence of

11:43:15AM 15    anything specific in this particular case.  That's an improper

16    commitment.

17              MR. MONROE:  Your Honor, our jury has been voir

18    dired ad nauseam on PTSD, and I just asked if he could ever

19    consider that.  That's kind of like ignoring an elephant in the

11:43:29AM 20    room.

21              MR. BROWN:  Judge, the way it should be framed is

22    could you consider it under any circumstances, not limited to

23    one particular issue.

24              THE COURT:  Yeah, it's a -- I don't want anybody

11:43:39AM 25    to anticipate what's going to happen in this trial, and I

1  cannot tell you right now if PTSD will even come in because

2  nobody knows until we start.  It is a little bit of a problem

3  because we've talked about it so much it has become the issue.

4           So I'm going to overrule the objection and let

11:44:00AM 5  you go into it a little bit more because we've had extensive

6  conversation about it, but I want to not warn you Mr. Monroe,

7  but you can't assume that --

8           PROSPECTIVE JUROR:  I understand.

9           THE COURT:  -- the way you think about it or the

11:44:19AM 10 way anybody else thinks about it or at all it's going to come

11 in.

12           PROSPECTIVE JUROR:  Well, we haven't received any

13 information that there has been a diagnosis or there is any

14 particular thing.  However -- and this is probably going to

11:44:33AM 15 affect more than just me.  I know this marine back there who

16 suffered from it.  If PTSD is a factor, there is no mention of

17 any option other than a sentence.  If the guy has got PTSD,

18 he's got to have treatment so that's another factor that's in

19 the back of the heads of the veterans in the room.

11:44:49AM 20          Why is there not an option, even if punishment is

21 required, to offer assistance to this guy as well because

22 sometimes, hey, just because we're vets doesn't make us less

23 human.  We all make mistakes.  We all do bad things from time

24 to time and we all have to pay those consequences.  But if

11:45:10AM 25 you're a veteran and you've got PTSD based on being a veteran,

1   you deserve treatment because you were put where you were not

2   otherwise have been that you otherwise would not have done.

3   He's in service to us, the rest of us, so we owe treatment to

4   him.

11:45:28AM 5                MR. BROWN:  Judge, I'm going to reurge my

6   objection at this time, Judge, that we're getting into

7   potential facts of the case.  There is no facts presented in

8   this.  We don't know if there was six or ten people shot at,

9   one person shot at, nobody shot at, PTSD or not, and I think

11:45:47AM 10  we're getting into --

11                THE COURT:  Do you have any other questions?

12                MR. MONROE:  Well, and I don't have a clue on

13  what's going to be brought out.  I don't have a clue.

14                PROSPECTIVE JUROR:  I understand.

11:45:59AM 15                MR. MONROE:  I know what the State will bring out,

16  but I don't have a clue on what the defense is going to do.

17                Another question I have is that you have a lot of

18  knowledge.  Can you keep it to yourself?  In other words, if it

19  doesn't come out from the witness chair, you can't give your

11:46:15AM 20  own opinions about it and it sounds to me like that might be

21  very difficult for you.  I don't mean that insulting.

22                MR. BROWN:  Judge, I'm going to object to that.

23  If --

24                THE COURT:  The objection is?

11:46:33AM 25                MR. BROWN:  The objection is that's a

misstatement.  If he has a personal knowledge of PTSD, he can

use that toward his deliberations concerning this case.  If he

hears a particular witnesses testify about PTSD and what their

testimony is, he can obviously tell the jurors, well, I believe

11:46:53AM  he's credible because he talked about x, y and z or I believe

he's not credible because he didn't talk about x, y, and z and

that's going to be based on his personal experiences.  So he

can take his personal experiences back there.

Again, we're talking about specific evidence in

11:47:13AM  this case and we're going down a trail of evidence that we

don't know if it's going to be presented or see if it's going

to be.

THE COURT:  I'll overrule your objection.  Go

ahead finish your answer -- your question.

11:47:23AM  MR. MONROE:  If I didn't state it accurately, each

individual juror is a part of their own personal environment.

PROSPECTIVE JUROR:  Sure.

MR. MONROE:  And that's part of the process.

You're absolutely entitled to it.  What I meant was that you

11:47:36AM  can't share it.  Do you see what I am saying?  You can't give

your knowledge to it.  If it didn't come from the witness

stand, it's not appropriate for you to share anything you know

with the other jurors.  That's what I meant.  Not that it can't

be a factor for you --

11:47:51AM  PROSPECTIVE JUROR:  I understand.

1              MR. MONROE:  -- but it can't be for somebody else.

2    And I don't know that I'm asking you to do something, but for

3    some people, that might be saying, you might as well tell me I

4    can't breathe.

11:48:03AM 5              PROSPECTIVE JUROR:  Well, given the fact that it

6    hasn't come up yet, several years ago, I could have

7    definitively said, no problem because I was a different person

8    then, but I've been trained and dealt with this issue.  It

9    would be very hard.  I'm not going to lie to you about that.

11:48:23AM 10   If I know something and it has a bearing, it would be very hard

11   not to say something.

12              MR. MONROE:  You would have to make a decision

13   based solely on what you hear from that witness stand and

14   nothing else.  Can you do that?  You're the only one that can

11:48:49AM 15   answer the question.  There is no shame in either answer.

16              PROSPECTIVE JUROR:  Well, since I have nothing to

17   go on, I could just throw out a yes or no.  Truth is that based

18   on what I hear, it's really going to determine what did I know

19   because they said something or didn't say something.  So

11:49:25AM 20   especially if somebody doesn't say something that should have

21   been said, that falls into that.  That's why it's hard.  If I

22   know it, I know it.  And that's a -- I can try but --

23              MR. MONROE:  The risk is there?

24              PROSPECTIVE JUROR:  The risk is there.

11:49:44AM 25              MR. MONROE:  I don't have any further questions of

1   this witness.

2              MR. BROWN:  I have no further questions.

3              THE COURT:  Okay.  If you'll have a seat.

4              PROSPECTIVE JUROR:  Yes, sir.

11:49:51AM 5   THE COURT:  We'll wait to the end for any other

6   challenges.

7              Who else would you like to bring?

8              MR. MONROE:  Number 14.

9              THE COURT:  Juror 14, that would be David

11:50:20AM 10  Manipole.

11              While we're talking folks, if y'all need to stand

12  up or somebody needs to make a run out to the restroom or

13  something, you can do that but just be real quiet.

14                    PROSPECTIVE JUROR NUMBER 19

11:50:31AM 15  THE COURT:  Good morning, Mr. Manipole.

16              PROSPECTIVE JUROR:  Good morning.

17              THE COURT:  Mr. Monroe, you have some questions.

18              MR. MONROE:  Just want to -- you've now heard the

19  voir dire presentation by both sides and I want to check back

11:50:43AM 20  with you on the range of punishment.  Do you feel like you can

21  still consider the entire range of punishment?

22              PROSPECTIVE JUROR:  Sure.  Yes.

23              MR. MONROE:  No problem with that?

24              PROSPECTIVE JUROR:  No.

11:50:54AM 25  MR. MONROE:  And nothing you've heard or has been

1  mentioned would say that one end of that spectrum has been

2  eliminated?

3          PROSPECTIVE JUROR:  No, no.  I'm satisfied.

4          MR. MONROE:  Okay.

11:51:04AM 5    THE COURT:  Any questions?

6          MR. BROWN:  No questions of you, sir.

7          THE COURT:  Thank you, sir.  You may go back to

8  your seat.

9          MR. MONROE:  A couple of people -- I have some

11:51:26AM 10  generic notes on four people that talked about the range of

11  punishment.  The first one is Number 24.

12          THE COURT:  Juror Number 24, Araceli Falcon.  Did

13  she step outside?  There she is.  Thank you.  Come on up, Ms.

14  Falcon.

11:51:49AM 15    MR. BROWN:  What number, Number 24?

16          THE COURT:  Number 24, yes.

17          PROSPECTIVE JUROR NUMBER 24

18          THE COURT:  Mr. Monroe has some questions for you.

19          MR. MONROE:  First of all, thank you for being

11:51:59AM 20  honest with us out there.

21          PROSPECTIVE JUROR:  You're very welcome.

22          MR. MONROE:  You expressed some apprehension about

23  being able to, one, decide punishment at all and then I think

24  you also expressed concern about the range of punishment, too,

11:52:13AM 25  and so I just want to -- tell me what's going on.  Do you think

1  you could assess the punishment against someone?  Can you do

2  that?

3          PROSPECTIVE JUROR:  I don't think I could do it

4  with him because I've seen him crying and it looks to me like

11:52:29AM 5  he's a bit remorseful and I think a little bit scared.  I think

6  I would have a hard time being objective.  I've been wanting to

7  go up to him and just hug him.

8          MR. MONROE:  Can I ask you this question.  Can you

9  consider the full range of punishment?

11:52:46AM 10          PROSPECTIVE JUROR:  No.

11          MR. BROWN:  The Judge has given you a range of

12  punishment of 5 years to 99 to life.  You haven't heard the

13  facts in this case.  Whether or not he's remorseful or accepts

14  responsibility, that whole thing is what you consider to assess

11:53:09AM 15  the punishment.  Is there a set of facts or a scenario that you

16  can say, you know what, this guy deserves the maximum range of

17  punishment; he did x, y, and z?

18          PROSPECTIVE JUROR:  I'm not saying -- I'm just

19  saying that the way he is right now, my first impression is

11:53:27AM 20  right now to go with as to how guilty and send him to prison,

21  sometimes that -- I don't think I would actually be able to be

22  objective.

23          MR. BROWN:  Okay.

24          PROSPECTIVE JUROR:  That's just --

11:53:42AM 25          THE COURT:  Thank you, ma'am.  You may go back to

1    your seat.

2                MR. MONROE:  Number 34.

3                THE COURT:  Juror Number 34, Judith Gausnell.

4    Would you come forward please, Number 34.

11:54:24AM 5              PROSPECTIVE JUROR NUMBER 34

6                THE COURT:  All right.  This is Juror Number 34,

7    it says Judith Gausnell.  Did you have some questions?

8                MR. MONROE:  Yes.  Yes, Your Honor.

9                Ms. Gausnell, first of all, thank you for your

11:54:36AM 10   candidness on the panel.  You never know when you're putting

11   somebody on the spot when you're asking questions out there.

12   But in response to a couple of questions, I think you expressed

13   some apprehension of not wanting to assess punishment against

14   somebody in general, I think, and then concerns about the range

11:54:48AM 15   of punishment.  I want to ask you about that.

16               PROSPECTIVE JUROR:  It's not a concern.  It's just

17   that I would never do 99 years.  I'm a great believer that

18   we're spending way too much money as taxpayers on putting

19   people in prison for things that they did that need

11:55:11AM 20   rehabilitation more than punishment.  And that's --

21               MR. MONROE:  Okay.  And you're absolutely entitled

22   to that opinion and you're not alone, I feel quite sure.  One

23   of the questions I need to ask you and it's the legal question

24   that I need to ask you, is it fair to say that you then could

11:55:28AM 25   not consider the entire range of punishment?

1        PROSPECTIVE JUROR:  I wouldn't consider 99 years

2  and I don't even know exactly what this case is about, but he's

3  a young man.

4        MR. MONROE:  I understand.

11:55:39AM 5        PROSPECTIVE JUROR:  I wouldn't want to pay for him

6  to spend 99 years in prison.

7        MR. MONROE:  All right.  That's -- no further

8  questions.

9        THE COURT:  Mr. Brown, do you have any questions?

11:55:48AM 10        MR. BROWN:  So there is no set of circumstances or

11  facts that you could ever consider in this type of a case of

12  burglary of a habitation with intent to commit aggravated

13  assault with a deadly weapon, whatever the circumstances may

14  be, there is no set of circumstances that you could personally

11:56:04AM 15  believe in or conjure up in your brain that would ever --

16        PROSPECTIVE JUROR:  I believe in the death

17  penalty.  I mean, you're asking me to make a decision on

18  something that I don't know what we're talking about.

19        MR. BROWN:  Sure, so that's what I am asking you.

11:56:22AM 20  Is there a set of facts in your own mind where you could say

21  under these set of circumstances, I could consider 99 or life?

22        PROSPECTIVE JUROR:  Well, I guess if he beat two

23  or three old people into just blobs, I don't know.  You know,

24  you're asking me to give an opinion on something that I don't

11:56:50AM 25  have the facts.

                    MR. BROWN:  Exactly.  So that's why -- I hate to

pin you down on this, it's very important, but that's why I had

asked you in your own mind, is there a set of circumstances or

facts that you just alluded to that you could say, yes, I could

consider the full range of punishment?

                    PROSPECTIVE JUROR:  Possibly, but --

                    MR. BROWN:  I hate to say it, but possibly could

it either be a yes or no?

                    PROSPECTIVE JUROR:  Murder, sure.

                    MR. BROWN:  Well, in this type of a case --

                    PROSPECTIVE JUROR:  I'm sorry.

                    THE COURT:  Let me -- this is all -- this is so

difficult.  We run into this a lot.  It's -- I don't want you

to try to think of a case where you could give 5 years or where

you could give 99 years.  The real issue is, if you hear the

evidence and if you think it's deserving of 99 years, then you

say even though it's deserving of 99 years, I'm not going to

give it, then you shouldn't serve.

                    PROSPECTIVE JUROR:  No, I would never do that.

                    THE COURT:  And if you thought it was deserving of

5 years, but then you said even if it's deserving of 5 years

I'm going to give 10.  You have to be open and wait until you

hear the evidence.  So if you think it's 99 years based on the

evidence, can you give 99 years?

                    PROSPECTIVE JUROR:  I am open.

1          THE COURT:  And if you think it's deserving of 5

2     years, can you give 5 years if that's what the evidence means

3     to you?

4          PROSPECTIVE JUROR:  Yes, sir.

11:58:17AM 5          THE COURT:  We're unique in Texas in that we have

6     the huge range, but it means that the jurors get to wait until

7     they've heard the facts and then they plug the punishment in

8     based on what the facts elicit, but we can't have jurors that

9     sit up there on a range that they say it's 10 to 20 and the

11:58:36AM 10    legislature says it's 5 to 99.  So can you consider the full

11    range of punishment when you're assessing?

12          PROSPECTIVE JUROR:  The answer is yes.

13          THE COURT:  Okay.  Any other questions?

14          MR. MONROE:  No, Your Honor.

11:58:47AM 15          MR. BROWN:  Thank you very much.

16          PROSPECTIVE JUROR:  I hope I wasn't --

17          THE COURT:  Thank you, Ms. Gausnell.  You can go

18    back and sit down.

19          MR. MONROE:  I think Number 26.

11:58:53AM 20          THE COURT:  All right.  Juror Number 26.  Bruce

21    Sandefur.  Yes, Mr. Sandefur.

22               PROSPECTIVE JUROR NUMBER 26

23          THE COURT:  All right.  This is Juror Number 26.

24    He has some questions for you.

11:59:14AM 25          MR. MONROE:  Yes, Mr. Sandefur and I mixed these

two questions together, so I'm not sure which one you responded

to.  They were both about the same.  We were talking about

punishment and one of the questions was, could you even sit in

punishment?  Could you do that, and the other was could you

11:59:30AM 5   consider the full range?  And I jotted your number down of one

of the two.  I didn't write down which one it was.  So let me

just ask you how you feel about that.  Are you comfortable

being put in this situation where you would be assessing

someone's punishment?

11:59:45AM 10          PROSPECTIVE JUROR:  Yes.

MR. MONROE:  Okay.  And then the second question

then becomes, you've now heard the punishment range, could you

consider the entire range of punishment or is one end of the

spectrum automatically precluded regardless of what the

12:00:01PM 15  evidence may be?

PROSPECTIVE JUROR:  It depends on all the

evidence, but yes, I could make varieties.

MR. MONROE:  Okay.  So you could consider there

could be a circumstance -- and I'm not asking you to expand on

12:00:12PM 20  it.

PROSPECTIVE JUROR:  Right.

MR. MONROE:  But as you stand here, you're not

precluded from the top end, you're not precluded from the

bottom end, and everything is available?

12:00:23PM 25          PROSPECTIVE JUROR:  Yes.

1          MR. MONROE:  Did I get it wrong?  Did I write it

2     down wrong that you had raised your card on couldn't or didn't

3     want to determine punishment?

4          PROSPECTIVE JUROR:  I don't remember doing it.

12:00:37PM  5     There were so many different questions.  I'm not sure.

6          MR. MONROE:  Okay.  Fair enough.

7          MR. BROWN:  No further questions, Judge.

8          THE COURT:  Thank you, sir.  You may go back to

9     your seat.

12:00:48PM 10          MR. MONROE:  Number 31.

11          THE COURT:  Juror Number 31, Mr. Thomas Severson,

12     can you come up to the bench, please?  Come on up.

13          I'm going to let you know, we've got a few more

14     people.  Forgive me that we're kind of going into the lunch

12:01:11PM 15     hour and I promise I'm going to give you a good lunch hour.

16     What we're going to do after we finish talking to just a few

17     more people is I'm going to let you go to lunch and the

18     attorneys will make their strikes while you're at lunch and

19     then when you come back from lunch, you'll know who the 12 are

12:01:25PM 20     that are going to be on the jury, so that's kind of where we

21     are.

22          Mr. Monroe, you have some questions.

23          PROSPECTIVE JUROR NUMBER 31

24          MR. MONROE:  Yes.  You had raised your card in

12:01:34PM 25     response to two or three questions and I'm going to follow-up

on it.  And nobody is trying to put you, the juror, in a
position that they don't want to be in.  And you expressed some
apprehension about sitting in judgment and assessing punishment
at all.

12:01:43PM          PROSPECTIVE JUROR:  I could -- I could decide
whether a person is guilty or not guilty, but I always thought
it was up to the Court to decide on the punishment.

          MR. MONROE:  Texas doesn't do it that way.  It's
an election that a defendant can make.  He can make an election
12:01:56PM for a court to do it or --

          PROSPECTIVE JUROR:  I understand.

          MR. MONROE:  I need to know how that affects you.
Knowing that that's what a juror in this case is going to be.
And you've got a range of punishment of 5 years and a minimum
12:02:09PM of up to 99 years, could you consider that entire range or
would that be something we're asking you to do that you could
not do?

          PROSPECTIVE JUROR:  I hate to disappoint you, but
I could decide if a person is found guilty, but I don't think I
12:02:21PM could decide on how long he should be put in jail.

          MR. MONROE:  You couldn't decide that at all?

          PROSPECTIVE JUROR:  I don't think so.

          MR. MONROE:  Is it just a --

          PROSPECTIVE JUROR:  I was kind of looking forward
12:02:30PM to being on the jury, too, because I was on a jury before and I

1    really enjoyed it.  And that was in Minnesota and --

2             MR. MONROE:  The question I have to ask you and

3    the legal way that I have to put on this is, can you consider

4    the entire range of punishment if you're sitting on the jury

12:02:50PM 5    and that's a yes or no answer.  Let me just ask you, can you?

6             PROSPECTIVE JUROR:  I could consider it, but I

7    don't think I could agree with everybody else on the jury how

8    long it should be.  Does that answer your question?

9             MR. MONROE:  Well, I think it does.  I think it

12:03:11PM 10   does.  That's all the questions I have.

11            THE COURT:  Any questions?

12            MR. BROWN:  No.

13            THE COURT:  All right.  Thank you, sir, you may go

14   back to your seat.

12:03:22PM 15            MR. BROWN:  We'll agree to 31.  We've agreed to

16   that while he was questioning him.

17            MS. COLEMAN:  To strike that one.

18            MR. MONROE:  Number 29.

19            THE COURT:  Number 29.  Tammie Colvin, Juror

12:03:58PM 20   Number 29, if you'll come up here a little bit closer.

21                 PROSPECTIVE JUROR NUMBER 29

22            THE COURT:  Did you have some questions, Mr.

23   Monroe?

24            MR. MONROE:  Well, you just expressed some bad

12:04:17PM 25   experience with law enforcement, and I just wanted to -- do you

think that would affect your experience as a juror?

PROSPECTIVE JUROR:  No, sir.  I had an off duty officer run a red light and he hit me and there was a witness there and I said -- well, I got out of my car and said you hit my car.  And he said, I didn't hit your car and the old man said, yes, you did.  He said I'm an officer and I didn't.  I got a ticket for that, and I ended up going to court and it was dismissed.

MR. MONROE:  That's all the questions I have.

THE COURT:  Did you have some questions, Mr. Brown?

MR. BROWN:  No.

THE COURT:  Thank you.

MR. BROWN:  We agreed to 29.

THE COURT:  Who is the next one?  You've agreed to strike number 29, so 31 and 29.

MR. MONROE:  Number 23.

THE COURT:  Juror Number 23, Guadalupe Elizondo, could you come forward, please?

PROSPECTIVE JUROR NUMBER 23

THE COURT:  All right.  Did you have some questions?

MR. MONROE:  Yes.  Mrs. Elizondo, I just wanted to have an opportunity to ask you again if you still feel like you could consider the entire range of punishment without knowing

1   anything about the case or do you feel like you would not be

2   able to consider one end or the other?

3                  PROSPECTIVE JUROR:  I would be able to.

4                  MR. MONROE:  You would be able to?

12:06:27PM 5       PROSPECTIVE JUROR:  Uh-huh.

6                  MR. MONROE:  You indicated that you had some

7   experience with post-traumatic stress.  Tell me what that is.

8                  PROSPECTIVE JUROR:  An event that happens in a

9   person's life that changes the way they feel or the way they

12:06:41PM 10  act.

11                 MR. MONROE:  I understand.  Did you have a family

12  member or somebody that suffers from that?

13                 PROSPECTIVE JUROR:  My husband did.

14                 MR. MONROE:  Okay.

12:06:49PM 15      PROSPECTIVE JUROR:  But he's deceased now.

16                 MR. MONROE:  He's deceased now.  And what branch

17  of the service was he in?

18                 PROSPECTIVE JUROR:  He was in the Army.

19                 MR. MONROE:  In the Army.  And was that during

12:07:01PM 20  Vietnam?

21                 PROSPECTIVE JUROR:  Yes, sir.

22                 MR. MONROE:  Anything about that that would make

23  you unable to serve as a juror in that experience or affect

24  your judgment?

12:07:11PM 25      PROSPECTIVE JUROR:  No.

|    |    |
|----|----|
| 1  | THE COURT:  Any questions? |
| 2  | MR. BROWN:  No, ma'am. |
| 3  | THE COURT:  Thank you very much.  You may go back |

THE COURT:  Any questions?

MR. BROWN:  No, ma'am.

THE COURT:  Thank you very much.  You may go back
to your seat.

12:07:19PM
Do you have anybody that you would like to --

We're getting close.

MR. BROWN:  Judge, we would like to call up Number
8.

THE COURT:  Paul Bryant, Juror Number 8, could you

12:08:13PM
come up please?

PROSPECTIVE JUROR NUMBER 8

THE COURT:  Thank you.  Mr. Brown, do you have
some questions?

MR. BROWN:  Yes, sir.  I have some question about

12:08:25PM
a belief that might be affected by a case like this and I
didn't want to ask you in front of everyone.

PROSPECTIVE JUROR:  Sure.

MR. BROWN:  If you don't mind, kind of going into
your type of experience on this type of a case.

12:08:36PM
PROSPECTIVE JUROR:  Are you talking about on a
jury?

MR. BROWN:  I asked you a question, have you been
affected in a burglary of a habitation type case and you had
raised your card.

12:08:46PM
PROSPECTIVE JUROR:  Yes.

1          MR. BROWN:  And I called you up here because I

2   didn't want to ask you in front of everybody.

3          PROSPECTIVE JUROR:  My wife and I have been I

4   guess the word is burgled -- is that the right word?

12:08:53PM 5          MR. BROWN:  Burglarized.

6          PROSPECTIVE JUROR:  Yeah.  Yeah, I remember I

7   called up and said robbed.  They said you weren't robbed but

8   you were burgled actually twice but that was, you know, not far

9   apart from when we lived down in Houston.  We were not home or

12:09:12PM 10   anything like that, it was a smash and grab type of thing.  My

11   son -- you also mentioned families.

12          MR. BROWN:  Sure.

13          PROSPECTIVE JUROR:  My son and his wife lived in

14   Dallas and within the past six months were burgled.

12:09:24PM 15          MR. BROWN:  Okay.  Because of that experience you

16   and your wife and also your son -- I give you the example of my

17   car getting broken into and that type of case -- because of

18   your past experiences of being burglarized, would that cause

19   you some type of apprehension of sitting on a case like this?

12:09:43PM 20   Would we start I guess behind the eight ball so-to-speak

21   because of the fact of your past experiences?

22          PROSPECTIVE JUROR:  Yeah.  I mean no more than

23   against people doing that where they happen to not be.  Simple

24   answer.

12:09:59PM 25          MR. BROWN:  And another question on the full range

1  of punishment and the effect that somebody is found guilty in a

2  case like this, could you consider the full range of punishment

3  being the low end of 5 years for this type of crime and the

4  high end of 99 years or life?

12:10:12PM 5      PROSPECTIVE JUROR:  I would like to think I would,

6  yes.

7      MR. BROWN:  Okay.  Thank you, sir.

8      MR. MONROE:  Just one question.  On your juror

9  card, you list a Junction address.

12:10:21PM 10      PROSPECTIVE JUROR:  Yes.

11      MR. MONROE:  I want to make sure you live in Kerr

12  County.

13      PROSPECTIVE JUROR:  I do.  I do.  I live so far

14  west in Kerr County that our mail comes from Junction, but I do

12:10:31PM 15  things in the county.

16      MR. MONROE:  All right.  Fair enough.  Thank you,

17  sir.

18      THE COURT:  Thank you.

19      MR. BROWN:  Number 15, Judge.

12:10:48PM 20      THE COURT:  Juror Number 15, Serena Burrough,

21  would you come forward?

22           PROSPECTIVE JUROR NUMBER 15

23      THE COURT:  Good afternoon now.

24      PROSPECTIVE JUROR:  Hello.

12:11:06PM 25      THE COURT:  Did you have questions, Mr. Brown?

1    MR. BROWN:  Yes, sir.  Yes, ma'am, I asked you

2 questions about people who had been affected or have this type

3 of crime happen to them or a family member and I believe you

4 raised your card; is that right?

12:11:19PM 5    PROSPECTIVE JUROR:  Yes, I'm not real sure the

6 difference between a burglary and threat, but twice in the last

7 six or seven years, my house has been busted into while I

8 wasn't there and took jewelry and other stuff.

9    MR. BROWN:  Okay.  Because of that experience,

12:11:33PM 10 like I explained to y'all the process of where I was talking

11 about my car was broken into and if I came to a jury the next

12 day and it was concerning somebody breaking into a car, I

13 probably wouldn't be the best juror in that type of case.

14 Because of your past experiences of having your house broken

12:11:50PM 15 into, would that affect your ability to sit on this case and

16 set it aside?

17    PROSPECTIVE JUROR:  I don't think so.

18    MR. BROWN:  You don't think so.  It wouldn't

19 affect you, is that what you're saying?  It wouldn't affect

12:12:02PM 20 your ability to sit on this?

21    PROSPECTIVE JUROR:  I don't think it would.

22    MR. BROWN:  I hate to pin you down, but I don't

23 think it would affect, would that be a yes or no?

24    PROSPECTIVE JUROR:  Okay.  No.

12:12:12PM 25    MR. BROWN:  Okay.  Thank you.  And then I have

another question asking you about the range of punishment being

able to consider a set of facts where you could consider the

lower range of 5 years and then also a set of facts that you

could consider the maximum on this type of case of 99 years or

12:12:29PM  life.  Is that something that you could do on this particular

case.

PROSPECTIVE JUROR:  Yes.  It's going to depend on

what the case is.  Some of the things that he said might make

me think it would be brutality.  That would certainly make me

12:12:43PM  think differently of than taking things.

MR. BROWN:  Sure.  Okay.  So it would depend on

the facts as to what you could consider?  There could be a set

of facts you could consider 5 years?

PROSPECTIVE JUROR:  Uh-huh.

12:12:55PM  MR. BROWN:  There could also be a set of facts

that you could consider 99 years?

PROSPECTIVE JUROR:  Yes.

MR. MONROE:  No questions.

MR. BROWN:  No other questions.

12:13:02PM  PROSPECTIVE JUROR:  I want to say that I realized

after the fact that when you asked if anybody had been a

veteran or their spouse was a veteran, I didn't say that my

spouse had been.  It was long before I knew him and he served

stateside.

12:13:17PM  THE COURT:  We'll make a note of that.  Thank you

1    for telling us.

2              MR. BROWN:  Judge, I'm sorry, I missed one.

3    Number 6.  I apologize.

4              THE COURT:  Juror Number 6, Ms. Wade-Olsen, why

12:13:28PM 5    don't you come up?

6                    PROSPECTIVE JUROR NUMBER 6

7              THE COURT:  Hello.

8              Mr. Brown, did you have some questions?

9              MR. BROWN:  Yes, ma'am.  I asked some questions

12:13:42PM 10   about the range of punishment and I don't know if I misspoke,

11   or if you remembered out in the hall, but my question to you is

12   the range of punishment is 5 years to 99 years or life in this

13   type of a case.  Knowing that, could you consider the full

14   range?  Is there a set of facts that you could consider 5 years

12:14:00PM 15   and a set of facts that you could consider the max, life?

16             PROSPECTIVE JUROR:  Yes.  I could consider from

17   the beginning to the end.

18             MR. BROWN:  Excuse me?

19             PROSPECTIVE JUROR:  I could consider -- it just

12:14:07PM 20   depends on what the situation is.

21             MR. BROWN:  The facts of the case?

22             PROSPECTIVE JUROR:  Uh-huh.

23             MR. BROWN.  Okay.  And you could look at the facts

24   and make a decision on what you think is appropriate for the

12:14:14PM 25   sentence?

1          PROSPECTIVE JUROR:  Yes, sir.

2          MR. BROWN:  Be the low end or the high end?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  No questions, Mr. Monroe?

12:14:22PM 5          MR. BROWN:  No questions.

6          THE COURT:  Thank you, ma'am.  You can go back to

7  your seat.

8          MR. BROWN:  18, Judge.

9          THE COURT:  18, we've already excused.

12:14:36PM 10          MR. BROWN:  We've already excused.  I'm sorry.

11  Okay.  21, Judge.

12          THE COURT:  Daniel Gold, Juror 21.

13             PROSPECTIVE JUROR NUMBER 21

14          THE COURT:  Mr. Brown is going to ask you some

12:15:06PM 15  questions.

16          MR. BROWN:  Yes, sir.  I need to ask a couple more

17  questions about whether somebody or a family member had been

18  affected by a burglary to their house and you had raised your

19  card and I didn't want to ask you in front of everybody, so I'm

12:15:19PM 20  bringing you up here to explain what happened and what your own

21  experience was with that.

22          PROSPECTIVE JUROR:  My own house has been broken

23  into which I considered it minor because it was kids doing it.

24  They went underneath the garage door and they went and broke my

12:15:33PM 25  back patio, so I thought that was minor.  We pretty much

1   settled it between ourselves and the parents paid for the

2   backdoor glass.  That's about the extent of it.

3                MR. BROWN:  Okay.

4                PROSPECTIVE JUROR:  Now, my mother in law and my

12:15:52PM 5   father-in-law's house was broke into down in Houston one time

6   and they were out of town, so I went in and guarded the house

7   while they were out of town.

8                MR. BROWN:  Okay.

9                PROSPECTIVE JUROR:  I've had that happen to me

12:16:06PM 10  also.

11               MR. BROWN:  Okay.  And I appreciate that.  Because

12  of these past experiences and knowing the nature of this case

13  is a burglary of a habitation or a house, would that affect

14  your ability to sit on this jury?

12:16:18PM 15               PROSPECTIVE JUROR:  No, sir.

16               MR. BROWN:  Okay.

17               PROSPECTIVE JUROR:  I would be fair listening to

18  what was said and considering that only.

19               MR. BROWN:  Okay.

12:16:27PM 20               PROSPECTIVE JUROR:  As I was told in the rules.

21               MR. BROWN:  Yes, sir.  And another rule that the

22  Judge had mentioned was the range of punishment in this

23  particular case.  Knowing that this is a burglary of a

24  habitation with intent to commit aggravated assault, could you

12:16:44PM 25  consider the low end of the spectrum, the 5 years just as well

1    as the high end?

2              PROSPECTIVE JUROR:  Yes, I could.  My thing is, I

3    want correction of the individual more than punishment.  I

4    would want to have him in there long enough to correct his

12:17:05PM 5   problem, not -- I'm not that -- maybe punishment is necessary,

6    but my end is more into correcting the situation.

7              MR. BROWN:  Okay.  I don't have any further

8    questions.

9              THE COURT:  Any questions?

12:17:20PM 10             MR. MONROE:  No questions.

11             THE COURT:  Thank you.  You can go back to your

12   seat, Mr. Gold.  Good to see you.

13             PROSPECTIVE JUROR:  Good to see you, sir.

14             MR. MONROE:  Did you strike Number 24?

12:17:54PM 15             THE COURT:  24 was not one that I was -- if I get

16   a challenge for cause, probably.

17             MR. MONROE:  I didn't know that you had asked for

18   them yet.

19             THE COURT:  I haven't asked for them.  I was going

12:18:07PM 20   to wait.

21             Okay.  Do you have any others?

22             MR. BROWN:  I've got three more, Judge.  The last

23   are basically 32, 33, 34.

24             THE COURT:  Do you think we'll get to those?

12:18:28PM 25             MR. BROWN:  I don't know.  That's why I was going

1    to ask you where we're at.  If you want to wait and see --

2                    THE COURT:  Let's go ahead.

3                        CHALLENGES FOR CAUSE

4                    THE COURT:  Right now, I think I've got 29 and 31

12:18:37PM 5    that y'all said you agreed to.

6                    MR. BROWN:  We're going to agree to those two.

7                    THE COURT:  And it looks to me like I need to hear

8    what y'all want to do on 3, 26, and 24.  Does anybody -- let's

9    take 3 first.  Does anybody want to issue a challenge for cause

12:18:56PM 10   on Number 3?

11                   MR. MONROE:  I think we're inviting jury

12   misconduct with Number 3.  I'm concerned about his inability to

13   commit, that he would not inject personal knowledge into the

14   equation and so the State feels like that's an impossible

12:19:17PM 15   situation for him to be in, and I challenge him for cause for

16   that reason.

17                   THE COURT:  And your response?

18                   MR. BROWN:  Yes, I think that he said, yes, he did

19   have past experiences.  He talked quite a bit about PTSD and

12:19:29PM 20   just because he has past experiences and knowledge of it

21   doesn't necessarily disqualify him as a juror.  He never came

22   out and said, I'm not going to do that, I am going to do this,

23   or I am going to do that.  He said I would try and I would tell

24   you that I'm going to do that, but I can't tell you for sure.

12:19:46PM 25   He hasn't heard any of the facts.  He doesn't know the

1  evidence, so he can't sit here and tell us what he is or is not

2  going to do.

3          THE COURT:  I'll sustain the challenge for cause

4  for Number 3.

12:19:57PM 5          MR. MONROE:  Number 24?

6          THE COURT:  24.

7          MR. MONROE:  She said unequivocally she could not

8  consider the entire range of punishment.  I think there may

9  be -- we didn't ask her if she's a U.S. citizen.  She was born

12:20:07PM 10 in Mexico.  I assume she is a citizen, she may not be, but we

11  would challenge her for cause on the range of punishment issue.

12          THE COURT:  Any response?

13          MR. BROWN:  We want to keep her on the jury panel.

14          THE COURT:  I'll sustain the challenge for 24.

12:20:17PM 15 Another one that I have circled is 26.

16          MR. MONROE:  I didn't make any notes, Judge.

17          MR. BROWN:  Judge, that was the range of

18  punishment and moral reasons and I believe they came up and

19  said they could, in fact, consider the full range and they

12:20:37PM 20 didn't have any moral issues.  I asked him about it and he said

21  he didn't remember raising his card to that issue.

22          THE COURT:  That's not even being raised.  Anybody

23  else that you want to issue a challenge for cause?

24          MR. BROWN:  So 26 is not being struck?

12:21:00PM 25          THE COURT:  I'm not striking him.

1          MR. BROWN:  Okay.  No, Judge, I don't think we

2     need to address the last three.

3          THE COURT:  So let's make sure that all of our

4     sheets are the same.  So right now, you're going to have a line

12:21:29PM 5     through 3, 18, 24, 29 and 31.

6          MR. BROWN:  Judge, I'm sorry, we never got the

7     updated list.  We still have the old list.

8          THE COURT:  Do you have another one of these?

9          MR. BROWN:  Okay.  Here we go.  I got it right

12:21:46PM 10     here.

11          THE COURT:  Okay.

12          MR. BROWN:  So 3, 18?

13          THE COURT:  24 and 29 and 31.  So we've got 1, 2,

14     3, 4, 5 and they all happen to be the first 32.  How about if I

12:22:08PM 15     keep 40 people here just in case somebody has an epiphany

16     during the lunch hour.  And I'll call up those people that

17     we're excusing to let them go.  Can y'all do your strikes and

18     start at -- is 1:30 long enough, an hour and ten minutes or do

19     you want to go maybe an hour and -- 1:45?

12:22:34PM 20          MR. BROWN:  Judge, I'm a diabetic and I'm going to

21     have to eat at some point in time.

22          THE COURT:  So I'll have all 40, less the ones

23     that we strike, come back at 1:45 and y'all get your list.

24     Come back a few minutes early for the clerk and she can get it

12:22:48PM 25     prepared, all right.  Thank you.

1          (Bench conference ended).

2          THE COURT:  All right.  I'm so sorry that we have

3    kept you through the lunch hour, but let me make the following

4    announcements.

12:23:01PM 5          Are y'all going to go out front to meet these

6    folks to let them go home, or do you want them to come up

7    here?

8          CLERK:  How many are you going to let go?

9          THE COURT:  We're going to keep 40.  We've got the

12:23:16PM 10   last five plus a few people, so it's about nine.

11         CLERK:  We can do it up here.

12         THE COURT:  All right.  So everybody who has a

13   Number from 1 to 40, you're going to need to come back after

14   lunch to see if you've made the 12 except the following people

12:23:35PM 15  that when I call your name and number, I want the people that

16   are going to be excused, like the last 5:  41, 42, 43, 44, 45,

17   plus these people will come up to the clerks and get your

18   payment and be excused and checked off.

19         So the following people will be excused:  Lee

12:23:56PM 20  Burns, Juror Number 3; Patricia Hannum I think we've already

21   let go, she had the back problem, Patricia Hannum; Juror 24,

22   Araceli Falcon; Juror 29, Tammie Colvin; and Juror Number 31,

23   Thomas Severson.  So you folks if you'll come up, plus Daniel

24   Conley -- I'm sorry.  Excuse me, Daniel Conley has to stay

12:24:20PM 25  here.  Sandra Meadow, Deborah Bessey, Jerry Benson, Janine

         1   Bellmann and David Cathey, y'all come on up and the clerk will

         2   check you out and take care of you with a check.  I think it's

         3   $6, is that right?  $10, all right.

         4              And the rest of you have a good lunch.  I'd like

12:24:38PM 5   for you to be back at 1:45.  The attorneys will be making their

         6   strikes during the lunch hour and we'll tell you who is going

         7   to be on the jury when you come back at 1:45.  You may be

         8   excused.

         9              (Lunch recess).

01:48:48PM 10              THE COURT:  All right.  We're going to call the

        11   names of the 12 that are chosen.  As I call your name, please

        12   take a seat in the jury box.

        13                   SELECTION OF THE JURY

        14              THE COURT:  Kimberly Chambers.

01:48:58PM 15              John Seymour.

        16              Nancy Smith.

        17              Clara Conner.

        18              Thomas Richards.  Be sure and watch that cord as

        19   you come across there.

01:49:18PM 20              Amanda Tenery.

        21              Carol Emmons.

        22              Laura Stovall.

        23              Delia Garza.

        24              Charles Collie.

01:49:43PM 25              Daniel Gold.

1           And Peggy Clanton.

2               Well, for you folks that were not chosen, you may

3       be frustrated to spend all day and then not be chosen for the

4       jury, but we can't do this without you, so I really appreciate

01:50:19PM 5    your help.  And I hope that whenever you're summoned in the

6       future that you'll always respond.  The quality of justice in

7       the whole system depends on the quality of the people that are

8       willing to serve, and of course you meet that criteria.

9               The BAILIFF:  Your Honor?

01:50:32PM 10       THE COURT:  Are we missing one of the jurors?

11              Let me see.  Everybody needs to kind of sit still

12      until we know who we're missing.

13              Did she have that list or did she take it?

14              Okay.  Let's wait for just a second and make sure

01:51:00PM 15   that he didn't have some unfortunate incident.

16              Let me call roll and see who we're missing.

17              Kimberly Chambers?

18              JUROR:  Yes, sir.

19              THE COURT:  John Seymour?

01:51:23PM 20       JUROR:  Yes, sir.

21              THE COURT:  Nancy Smith?

22              JUROR:  Here.

23              THE COURT:  Clara Conner?

24              JUROR:  Here.

01:51:29PM 25       THE COURT:  Thomas Richards?  Thomas Richards?

1              Okay.  Mr. Richards is Number 12.

2              CLERK:  Do you want me to try calling him?

3              THE COURT:  Hang on a second.

4              MR. BROWN:  Judge, I believe he's Number 7.

01:52:26PM 5   THE COURT:  7?

6              MR. BROWN:  Yes, sir.

7              THE COURT:  Okay.  Sheriff, do you want to call

8   him?

9              (Discussion off the record).

01:54:20PM 10  THE COURT:  I tried the business and got an

11  answering machine.  It went straight to his number.  Nature

12  Blinds, are you familiar with that?

13             THE BAILIFF:  Who?

14             THE COURT:  Nature Blinds?

01:54:31PM 15  THE BAILIFF:  Yeah.  They build hunting blinds up

16  toward Ingram.

17             THE COURT:  Nobody answered the business phone.

18             THE BAILIFF:  There was a home phone.  It didn't

19  even say who the name was to make sure I was calling the right

01:54:46PM 20  one, but I did leave a message who it was for.

21             THE COURT:  Here he is.

22             What was the last -- the last name on our list is

23  Peggy Clanton.  Peggy Clanton is Number 28.

24             JUROR:  Your Honor?

01:55:16PM 25  THE BAILIFF:  There he is.

TERI THOMAS, CSR, RPR, CMRS

1          THE COURT:  Never mind.  I was going to kind of

2    come up with some alternatives.

3          We saved one last seat and whoever the last

4    person to come in got that seat.

01:55:33PM 5          Got a seat for you right here.

6          All right.  Robin Berlew, our District Clerk, her

7    assistant, they're going to meet you out in front for you

8    folks who were not picked to give you your $10 for being here

9    today.  And thank you so much.  I appreciate you being willing

01:55:53PM 10   to serve.  You may be excused.

11                   OATH TO THE JURY

12          THE COURT:  For you 12 who are picked, I have

13   another oath to give you.  Would you raise your right hand?

14          Do each of you solemnly swear that in cases

01:56:14PM 15   between the parties which shall be submitted to you, you will a

16   true verdict render according to the laws that may be given to

17   you in the Charge of the Court and the evidence submitted to

18   you under the rulings of the Court so help you God?  You can

19   answer in the affirmative and say, I will.

01:56:30PM 20          JURORS:  I will.

21          THE COURT:  Thank you.

22                 INSTRUCTIONS TO THE JURY

23          THE COURT:  I'm required to give you certain

24   instructions, and I think it makes it a little easier if you

01:56:37PM 25   can read along with me.  Would you read along as I give you

1    instructions.  Those were placed in your seat.

2              Ladies and Gentlemen, do not mingle with nor talk

3    to the lawyers, the witnesses, the parties or any other person

4    who might be connected with or interested in this case, except

01:56:48PM 5    for casual greetings.  They have to follow these same

6    instructions and you will understand it when they do.

7              Do not accept from, nor give to, any of those

8    persons any favors however slight, such as rides, food or

9    refreshments.

01:56:57PM 10              Do not discuss anything about this case, or even

11   mention it to anyone whomsoever, including your wife or husband

12   nor permit anyone to mention it in your hearing until you are

13   discharged as jurors or excused from the case.  If anyone

14   attempts to discuss the case, report it to me at once.

01:57:12PM 15              Do not even discuss this case among yourselves

16   until after you've heard all the evidence, the Court's charge,

17   the attorneys' arguments until I have sent you to the jury room

18   to consider your verdict.

19              Do not make any investigation about the facts of

01:57:24PM 20   this case.  Occasionally we have a juror who privately seeks

21   out information about a case on trial.  This is improper.  All

22   evidence must be presented in open court so that each side may

23   question the witnesses and make proper objection.  This avoids

24   a trial based upon secret evidence.  These rules apply to

01:57:42PM 25   jurors the same as they apply to the parties and to me.  If you

know of or learn anything about this case except from the

evidence admitted during the course of this trial, you should

tell me about it at once.  You have just taken an oath that you

will render a verdict on the evidence submitted to you under my

01:57:54PM  5   rulings.

Do not make personal inspections, observations,

investigations or experiments, nor personally view premises,

things or articles not produced in court.  Do not let anyone

else do these things for you.

01:58:06PM 10   Do not tell other jurors your own personal

experiences nor those of other persons, nor relate any special

information.  A juror may have special knowledge of matters

such as business, technical or professional matters or he may

have expert knowledge or opinions, or he may not know what

01:58:21PM 15   happened in this or some other lawsuit.  To tell the jurors any

of this information is a violation of these instructions.

Do not seek information contained in law books,

dictionaries, public or private records or elsewhere, which is

not admitted in evidence.

01:58:35PM 20   At the conclusion of all the evidence, I may

submit to you a written charge.  Since you will need to

consider all the evidence admitted by me, it is important that

you pay close attention to the evidence as it is presented.

The Texas law permits proof of any violation of

01:58:47PM 25   the rules of proper jury conduct.  By this, I mean that jurors

1    and others may be called upon to testify in open court about

2    acts of jury misconduct.  I instruct you, therefore, to follow

3    carefully all instructions which I have given you, as well as

4    others which you later receive while this case is on trial.

01:59:02PM  5         You may keep these instructions and review them as

6    the case proceeds.  A violation of these instructions should be

7    reported to me.

8         And I have to add to that in this day in time, we

9    all have to take our cell phones and turn them off.  And during

01:59:15PM 10   the breaks, absolutely collect your cell phone and check and

11   see if you have messages and stuff.  But while the case is

12   going on, we have to turn those off.  And we don't want you to

13   try to look something up, to take your cell phone and try to do

14   any kind of independent investigation.  That would be improper.

01:59:35PM 15   So we want to -- if you're checking the phone, don't use it to

16   Google something in this case.  That -- we might get a reversal

17   if we had to do that.

18        So with those instructions, at this time I'm

19   going to call for trial, Cause Number B13-637, styled the

01:59:51PM 20   State of Texas versus Vernon Lee Travis, III.

21        Is the State ready to proceed?

22        MR. MONROE:  Your Honor, the State is ready to

23   proceed.

24        THE COURT:  Is the defendant ready to proceed?

02:00:02PM 25   MR. BROWN:  Ready to proceed, Your Honor.

1          THE COURT:  Mr. Travis, would you please stand and

2   would the State please read the indictment under which the

3   defendant has been charged.

4          MR. MONROE:  Yes, Your Honor.

02:00:10PM  5          In the name and by authority of the State of

6   Texas, the Grand Jurors for the County of Kerr, State of Texas,

7   duly selected, impaneled, sworn, charged and organized as such

8   at the July term, A.D., 2013 of the 198th Judicial District

9   Court of said county, upon their oaths present in and to the

02:00:31PM 10   Court that Vernon Lee Travis, III, on or about September 5,

11   2013, and before the presentment of this indictment, in said

12   county and state, did then and there intentionally or knowingly

13   enter a habitation, without the effective consent of Wylie

14   Mitchell Wilkinson, the owner thereof, and attempted to commit

02:00:53PM 15   or committed the felony offense of aggravated assault with a

16   deadly weapon.  Against the peace and dignity of the State.

17   Signed, foreman of the Grand Jury.

18          THE COURT:  Mr. Vernon Lee Travis, how do you

19   plead to those charges?

02:01:10PM 20          THE DEFENDANT:  Guilty.

21          THE COURT:  Would you approach the bench just

22   briefly, Mr. Brown and Mr. Travis?

23          (Bench conference).

24          THE COURT:  Mr. Travis, because this is a guilty

02:01:24PM 25   plea, I would like to put this on the record.

1          I've been presented with a Defendant's Plea of

2    Guilty, Waivers and Admonishments that were signed by you and I

3    think your attorney was with you when you went over this prior

4    to the case today.  Did you go over these waivers and these

02:01:39PM 5   admonishments carefully?

6                    THE DEFENDANT:  Yes, sir.

7                    THE COURT:  Do you feel like you understand your

8    rights?

9                    THE DEFENDANT:  Yes, sir.

02:01:44PM 10                   THE COURT:  And, Mr. Brown, did you help your

11   client go through the waivers and the stipulations and the

12   admonishments in the written plea document?

13                   MR. BROWN:  I did, Your Honor.

14                   THE COURT:  And do you feel like he understands

02:01:52PM 15  his rights?

16                   MR. BROWN:  I believe he does.

17                   THE COURT:  And, Mr. Travis, are you pleading

18   guilty freely and voluntarily because you are guilty?

19                   THE DEFENDANT:  Yes, sir.

02:01:59PM 20                  THE COURT:  All right.  This Court will accept the

21   plea of guilty that's been made in the presence of the jury.

22                   THE DEFENDANT:  Thank you.

23                   MR. BROWN:  Thank you, Your Honor.

24                   THE COURT:  Go back to your seat.

02:02:07PM 25                  (Bench conference ended).

1                    THE COURT:  Mr. Monroe, would the State like to

2     present an opening statement?

3                    MR. MONROE:  Yes, Your Honor.

4                    THE COURT:  You may proceed.

02:02:15PM  5                         OPENING STATEMENT

6                    MR. MONROE:  May it please the Court and opposing

7     counsel, the State sometimes doesn't know officially how these

8     trials are going to rest.  We don't have to be told everything

9     right up front, so I thought there might be a plea of guilty.

02:02:32PM 10    So I'll tell you how we go when there has been a plea of

11    guilty.  Most of the time there is not one and we have to prove

12    everything.

13                    The State still has to put on what's called a

14    prima facie case of what happened in the case.  At the

02:02:47PM 15    conclusion of that, I anticipate the Court will give you a

16    charge and will instruct you to go to the jury room, select a

17    foreman and find the defendant guilty, but prior to that time,

18    I still have to put on I guess what I call a mini case so I'm

19    going to do that.

02:03:04PM 20                    I'm going to -- I'm planning on doing that with

21    not necessarily having -- calling every single law enforcement

22    officer that did every single little aspect of the

23    investigation.  There could be 15 or 20 officers involved.

24    This person found a gun, that person found a ski mask, or

02:03:24PM 25    whatever.  I'm going to try to do it through one that's going

1    to give you an overview of what happened and what we've

2    accused this defendant of doing.

3                Bear in mind that the second phase of this case

4    is the punishment phase, so everything you learn during this

02:03:42PM 5    phase you can carry that with you.  And I anticipate at the

6    punishment phase, you will, in fact, get additional evidence

7    that's designed to assist you, influence you for lack of a

8    better term, as to what you think is the appropriate

9    punishment.

02:03:59PM 10                But as to the guilt and innocence phase of the

11    trial, I think the evidence is going to show you that on or

12    about September 5, 2013, there was a criminal act committed

13    out on Madrona Drive here in Kerr County.  It involved two

14    defendants, one of which is this gentleman sitting right here

02:04:21PM 15    and the other which is sitting in the Kerr County Jail.

16                They -- one of them wearing body armor, both of

17    them carrying firearms, kicked in the door of a residence when

18    people were inside, entering the residence, brandishing the

19    firearms, actually pointed the firearms at a mother and her

02:04:43PM 20    four-year-old, or three-year-old I think at that time child,

21    discharged the firearms and fled the scene.

22                I think the evidence will show that they -- and

23    because it goes without saying, they did not have consent of

24    the owner of the residence to do that, to enter.  If evidence

02:05:06PM 25    is presented to you that shows those facts, then the evidence

1    of the burglary will have been met.

2           So that's what this portion is going to be.  I'm

3    going to try to give you a streamline version of what we

4    consider to have been a calculated incident, that was

02:05:25PM 5    premeditated, that the defendants knew exactly what they were

6    doing.  It was not some compulsive act caused by unknown

7    forces over which there is no control and it was a crime of

8    violence and it's fortunate we're not sitting here with having

9    someone being hurt or killed.  And the State will meet its

02:05:52PM 10    burden of proof in that respect and I look forward to

11    submitting that evidence to you.

12           THE COURT:  Mr. Brown, would you like to make an

13    opening statement?

14           MR. BROWN:  Just briefly, Your Honor.  Thank you.

02:06:01PM 15                    OPENING STATEMENT

16           MR. BROWN:  Good afternoon, Ladies and Gentlemen.

17    As we talked about in voir dire, we talked about accepting

18    responsibility.  Since day one, Vernon knew that he was going

19    to come before this jury or court and plead guilty.  He's not

02:06:14PM 20    trying to hide the fact of what he did.  There are

21    circumstances surrounding this case.  There are issues.  We're

22    not contesting the elements of the crime but some of the facts

23    of how this crime was committed and who was involved will be

24    probably contested.  As you heard the statement, there are two

02:06:31PM 25    people involved.  There was another individual by the name of

Timothy Scott Pugh who actually drove the car, who actually

kicked the door in, who actually went into the house first.

I believe the evidence is going to show that

concerning the child, you're going to hear the evidence that we

02:06:47PM 5  believe that Mr. Travis was not near the child at any point in

time.  He was not the one who fired his weapon first.  It was

actually another individual that was in the house that actually

fired the weapon at him, that he fired back into the ground as

he was leaving the house.  You're going to hear evidence of

02:07:05PM 10  that.  But we're not contesting the actual elements of the

case.

There will be issues throughout the trial as to

who did what and how they did it.  Maybe they won't contest it.

Maybe they'll agree with our position and so forth, and I

02:07:22PM 15  believe the witnesses, the co-defendant is Timothy Scott Pugh.

I hope you get to hear from him.  He is in custody right here.

He's under subpoena.  We anticipate he is going to testify.

The individual in the house, Wylie Wilkinson, the

individual person that owned the house, I believe you're going

02:07:41PM 20  to hear from him.  I believe he's under subpoena.  You're going

to hear him testify as well.  You're going to hear exactly all

the circumstances why the gentlemen went to the house, what

they were doing there and how Mr. Wilkinson was involved and

the whole story.

02:07:56PM 25  As I told you all from the beginning, it is not

1  Vernon's position to contest this.  We talked about the PTSD

2  during voir dire.  That's something that was talked about quite

3  a bit.  You're going to hear, I believe, testimony in evidence

4  in regard to that concerning the verdict.  And his name is

02:08:14PM 5  Vernon Travis, III.  So from time to time, I may call him Trey

6  because that's what I've got to know him as Trey, III, over the

7  last six or eight months.  So Vernon Travis and Trey, they're

8  all the same person.

9          He's pled guilty.  The Judge is going to give you

02:08:34PM 10  a charge to find him guilty.  I suspect you will find him

11  guilty because he has pled guilty.  He's accepted

12  responsibility for this charge.  However, during the punishment

13  aspect of the case, that's why I wanted to make sure that

14  everybody could consider the full range, consider factors why

02:08:48PM 15  somebody might be eligible for the lower end of the sentence

16  range versus the higher end, factors concerning the case,

17  factors surrounding Vernon Travis.  So at the end of the day, I

18  know y'all are going to find him guilty.  He's pled guilty.

19          I'll probably give another opening just before we

02:09:08PM 20  do punishment, but I want to get an opportunity to come over

21  here and speak to y'all that it was his intention day one to

22  come up here and plead guilty.

23          Thank you.

24          THE COURT:  The State may call its first witness.

02:09:22PM 25          MR. MONROE:  Your Honor, at this time, the State

1    would invoke the rule.

2                 THE COURT:  Do you have any witnesses in here

3    regarding guilt/innocence, Mr. Monroe?

4                 MR. MONROE:  The State has one and it will be the

02:09:35PM 5    first witness to call, Officer Carol Twiss.

6                 THE COURT:  Do you have any witnesses regarding

7    guilt/innocence?

8                 MR. BROWN:  Not regarding guilt/innocence, Your

9    Honor.

02:09:44PM 10                THE COURT:  If we get to another stage of this,

11   then we'll address that again.

12                MR. BROWN:  Thank you, Judge.

13                THE COURT:  All right.  So Ms. Twiss, is that your

14   first witness?

02:10:06PM 15               Ma'am, will you raise your right hand.

16                     OFFICER CAROL TWISS,

17   having been first duly sworn, testified as follows:

18                THE COURT:  Thank you and have a seat.  Tell us

19   your full name.

02:10:11PM 20               THE WITNESS:  Carol Twiss.

21                THE COURT:  All right.  Is the microphone on?

22   There you go.

23                Mr. Monroe.

24                     DIRECT EXAMINATION

02:10:22PM 25   BY MR. MONROE:

1     Q.   Officer Twiss, what is -- what is your official title?

2     A.   Captain.

3     Q.   All right.  May I call you Captain Twiss?

4     A.   Yes, sir.

02:10:37PM 5     Q.   All right.  Tell the jury your business profession or

6     occupation.

7     A.   I'm a deputy sheriff with the Kerr County Sheriff's

8     Office.

9     Q.   And you just told us that you are a captain and tell us

02:10:47PM 10    how you got to be a captain.

11    A.   Twenty-two years of work.  I began my career in law

12    enforcement 22 years ago, was a jail administrator, patrol

13    deputy, investigator, and last ten years I've spent in charge

14    in the criminal investigation division.  I have approximately

02:11:09PM 15    3000 hours of training, law enforcement training.  I hold a

16    master's of peace officer certification and currently supervise

17    all the investigators in CID.

18    Q.   All right.  Tell us a little bit about your general

19    duties on a day-to-day basis.  You say you're in charge of

02:11:35PM 20    criminal investigations.  What does that entail?

21    A.   Reviewing reports, going to crime -- traveling to crime

22    scenes.  We work cases anything from minor of thefts all the

23    way to murder.

24    Q.   Okay.  And how many people are under your direct

02:11:51PM 25    supervision?

1    A.   There are five investigators and one evidence

2  technician.

3    Q.   Okay.  And on -- on any given occurrence in which you

4  believe that a crime may have occurred, how would your office

02:12:05PM 5  be involved and then how would the chain of command work as far

6  as who does what on any particular investigation?

7    A.   Well, it largely depends on each one, but normally the

8  patrol division takes the call and then if it's a large crime

9  scene or one involving a felony, they'll call me and request

02:12:24PM 10  assistance.  If it's minor and I think one investigator can

11  handle it, they'll send one, whoever is on call.  If it's large

12  and requires a lot of people, we'll send out everybody.

13    Q.   Okay.  How often do you personally respond to these?

14    A.   Very often.

02:12:43PM 15    Q.   All right.  And let us narrow it down then to

16  situations where you've personally responded to.  And once you

17  get out to what you believe may well be a crime scene, how do

18  you then delegate duties, delegate responsibilities?  How do

19  you do that?

02:13:00PM 20    A.   Well, if it's a small scene, we may have someone that

21  we assign to take photographs or collect evidence.  Multiple

22  scenes, you might have to have one person in charge of each

23  area and then you prioritize according to what needs to be done

24  first.

02:13:15PM 25    Q.   I see.  All right.  And who would make that

determination?

A.   If I'm on scene, probably me.  If the sheriff is there, he'll usually outrule me.

Q.   Hopefully y'all aren't in conflict on those?

A.   Not normally, no.

Q.   All right.  Once work is done at the scene -- and what kind of things do y'all do at the scene?

A.   We make photographs, collect evidence, interview victims, witnesses, suspects.  Generally, we don't normally interview suspects at the scene unless, you know, they've got something we need from them, but usually we take them back to the office for that.

Q.   All right.  And then once the evidence is gathered from the scene, what -- what is the next thing that occurs?

A.   The next process is to return to the office, secure it in the locker, introduce it into the system.

Q.   All right.  Do you then have occasions with your personnel to review what each individual has learned with their responsibilities on a particular incident?

A.   Normally they'll write a report.  We'll have a discussion.  In our division, we have discussions, you know, a couple of times a week about crime scenes or cases, caseloads, things like that.

Q.   Once a case then -- you've done all the investigation you feel like can be done or needs to be done at that point in

1    time, then what is the next step?

2        A.   If we have some major questions, we might consult with

3    our District Attorney's office and then cases are put together

4    and submitted for review by a Grand Jury.

02:14:54PM 5     Q.   All right.  And once it reaches that level in your

6    office, who then generally is in charge of the cases from that

7    point forward?

8        A.   Once its completed?

9        Q.   Yes.

02:15:10PM 10    A.   I'll review it and forward to whatever prosecutor gets

11   the case.

12       Q.   So it kind of begins with you then?

13       A.   Most of the time, yes.

14       Q.   Most of the time?

02:15:20PM 15    A.   There are other -- we have another patrol captain and

16   there are cases that don't come to me that end with patrol and

17   I don't review those but whatever comes across CID's desk.

18       Q.   And what kind of cases might that be?

19       A.   A DWI, or if they saw a burglary before it gets to us,

02:15:38PM 20   it might end there.  Criminal mischief, misdemeanor cases.

21       Q.   All right.  And you said you have been a captain for

22   ten years?

23       A.   I've been in charge of CID for ten years.  I'm not sure

24   of the title changes in-between there.

02:15:53PM 25    Q.   Okay.  So you've had different titles and now the title

 1   as captain?

 2        A.   Yes.

 3        Q.   All right.  Let me direct your attention back to

 4   September 5, 2013, and were you working on that day?

02:16:06PM  5        A.   I was.

 6        Q.   And do you recall anything significant about that day?

 7        A.   I overheard our deputies being dispatched to a house in

 8   south Kerr County for a burglary in progress, and when I heard

 9   the call out, we were -- we were pretty central, so I sent all

02:16:29PM 10   of our investigators in that general direction.

11        Q.   Okay.  Tell the jury a little bit about what you just

12   said.  You heard from dispatch and then you guys reacted based

13   on the dispatch?

14        A.   Well, we have a speaker in our office area so we can

02:16:44PM 15   hear what the patrol division is doing, because sometimes

16   they'll -- we've only got four deputies or five deputies on

17   duty.  They're patrolling 1100 square miles and if two or three

18   of them are tied up on something major on the north -- or the

19   west side of town and two of them or maybe one of them is on

02:17:03PM 20   the east side of town and he's alone, we might be able to

21   respond quickly and help them.  So we basically monitor in case

22   they might need our help.

23        Q.   Okay.  And on this particular day, you overheard --

24        A.   Overheard the radio traffic.

02:17:18PM 25        Q.   Would that be somebody calling in then to report what

1    they believe is an offense?

2        A.   Yes.

3        Q.   The dispatcher announces it and you hear it?

4        A.   Yes.

02:17:27PM 5   Q.   All right.  Tell me once you hear the dispatch, what

6    did you as head of your department do?

7        A.   I told all of our investigators to start heading in the

8    direction of Camino Real and looking specifically for a blue

9    vehicle that they saw leaving the scene.

02:17:43PM 10   Q.   They being who?

11       A.   The dispatch.

12       Q.   All right.  And who was supposedly leaving the scene?

13       A.   Two armed male subjects, one being white and one being

14   dark skin.  They didn't know if he was Black or Hispanic.

02:17:57PM 15   Q.   All right.  Now, first of all, let's start back and I

16   believe you said that the place you went was in the southern

17   part of Kerr County.  Do you recall the address?

18       A.   You know, initially when we got called, the address of

19   the residence I did not hear that, so we just started heading

02:18:19PM 20   in the general direction of Camino Real.  But the actual

21   address where the offense occurred was on Madrona, 347 Madrona.

22       Q.   Is that a Kerrville address?

23       A.   It is Kerr County, a Kerrville address.

24       Q.   Tell the jury -- probably most of the jurors know where

02:18:37PM 25   that is physically but from this courthouse, how would a person

1    drive to go out to where that is?

2        A.    If you travel south on Highway 16, Madrona is a

3    right-hand turn off of Highway 16.  It's probably two miles

4    out.

02:18:53PM 5        Q.    All right.  Is it part of a subdivision, a larger

6    subdivision if you know?

7        A.    I don't think it's a subdivision, but it has -- there

8    are some modular homes or manufactured homes in there.

9        Q.    Is it the Kerrville side of Upper and Lower Turtle

02:19:07PM 10   Creek Road?  It's before you get there?

11       A.    Yes.

12       Q.    So before the Mini Mart, it's out there?

13       A.    Before the Mini Mart.

14       Q.    All right.  All right.  So you went out personally?

02:19:18PM 15       A.    I did.

16       Q.    And can you tell us other members of the sheriff's

17   department who also went out?

18       A.    I know Casey Spence was the first responding deputy,

19   Chris Ö'Keeffe, Maria Dominguez, James Ledford, Jimmy Vasquez,

02:19:37PM 20   Sherry James, Chief Deputy Clay Barton.  I'm trying to think of

21   all of them.  Jeff McCoy, Clint Massingill, Mark Fields.  There

22   was a lot -- Bill Hill.  I think that was most of the sheriff's

23   department, if not all.

24       Q.    And it seems like a lot of people?

02:20:00PM 25       A.    Yes.

1      Q.   Tell the jury why you felt necessary to have that

2   number of people respond.

3      A.   Two reasons.  The first -- first of all, not all of

4   those people responded to begin with.  A quite a few of them

02:20:17PM 5   did because a Texas Department of Public Safety trooper was the

6   first person to arrive in that area and he observed the

7   defendant and co-defendant driving away from the residence

8   toward Highway 16 on Madrona.  He turned around and started to

9   chase after them and they stopped and bailed out of the car and

02:20:38PM 10   ran into the woods.  So our fear at that point was that we had

11   two armed subjects in the woods.  We have residences there.

12   This was about the time school buses are running through that

13   neighborhood, so we wanted to make sure that we saturated with

14   police and either got them into custody or made sure that we

02:20:57PM 15   had a safety net to know where they were at.

16      Q.   It may be an oversimplification, but why do you respond

17   so much more aggressively if there is a report of someone being

18   armed?

19      A.   We don't know what their mental status is.  We don't

02:21:16PM 20   know if they're dangerous, if they're going to shoot somebody.

21   They're obviously scared.  They're running from us so we need

22   to make sure we get them contained.

23      Q.   So is it safe to say that there is a heightened sense

24   of awareness if there has been reported there are firearms

02:21:34PM 25   involved?

1    A.   Yes, sir.

2    Q.   All right.  Before I start getting you to talk about

3  what actually you learned happened out there, tell the jury

4  basically an overview of what all the sheriff's department did

02:21:47PM  5  out there that day.

6    A.   Well, our first priority was obviously to get these

7  guys into custody.  As we were driving out there, Mr. Travis

8  came walking out of the woods and Casey Spence immediately took

9  him into custody.

02:22:04PM 10        We then had another subject in the woods so our

11  second focus then was to secure that vehicle to prevent

12  evidence tampering and then to get Mr. Pugh into custody.  So

13  we set up a perimeter and then finally I had to make sure that

14  the house was secure and had an officer there, so I sent one

02:22:24PM 15  of the investigators to the house to secure that and kept

16  everybody else at the scene where they jumped out of the car

17  so that we could hopefully get him into custody pretty quick.

18    Q.   Okay.  Once you have taken custody of the two people

19  you believe to be the actors involved --

02:22:40PM 20    A.   Yes.

21    Q.   -- what else was done out there at the scene in order

22  to try to get a handle on what had actually occurred?

23    A.   Well, we attempted to talk to both defendants.  Mr.

24  Travis refused to say anything more than we had a sex offender

02:22:56PM 25  running around out there.  And Mr. Pugh did disclose what -- he

1    admits to us and he indicates to us that they had thrown out

2    the two firearms they had in their possession, threw them out

3    the window of the vehicle, so the safety focus now was to

4    retrieve the firearms.

02:23:17PM 5    Q.   And what physically did you guys do to try to see if

6    there were any firearms?

7    A.   We formed a line of officers in the area where Mr. Pugh

8    said they threw the guns out and walked probably two miles, a

9    mile and a half looking for those firearms.

02:23:32PM 10    Q.   And were firearms ultimately located?

11    A.   Yes, two firearms were located.

12    Q.   What kind of firearms were they?

13    A.   One was a 9 millimeter Ruger and the other one was a

14    Glock .45.

02:23:41PM 15    Q.   Both of those are pistols?

16    A.   They are pistols.

17    Q.   Semiautomatic?

18    A.   Yes, sir.

19    Q.   Were they loaded?

02:23:47PM 20    A.   They were both loaded.

21    Q.   What was done -- and again, before we start talking

22    about what we actually learned, what generally was done at the

23    scene itself?

24    A.   I want to clarify, they weren't fully loaded.  They did

02:24:02PM 25    have ammo in them.

1    Q.    Not fully loaded but not necessarily a round in the

2  chamber?

3    A.    Not fully loaded like a -- where a Glock might take 12

4  or 13 rounds.  There was not 13 or 12 rounds in the clip in the

02:24:13PM 5  magazine.

6    Q.    But the guns had ammunition --

7    A.    But they did have ammunition.

8    Q.    All right.  What was done at the residence for this?

9  What all did you do out there?

02:24:24PM 10    A.    I sent the guys over there to photograph and to

11  determine exactly what happened in the house.

12    Q.    Okay.

13    A.    Collect evidence.  Obviously looked for shell casings,

14  stay and talk to the witnesses.

02:24:38PM 15    Q.    Okay.  Okay.  Talk to the witnesses.  Who all was

16  talked to?

17    A.    At the residence, the two people that were in the

18  residence that could provide us with a statement was Wylie

19  Wilkinson and his sister, Amber.

02:24:52PM 20    Q.    And was Wylie Wilkinson the owner of the residence?

21    A.    He indicated that he was.

22    Q.    And you said there were three.  Who was the third one?

23    A.    The three-year-old child.

24    Q.    And whose child is this?

02:25:05PM 25    A.    Wylie's sister Amber.

         1      Q.   All right.  So you spoke to Wylie and you spoke to

         2   Amber?

         3      A.   I did.

         4      Q.   And took statements from them?

02:25:17PM 5      A.   Yes.

         6      Q.   And you looked around to gather physical evidence.

         7   Tell us about what all was done in that respect.

         8      A.   Well, when we entered the living room, it was obvious

         9   that shots had been fired through the wall into a bedroom and

02:25:35PM 10  also into the door leading into that same bedroom.

        11      Q.   From the living room area?

        12      A.   From the living room.

        13      Q.   Into the bedroom?

        14      A.   Into the bedroom.

02:25:44PM 15     Q.   All right.

        16      A.   And we knew that because there was some damage to the

        17   bed where the bullet struck, there was damage to a fan where

        18   bullets struck.  So all those shots were fired into the

        19   bedroom, not coming out of the bedroom.  So we were looking for

02:25:58PM 20  shell casings.  We were looking for -- in the living room area,

        21   we were looking for bullet fragments and damage inside of the

        22   bedroom.

        23      Q.   All right.  What else was done in an overview, if

        24   anything, that you haven't told us about?

02:26:12PM 25     A.   Just photographing and also determining in what room

1    each person was in when this incident took place.

2        Q.   All right.  Let's start off with Mr. Wilkinson --

3        A.   Yes.

4        Q.   -- the owner of the residence.  Did you learn from your

02:26:28PM 5  investigation of whether or not the two alleged defendants had

6    permission to enter the residence?

7        A.   They did not.

8        Q.   All right.  What time of day did this supposedly

9    happen?  Was this at night, early in the morning, in the

02:26:43PM 10 afternoon, what was it?

11       A.   It was late in the afternoon, about 3:45.

12       Q.   Okay.  You mentioned that there was a possibility of

13   school children, school buses?

14       A.   The school buses passed us when we were out looking

02:26:55PM 15 for --

16       Q.   I take it then this was a weekday as well?

17       A.   It was.

18       Q.   All right.  Okay.  When you talked to Mr. Wilkinson,

19   we'll get into what he may have said or what information you

02:27:08PM 20 learned later.  Who else did you talk to?

21       A.   Amber.

22       Q.   Okay.  And did you ask Amber what all she had seen,

23   heard, and observed while she was there?

24       A.   Yes.

02:27:19PM 25 Q.   And you got the same information from Mr. Wilkinson?

         1        A.   Yes.

         2        Q.   And then did you attempt as best you could to

         3    corroborate the physical evidence that you saw on the scene

         4    with the information given to you by those two witnesses?

02:27:33PM 5       A.   Yes.

         6        Q.   All right.  Is there anything about the overall

         7    investigation that you did that I haven't asked you about

         8    before I get into what you learned?

         9        A.   I don't believe so.

02:27:45PM 10      Q.   Okay.  Then let's get into what you learned.

        11             I'll let you start off by telling us -- I'll

        12    probably break up a long narrative, but I'll try to speed this

        13    through.  Give the jury an overview of what you learned from

        14    the investigation as to what had taken place on September 5,

02:28:05PM 15  2013.

        16        A.   From the very beginning, we were -- we overheard a

        17    dispatch put out that there was two armed men inside of a

        18    residence that had forced their way in and that they both had

        19    firearms.  While the call is being put out, the dispatcher

02:28:23PM 20  reports that shots were being fired.  We traveled to that area.

        21    The first contact that I had with anybody was Casey Spence who

        22    is a patrol deputy and he had taken Mr. Travis into custody and

        23    informed me that he had a .45-caliber bullet in his pocket and

        24    he also had a pair of gloves in his pocket and a spent

02:28:50PM 25  9 millimeter shell casing.

1           I attempted to talk to Mr. Travis, asked him what

2   was going on, if he wanted to tell me who was with him and he

3   basically said he didn't know what we were talking about,

4   indicated that we had a sex offender running around in the

02:29:09PM 5   neighborhood.

6           He then wanted to complain and let's make a deal

7   and I'm not at liberty to do that, so I closed the door to the

8   car and went on down -- I made sure he was taken care of and

9   went on down to the scene where the vehicle was.  It was kind

02:29:26PM 10   of parked off the road in the brush where they had run off.

11           Deputy Moorman, he's a state trooper, Trooper

12   Moorman, he was the first one to encounter them and he

13   transmitted over the radio or that he indicated that the

14   passenger in this car had a firearm, he could see the firearm,

02:29:45PM 15   so obviously we were looking for guns at this point and the

16   second suspect Mr. Pugh.

17           Inside of the vehicle, I observed an EMS uniform,

18   boxes for guns, plastic boxes that you carry guns in.  There

19   was a soft gun case.  Those were all in the backseat of the

02:30:10PM 20   car.  Also there was a spent shell casing on the floorboard,

21   the passenger side floorboard of the car.  We secured that.

22       Q.   What caliber shell casing was it?

23       A.   .45.

24       Q.   .45.

02:30:25PM 25       A.   We secured the car, requested a rotation wrecker, and

as we were doing -- setting up the perimeter to start searching

the wooded area, Mr. Pugh came walking out of the woods, arms

raised, I give up.  They took him into custody.  Officer

Ledford was assigned to Mirandize him, asked him if he wanted

to talk to us, which he did.  And he indicated to us that he

had traveled here with the defendant for the purposes of

robbing the homeowner.  He said he kicked the door in.

Q.   He, Mr. Pugh?

A.   Mr. Pugh --

Q.   All right.

A.   -- kicked the door in.  And as he kicked it, Mr. Travis

went in.  That was corroborated by the fact that the door

striker plate was busted.  The door was busted open.

They both -- he indicated they went into the

residence with firearms drawn.  Mr. Travis was wearing a body

armor, which we did recover.  They threatened the homeowners.

Mr. Wilkinson had run into the bedroom and locked the door.

And the sister had run down or was in the bedroom with her

little boy and stayed in there with her son.  She didn't want

him to get hurt.

Q.   Had -- did you learn through the investigation, had

they done this as a result of getting the door kicked in or had

they observed the people in advance or what happened?

A.   Mr. Wilkinson and Ms. Wilkinson ran into the rooms

because they were scared.  They didn't know who these people

1    were.  They didn't have permission to be in their home.  They

2    saw the guns prior to them coming in and they feared for their

3    life.

4        Q.    Go ahead.  I'm sorry to interrupt you.

02:32:16PM  5    A.    Amber said she went into the bedroom and that both of

6    the defendants had pointed the firearms at her.  They wanted

7    her to send the little boy out into the living room, which she

8    refused to do.

9        Q.    Did she say whether or not anybody pointed a gun at

02:32:32PM 10    her?

11        A.    She said both of them did.  She said that eventually

12    Mr. Travis went to the living room.  She can -- from where she

13    was at, the position, you can see the door to Wylie's bedroom

14    and she heard the gun being fired into the wall.  She could

02:32:49PM 15    hear shots fired.  She was worried that her brother had been

16    shot.  Mr. Wilkinson indicated that he was scared that his

17    sister was being injured and he himself pulled out his -- he

18    had a firearm and he said -- it was a .40 caliber firearm.  He

19    pulled that out and he fired a shot into the floor in the

02:33:14PM 20    bedroom and there was a hole in the floor in the bedroom.

21             He then -- he said he was scared.  He jumped out

22    of the window, he ran to the neighbor's house and asked them

23    to call 9/11.

24             MR. MONROE:  May I approach the witness, Your

02:33:33PM 25    Honor?

1          THE COURT:  Yes, you may.

2     Q.   (BY MR. MONROE) Captain Twiss, let me hand you --

3          Let me stop for a second and could I just get some

4     stickers from the court reporter.

02:35:38PM 5          Carol, I'll ask you while I'm doing this if you'll

6     be looking at these photographs while I'm numbering these so it

7     will save us a little bit of time.

8          With respect to the photographs, I've handed you

9     what I've marked as State's Exhibits 1 through 23; and while

02:37:05PM 10  you were going through those, did you have an opportunity to

11    look at those photographs?

12    A.   Yes.

13    Q.   Were these photographs taken by members of the

14    sheriff's department at the scene itself?

02:37:15PM 15  A.   Some may have been.  There may be one or two in there

16    that were not.

17    Q.   Okay.  Let's look through there and see if there were

18    some that were not and we'll talk about them separately.

19    A.   These all were.

02:37:50PM 20  Q.   Okay.  These were all taken by your office?

21    A.   Yes.

22    Q.   And do State's Exhibits 1 through 23 reasonably and

23    accurately portray what is depicted in the photographs?

24    A.   Yes, sir.

02:38:05PM 25  Q.   At the time of the event?

1      A.   Yes, sir.

2            MR. MONROE:  All right.  Your Honor, I offer

3  State's Exhibits 1 through 23 into evidence.

4            (State's Exhibit Nos. 1-23 offered).

02:38:15PM  5            THE WITNESS:  Do you want 24?

6            MR. MONROE:  Just hold it there.

7            MR. BROWN:  Judge, we have no objections for

8  Exhibits 1 through 23.

9            THE COURT:  All right.  State's Exhibits 1 through

02:39:17PM 10  23 are admitted.

11            (State's Exhibit Nos. 1-23 admitted).

12      Q.   (BY MR. MONROE) Captain Twiss, State's Exhibit 24, do

13  you recognize that drawing?

14      A.   It looks like the floor plan for the house.

02:39:29PM 15      Q.   It's not necessarily to scale, but does that fairly and

16  accurately -- we're going to get you to describe it in a minute

17  if that's an accurate photograph.

18      A.   Yes, sir.

19            MR. MONROE:  Your Honor, we would offer State's

02:39:42PM 20  Exhibit 24 into evidence.

21            (State's Exhibit No. 24 offered).

22            MR. BROWN:  No objection to 24, Your Honor.

23            THE COURT:  State's Exhibit 24 is admitted.

24            (State's Exhibit No. 24 admitted).

02:40:03PM 25      Q.   (BY MR. MONROE) All right.  Let's start off first of

1   all by going through the photographs and telling us what these

2   things are and then we're going to talk a little bit more about

3   them.

4                    State's Exhibit 1.

02:40:16PM  5   A.   This is the residence where Mr. Wilkinson lives.

6   Q.   All right.  Back up for a second.  All right.  State's

7   Exhibit Number 1, can you -- here is a pointer.  Can you point

8   on State's Exhibit 1 with the laser pointer about where the

9   front door is?

02:40:36PM 10   A.   Right here off the deck.

11   Q.   All right.  What is State's Exhibit Number 2?

12   A.   The front porch, the front door, entrance to the

13   residence.

14   Q.   All right.  Now, is this the entrance that you said was

02:40:53PM 15   kicked in?

16   A.   Yes.

17   Q.   All right.  And somewhere in these photographs, we have

18   photographs of that, right?

19   A.   We do.

02:40:59PM 20   Q.   State's Exhibit Number 3 is what?

21   A.   That's the front door that was kicked in in front of

22   the house.

23   Q.   The windows that are right there in that picture, what

24   are those windows looking into?

02:41:11PM 25   A.   These are in the living room.

1      Q.   All right.   State's Exhibit Number 5, the same thing?

2    Same thing?

3      A.   The same thing, the front windows, front door.

4      Q.   All right.   State's Exhibit 6?

02:41:21PM 5      A.   This is Mr. Wilkinson's bedroom, front living room

6    windows and front door.

7      Q.   Okay.   It appears that the window is opened there?

8      A.   Yes, sir.

9      Q.   What did you learn about that window, whether or not it

02:41:36PM 10    had to do with this entire scene?

11      A.   Mr. Wilkinson said he climbed out of his window and ran

12    to the neighbors house to get help.

13      Q.   All right.   State's Exhibit Number 7, what is that?

14      A.   This is, again, it looks like Mr. Wilkinson's window.

02:41:55PM 15      Q.   All right.   State's Exhibit Number 8?

16      A.   This is the front door entrance to the residence.   This

17    is the living room, dining area and kitchen.

18      Q.   All right.   What is significant about this photograph?

19      A.   Well, the striker plate for the door is damaged.

02:42:21PM 20      Q.   Point that out, the damaged areas if you would to the

21    jury?

22      A.   It's all this area right here.

23      Q.   And is that how you found it?

24      A.   Yes, sir.

02:42:31PM 25      Q.   All right.   State's Exhibit -- the next slide, State's

1    Exhibit 8?

2        A.   That's the door frame which has obvious damage.

3        Q.   And is that splintered wood that's there?

4        A.   Yes.

02:42:48PM  5        Q.   All right.   State's Exhibit Number 9?

6        A.   Same thing, door frame, pieces of the door, striker

7    plate on the floor.

8        Q.   State's Exhibit Number 10, is that a close-up of the --

9        A.   That's the striker plate that was kicked off the door.

02:43:07PM 10        Q.   So the door received some force?

11        A.   Quite a bit.

12        Q.   State's Exhibit Number 11?

13        A.   This is --

14        Q.   Wait a minute.   That's not it.   Skip that slide.

02:43:23PM 15    There.

16        A.   This is Mr. Wilkinson's bedroom door, the two bullet

17    holes in it and the wall right next to it.

18        Q.   All right.   State's Exhibit Number 12, what is that?

19        A.   We just put these rods in to show the path of the

02:43:41PM 20    bullet.   That one went in this direction.

21        Q.   And are you sure that the origin of the firing of the

22    gun occurred outside the bedroom door in towards the bedroom?

23        A.   Yes, because there was damage inside the bedroom from

24    the striking bullet.

02:43:59PM 25        Q.   All right.   State's Exhibit 13, what is the

1    significance of this?

2        A.    The fan is damaged where the bullet hit it and then ran

3    into the wall.

4        Q.    And where was the fan located?

02:44:09PM 5    A.    I believe where they found it.

6        Q.    There --

7        A.    It was inside Mr. Wilkinson's bedroom.

8        Q.    All right.  State's Exhibit 14?

9        A.    And these also show the path of the bullet that

02:44:20PM 10   traveled into the room and into the bed.

11       Q.    Okay.  So it appears that the door was closed at the

12   time those shots were fired?

13       A.    Correct.

14       Q.    All right.  State's Exhibit Number 15, what is the

02:44:31PM 15   significance of this?

16       A.    That's the path the bullets took, right into the edge

17   of the bed, in Mr. Wilkinson's bedroom.

18       Q.    All right.  State's Exhibit Number 16?

19       A.    This is Mr. Wilkinson's window and you can see a bullet

02:44:49PM 20   mark that's coming into the room.

21       Q.    Okay.  State's Exhibit 17?

22       A.    Same thing.  It's his window.

23       Q.    Okay.  State's Exhibit 18?

24       A.    That's where the bullet skipped off the floor, came

02:45:03PM 25   through the window.

          Q.   State's Exhibit 19?

          A.   It struck into the restroom cabinetry.

          Q.   Okay.  That's somewhere in the bedroom?

          A.   Yes.  It's directly in the path of that window.

02:45:21PM  Q.   All right.  State's Exhibit 20.  Now, what's the view

here?

          A.   This is the backseat of Mr. Pugh's car.  That's his EMS

jacket.  That's the box for that Ruger.  There is a soft case

for a handgun.

02:45:38PM  Q.   And the Ruger was what caliber again?

          A.   9 millimeter.

          Q.   And the other handgun you said was a Glock?

          A.   A .45-caliber Glock.

          Q.   Okay.  State's Exhibit 21?

02:45:50PM  A.   That is Mr. Pugh's EMT badge.

          Q.   All right.  State's Exhibit Number 22?

          A.   That is the .45-caliber Glock that we found on the

ground.

          Q.   Tell us about where that was found.

02:46:08PM  A.   That was found pitched off the side of the road in the

direction going toward -- it was going toward Highway 16 on

Madrona between the residence where the complainants were and

where we found the car.

          Q.   Okay.  The next one?

02:46:30PM  A.   That is the 9 millimeter Ruger handgun that we also

1   located in that same general area.

2       Q.   Okay.

3            MR. MONROE:  Your Honor, I ask for permission to

4   publish these photographs to the jury.

02:46:48PM 5            THE COURT:  You may do so.

6            MR. MONROE:  Let's put up State's Exhibit 24.

7       Q.   (By Mr. Monroe) Okay.  What's on the screen is, is it

8   not Captain Twiss, the same thing as State's Exhibit 24?

9       A.   Correct.  A not-to-scale layout of the house.

02:47:40PM 10       Q.   Can you show the jury where by pointing your laser

11   pointer on State's Exhibit 24 where the front entrance to the

12   house would be?

13       A.   Right here.

14       Q.   All right.  And where is the entrance to the bedroom

02:47:59PM 15   that Mr. Wilkinson was in?

16       A.   It's right here.

17       Q.   Okay.  We see a line there angled right above your

18   laser pointer, would that be the door?

19       A.   Uh-huh, that would be the door.

02:48:12PM 20       Q.   And the State's exhibits where you showed the bullet

21   paths, would they have been fired through that door?

22       A.   Through that door, yes.

23       Q.   All right.  And you said one bullet was on the wall?

24       A.   That was right about here and it was going in this

02:48:29PM 25   direction and these two bullets were in the door coming this

1    direction.

2        Q.   Okay.  So the bullets were fired in multiple directions

3    into the bedroom?

4        A.   Yes.

02:48:40PM 5    Q.   Okay.  Where did you learn through the investigation

6    was Mr. Wilkinson's sister, Amber, located?

7        A.   She was in this bedroom with her son.

8        Q.   All right.  And do you remember her son's name?

9        A.   Brennan.

02:48:53PM 10   Q.   And how old was Brennan again?

11       A.   Three.

12       Q.   Where in that bedroom did you learn from your

13   investigation physically were Amber and Brennan?

14       A.   She indicated she was in this area by the door because

02:49:10PM 15   she could see into Wylie's bedroom or -- well, not into, but

16   the door into Wylie's bedroom where she was positioned.

17       Q.   Did she indicate she was in a line of sight that she

18   could --

19       A.   Yes.

02:49:22PM 20   Q.   -- where she could see what happened?

21            MR. BROWN:  We have no objection to this exhibit.

22       Q.   (BY MR. MONROE) Captain Twiss, let me hand you what's

23   been marked as State's Exhibit 25 and ask if you can look at

24   that?

02:50:38PM 25   A.   Okay.  This is a picture taken from inside of the room

1   Amber was in and you can see Wylie Wilkinson's bedroom door.

2       Q.   And does that photograph, State's Exhibit 25, fairly

3   and accurately represent what it purports to be?

4       A.   Yes, sir.

02:51:00PM 5        MR. MONROE:  We would offer State's Exhibit 25

6   into evidence.

7            (State's Exhibit No. 25 offered).

8            MR. BROWN:  No objection, Your Honor.

9            THE COURT:  State's Exhibit 25 is admitted.

02:51:09PM 10       (State's Exhibit No. 25 admitted).

11           MR. MONROE:  May I publish it to the jury, Your

12   Honor?

13           THE COURT:  Yes.

14       Q.   (BY MR. MONROE) And tell the jury again, State's

02:51:16PM 15   Exhibit 25, what is that -- what is the purpose of that photo?

16       A.   Just to give you a view of what she can see at the time

17   of the incident.

18       Q.   And did she advise you that she was, in fact, able to

19   see?

02:51:27PM 20       A.   Yes.

21       Q.   Okay.  Through your investigation, who did you learn

22   actually entered into the residence?

23       A.   Vernon Travis and Timothy Pugh.

24       Q.   And which of Mr. Travis or Mr. Pugh were armed?

02:51:55PM 25       A.   Both of them.

1    Q.   Do you know from your investigation which gun was in

2   the possession of which person?

3    A.   The 9 millimeter was in Mr. Pugh's possession and the

4   .45 was in Mr. Travis' possession.

02:52:14PM  5    Q.   Okay.  And did you learn from your investigation --

6   you've told us but I'll ask you so the record is clear --

7   whether or not either or both of those firearms were discharged

8   in that residence?

9    A.   We were told that only Mr. Travis fired the guns and

02:52:32PM 10   Mr. Pugh was standing over Amber holding the gun pointing at

11   her.

12    Q.   All right.  Now, approximately what is -- what does

13   your investigation show you is approximately where Mr. Travis

14   was at the time he discharged the weapon?

02:52:58PM 15    A.   She indicated he was in the dining/living area when the

16   firearm was discharged.

17    Q.   Did you learn from your investigation whether there was

18   somebody actually in that room in which the direction the

19   firearm was fired?

02:53:15PM 20    A.   Mr. Wilkinson was in that room.

21    Q.   Okay.  What did you learn after the firearm was

22   discharged -- what's the next thing your investigation told you

23   happened?

24    A.   Mr. Wilkinson indicated that he fired his gun and told

02:53:29PM 25   him to get out of his house and then jumped out the window and

1   ran to the neighbors and asked them to call 9/11.

2       Q.  Was there some confusion as to which guns may have been

3   fired first?

4       A.  Yes, because they indicate -- I think Mr. Wilkinson

02:53:50PM 5   indicated they fired first and I think Mr. Pugh indicated that

6   he may have fired a shot -- Mr. Wilkinson may have fired a shot

7   first.

8       Q.  So we're not exactly sure?

9       A.  No.

02:54:04PM 10      Q.  All right.  Did I -- I asked you to bring some actual

11  physical evidence with you today?

12      A.  Yes, sir.

13      Q.  Did you do that?

14          MR. MONROE:  Can Captain Twiss be excused or is it

02:54:21PM 15  here?

16          THE WITNESS:  It's locked in the office.

17          THE BAILIFF:  Okay.

18          MR. MONROE:  Your Honor, could Mr. Brown and I

19  approach the bench for just a second?

02:55:48PM 20          (Bench conference).

21          MR. MONROE:  We actually spoke earlier about

22  trying to get him on the road.

23          MR. BROWN:  Let's just press forward.  I mean --

24          THE COURT:  We can stop at --

02:56:03PM 25          MR. BROWN:  I don't mind.  No, let's go.  We're

1    here, I'm ready to continue.

2              THE COURT:  Okay.

3              MR. MONROE:  All right.

4              (Bench conference ended).

02:56:30PM 5    Q.   (BY MR. MONROE) Let me mark this bag as State's

6    Exhibit 26.  Tell the Court before you open that and talk about

7    it how evidence is gathered and how it's maintained in your

8    office.  There is a brown paper bag around that.  Tell us how

9    that happens, how that works.

02:56:49PM 10   A.   Usually whatever we collect at the scene we'll bag.  We

11   don't always keep it in the same bag.  We may take it into the

12   office and put it in a plastic heat seal bag.  We'll put a

13   label on it, seal it, initial it.  We know no one has been

14   inside of it.  It then goes into an evidence locker or if it

02:57:11PM 15   doesn't fit into a locker, either myself or Mark Fields who is

16   our assigned evidence technician will come in and take

17   possession of it and it's locked inside of a vault.  And there

18   it remains unless we send it to a crime lab, bring it to trial,

19   or on occasion a prosecutor and defense attorney will come over

02:57:30PM 20   and review the evidence before trial and we'll pull it out for

21   that reason.

22   Q.   Where has that been?

23   A.   This piece of body armor has been in our lab.

24   Q.   Okay.

02:57:40PM 25   A.   I mean in our evidence vault since the incident

1    occurred.

2        Q.   Okay.  Nobody has retrieved it since it was collected?

3        A.   (Nods head up and down).

4        Q.   Will you open that, please.

02:58:07PM  5            Okay.  We've removed something from State's

6    Exhibit 26 and I'm going to -- when we finish, I'm going to

7    have you put it back in there so we can mark it as State's

8    Exhibit 26.  What did you take out of State's Exhibit 26?

9        A.   This is a ballistics vest that police use.

02:58:24PM 10        Q.   Where was that located?  What did that have to do with

11   this event?

12        A.   It was actually located in the woods when we were

13   searching for the suspects and the firearms, and Mr. Pugh

14   indicated that Travis was wearing this during the event.

02:58:39PM 15        Q.   And did the rest of your investigation tend to verify

16   that, that Mr. Travis was wearing body armor?

17        A.   We believe so.  The inside of the pocket of the body

18   armor, we found a business card belonging to Anthony Travis who

19   is the police officer and the brother of Mr. Vernon Travis.

02:59:03PM 20            MR. MONROE:  Your Honor, I would offer State's

21   Exhibit 26 into evidence, which is going to be the bag, the

22   evidence bag as well as the body vest.

23            (State's Exhibit 26 offered).

24            MR. BROWN:  We don't have any objections, Your

02:59:32PM 25   Honor.

1              THE COURT:  State's Exhibit 26 is admitted.

2              (State's Exhibit No. 26 admitted).

3         Q.   (BY MR. MONROE) Captain Twiss, what is something like

4    State's Exhibit 26 actually used for?

02:59:48PM 5    A.   Protection to keep yourself from being shot.

6         Q.   The old movies call them bullet proof vests, is that

7    what they're called?

8         A.   Yes.  Yes.

9         Q.   All right.  Have you investigated a lot of burglaries

03:00:03PM 10  involving bullet proof vests?

11        A.   No.

12             MR. MONROE:  Request permission to publish

13   Exhibit 26, Your Honor?

14             THE COURT:  Why don't you take it out of the bag

03:00:26PM 15  and then when we're all finished -- because I hate for

16   everybody to have to crinkle that bag around and we'll let

17   Scott put it back in there after we're finished.

18             MR. MONROE:  Fair enough.  Which Scott?

19             THE COURT:  This Scott.  Officer Van Klaveren, I'm

03:00:46PM 20  sorry.

21             You may continue, Mr. Monroe.

22             MR. MONROE:  Okay.

23        Q.   (BY MR. MONROE) I've marked a box as State's Exhibit 27

24   and ask if you look in that box and State's Exhibit 27 appears

03:01:34PM 25  to have been sealed.  Has it been sealed since the incident?

1    A.   No, it's been opened when we submitted it to the crime

2    lab and it's been returned to us this way.

3              Do you want them both opened?

4    Q.   Go ahead and open them.  I'll mark the other box as

03:02:14PM 5   State's Exhibit 28 and ask you to open that as well.

6              It starts off with State's Exhibit 27.  Can you

7    take that out of the box -- well, let me -- let me do this

8    first.

9    A.   It's kind of locked down to prevent injury.

03:02:49PM 10             MR. MONROE:  We will offer State's Exhibit 27 and

11   28 which really is going to be the box and its contents.

12             THE COURT:  Did you make the offer?

13             MR. MONROE:  If I didn't, I'll offer State's

14   Exhibit 27 and 28.

03:03:46PM 15             (State's Exhibit Nos. 27-28 offered).

16             THE COURT:  Any objection?

17             MR. BROWN:  No objection, Your Honor.

18             THE COURT:  State's Exhibit 27 and 28 are

19   admitted.

03:03:53PM 20             (State's Exhibit Nos. 27-28 admitted).

21   Q.   (BY MR. MONROE) Let's talk about these separately and

22   kind of describe to the jury how these are maintained.  Start

23   off with State's Exhibit 27 and now you can tell the jury what

24   that is and you can display it.

03:04:04PM 25   A.   We package all our firearms in a box to prevent

1    accidental discharge.  We put a tight strap through the slide

2    to keep it from going off for everybody's protection, and the

3    magazine is stored in the box separate from the weapon and then

4    the bullets are stored separate from the box.

03:04:24PM  5              This is the 9 millimeter Ruger.

6        Q.    That was allegedly in the possession of whom?

7        A.    Timothy Pugh.

8        Q.    All right.  At the time that the gun was located on the

9    side of the road, the magazine was actually in the gun?

03:04:39PM 10        A.    It was in the gun.

11        Q.    And it had bullets in the magazine?

12        A.    It did.

13        Q.    All right.  And State's Exhibit 28?

14        A.    It had nine unfired bullets.

03:04:49PM 15        Q.    Nine unfired bullets in 27.  All right.

16        A.    And then this is the .45 caliber Glock and this had one

17    unfired bullet.

18        Q.    All right.  Now, these weapons would both be

19    characterized as semiautomatic weapons; is that correct?

03:05:08PM 20        A.    Yes, sir.

21        Q.    All right.  And for the benefit of a juror who may not

22    be familiar with pistols like this, what happens to the shell

23    casing each time that gun is discharged?

24        A.    It ejects out of the gun unless it gets stuck in the

03:05:21PM 25    slide, which happens on occasion but not very often.

1      Q.   As opposed to the revolver where the shell casing stays

2  in the cylinder?

3      A.   Stays inside the casing.

4      Q.   All right.  I think you've probably already covered

03:05:36PM 5  this, but both of these firearms now in their current condition

6  are unloaded and not capable of being fired in this condition?

7      A.   That's correct.

8           MR. MONROE:  I would like to show State's

9  Exhibits 27 and 28 to the jury.

03:05:49PM 10           THE COURT:  You may do so.

11           MR. MONROE:  And if you don't mind Officer Van

12  Klaveren showing these to the jurors?

13           THE COURT:  That would be fine.

14      Q.   (BY MR. MONROE) State's Exhibit 28, the .45 was in the

03:06:00PM 15  possession of whom?

16      A.   Mr. Travis.

17      Q.   It may sound like a silly question, but let me ask it

18  anyway.  Are both State's Exhibit 27 and 28 capable of

19  inflicting serious bodily injury and/or death?

03:06:24PM 20      A.   Yes.

21      Q.   You actually, Captain Twiss, learned the identity of

22  these two perpetrators and saw them at the scene?

23      A.   Saw both of them, talked to both of them.

24      Q.   All right.  And you see Vernon Lee Travis in this

03:07:08PM 25  courtroom?

1    A.   Yes.

2    Q.   Can you point him out to the jury?

3    A.   He's sitting at the defense table wearing a light blue

4    shirt and a blue light-colored tie.

03:07:20PM 5    Q.   There are three people at the defense table and he's

6    the one in the middle?

7    A.   The one in the middle.

8         MR. MONROE:   I would like the record to reflect

9    that the witness has identified the defendant.

03:07:31PM 10   Q.   (BY MR. MONROE) You said that as the investigation

11   continued that one of your officers attempted to obtain a

12   statement from Mr. Travis.

13   A.   I spoke -- tried to speak to him twice and Investigator

14   Ledford spoke to him once.

03:07:51PM 15   Q.   When Investigator Ledford spoke to him, Investigator

16   Ledford is one of the officers under your direction?

17   A.   That's correct.

18   Q.   Is this something that you would have assigned to

19   Investigator Ledford?

03:08:05PM 20   A.   Yes, sir.

21   Q.   Tell me at what location did Investigator Ledford

22   attempt to talk to the defendant?

23   A.   At the Kerr County Sheriff's Office.

24   Q.   Tell the jury how you do that at the sheriff's office.

03:08:19PM 25   Describe where you are and what happens?

1       A.   We have an interview room in both of our annex and our

2  main building.  In this particular case, they were in our main

3  building.  The room was equipped with video and audio and every

4  interview that we do we try to do in there with a recording.

03:08:39PM  5       Q.   And what is protocol when an officer is trying to take

6  a statement from the defendant?  What's the first thing the

7  officer does?

8       A.   We bring them into the room and we may visit with them

9  a little bit about personal matters but not the actual offense.

03:08:53PM 10  We read them the Miranda warning and waiver and if they elect

11  to waive their rights and speak to us, then we'll continue the

12  interview.

13       Q.   And you said earlier that that entire event would be

14  recorded?

03:09:08PM 15       A.   Yes.

16       Q.   And in a format where both the audio and the video are

17  recorded --

18       A.   Yes.

19       Q.   -- and maintained?

03:09:36PM 20            Now, where are those kept, those recordings and

21  in what format are they kept?

22       A.   They go to a hard drive and as soon as the interview is

23  complete or as soon as possible thereafter, we put them on a CD

24  or a DVD and they are kept in the evidence vault.  A copy of

03:09:57PM 25  them will be sent to the prosecutor and we work off of copies

1    but the original copy -- the first copy that we burn goes into

2    the evidence vault and remains there.

3        Q.   Let me hand you what is State's Exhibit 29 and State's

4    Exhibit 30 and ask if you can identify those?

03:10:16PM 5        A.   Yes, these are copies of the interview done with Mr.

6    Travis made by our office.

7        Q.   Right.  And State's Exhibit 29 is the entire interview,

8    State's Exhibit 30 is a redacted?

9        A.   That's correct.

03:10:28PM 10        Q.   These were taken under your supervision, although you

11    were not directly conducting the interview yourself?

12        A.   That's correct.

13        Q.   Was it Investigator Ledford?

14        A.   Yes.

03:11:06PM 15                MR. MONROE:  Your Honor, we would offer -- the

16    State would offer Exhibit 29 for the record and officially the

17    redacted version of State's Exhibit 30 to be reviewed by the

18    jury.

19                (State's Exhibit No. 29-30 offered).

03:11:22PM 20                THE COURT:  Any objection?

21                MR. BROWN:  May we approach, Your Honor?

22                THE COURT:  Yes.  And I think this would probably

23    be an appropriate time to take a break.  And so why don't I let

24    y'all go ahead and go with the bailiff and we'll take a

03:11:35PM 25    15-minute recess and we'll start back up.

1          (Jury not present).

2          THE COURT:  Did you have something, Mr. Brown?

3          MR. BROWN:  I did, Judge.  This was the DVD that

4    they gave me at the end of last week that I have not had an

03:12:15PM 5    opportunity to review.  It didn't work.  That was something

6    that we were going to try to do at one of the breaks.  And

7    unfortunately, I got here late this morning and with everything

8    else, I still haven't had the opportunity to review it, so --

9          THE COURT:  Do you want to stop for the day, look

03:12:31PM 10   at it tonight, come in and finish in the morning?

11         MR. BROWN:  Sure.

12         THE COURT:  And do you have a charge ready?

13   We'll get that all ready to go.  Get a copy to Mr. Brown.

14         MR. BROWN:  I don't have the charge.  Do y'all

03:12:45PM 15   want to email it to me?

16         THE COURT:  Because we would like to have that

17   ready to go whenever we finish with the evidence, so --

18         When Scott gets back up here, I'll ask him.

19         MS. COLEMAN:  This is the guilt or innocence

03:13:04PM 20   charge that you're talking about?

21         THE COURT:  Yes, guilt/innocence.  I assume there

22   is no problem, but they need to have a chance to look at it.

23         Scott, anything we need to do when I bring them

24   back in?  Do you got anything that you need to do, just minor

03:13:22PM 25   things you need to do before you tie up for the day?

1           MR. MONROE:  No.

2           THE COURT:  Okay.  And do you have a copy for him?

3  Keep that with Teri.  Does he have something he can take with

4  him to read or look at it?

03:13:34PM 5           Do you want to look at it here or did you want to

6  take it home?

7           MR. BROWN:  If we're going to break, I might try

8  to make it over there, Judge.

9           MR. MONROE:  You said nine?

03:13:42PM 10           MR. BROWN:  If you say nine, I can be here at 8:15

11  again.

12           THE COURT:  I would like to start at 9 o'clock in

13  the morning.

14           So I'll let y'all work that out.  Don't take that

03:13:49PM 15  away because that's Teri's now, those exhibits.

16           MR. MONROE:  They've been offered and admitted?

17           THE COURT:  Do you want me to admit -- do you want

18  me to admit -- you haven't had a chance to look at them.  So

19  they are not Teri's yet.  They haven't been admitted.

03:14:09PM 20           MR. MONROE:  We will hang on to these.  We'll be

21  here early in the morning and you can --

22           THE COURT:  Let them go ahead and take their

23  break.  I'm not going to round them up.  When they come back

24  in, I'm going to tell them.  We'll try to get some witnesses

03:14:23PM 25  lined up and we'll start back at 9:00 in the morning.

1          Off the record.

2          (Recess).

3          THE COURT:  Okay.  You can bring them in.

4          (Jury present).

03:29:44PM 5          THE COURT:  Thank you.  You may have a seat.

6          Ladies and Gentlemen of the Jury, we've been

7 working on some stuff while you were back on break and in

8 order for us to keep going without a couple more breaks, I'm

9 going to go ahead and excuse you this afternoon.  We have some

03:29:59PM 10 work that we need to do where we can get right back into it

11 tomorrow morning and go ahead and finish up the

12 guilt/innocence phase of the trial.  So I hope you don't mind

13 getting off early today.  We're going to pay you the full

14 wages.  Even though you take off a little bit earlier, we'll

03:30:18PM 15 give you the full compensation.

16          When you come back tomorrow morning, we're going

17 to start at nine.  I'd like for you to be here a few minutes

18 early back in the jury room where you took your break.  We'll

19 be looking for you in the morning.  When you come in, the

03:30:32PM 20 bailiffs will be looking for you and they'll escort you back

21 there and we'll have some coffee and like to start right at

22 nine.

23          And it's very important that you remember the

24 instructions that I gave you, that you don't talk about the

03:30:37PM 25 case to anybody or read anything in the paper about the case.

You're going to get home and your spouse or significant others

are going to say tell me everything about it.  And as soon as

you do that, they're going to say, Well, let me tell me what I

would do.  And it's really not fair because they were not here,

03:30:53PM you know, and they didn't hear people testify.  So I hope that

you can tell them they can take you out to eat and you'll tell

them all about it when it's over.

So I'm going to let y'all go and we'll see you in

the morning and we'll finish up this guilt/innocence phase

03:31:09PM probably tomorrow morning.

And y'all help me remember that -- go this way.

Y'all help me remember, I'm going to get y'all some legal pads

and pens tomorrow in case y'all want to take some notes.

Go ahead and go with the bailiff and go in this

03:31:35PM direction.

(Jury not present).

THE COURT:  Okay.  Y'all have a seat.  And is

there something, Mr. Brown, that you wanted to bring up?

MR. BROWN:  Yes, it was brought to my attention,

03:31:52PM Judge, there was an out-of-state warrant.  There was a --

THE COURT:  I want to make sure the prosecutor can

hear.  I want to make sure you can hear what's going on.

MR. BROWN:  I'm sorry.

It was brought to my attention that there was a

03:32:09PM bond recommendation on an out-of-state warrant.  I believe the

1    sheriff is looking it up now.  I believe they received the

2    paperwork on it.  And if that's the case, we would like to have

3    my client released so we can continue to meet with him in San

4    Antonio.  And the State, they didn't object to me transferring

03:32:27PM  5    the bonds on to the reindictments, that's part of the hold on

6    him.  They didn't have any objection to that and I believe the

7    family would be prepared to post the bond if --

8           SHERIFF:  Well, I think the issue is because that

9    matter on the charge and normally that's a no bond because we

03:32:41PM 10    don't set bonds on their charge and they may have a magistrate

11    this morning set a bond on their charge, but what will be filed

12    is a fugitive from justice, and that's the warrant that if that

13    magistrate wants to set that same bond in the morning, he'll be

14    able to.  But the charge in Texas actually has to be a fugitive

03:33:02PM 15    from justice.  I just haven't seen that and I can't get on the

16    system to see it.  But if it is, our local magistrate had

17    originally set a thousand dollar surety bond on that that he

18    could make, but he's also being held on all these

19    reindictments.  When they were reindicted, they were not done

03:33:19PM 20    as carryovers.  So if the Court wished to have them done as

21    carryovers and if that magistrate wanted to keep that thousand

22    dollar bond on a fugitive from justice warrant, then at that

23    point he'll be able to be --

24           THE COURT:  Do you see any problem in carrying

03:33:36PM 25    over the bonds from the original --

1          MR. MONROE:  We originally agreed.

2          THE COURT:  That's what I remember.  I think that

3  y'all had agreed to do that, so do I need to just make a little

4  docket entry or something for you, Sheriff?

03:33:47PM 5          SHERIFF:  Yes, that those have been done as

6  carryover bonds on those reindictments, and that's all I need.

7  I can get it verbally from you and that's enough for now.

8          THE COURT:  I'm going to give a verbal instruction

9  to carry over all those bonds from the original indictments to

03:33:59PM 10  these reindictments.  And then, you know, we can't set the bond

11  for this out of state, but if there is a bond in place --

12          SHERIFF:  Right.  And that's what I would have to

13  look at and --

14          THE COURT:  He's been magistrated and a bond set.

03:34:11PM 15  Has there been a bond set?

16          SHERIFF:  He was magistrated and I'm afraid it was

17  just on the actual charge in Arizona, which is not the correct

18  charge.  The correct charge would be fugitive from justice as

19  far as Texas, okay, and whatever -- normally that runs through

03:34:26PM 20  our county court at law, whatever the county court at law wants

21  to do.  I don't know that there was any bond recommendation out

22  of Arizona.

23          THE COURT:  Well, on the charge in Arizona, they

24  set a bond of a thousand dollars?

03:34:39PM 25          SHERIFF:  I do not know that.  I know our local

         1   magistrate did, which would tend me to believe that that may

         2   have been what Arizona's intent was.

         3                   THE COURT:  Yeah.

         4                   SHERIFF:  Okay.  But I will have to see what they

03:34:49PM 5   do when he is actually charged properly.

         6                   THE COURT:  Well, these bond things are between

         7   you and the defendants.  What do you need from me?

         8                   SHERIFF:  I don't need anything on the Arizona

         9   from you at this point.

03:34:59PM 10                   THE COURT:  Okay.

        11                   SHERIFF:  Okay.  I'll look at it when I get long

        12   gone and see what status we're at and where we're at, and he

        13   may even be remagistrated in the morning, which is what I

        14   suspect will happen.

03:35:12PM 15                   MR. BROWN:  Is he eligible for bond now, the

        16   thousand dollar bond?

        17                   SHERIFF:  Not if that's not correct.

        18                   THE COURT:  Okay.  I'm going to let you and the

        19   sheriff --

03:35:22PM 20                   SHERIFF:  If I can get on here, I could figure it

        21   out for you.

        22                   THE COURT:  If you need my input though, y'all can

        23   get me back in here and I'll work on it, but I'm going to let

        24   the two of y'all see if you can --

03:35:32PM 25                   SHERIFF:  If nothing else, worse case scenario,

1  I'll get them to file the fugitive from justice this evening.

2  We may need a bond set on it and whatever that is, but I don't

3  even know what the original charge is in Arizona.

4          THE COURT:  Okay.  Anything else?

03:35:47PM  5          MR. MONROE:  Nothing else.

6          THE COURT:  All right.  Be sure and be here a

7  little bit early because we want to start right at nine.  Okay.

8          All right.  We're excused for the evening.  We're

9  in recess.

03:36:04PM 10

11          (Proceedings concluded at 3:36 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        REPORTER'S CERTIFICATE

THE STATE OF TEXAS      )
COUNTY OF KERR          )

            I, Teri Thomas Nunley, Official Court Reporter in

and for the 198th District Court, Kerr County, State of Texas,

do hereby certify that the above and foregoing contains a true

and correct transcription of all portions of evidence and

other proceedings requested in writing by counsel for the

parties to be included in this volume of the Reporter's

Record, in the above-styled and numbered cause, all of which

occurred in open court or in chambers and were reported by me.

            I further certify that this Reporter's Record of

the proceedings truly and correctly reflects the exhibits, if

any, admitted by the respective parties.

            I further certify that the total cost for the

preparation of this Reporter's Record is $See Vol 4 and was

paid by Mr. Gary F. Churak, Attorney for the Defendant.

            WITNESS MY OFFICIAL HAND this the 30th day of

November, 2014.

                    _\s\ Teri L. Thomas
                    Teri L. Thomas, Texas CSR #1789
                    Expiration Date:  12/31/2015
                    Official Court Reporter
                    132 Oak View Drive
                    Boerne, Texas 78006
                    Telephone:  (210)415-8111
                    Facsimile:  (830)249-7317
                    Email:  tthomasnunley@gmail.com