REPORTER'S RECORD
VOLUME 3 OF 5 VOLUMES
TRIAL COURT CAUSE NO. B13-637
COURT OF APPEALS NUMBER 04-14-00560-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | KERR COUNTY, TEXAS |
| | ) | |
| | ) | |
| VERNON LEE TRAVIS, III | ) | 198TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On May 7, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before a jury and the Honorable Stephen B. Ables, Judge presiding, 198th District Court, held in Kerrville, County of Kerr, Texas; Proceedings reported by machine shorthand.

1                    A P P E A R A N C E S

2

3    ATTORNEY FOR THE STATE OF TEXAS
        Mr. Scott Monroe
4       SBOT NO. 14272700
            DISTRICT ATTORNEY
5                and
        Ms. Donnie Coleman, Assistant District Attorney
6       SBOT:  04558600
            402 Clearwater Paseo, Suite 500
7           Kerrville, Texas 78028
            Telephone:  (830) 315-2460
8           Facsimile:  (830) 315-2461

9

    ATTORNEY FOR THE DEFENDANT
10      Mr. Shawn C. Brown
        SBOT NO. 24003613
11           and
        Mr. Brian Orihel
12      SBOT NO. 24079087
            LAW OFFICE OF SHAWN C. BROWN
13          540 S. St. Mary's Street
            San Antonio, Texas 78205
14          Telephone:  (210) 224-8200
            Facsimile:  (210) 224-8214

15

16

17

18

19

20

21

22

23

24

25

CHRONOLOGICAL INDEX
VOLUME 3
TRIAL ON THE MERITS

MAY 7, 2014                                              <u>PAGE</u>   <u>VOL</u>

PROCEEDINGS                                                 6      3

| <u>WITNESSES</u> | <u>DIRECT</u> | <u>VD</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> | <u>VOL</u> |
|---|---|---|---|---|---|---|
| GUILT/INNOCENCE | | | | | | |
| CAPTAIN CAROL | | | | | | |
| TWISS | | | | | | |
| BY MR. MONROE | 12 | | | 40,46 | | 3 |
| BY MR. BROWN | | | 14 | | 45 | 3 |
| | | | | | | |
| JAMES LEDFORD | | | | | | |
| BY MR. MONROE | 47 | | | 69 | | 3 |
| BY MR. BROWN | | | 52 | | | 3 |
| | | | | | | |
| CAPTAIN CAROL | | | | | | |
| TWISS | | | | | | |
| BY MR. MONROE | 72,75 | | | | | 3 |
| BY MR. BROWN | | 73 | 77 | | | 3 |
| | | | | | | |
| PUNISHMENT PHASE | | | | | | |
| NAOMI WEATHERLY | | | | | | |
| BY MR. MONROE | 98 | | | 106 | | 3 |
| BY MR. BROWN | | | 104 | | 112 | 3 |
| | | | | | | |
| AMBER WILKINSON | | | | | | |
| BY MR. MONROE | 115 | | | 141 | | 3 |
| BY MR. BROWN | | | 127 | | 142 | 3 |
| | | | | | | |
| DR. JOHN ROACHE | | | | | | |
| BY MR. BROWN | 144 | | | 192 | | 3 |
| BY MR. MONROE | | | 167 | | 194 | 3 |
| | | | | | | |
| ANISSA GONZALEZ | | | | | | |
| BY MR. BROWN | 199 | | | | | 3 |
| BY MR. MONROE | | | 206 | | | 3 |
| | | | | | | |
| RANDY L. KENNEDY | | | | | | |
| BY MR. BROWN | 209 | | | | | 3 |
| BY MR. MONROE | | | 217 | | | 3 |
| | | | | | | |
| JENNA RODRIGUEZ | | | | | | |
| BY MR. BROWN | 219,225 | | | | | 3 |
| BY MR. MONROE | | 225 | | | | 3 |
| BY MR. MONROE | | | 226 | | | 3 |

CHRONOLOGICAL INDEX
VOLUME 3
TRIAL ON THE MERITS
(CONTINUED)

| WITNESSES | DIRECT | VD | CROSS | REDIRECT | RECROSS | VOL |
|---|---|---|---|---|---|---|
| VERNON LEE TRAVIS, JR. | | | | | | |
| BY MR. BROWN | 231 | | | | | 3 |
| BY MR. MONROE | | | | 246 | | 3 |

| | PAGE | VOL |
|---|---|---|
| THE STATE WILL REST | 78 | 3 |
| THE DEFENSE RESTS | 79 | 3 |
| OBJECTIONS TO THE CHARGE | 79 | 3 |
| STATE CLOSES | 81 | 3 |
| DEFENSE CLOSES | 82 | 3 |
| GUILT/INNOCENCE PHASE CHARGE TO THE JURY THE COURT | 82 | 3 |
| CLOSING STATEMENT MR. MONROE | 84 | 3 |
| CLOSING STATEMENT MR. BROWN | 85 | 3 |
| GUILT/INNOCENCE VERDICT | 88 | 3 |
| PUNISHMENT PHASE OPENING STATEMENT MR. MONROE | 91 | 3 |
| OPENING STATEMENT MR. BROWN | 92 | 3 |
| STATE RESTS ON PUNISHMENT | 142 | 3 |
| REPORTER'S CERTIFICATE | 251 | 3 |

EXHIBIT INDEX
VOLUME 2
TRIAL ON THE MERITS

| NO. | STATE'S | OFFERED | ADMITTED | VOL |
|-----|---------|---------|----------|-----|
| 29 | ENTIRE VIDEO INTERVIEW (IDENTIFICATION ONLY) | 50 | 51 | 3 |
| 30 | REDACTED VIDEO INTERVIEW | 50 | 51 | 3 |
| 31 | GLOVES AND BAG | 13 | 13 | 3 |
| 32 | PHOTOGRAPH | 73 | 75 | 3 |
| 33 | PHOTOGRAPH | 73 | 75 | 3 |
| 34 | PHOTOGRAPH | 73 | 75 | 3 |
| 35 | PHOTOGRAPH | 73 | 75 | 3 |
| 36 | PHOTOGRAPH | 73 | 75 | 3 |
| 37 | PHOTOGRAPH | 73 | 75 | 3 |
| 38 | INDICTMENT FOR SENTENCE, PROBATION, CONDITIONS OF PROBATION FROM THE STATE OF ARIZONA | 100 | 101 | 3 |
| 39 | SET OF PROBATION CONDITIONS THAT MR. TRAVIS SIGNED WHEN HE CAME TO TEXAS | 103 | 103 | 3 |
| 40 | PHOTOGRAPH OF BOY | 126 | 126 | 3 |
| 41 | PHOTOGRAPH OF BOY | 126 | 126 | 3 |
| 42 | CERTIFICATE OF RELEASE | 174 | | 3 |

| NO. | DEFENDANT'S | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | DR. DELWIN WILLIAMS' MEDICAL RECORDS | 148 | | 3 |

                    P R O C E E D I N G S

                    (Jury not present).

                    THE COURT:  We're on the record out of the
          presence of the jury.

08:35:40AM          This is Cause Number B13-637, State of Texas
          versus Vernon Lee Travis.  And yesterday, there had been an
          offer of a videotape, but the case was recessed for the defense
          attorney to look at that videotape.  And did you have an issue
          with the videotape, Mr. Brown?

08:35:50AM          MR. BROWN:  I do, Judge, two issues.  I think
          there are two -- actually two videos that were tendered, I
          believe, an entire one and a redacted or partial one and I was
          under the impression that the only one we would be dealing with
          was the partial.  We've got numerous issues if they are going
08:36:08AM to try to admit the entire interview.  We believe that there is
          extraneous information on there.  There is some other issues
          that are contained in that entire video that we have objections
          with and I thought that they were giving me the partial to
          address some of those concerns and then after reviewing the
08:36:26AM partial last night, I have additional concerns with the
          partial.

                    First and foremost, it's an interview of my client
          and there is a Deputy Ledford who conducted the interview and
          there is some talk back and forth.  He asks some questions, who
08:36:44AM are you, why were you up here, and that nature.  Towards the

end of the interview, as things I guess get contentious between

my client and him, he starts to tell him, well, this isn't

Austin, this isn't Dallas, this isn't San Antonio, this is Kerr

County, this is Kerrville and juries here will pick you apart

08:37:06AM 5    if you want to go to a jury trial.  And we believe that that is

highly prejudicial against my client.  That's not his

statement.  It was a statement made by an officer who is

conducting the interview.  It's hearsay, it's prejudicial under

403 and I don't think that any -- it's commenting on the

08:37:26AM 10   purview of the jury what they're supposed to make a decision on

all the evidence and he's coming in and commenting on that to

kind of direct them in a backdoor manner so-to-speak by saying

this is what this jury needs to do and this is what they're

going to do to you.  I think that would be highly prejudicial

08:37:46AM 15   against my client.  I think that that -- it's not evidence, it

is not relevant.  We would ask that that portion of it be taken

out.  It's probably the last, I don't know, two and a half

minutes.  It's about 1145 total, so it starts somewhere around

8:30 and -- 8 point 30 minutes of the video and goes on.  So

08:38:08AM 20   that's our first issue with the partial DVD.

THE COURT:  Do you want to respond to that, Mr.

Monroe?

MR. MONROE:  Well, first of all, the entire video,

which is I think 29 is really offered for identification

08:38:26AM 25   purposes for the appellate record.  We don't intend to play the

1    entire video to publish that to the jury.

2              Exhibit 30 was the redacted video which was the

3    one which we're going to use.  That's where I will address the

4    rest of my comments to Exhibit 30.

08:38:41AM 5            The comments that he mentioned are on there.  I

6    think it was an investigation and interrogation technique by

7    Mr. Ledford, the same as it is for an officer to make up

8    stories that aren't true in an attempt to get a defendant to

9    talk.  That would be our position on those.  It would go to the

08:38:58AM 10  weight, not to the admissibility.

11             We have the video qued up and the Court can watch

12   it and we can watch the whole redacted video.  If you have it

13   written down where that part is, we can go straight to that

14   part.  And if the Court says take it out, we'll take it out.

08:39:18AM 15            THE COURT:  All right.  And what's the second

16   point, Mr. Brown?

17             MR. BROWN:  Well, in the event, depending on the

18   Court's ruling, we would also -- he offered it and the proper

19   predicate wasn't laid for this particular video and I know that

08:39:28AM 20  we had talked originally with the Court that we were going to

21   allow this officer to testify to some of the things that other

22   officers did.  There wasn't an agreement to this video.  I

23   haven't seen it.  I wasn't agreeing to allow that to come in

24   through any officer or anybody for that matter.  And so we

08:39:47AM 25  believe that the proper predicate hasn't been laid for the

1    admissibility in this case.

2              THE COURT:  Mr. Monroe?

3              MR. MONROE:  Again, it's always a little awkward

4    for the State to do it the way we did it because we did that

08:39:58AM 5    agreement for streamlining and agree to allow one officer to

6    sponsor basically things that were done in the correct chain

7    and custody and have gone through several of them.  We can have

8    Officer Ledford here, that's not a problem, if that's what he

9    wants to do and I'm happy to put the evidence in the record.

08:40:17AM 10    It reasonably shows what it's supposed to purport.  I just

11    thought I was in compliance with what we agreed to do.

12              Now, as far as Mr. Brown not seeing it, now, he's

13    had the original video from the day discovery was given to

14    him.  So he may not have looked at it before, that's fine, but

08:40:37AM 15    he's had it.  So I wanted to make sure I addressed the comment

16    when he said that he hadn't even seen it.  That's his own

17    choice.

18              The original video was given to him in discovery.

19    The redacted video was only given to him a couple of days ago.

08:40:52AM 20    We didn't add anything to it, we took things out.

21              THE COURT:  So you're wanting the State to bring

22    in I guess Officer Ledford to prove up that he gave him his

23    rights and that the video was done in accordance with law?  You

24    want us to do that?  You know, I thought that y'all wanted to

08:41:06AM 25    just kind of do this abbreviated, but you want the State to

1   bring in Officer Ledford?

2           MR. BROWN:  I did, too, Judge, and I wasn't aware

3   that they were going to offer the statement.  I thought that

4   she was going to talk about the elements of the crime, people

08:41:23AM 5   coming in and telling her what people found about the

6   investigation, and that he entered the house without the

7   effective consent of the owner.  He shot a firearm.  I think

8   all the elements have been met.

9           I wasn't aware that they were going to offer the

08:41:34AM 10  redacted or the full version or whatever the case may be.  And

11  I haven't seen -- I have seen the entire video, but we had

12  issues with that and when they tried to offer, we were going

13  to -- I talked to the investigator about it and I believe

14  that's probably why he gave us the partial because of the

08:41:48AM 15  issues that we had with the statements.  We still have an issue

16  with the partial and that's concerning the tail end of the

17  interview that we previously discussed.

18          THE COURT:  But the offensive part to you is where

19  he said, You don't want to mess with a Kerr County jury

08:42:06AM 20  basically?

21          MR. BROWN:  You don't want to be -- yeah, this

22  isn't San Antonio, Dallas, or Houston.  This is Kerr County.

23  The jury is going to rip you apart.

24          THE COURT:  All right.  My ruling is that I'll let

08:42:18AM 25  you show the whole redacted video.  The puffing that officers

do is generally admissible, even when they make -- like you
said, even when they make things up, it is generally
admissible.

08:42:32AM        But now if you didn't have an agreement on laying
the predicate for the video, I guess you need to get in charge
of the officer -- have the officer come in and prove up the
predicate.

MR. MONROE:  We called him.  We called him to be
here this morning.

08:42:44AM        MS. COLEMAN:  He's here.

MR. MONROE:  He's here.  I've got a couple more
things with Ms. Twiss so we can finish with her and then I'll
pass her and then we can put on Officer Ledford.

THE COURT:  That would be great.  So we're going
08:42:56AM   to start right at nine when the jurors get here and we'll see
you here in a few more minutes.

(Recess).

THE COURT:  Bring in the jury.

(Jury present).

09:05:41AM        THE COURT:  Ladies and Gentlemen of the Jury,
thank you for being here.  I think y'all were ready to go about
a quarter to nine, but it took a while to round up everybody to
get started but it's pretty close to the time.

When we stopped yesterday, the State was
09:05:53AM   presenting its case in chief in the guilt/innocence phase of

          the trial and Ms. Twiss -- Captain Twiss was on the stand.

                    You may continue with your direct examination, Mr.

          Monroe.

                    MR. MONROE:  Thank you, Your Honor.

09:06:02AM        CAPTAIN CAROL TWISS,

          having been previously duly sworn, testified as follows:

                    DIRECT EXAMINATION (continued)

          BY MR. MONROE:

             Q.  Captain Twiss, a couple of things that I think I may

09:06:10AM  have neglected to ask you yesterday.

                    First of all, when you have information -- or did

          you obtain information as to the birth and date of the

          defendant?

             A.  Yes, sir.  It's August 24, 1984.

09:06:20AM     Q.  1984?

             A.  Yes, sir.

                    MR. MONROE:  May I approach the witness?

                    THE COURT:  Yes.

             Q.  (BY MR. MONROE) Now, we yesterday introduced into

09:06:29AM  evidence State's Exhibits 28, 27, and 26, which were physical

          evidence that was found at the scene; is that correct?

             A.  Yes, sir.

             Q.  That's not the only evidence that was found out there,

          is it?

09:06:45AM     A.  No, sir.

1       Q.    All right.  Let me hand you what I have marked as

2   State's Exhibit 31 and ask if you can look at that.  Open it

3   up, and can you identify that for the record, please?

4       A.    Yes, sir.  These were gloves that were found in Mr.

09:07:21AM 5   Vernon Travis' pockets.

6       Q.    Say that again.

7       A.    They are gloves found in Mr. Vernon Travis' pockets.

8       Q.    They were in his possession at the time he was detained

9   there at the scene?

09:07:34AM 10       A.    When Officer Spence detained him, they were found in

11   his pockets.

12              MR. MONROE:  Your Honor, the State would offer

13   State's Exhibit 31.

14              (State's Exhibit 31 offered).

09:07:54AM 15              MR. BROWN:  Judge, we have no objection to 31.

16              THE COURT:  State's 31 is admitted.

17              (State's Exhibit No. 31 admitted).

18       Q.    (BY MR. MONROE) Did you learn from your --

19              MR. MONROE:  May I publish it to the jury, Your

09:08:07AM 20   Honor?

21              THE COURT:  Yes, you may.

22              MR. MONROE:  Can I do the sack separately so --

23              THE COURT:  Let's leave the sack with Officer Van

24   Klaveren.

09:08:17AM 25       Q.    (BY MR. MONROE) Did you learn from your investigation,

Captain Twiss, whether or not Mr. Travis was actually wearing
those gloves during any part of this?

   A.   I believe one of the witnesses observed him wearing
them.

09:08:31AM   Q.   Okay.  And it was brought to my attention I may not
have asked this question yesterday.  Did you learn from your
investigation whether or not one of those two firearms was
actually discharged in the residence?

   A.   Yes.

09:08:42AM   Q.   Which firearm was discharged?

   A.   The .45-caliber.

   Q.   And did you learn from your investigation as to which
of the two actors discharged the gun?

   A.   Mr. Travis.

09:08:56AM       MR. MONROE:  I pass the witness.

       THE COURT:  Mr. Brown?

       MR. BROWN:  Yes, Your Honor.

               CROSS-EXAMINATION

BY MR. BROWN:

09:09:02AM   Q.   Captain Twiss, my name is Shawn Brown.  We've never met
before, have we?

   A.   No, sir.

   Q.   I've got a few questions for you and if there is
something that I ask you that you don't understand, just ask me
09:09:14AM to rephrase the question.

1    A.   Yes, sir.

2    Q.   You said you've been in law enforcement for

3    approximately 22 years?

4    A.   Yes, sir.

09:09:21AM 5         MR. BROWN:   Just a second, I need to put this on.

6    Q.   (BY MR. BROWN) And I guess you've received -- you

7    talked about 3000 hours of training; is that right?

8    A.   Yes, sir.

9    Q.   And your position as a captain, what are your duties?

09:09:37AM 10    A.   They vary.   I have some responsibilities to help the

11   jail division, investigate crimes, assist other investigators,

12   review reports, things of that nature.

13   Q.   And in this particular case, what were your duties?

14   A.   In this particular case, because we had so many areas,

09:10:02AM 15   I was trying to assign people to tasks and also help at the

16   scene.

17   Q.   So you were kind of in charge of the investigation; is

18   that right?

19   A.   Well, in a sense, yes.

09:10:16AM 20    Q.   All right.   And through your training and experience, I

21   guess you've learned that writing reports is very important;

22   wouldn't you agree?

23   A.   Yes, sir.

24   Q.   And that is because the day an offense occurs, your

09:10:31AM 25   memory is much fresher than -- as opposed to seven or eight

 1    months down the road; would you agree with that?

 2        A.   Yes, sir.

 3        Q.   And so it assists you when you come into testify before

 4    a jury as well as it assists the prosecutors when they are

09:10:47AM 5    looking at a case to see what type of case they have?

 6        A.   Yes, sir.

 7        Q.   Would you agree with that?

 8        A.   Yes, sir.

 9        Q.   And you're under oath today, right?

09:10:54AM 10        A.   Yes, sir.

11        Q.   And it's important that you tell this jury the truth

12    about everything that happened and everything you found; isn't

13    that right?

14        A.   Yes, sir.

09:11:00AM 15        Q.   And you've learned that from your training and

16    experience and you just know that from growing up?

17        A.   Yes, sir.

18        Q.   Now --

19             MR. BROWN:  Can I see her report?

09:11:09AM 20             Judge, under 612 and under 615, I would like to

21    look at any reports that this officer reviewed or deputy

22    reviewed prior to testifying.

23             THE COURT:  Do you have them there?

24             THE WITNESS:  I have mine here.

09:11:21AM 25             MR. BROWN:  May I approach the witness, Your

1    Honor?

2              THE COURT:  Yes.

3              MR. BROWN:  Thank you.

4    Q.   (BY MR. BROWN) And this is your report?

09:11:41AM 5    A.   Yes, sir.

6    Q.   Do you remember how many pages it is?

7    A.   Not exactly.  I can count them for you.

8    Q.   Will you look and just make sure it's an entire copy of

9    your report.

09:12:00AM 10            You don't have to read the whole thing, you know,

11   if it's page by page and you recognize it.

12   A.   Yes, sir, it looks like it.

13   Q.   Okay.  So no additions or deletions to this?

14   A.   There may be some supplemental reports for firearms

09:12:49AM 15   testing.

16   Q.   Now, I notice you have other reports in your file.

17   A.   Yes.

18   Q.   Did you also review those prior to testifying today?

19   A.   Yes.

09:13:01AM 20   Q.   Okay.  And you also -- you made mention that part of

21   your job was to I guess compile all the reports and eventually

22   forward them on to the DA's office; is that right?

23   A.   Yes.

24   Q.   So you essentially read every report from every officer

09:13:19AM 25   or deputy in this case; is that right?

1    A.    The initial -- I read them recently, but the initial

2    report is written by the patrol division.  It was not something

3    that I read.  They were done through the patrol captain.

4    Q.    Okay.  And have you read them?

09:13:34AM 5    A.    I have read them since.

6    Q.    Okay.  Prior to your testimony here yesterday and

7    today?

8    A.    Yes.

9    Q.    And you're familiar with them; is that right?

09:13:43AM 10    A.    Yes, sir.

11    Q.    One concern I have is and it may be small, but you

12    mentioned -- do you recall the address of the location?

13    A.    It was -- it was 347 Madrona.

14          MR. BROWN:  May I approach the witness, Your

09:14:08AM 15    Honor?

16          THE COURT:  Yes.

17    Q.    (BY MR. BROWN) Do you recognize this document?

18    A.    Yes.

19    Q.    What is that?

09:14:18AM 20    A.    It's a cover sheet the officers write up.  It's just a

21    cover sheet.  This is the actual report to put information into

22    the computer with.

23    Q.    Okay.  Would you tell me the location that's listed on

24    the prosecution guide.

09:14:34AM 25    A.    351 Madrona.

1    Q.   Okay.  So actually the address was not 347, it was 351;

2    would you agree?

3    A.   The address given by Mr. Wilkinson was 351 Madrona.

4    The address given by our dispatch and the address that we were

09:14:51AM 5    responding to that date was 347 Madrona.

6    Q.   Okay.  But his actual address and what he told you was

7    351, correct?

8    A.   The physical address is 351 Madrona.

9    Q.   And that's what was asked yesterday.  Where did it take

09:15:09AM 10   place and that was the physical address, 351 Madrona?

11   A.   Well, I may have misunderstood what he said.  What he

12   said was where were we dispatched to.

13   Q.   Now, you've also not only reviewed the police officer

14   reports and the deputy reports but you've also reviewed the

09:15:25AM 15   statements contained therein, correct?

16   A.   The statements from each individual person?

17   Q.   Various witnesses in this case?

18   A.   Yes, sir.

19          MR. BROWN:  Judge, may I approach the photos?

09:15:39AM 20          THE COURT:  Yes.

21          MR. BROWN:  Thank you.

22   Q.   (BY MR. BROWN) Now, yesterday, you testified to the

23   jury that both guns were fully loaded.  Do you recall that?

24   A.   No, I did not.  I said that they were -- had been fired

09:15:57AM 25   or a -- one of them had at least been fired.

1    Q.   Okay.  So --

2    A.   The magazine was not full in at least one of them.

3    Q.   It was not full, but it did have --

4    A.   It had ammo in it.

09:16:10AM  5    Q.   In the magazine?

6    A.   Well, it was in the firearm itself.

7    Q.   Okay.

8    A.   I believe it was -- in chambers in the round of a .45,

9    it was chambered and the magazine was still in the gun.

09:16:21AM 10    Q.   Okay.

11    A.   The 9 millimeter had bullets in it.

12    Q.   And had the magazine in it?

13    A.   Yes, sir.

14    Q.   So both guns had the magazine in it?

09:16:26AM 15    A.   Yes, sir.

16    Q.   Okay.  And when you took these pictures of the house

17    and the guns where they were found, they were taken where they

18    were found as is; is that right?

19    A.   I didn't take the photographs, but to my knowledge they

09:16:36AM 20    were taken as is, yes.

21    Q.   Before they were picked up off the ground?

22    A.   Before they were picked up off the ground.

23    Q.   Which gun is this right here, State's Exhibit 24?

24    A.   That is the .45 caliber Glock.

09:17:16AM 25    Q.   And that's what was found right there on the ground?

1    A.   Yes, sir.

2    Q.   And this is the 9 millimeter?

3    A.   Yes, sir.

4    Q.   Okay.  Now, you also testified yesterday that --

09:17:31AM  5  concerning the window where Wylie was located inside the room,

6    do you recall that?

7    A.   The bedroom window, yes, sir.

8    Q.   And you testified that a shot came from outside the

9    house to inside the house; do you recall that?

09:17:48AM 10  A.   It appeared so, yes, sir.

11   Q.   Well, you didn't say it appeared so.  You told this

12   jury that a fire -- there was a gunshot fired from outside the

13   house to inside the house?

14   A.   There was -- it appeared that a shot was fired outside

09:18:02AM 15  the house into the house.

16   Q.   Do you know who officer or Deputy Vasquez is?

17   A.   I do.

18   Q.   What was his duties that day?

19   A.   He was assisting our evidence technicians at the crime

09:18:17AM 20  scene.

21   Q.   Okay.

22        MR. BROWN:  May I approach the witness, Your

23   Honor?

24        THE COURT:  Yes.

09:18:21AM 25  Q.   (BY MR. BROWN) I want you to read Paragraph 6 and

1  you've told me you reviewed his report prior to testifying.

2  Review Paragraph 6 for me.

3      A.   Okay.

4      Q.   According to your deputy who was in charge of the scene

09:18:44AM 5  and the evidence and so forth, he specifically stated there

6  were no shots fired from outside the house into the house,

7  correct?

8      A.   He said he found no bullet holes outside the house.

9  This was on the lip of the window.

09:18:56AM 10      Q.   Okay.  And the window was open, so if he would have

11  gone by that window and he actually took pictures, he would

12  have seen the bullet hole, correct?

13      A.   He may have.  I can't say that he would have.

14      Q.   So you're not sure whether there was any shots fired

09:19:13AM 15  from outside the house to inside the house, are you?

16      A.   I am sure.

17      Q.   And who told you that?

18      A.   I went -- I went to the scene myself and there is a

19  photograph of that hole in the window.  Well, it's actually on

09:19:25AM 20  the edge --

21      Q.   Well --

22      A.   -- of the trim of the window coming into the house.

23      Q.   You didn't do any ballistics on that window sill to

24  verify whether the bullet was coming in the house or going out

09:19:38AM 25  of the house, did you?

1    A.   We didn't do any ballistics testing, no.

2    Q.   Okay.  So that's just your opinion?

3    A.   It is my opinion.

4    Q.   And that's contrary to what Deputy Vasquez said?

09:19:51AM 5    A.   I disagree with you.  I think Deputy Vasquez said he

6    found no bullet holes on the exterior portion of the house.

7    This is on the lip of a window sill.

8    Q.   Actually he said that he didn't locate any bullet holes

9    that had entered the residence.

09:20:08AM 10    A.   Yes, he didn't see any bullet holes on the exterior

11    portion of the house.

12    Q.   That had entered the residence?

13    A.   Okay.

14    Q.   Do you disagree with that?  I'll have you read it

09:20:19AM 15    again.

16    A.   I disagree with his statement what he wrote.  I

17    disagree that there was not a bullet hole fired into the house.

18    Q.   Nobody told you they fired in the house, did they?

19    A.   No.

09:20:29AM 20    Q.   Wylie didn't tell you.  Wilkinson, the person in the

21    room, did not tell you that anybody fired from outside the

22    house inside the house, did he?

23    A.   They did -- he did say there was an exchange of gunfire

24    outside of the residence and I don't know in what direction

09:20:44AM 25    they would have travelled.

 1     Q.    That's not exactly what he said.  He said as the car

 2  was driving away, he fired at the vehicle two times?

 3     A.    Yes.

 4     Q.    Okay.  So --

09:20:52AM  5     A.    There was an exchange of gunfire between them.

 6     Q.    But not while he was in the house?

 7     A.    No, while they were both outside the residence.

 8     Q.    And he said he was the one that shot and there was no

 9  return fire, correct?

09:21:05AM 10     A.    Mr. Wilkinson said he fired at the vehicle and we -- I

11  believe there were shots fired from the vehicle because there

12  was a spent .45 caliber shell casing inside of the passenger's

13  side of the car, and Trooper Moorman observed the defendant

14  outside of the vehicle holding the gun as he's driving up to

09:21:26AM 15  the scene.

16     Q.    He never saw him fire the gun, did he?

17     A.    He did not see him fire the weapon.

18     Q.    And it has been established that there were shots fired

19  inside the house, correct?

09:21:36AM 20     A.    Absolutely.

21     Q.    And you didn't find all the shell casings inside the

22  house, did you?

23     A.    No, sir.

24     Q.    And the ones fired on him were from inside the house,

09:21:44AM 25  correct?

1     A.   It's a possibility.

2     Q.   So you have no personal knowledge that anybody shot

3  towards the house to where a bullet could enter the house, do

4  you?

09:21:53AM 5     A.   Based on those scene photos --

6     Q.   That's not what I am asking you.  You have no personal

7  knowledge, do you?

8     A.   I do have personal knowledge.  Based on what I saw at

9  the scene, a bullet traveled into that residence.

09:22:06AM 10     Q.   Wylie Wilkinson didn't tell you that somebody shot

11  inside that window, did he?

12     A.   No.

13     Q.   He was the one inside the room?

14     A.   He was inside the room.

09:22:14AM 15     Q.   You testified to this jury that -- that the two

16  individuals that came into the house were the first ones to

17  fire shots?

18     A.   If I -- if I said that -- if I said that, I could be

19  mistaken, but I think Wylie Wilkinson said that he fired a shot

09:22:44AM 20  into the floor of the residence in an attempt to scare these

21  guys out of there and they fired shots into the bedroom and --

22     Q.   Let's back up.

23     A.   I think that's how the shots fired went.

24     Q.   I want to make sure the jury knows because yesterday

09:23:02AM 25  the impression was left that these two guys came into the house

1    and started firing first.  That's not the case, is it?

2        A.  These two guys kicked the door in.  Mr. Wilkinson said

3    he fired a shot into the floor.

4        Q.  First?

09:23:16AM 5    A.  He may have said he did it first.

6        Q.  Okay.

7        A.  Then they -- they fired shots or Mr. Travis fired shots

8    into the door, into the wall, and those were the shots fired

9    into the house.

09:23:28AM 10   Q.  Now --

11       A.  Inside of the house.

12       Q.  Okay.  Just so the jury is clear, Wylie Wilkinson told

13   you he fired first?

14       A.  Mr. Wilkinson said he fired the shots trying to get

09:23:40AM 15   them to leave his residence.

16       Q.  That's not my question.  He told you he fired the gun

17   first?

18       A.  He said he fired a shot.

19       Q.  First?

09:23:48AM 20   A.  First.

21       Q.  Thank you.

22       A.  To get them to leave his residence.

23       Q.  Okay.  Now, I'm going to show you State's Exhibit 14,

24   and these are the two holes that you're talking about out of

09:24:00AM 25   the door; is that correct?

1       A.    That's correct.

2       Q.    Okay.  And one of them actually appears, which is the

3  orange band, appears to go into the bed, like has a direct line

4  from the door to the bed; would you agree with that?

09:24:13AM 5    A.    I do.

6       Q.    Okay.  And the green line, which is another hole coming

7  through the door, y'all directed to the bed but there is not

8  really any holes or any torn up fabric or anything of that

9  nature, is there?

09:24:26AM 10   A.    We put the rods in there and there is fabric in there.

11  I'm not sure why they didn't take a picture of it.

12      Q.    Do you have a picture showing that?

13      A.    No, sir.

14      Q.    Is there any pictures anywhere showing that this bullet

09:24:39AM 15  entered the bed?

16      A.    No, sir.

17      Q.    And who was in charge of that?

18      A.    Mark Fields was our evidence technician at the scene in

19  charge of taking photographs.

09:24:46AM 20   Q.    So it's your testimony that this bullet came through

21  the door and entered perfectly right between the two

22  mattresses, didn't touch any of the material and somehow lodged

23  its way into the bed?

24      A.    Yes, that's where the rods went.

09:25:01AM 25   Q.    Okay.  If that's where the rods went, but it very

1  easily -- when Wylie shot, very easily could have gone out of

2  the door?

3     A.  No, I don't believe that took place.

4     Q.  Okay.  Well, you don't believe it took place, but you

09:25:13AM 5  have no personal knowledge that that did not take place, do

6  you?

7     A.  No, I don't have any personal knowledge, but it's not

8  likely.

9     Q.  The prosecutor was asking you questions about the

09:25:23AM 10  locations of the bullets and where they came and where they

11  came from and so forth and you never accounted for Wylie

12  Wilkinson's bullet yesterday, or bullets?

13     A.  Specifically what are you talking about?

14     Q.  If he fired into the ground, why was there not any

09:25:46AM 15  pictures taken of the shot that he fired?

16     A.  There is a picture of the floor.

17     Q.  Okay.  Yesterday you testified that the picture from

18  the floor was the bullet coming through the window, ricocheting

19  off the floor and going into the cabinets?

09:26:02AM 20     A.  That picture that they took is the one that's showing

21  you is the one that came through, skipped up into the cabinet,

22  yes.

23     Q.  Where is the picture of Wylie Wilkinson's bullet that

24  went into the floor?

09:26:13AM 25     A.  I'm not sure.

1      Q.   Do you have one?

2      A.   I don't have one with me, no.

3      Q.   And you're sure that none of those shots are Wylie

4  Wilkinson's?

09:26:28AM  5      A.   Inside of his room?

6      Q.   Yes.

7      A.   I'm sure.

8      Q.   Okay.

9      A.   Except for the one he knowingly told us he fired.

09:26:34AM 10      Q.   Well, I'm talking about the pictures.  You don't know

11  which one of those holes or which one of the skips or which one

12  of the window sills could potentially have been his, do you?

13      A.   I don't believe any of the ones that we've showed you

14  were fired from Mr. Wilkinson's gun.

09:26:49AM 15      Q.   You have no personal knowledge of that, do you?

16      A.   Based on the evidence at the scene, I don't believe

17  that happened.

18      Q.   Well, that's what you believe, but you don't have any

19  personal knowledge, you don't have any ballistics, you don't

09:27:00AM 20  have any comparisons of the gun holes to determine what type of

21  bullet went through the door and what type of bullet skipped

22  off the floor, do you?

23      A.   We submitted that to the crime lab and they didn't tell

24  us --

09:27:09AM 25      Q.   I'm asking you do you have that?

1        A.   No.

2        Q.   It's pretty well established I believe that Timothy

3    Scott Pugh -- and Mr. Pugh was the one who came to the door

4    first; is that right?

09:27:27AM 5    A.   Mr. Pugh said they came to the door together.  He

6    kicked the door in and then your client went in first.

7        Q.   So Mr. Pugh kicked in the door?

8        A.   Absolutely.

9        Q.   And then they both go into the house?

09:27:40AM 10   A.   Yes.

11       Q.   Mr. Pugh drove the vehicle from San Antonio to

12   Kerrville; is that right?

13       A.   That's correct.

14       Q.   And you don't have any reason to dispute that, do you?

09:27:52AM 15   A.   No.

16       Q.   I just want to address this one more time because you

17   testified specifically and directly to this jury yesterday that

18   there was confusion as to who fired the gun first and that was

19   your exact word, confusion?

09:28:42AM 20   A.   Yes.

21       Q.   After speaking with Wylie Wilkinson and him telling you

22   specifically that he fired the gun first, I guess I'm not sure

23   why there is confusion.

24       A.   Wylie didn't tell me he fired the gun first.  Wylie

09:28:56AM 25   told another investigator he fired the gun.

```
 1     Q.   First?

 2     A.   He said he fired the gun.

 3     Q.   Okay.  So there is really not any confusion.  I mean it

 4  is pretty well established in the interview of Wylie Wilkinson

 5  that he fired the gun first?

 6     A.   Wylie Wilkinson said he fired the gun to get the

 7  defendants out of the house.  He was scared.

 8     Q.   And I don't understand why you won't agree to the word

 9  "first."  Like, why do you keep avoiding that?  I keep asking

10  you --

11     A.   I'm not avoiding it.  He said he fired the gun.

12     Q.   First?

13     A.   Okay.  I'm agreeing with you that he fired the gun.

14     Q.   First?

15     A.   Okay.

16     Q.   So there was not any confusion?

17     A.   No.

18     Q.   Are you familiar with Vernon Travis' military

19  background?

20     A.   Slightly.

21     Q.   Are you aware that he did an extension or overseas tour

22  in Iraq?

23     A.   I am.

24     Q.   And are you aware that it happened just around the time

25  9/11 happened?
```

1     A.   No.

2     Q.   You don't know when he did it?

3     A.   I'm not sure of the dates.  I'm aware that he was

4     there, worked in the mailroom.

09:30:02AM 5     Q.   Okay.  And do you know what branch of the military he

6     was with?

7     A.   I believe he was in the Army.  Was he in the Army?

8     Q.   Well, he was in the Air Force.

9     A.   Air Force.  I think he was in the Air Force.

09:30:12AM 10     Q.   So you really don't know what he did over there?

11     A.   I don't know the extent of his background, only what I

12     read on his discharge papers.

13     Q.   Okay.  Through reviewing the statements and so forth,

14     did you learn that Scotty or Timothy Pugh and Vernon Travis had

09:30:52AM 15     been drinking prior to arriving in Kerrville?

16     A.   I could smell alcohol on Scotty's breath.

17     Q.   Okay.  And what about Vernon?

18     A.   I don't recall smelling any alcoholic beverages on his

19     breath.

09:31:12AM 20     Q.   Well, Scotty told you that Vernon showed up at his

21     house and was drinking and continued to drink when they showed

22     up that morning; do you recall that?

23     A.   He didn't tell me directly.  He told another

24     investigator.

09:31:25AM 25     Q.   And you reviewed those reports?

1     A.   Yes.

2     Q.   You don't have any reason to dispute that, do you?

3     A.   Other than what I observed at the scene, no.

4     Q.   Did he tell you how long they had been drinking?

09:31:38AM 5     A.   He said he had worked the previous night until one and

6     then they got together, made phone calls.  I don't know exactly

7     how many beers or whatever they drank or how many throughout

8     the day, no.

9     Q.   Okay.  But you do know that they were drinking?

09:31:57AM 10     A.   I know that he said they were drinking and I know that

11     he smelled of alcohol.

12     Q.   Okay.  Did y'all -- and he was driving the car; is that

13     right?

14     A.   He was.

09:32:05AM 15     Q.   Did y'all do any field sobriety test to determine

16     whether or not he was intoxicated?

17     A.   No.

18     Q.   I mean, because driving on the streets of Kerr County,

19     Texas, while intoxicated, that's an offense; is it not?

09:32:19AM 20     A.   It is.

21     Q.   And y'all just chose not to investigate that?

22     A.   We chose not to pile on a bunch of charges.  He already

23     had committed a pretty serious felony.

24     Q.   Well, you got him for evading arrest in a vehicle,

09:32:33AM 25     didn't you?

1    A.    That's correct, which is a pretty serious felony.

2    Q.    The lowest classification of a felony; is that right?

3    A.    It may be the lowest classification, but it's still a

4    pretty serious felony that young.

09:32:44AM 5    Q.    Are DWIs serious to you?

6    A.    They are.

7    Q.    Through your, I guess, interviews of Wylie, he kind of

8    told you and ran through what he was doing that day; do you

9    recall that?

09:32:55AM 10    A.    Yes.

11    Q.    Okay.  And through I guess reviewing reports and

12    statements, you've learned that I guess he was sitting outside

13    on the front porch smoking marijuana with his friend?

14    A.    He told us that he had been working on the siding of

09:33:10AM 15    his house and that he had gone on the front porch to smoke.  I

16    don't recall him saying he smoked marijuana that day.  He said

17    he smokes cigarettes but he doesn't smoke inside of his house.

18    He did admit to smoking marijuana.  I don't believe he said

19    that he smoked it that day.

09:34:00AM 20    Q.    What time did you arrive to the scene?

21    A.    Oh, it would have been close to 3:45, 3:50, somewhere

22    in there, three -- somewhere around 3:50.  We got the call at

23    3:46 I think and somewhere within the next 5 or 10 minutes we

24    arrived.

09:34:24AM 25    Q.    Did Scotty tell you why they went there?

1    A.    Scotty told an investigator that they went there to rob

2    the people who lived in the residence.

3    Q.    He didn't say the people, he said the guy that was

4    there; is that right?

09:34:40AM 5    A.    Yes.

6    Q.    It's a male.  And did he tell you why?

7    A.    He said he had -- he was a drug dealer and he had a

8    couple of thousand dollars that they were supposed to steal.

9    Q.    Did he get into the fact that the guy may have owed him

09:34:57AM 10    money?

11    A.    Not to me.

12    Q.    Do you remember that being --

13    A.    No.  No, he said the guy was a drug dealer and they

14    were going there to rob him of his drugs.

09:35:05AM 15    Q.    And then he -- Wylie had a gun in the house?

16    A.    Wylie did have a gun in his house.

17    Q.    He did have a safe; is that right?

18    A.    He did have a safe.

19    Q.    Now, you mentioned that Amber, the lady said that both

09:35:24AM 20    individuals came into the house and pointed a gun at her?

21    A.    She did.

22    Q.    And Timothy when he was interviewed said absolutely

23    not, we didn't do that?

24    A.    Okay, yes.

09:35:33AM 25    Q.    Do you agree with that?

1      A.    Yes.

2      Q.    And actually nobody admitted to doing that, did they?

3      A.    Timothy said that he had -- he pointed the gun, but he

4  was trying to be nice and he didn't really want to be there.

09:35:50AM  5  He stayed by the doorway.  He also --

6      Q.    He said he never stuck it to her head or pointed it at

7  her head?  He --

8      A.    Correct.

9      Q.    He was telling her to get in the room with the child?

09:36:01AM 10  A.    That's right.  He said Travis did that.

11     Q.    He didn't say Travis stuck the gun at the lady's head?

12     A.    He said Travis pointed a gun at her.

13     Q.    He did?

14     A.    Yeah.

09:36:11AM 15  Q.    You're sure about that?

16     A.    Yes.

17     Q.    You're 100 percent sure?

18     A.    Yes.

19     Q.    Do you have a copy of his statement in front of you?

09:36:22AM 20  A.    No, I do not.

21           MR. BROWN:  May I approach the witness, Your

22  Honor?

23           THE COURT:  Yes.

24     Q.    (BY MR. BROWN) I want you to read through this and tell

09:37:24AM 25  me and show me where Timothy Scott Pugh says that he pointed

1    the gun at her.

2        A.   This is Investigator Ledford's report?

3        Q.   Yes, it's his statement.

4        A.   Investigator Ledford told me at the scene that Timothy

09:37:45AM 5    said they both went into the residence, they both --

6        Q.   Show me where it's contained in his report that that

7    happened.

8        A.   It may not be in his report.

9        Q.   You said you read it?

09:37:55AM 10   A.   I did read it.

11       Q.   Show me where it's at.

12       A.   It may not be in his report.

13       Q.   Well, whose report is it in because I have not seen

14   anywhere where Timothy Scott Pugh says that Vernon Travis stuck

09:38:08AM 15   a gun or pointed a gun at this lady's head?

16       A.   At the scene --

17       Q.   I'm not asking you at the scene.  I asking which report

18   it's in you said you reviewed?

19       A.   You're asking me if it was said and I'm telling you it

09:38:18AM 20   was.

21       Q.   Where is it in a report?

22       A.   It's not in that report.

23       Q.   It's not in any report, is it?

24       A.   Yes.

09:38:24AM 25   Q.   Which report is it in?

1      A.   Investigator Ledford reported to me.  He told me --

2      Q.   I'm not asking what he reported to you.  I'm asking

3   what report it's in that says that.

4      A.   It may not be in that written report.

09:38:38AM 5      Q.   I'm not asking if it's in that written report.  I want

6   to know any report that contains that statement.

7      A.   I'm just saying it's not in that written report.

8   Investigator Ledford told me at the scene that Mr. Pugh

9   informed him that he stood by the door while Travis pointed the

09:38:54AM 10   gun and Travis was acting crazy --

11           MR. BROWN:  I'm going to object to nonresponsive,

12   Your Honor.

13           THE COURT:  I think she's answered the question.

14   Let's ask another question.

09:39:06AM 15      Q.   (BY MR. BROWN) There is not a report that contains

16   that, is there?

17      A.   No.

18      Q.   After y'all arrived at the scene and the car drove

19   away, I believe you mentioned that there was a DPS trooper that

09:40:09AM 20   was the first one on the scene?

21      A.   Yes.

22      Q.   Okay.  And at some point in time, did you learn that

23   Vernon Travis had thrown the guns out the window?

24      A.   Yes.

09:40:20AM 25      Q.   And did he -- ultimately was he the first one that came

1  out and gave himself up and came to the police?

2     A.   No.  He came out of the woodline and was encountered by

3  our officer.

4     Q.   Okay.  But he was the first one to do so?

09:40:34AM 5     A.   He came out of the woodline, yes.

6     Q.   But out of him and Scotty Pugh, he was the first one to

7  come out?

8     A.   Yes.

9     Q.   Okay.  And he didn't cause any problems?  I mean, he

09:40:44AM 10  didn't go running up like he was going to attack anybody or

11  anything of that nature, did he?

12     A.   No.

13     Q.   He was compliant with the officers who demanded him to

14  get on the ground and sit there until they could approach him?

09:40:57AM 15     A.   They never asked him to get on the ground but he did

16  comply with what they asked him to do.

17     Q.   He didn't pull a gun out and point it at them or

18  anything like that?

19     A.   No.

09:41:06AM 20     Q.   In fact, he didn't have any guns on him when they came

21  to him?

22     A.   No.

23     Q.   And after they came and I guess arrested him and placed

24  him in custody, where did they put him next?

09:41:16AM 25     A.   In the backseat of the patrol vehicle.

1    Q.   And then took him down to the Kerr County Jail, or

2    where did they take him to?

3    A.   No, took him to the location of the blue car that they

4    were driving.

09:41:28AM 5    Q.   How much later after the fact did Scotty Pugh come out?

6    A.   Oh, I want to say within the next 15 minutes he came

7    out of the woodline.

8              MR. BROWN:   I don't have any further questions of

9    this witness, Your Honor.

09:42:06AM 10              THE COURT:   Any other questions, Mr. Monroe?

11              MR. MONROE:   Just a couple briefly, Your Honor.

12                        REDIRECT EXAMINATION

13   BY MR. MONROE:

14   Q.   Did Mr. Pugh tell you that Mr. Travis fired the gun --

09:42:20AM 15   his gun three times in the residence?

16   A.   Yes.

17   Q.   Now, Mr. Brown made some comments about ballistics and

18   I've always looked at ballistics as a combination of --

19              MR. BROWN:   Objection to the prosecutor

09:42:36AM 20   testifying.

21              MR. MONROE:   I'm just trying to lay a predicate to

22   get to a specific question.

23              THE COURT:   Let me hear what the question is.

24              MR. MONROE:   I'll rephrase it.  I'll withdraw it.

09:42:45AM 25              THE COURT:   Okay.

Q.    (BY MR. MONROE) Tell me what ballistics means to you.

A.    It is determining whether or not a bullet was fired from a specific gun.

Q.    Okay.  Fired from a specific gun?

09:42:56AM  A.    Correct.

Q.    A caliber?

A.    A caliber or there is tooling, tool marks on the -- on the bullet.

Q.    All right.  And so ballistics would be important in this case in what respect?

09:43:08AM  A.    Oh, to determine who fired which gun or if a specific bullet was fired from a gun.

Q.    All right.  Were you able to locate or were the evidence technicians able to locate bullets themselves?

09:43:26AM  A.    I think they -- I do think they located one.

Q.    Right.  And were they able to determine -- were they tested ballistically?

A.    We sent it to the crime lab with the guns and they did test it and they were not able to tell us which gun fired it.

09:43:43AM  Q.    Inconclusive?

A.    Inconclusive.

Q.    And you've had extensive experience in ballistics, is that fair to say?

A.    I wouldn't say I've personally done ballistic testing,

09:43:56AM  but I've seen the test results come back.

1    Q.   Is it unusual that ballistic tests are sometimes

2  inconclusive?

3              MR. BROWN:  I'm going to object, Your Honor.  She

4  said she doesn't have much training and experience in this.

09:44:06AM 5              THE COURT:  Overruled.

6    Q.   (BY MR. MONROE) Is it unusual --

7    A.   It's not unusual for reports to come back inconclusive.

8    Q.   Okay.  Now, let's -- is there a difference between

9  ballistics, that phrase, and the direction of travel?  Is that

09:44:20AM 10  considered ballistics?

11    A.   No, one of them is trajectory.

12    Q.   Okay.  Trajectory.  And the little colored poles that

13  are in --

14    A.   Rods.

09:44:30AM 15    Q.   The rods, right.  Is that an indication of ballistics

16  or is that an indication of trajectory?

17    A.   It's just direction of travel.

18    Q.   All right.  And is it -- are there things that an

19  officer such as yourself can look for, physical things at a

09:44:46AM 20  scene, to help you determine direction of travel?

21    A.   Yes.  You look for damaged items.  We use those rods

22  for direction of travel, damage to items.

23    Q.   Well, for example, if you find where the bullet ended

24  up, that gives you an idea of direction of travel?

09:45:07AM 25    A.   Sure.

1    Q.   With the two rods that are shown in State's exhibits,

2    does that indicate that the direction of travel originated

3    outside the bedroom or inside the bedroom?

4    A.   Inside.   There were no bullet holes in the kitchen or

09:45:22AM 5    dining room area.

6    Q.   All right.   And the bullet ended up somewhere in the

7    bed?

8    A.   Yes.

9    Q.   So it started from outside the bedroom and the gun was

09:45:28AM 10   fired into the bedroom?

11   A.   Yes.

12   Q.   Same thing with the bullet in the wall?

13   A.   Yes.

14   Q.   Now, the issue regarding alcohol, did you observe

09:45:39AM 15   anything about Mr. Travis at the scene that would have caused

16   you to believe that Mr. Travis was intoxicated?

17   A.   No.

18   Q.   Did you smell alcohol on or about Mr. Travis' person?

19   A.   No.

09:45:55AM 20   Q.   Do you have any idea whether he had been drinking

21   before?

22   A.   No.   Only -- only what Mr. Pugh -- what Mr. Pugh said.

23   Q.   But did you observe any alcohol on Mr. Travis?

24   A.   No.

09:46:12AM 25   Q.   All right.   Now, you said -- you mentioned and it's

1    probably me not hearing very well, but sometimes we use

2    pronouns of he and she and so on and we used the pronoun of he

3    a couple of times, that he had worked the previous night?  Who

4    was he?

09:46:30AM  5    A.   Scotty, Mr. Pugh.

6    Q.   Mr. Pugh?

7    A.   He worked the previous night.  He was a paramedic.

8    Q.   And who also had been drinking then and acknowledged

9    that he had been drinking the previous night?

09:46:41AM 10    A.   Mr. Pugh.

11    Q.   Mr. Pugh.  Did -- when Mr. Travis was apprehended at

12    the scene, right there at the scene, he came out of the woods;

13    is that correct?

14    A.   Uh-huh.  Yes.

09:47:03AM 15    Q.   Did he say anything at that time?

16    A.   He said he was out for a walk.

17    Q.   Out for a walk?

18    A.   Right.

19    Q.   Did he --

09:47:10AM 20    A.   He didn't come out with his arms raised or anything

21    like that.

22    Q.   He said he had been out for a walk?

23    A.   Yes.

24    Q.   All right.  Now, the address issue, it's my

09:47:22AM 25    understanding that this whole scenario began with a 9/11 call?

1      A.   It did.

2      Q.   And can you tell the jury from what address the 9/11

3   call came from?

4      A.   Everything that we had dispatched to 347 Madrona.

09:47:45AM 5      Q.   And is that next door to 351?

6      A.   It is.

7      Q.   All right.  You said that Trooper Moorman saw a person

8   on the passenger side of the car with the firearms?

9      A.   He did.

09:48:02AM 10      Q.   Who was on the passenger's side of the car?

11      A.   Mr. Travis.  He saw him with a firearm.

12      Q.   A firearm.  And he saw him -- did he describe the

13   firearm that he saw?

14      A.   He said it was a black firearm.

09:48:15AM 15      Q.   We know now that the black firearm is which one?

16      A.   The .45 caliber Glock.

17      Q.   Where is Mr. Pugh as we speak?

18      A.   He's in the Kerr County Jail awaiting trial.

19           MR. MONROE:  Pass the witness.

09:48:32AM 20           THE COURT:  Any other questions, Mr. Brown?

21           MR. BROWN:  Just a couple of follow-up.

22                    RECROSS-EXAMINATION

23   BY MR. BROWN:

24      Q.   The prosecutor brought up the address again.  The way

09:48:44AM 25   it was phrased to you yesterday was, where did this take place

 1    and the response was 347.  Actually, the address was 351; would

 2    you agree with that?

 3        A.   The 9/11 call came from 347.  Mr. Wilkinson lived at

 4    351.

09:48:59AM 5        Q.   They didn't ask you yesterday where the 9/11 call came

 6    from, did they?

 7        A.   I believe he asked me where I was dispatched to.

 8        Q.   At the location of the offense, do you recall that?

 9        A.   Yes, we were dispatched to 347 Madrona.

09:49:14AM 10        Q.   Now, Timothy or Scotty Pugh has not taken a plea in

11    this case, has he?

12        A.   None that I'm aware of, no.

13        Q.   He hasn't pled guilty like Mr. Travis has, has he?

14        A.   No, he hasn't come to trial yet.

09:49:34AM 15              MR. BROWN:  I have no further questions.

16              THE COURT:  Do you have any questions, Mr. Monroe?

17              MR. MONROE:  Yes, sir.

18                      REDIRECT EXAMINATION

19    BY MR. MONROE:

09:49:41AM 20        Q.   Did Mr. Pugh give a voluntary statement?

21        A.   He did.

22        Q.   Did he acknowledge responsibility?

23        A.   He did.

24        Q.   Did Mr. Travis do that?

09:49:49AM 25        A.   No.

1          MR. MONROE:  No further questions.

2          MR. BROWN:  No further questions, Your Honor.

3          THE COURT:  Thank you, ma'am.  You may step down.

4          Your next witness, Mr. Monroe?

09:50:00AM 5          MR. MONROE:  Officer James Ledford.

6          THE COURT:  James Ledford, Officer Witt.

7          Officer, would you raise your right hand and be

8  sworn.

9                        JAMES LEDFORD,

09:50:34AM 10 having been first duly sworn, testified as follows:

11          THE COURT:  Have a seat and state your name for

12 us.

13          THE WITNESS:  James Ledford.

14          THE COURT:  Mr. Monroe.

09:50:41AM 15                  DIRECT EXAMINATION

16 BY MR. MONROE:

17     Q.  And, Officer Ledford, what is your business profession

18 or occupation?

19     A.  I'm a law enforcement officer.  I'm employed as an

09:50:49AM 20 investigator for the Kerr County Sheriff's Office.

21     Q.  And tell the jury a little bit about your law

22 enforcement background.

23     A.  I have about 25 years of experience.  I have been in

24 Kerr County for about 12 years.  I've been in CID for about 11

09:51:05AM 25 years.  Prior to that, I was in Fort Stockton and then Brady

1    before that.

2        Q.   As a matter of fact, in Brady what was your final

3    upgrade?  What was your position?

4        A.   I was Chief of Police there.

09:51:21AM  5        Q.   And you say you've been in Kerr County for about 12

6    years?

7        A.   Yes, sir.

8        Q.   Now -- and let me just direct you back to the time

9    period around September of 2013, what were your

09:51:30AM 10    responsibilities at that time?

11        A.   I was an investigator for the sheriff's office.

12        Q.   Okay.  All right.  And did you have an occasion to

13    become involved in the investigation of criminal activity out

14    on Madrona Drive in Kerr County?

09:51:46AM 15        A.   Yes, sir, I did.

16        Q.   And what were your roles with respect to that

17    investigation?

18        A.   Originally I helped -- we looked for the suspect and

19    then I interviewed one of the suspects outside my vehicle and

09:51:58AM 20    then assisted in locating the weapons, and then I interviewed

21    both of those suspects.

22        Q.   Okay.  And when you said you interviewed both the

23    suspects, the last statement you gave, where did those

24    interviews take place?

09:52:12AM 25        A.   At the sheriff's office.

1    Q.   All right.  Did you interview Mr. Travis?

2    A.   Yes, sir, I did.

3    Q.   All right.  Tell the jury what the protocol or what

4    rules and regulations you followed as a matter of course when

09:52:29AM 5    you're going to attempt to interview a suspect in a criminal

6    case?

7    A.   I took him into the interview room, activated the video

8    recording equipment.  I then read him the Miranda warning and

9    the waiver of rights.

09:52:47AM 10    Q.   And is a determination made at some point during this

11    event as to whether the video recording equipment is working

12    properly?

13    A.   Yes, there is.

14    Q.   And is that something that you also verify or determine

09:53:00AM 15    either during the event itself or immediately thereafter?

16    A.   Yes, sir, I did.

17    Q.   And did you do that in this case?

18    A.   Yes, sir, I did.

19         MR. MONROE:  May I approach the witness?

09:53:09AM 20         THE COURT:  Yes.

21    Q.   (BY MR. MONROE) I'll hand you what's been marked for

22    identification purposes only as State's Exhibit 29 and then

23    I'll hand you what's also been marked as State's Exhibit 30

24    which has been offered into evidence.  Do you recognize those

09:53:28AM 25    two?

1    A.   Yes, sir, I do.

2    Q.   And State's Exhibit 29 is the entire statement,

3  correct?

4    A.   That's the entire interview, yes, sir.

09:53:34AM 5    Q.   And State's Exhibit 30 is redacted?

6    A.   Yes, sir, it is.

7    Q.   Regarding State's Exhibit 30, you looked at that prior

8  to today?

9    A.   Yes, sir, I did.

09:53:43AM 10    Q.   Does it reasonably and accurately portray the events as

11  they took place on that day?

12    A.   Yes, sir, it does.

13    Q.   And this is an interview with you and Mr. Travis?

14    A.   Yes, sir, it is.

09:53:54AM 15         MR. MONROE:  We would offer into evidence State's

16  Exhibit 30 and State's Exhibit 29 just be attached for

17  identification purposes.

18         (State's Exhibit Nos. 29-30 offered).

19         THE COURT:  Any objection?  Mr. Brown?

09:54:06AM 20         MR. BROWN:  Yes, sir.  Same objections that we

21  made previously to the Court.

22         THE COURT:  All right.  I'll overrule those

23  objections and I'll admit 30 for purposes of the record -- I'm

24  sorry, 29 for purposes of the record and 30 for purposes of

09:54:18AM 25  this hearing.

1          (State's Exhibit 29-30 admitted).

2          MR. MONROE:  Yes, sir.  We would like to publish

3    State's Exhibit 30 to the jury.

4          THE COURT:  All right.

09:54:53AM  5          (Video played).

6          THE COURT:  Any questions of --

7          MR. MONROE:  Just a few more.  I'm going to let

8    Officer Van Kalveren raise the screen.

9    Q.   (BY MR. MONROE) A couple of questions, Officer Ledford.

10:07:16AM 10   Approximately how long after Mr. Travis had been apprehended at

11   the scene was it before this interview took place?

12   A.   I would say approximately a couple of hours.

13   Q.   All right.  Mr. Travis was detained that entire time,

14   correct?

10:07:36AM 15   A.   That's correct.

16   Q.   All right.  Did you see Mr. Travis out there on the

17   scene as well?

18   A.   Yes, sir, I did.

19   Q.   And in your training as a law enforcement officer and I

10:07:49AM 20   understand you've actually been on patrol for a period of time,

21   have you been trained to recognize people who appear to be

22   intoxicated?

23   A.   Yes, sir, I have.

24   Q.   And have you learned to recognize the smell of alcohol?

10:08:03AM 25   A.   Yes, sir.

1    Q.   Well, let me ask you this.  At the scene did Mr. Travis

2  smell of alcohol?

3    A.   Yes, sir, he did.

4    Q.   All right.  At the interview, did Mr. Travis show signs

10:08:16AM 5  of being intoxicated?

6    A.   Yes, sir, he did.

7    Q.   Okay.  Did you believe he was intoxicated to the point

8  that he was not -- did not know what he was doing?

9    A.   No, sir.

10:08:28AM 10   Q.   All right.  Now, did you have conversations with Mr.

11  Travis at the scene regarding the discharge of weapons?

12    A.   Yes, sir.

13    Q.   And what did Mr. Travis tell you at the scene with

14  respect to whether or not he had discharged a weapon?

10:08:44AM 15    A.   He denied that.

16         MR. MONROE:  Pass the witness.

17              CROSS-EXAMINATION

18  BY MR. BROWN:

19    Q.   Deputy Ledford, my name is Shawn Brown.  I have a few

10:09:02AM 20  questions for you.  Anytime you don't understand the question,

21  just ask me to repeat it and I'll be happy to do so.

22         THE COURT:  Pull that microphone down some.

23    Q.   (BY MR. BROWN) How long have you worked with the Kerr

24  County Sheriff's Department?

10:09:17AM 25    A.   About 12 years.

1    Q.   And what are your duties and descriptions now?

2    A.   I'm a criminal investigator.  I investigate I guess

3  every crime that can be committed in the county.

4    Q.   Okay.  And that's all crimes; is that right?

10:09:33AM  5    A.   Yes, sir.

6    Q.   And you've had I guess training through your experience

7  on how to take statements and so forth; is that right?

8    A.   That's correct.

9    Q.   And concerning writing a report, you've also received

10:09:48AM 10  training and had quite a bit of experience through your

11  criminal investigations on writing reports; would you agree

12  with that?

13    A.   Yes, sir.

14    Q.   And just as Captain Twiss came in and testified, it's

10:10:02AM 15  important to write a detailed report because it helps you

16  remember what happened maybe six or eight months ago that you

17  may not remember today; would you agree with that?

18    A.   That's correct.

19    Q.   And also it helps the prosecutor when they're reviewing

10:10:15AM 20  a file; is that right?

21    A.   Yes, sir.

22    Q.   And everything that you put in your report is as much

23  detail as you can put in there and it's true and accurate;

24  would you agree with that?

10:10:27AM 25    A.   I would agree with that.

1          MR. BROWN:  Your Honor, with regard to 612 and

2    615, we would request any reports or documents that this

3    officer has relied upon prior to testifying today.

4          THE COURT:  Do you have your reports with you?

10:10:43AM  5          THE WITNESS:  No, sir, I don't.

6          THE COURT:  Do you have a copy of his report?

7          MR. MONROE:  I don't know what he's relied on.

8          THE COURT:  Okay.

9    Q.   (BY MR. BROWN) What did you rely upon prior to

10:10:51AM 10    testifying today?

11    A.   I reviewed my report and the videos.

12          MR. BROWN:  We would request his --

13          THE COURT:  You don't have a copy of his report?

14          MR. BROWN:  I do and I'll take it to him and just

10:11:04AM 15    ask if it's a fair and accurate copy.

16          THE COURT:  All right.

17    Q.   (BY MR. BROWN) I'm going to show you what's been given

18    to me through discovery and ask you if you reviewed this.  It's

19    22 pages.  Is that how many pages your report was?

10:11:19AM 20    A.   It's probably -- if that's what it shows, that's what

21    it is; yes, sir.

22    Q.   That's a pretty detailed report, would you agree with

23    me?

24    A.   Yes, sir.

10:11:26AM 25    Q.   And it's probably one of the longest in this

1    investigation, would you agree with that?

2        A.   I'm not sure.  I didn't read or review everybody's

3    reports.

4        Q.   Okay.  Did you review anybody's reports?

10:11:38AM 5    A.   No, sir, I didn't.

6        Q.   Is that a true and accurate copy of your report minus

7    the notes that I've written on it?

8        A.   Without reading the entire report, I would say more

9    than likely it is.

10:11:50AM 10    Q.   Okay.  Thank you.  If at any time you need to review

11    this to refresh your memory, just let me know.

12        A.   Yes, sir.

13        Q.   How were you dispatched to the scene?

14        A.   Actually we were at the office and I overheard a

10:12:06AM 15    trooper or the call go out from our dispatch to the patrol

16    deputies and then I told Captain Twiss what I had heard via my

17    walkie-talkie.

18        Q.   Okay.  And did you ultimately go to the location?

19        A.   Yes, sir, I did.

10:12:25AM 20    Q.   What location was that?

21        A.   Madrona.

22        Q.   Which address?

23        A.   We stopped where Deputy Spence had Mr. Travis detained.

24        Q.   So by the time you came to the scene, Vernon Travis was

10:12:43AM 25    already in custody?

1    A.   I don't think he was in custody.  He was -- yes, sir,

2    he was in custody.  Yes, sir.

3    Q.   Okay.  So he had already come out -- come up to Deputy

4    Spence and then taken into custody?

10:12:56AM 5    A.   That's correct.

6    Q.   Okay.  And did you go back to the location of 351

7    Madrona?

8    A.   No, I didn't.

9    Q.   Okay.  So you never made it actually to the location

10:13:09AM 10   where this occurred?

11   A.   No, sir, I didn't.

12   Q.   And did you at that point in time take custody of

13   Vernon Travis?

14   A.   No, sir, I didn't.

10:13:17AM 15   Q.   Okay.  How did you come about to have contact with

16   Vernon Travis?

17   A.   Talked to him there where Deputy Spence had him

18   detained.

19   Q.   Okay.  There at the roadside?

10:13:32AM 20   A.   Yes, sir.

21   Q.   Okay.  And ultimately did you not only take a statement

22   from Vernon Travis but also Scotty Pugh who was with him?

23   A.   Timothy Pugh?

24   Q.   Yes.

10:13:43AM 25   A.   Yes, sir, that's correct.

                1       Q.    Okay.  So you took a statement from him as well?

                2       A.    Yes, sir, I did.

                3       Q.    And the prosecution said that he came forward and

                4    basically told you everything that happened; would you agree

10:13:56AM      5    with that?

                6       A.    Who are you talking about?

                7       Q.    Timothy Pugh.

                8       A.    Yes, sir, that's correct.

                9       Q.    And you believed him to be credible at the time he gave

10:14:06AM     10    the statement?

               11       A.    He appeared to be, yes, sir.

               12       Q.    And where did -- where did both of these individuals

               13    give their statements?

               14       A.    At the -- Timothy Pugh, I talked to him outside my

10:14:18AM     15    vehicle on Madrona, and then I did a videotaped interview with

               16    him at the Kerr County Sheriff's Office.

               17       Q.    Okay.  And you asked him why they came up there, do you

               18    recall that?

               19       A.    Who are we talking about?

10:14:36AM     20       Q.    Timothy Pugh.

               21       A.    Yes, sir.

               22       Q.    And from asking him, you learned that they were coming

               23    up to Kerrville because there was a drug dealer that owed them

               24    money; is that right?

10:14:49AM     25       A.    No, sir.

Q.   What was the issue?  Why were they coming up here?

A.   They were coming up here to rob a drug dealer and supposedly Pugh was going to get around $2,000.00.

Q.   If I didn't say that before, I apologize.  That's what I meant to say, is that they were coming up here to rob a drug dealer; is that right?

A.   That's correct.

Q.   And did Timothy ever indicate to you when he found out that he was going to be involved in this?

A.   He said it was that morning.

Q.   The morning that they came up to Kerrville was the first time that they found out about it?

A.   That's what he said, yes, sir.

Q.   Did you have any reason not to believe that?

A.   I had no reason or no way to disprove that.

Q.   Okay.  But my question is, did you have any reason not to believe him?

A.   Not really, no, sir.

Q.   Did he tell you who drove the car?

A.   He did.

Q.   And who was that?

A.   Timothy Pugh.

Q.   Okay.  And did he tell you what the plan was when they got to the house?

A.   To rob a drug dealer.

1    Q.   And did he tell you how they were going to do it?

2    A.   I don't believe so.

3         MR. BROWN:  May I approach the witness, Your

4    Honor?

10:16:13AM 5         THE COURT:  Yes, sir.

6    Q.   (BY MR. BROWN) Read Paragraph 24, please, sir, to

7    yourself.

8    A.   Okay.

9    Q.   Did he tell you what they basically were going to do to

10:16:31AM 10   rob this drug dealer?

11   A.   They were going to grab the money and run out of the

12   house.

13   Q.   He never told you that they were going to shoot

14   anybody, did he?

10:16:40AM 15   A.   No, he didn't.

16   Q.   He never told you they were going to use the weapons

17   when they got into the house, did he?

18   A.   No, sir, he didn't.

19   Q.   They were going to get in and get out as quick as

10:16:51AM 20   possible?

21   A.   That's what it appeared.

22   Q.   Yes, sir.  Did he tell you how he made it to the

23   location at 351 Madrona?

24   A.   He said that Vernon Travis gave him directions.

10:17:05AM 25   Q.   Do you recall if he said that Vernon Travis had a GPS

1   on his phone or if he had a map or anything of that nature?

2       A.   He said that they didn't.

3       Q.   They didn't have any directions?  They didn't have a

4   GPS, Vernon just told them where they were going?

10:17:22AM  5   A.   That's correct.

6       Q.   And he, in fact, told you that Vernon had never been

7   there before, didn't he?

8       A.   I'm not sure.

9            MR. BROWN:  May I approach the witness, Your

10:17:35AM 10   Honor?

11           THE COURT:  Yes.

12      Q.   (BY MR. BROWN) Read Paragraph 29 to yourself, sir.

13      A.   Okay.

14      Q.   And it appears that he said, Not that I know of?

10:17:52AM 15   A.   That's correct.

16      Q.   Okay.  So he had no knowledge of Vernon Travis ever

17  being there or how he had gotten directions to that location;

18  is that right?

19      A.   That's correct.

10:18:03AM 20   Q.   And he never mentioned that they followed anybody up to

21  the house, did he?

22      A.   No, he didn't.

23      Q.   Once they got to the location, did Timothy tell you how

24  they got into the house?

10:18:27AM 25   A.   Timothy said he kicked the door open.

1    Q.   And he was the first one in?

2    A.   He stood in the doorway and Vernon Travis went into the

3    house.

4    Q.   Okay.  Did he tell you what portion of the house that

5    Vernon Travis went to?

6    A.   To the kitchen area.

7    Q.   He never told you that Vernon Travis went to the

8    bedroom where the lady and the child was, did he?

9    A.   I don't think he did, no, sir.

10   Q.   Okay.  So if another officer came in here and testified

11   to that and said that you told him that, that wouldn't

12   necessarily be true, would it?

13   A.   That I said that?

14   Q.   Yes, sir.

15   A.   I don't remember saying that.

16   Q.   Okay.  And you didn't write that in your report either,

17   did you?

18   A.   I don't think I did, no, sir.

19   Q.   When they came in there, did Timothy tell you who fired

20   the shot first?

21   A.   He said that somebody fired a shot in a bedroom.

22   Q.   So the individual that was in the bedroom fired the

23   shot first?

24   A.   Yes, sir.

25   Q.   That wasn't Vernon Travis or Timothy Scott Pugh?

         1       A.    That's what Timothy said.

         2       Q.    There wasn't any confusion about that, was there?

         3       A.    No, sir.

         4       Q.    Did you ever talk to the individual in the bedroom?

10:19:46AM  5       A.    No, sir, I didn't.

         6       Q.    Did you ever learn from any of the other officers that

         7  he admitted to shooting first?

         8       A.    No, I didn't.

         9       Q.    Timothy clearly told you that the individual in the

10:20:02AM 10  room shot first?

        11       A.    That's correct.

        12       Q.    Did he tell you where the bullet exited the bedroom?

        13       A.    I don't recall.  I thought that -- I really don't

        14  recall.

10:20:25AM 15       Q.    You don't recall him telling you that the bullet exited

        16  from the doorway of the bedroom?

        17       A.    Maybe he did, yes, sir.

        18       Q.    He told you that he saw the bullet come out the door of

        19  the entryway to the bedroom; is that right?

10:20:39AM 20       A.    I believe that's correct.

        21       Q.    And when the shots were fired or when the individual

        22  fired the shot, Vernon was still in the kitchen area; is that

        23  right?

        24       A.    That's what Timothy said.

10:20:55AM 25       Q.    You don't have any reason to dispute that, do you?

1    A.   I have no idea.  I mean, that's just what he said.

2    Q.   You don't have any evidence to indicate otherwise, do

3 you?

4    A.   No, sir.

10:21:09AM 5    Q.   And you asked Timothy what Vernon did after the shots

6 were fired and he told you that Vernon fired back; is that

7 right?

8    A.   That's correct.

9    Q.   And then what did he do next?

10:21:22AM 10    A.   Timothy told Vernon that they needed to get out of

11 there and that Vernon fired another round and then they left.

12    Q.   Okay.  At no point in time did Timothy ever tell you

13 that he or Vernon went over to the lady and stuck a gun to her

14 head, did he?

10:21:41AM 15    A.   I don't think he did.

16    Q.   Well, you don't have that in your report?

17    A.   Well, if it's not in the report, he didn't say it.

18    Q.   So if somebody else came in and testified to that, that

19 you told them that, that wouldn't necessarily be true, would

10:21:57AM 20 it?

21    A.   I didn't -- I don't think I told them that.

22    Q.   You didn't tell anybody that?

23    A.   I could have, but I -- I don't remember that.

24    Q.   It's not in your report, is it?

10:22:08AM 25    A.   No, sir.

1    Q.  But, in fact, what Timothy Pugh told you was that

2  Vernon yelled to the lady and the child to stay in the bedroom,

3  didn't he?

4    A.  That's correct.

10:22:27AM  5    Q.  He never went over there and screamed and yelled at him

6  and told her to send the child out, did he?

7    A.  I don't remember.

8         MR. BROWN:  May I approach the witness, Your

9  Honor?

10:22:39AM 10         THE COURT:  Yes.

11    Q.  (BY MR. BROWN) Read that to yourself, please.

12    A.  Okay.

13    Q.  So he told you that Vernon yelled at the lady and the

14  child to stay in the bedroom; did he not?

10:23:19AM 15    A.  That's correct.

16    Q.  Did Timothy Pugh ever tell you that they fired shots

17  from outside the house into the house?

18    A.  No, sir.

19    Q.  Did you have any information from anybody there or any

10:23:41AM 20  of the reports that indicated that anybody did that?

21    A.  I didn't have any indication from anybody that that

22  happened.

23    Q.  What did they tell you they did next once they left the

24  house?

10:24:08AM 25    A.  They got in the car and drove off.

Q.   Okay.  Did Timothy tell you that they started drinking
early that morning?

A.   Yes, sir, he did.

Q.   They started drinking beer?

A.   Beer and I believe there was some liquor.

Q.   Okay.  And that's why you testified to this jury that
you believe not only did he smell of alcohol but he showed
signs of intoxication; is that right?

A.   I probably need to correct the intoxication part during
the interview.  I did smell a little alcohol, but I don't think
he was intoxicated.

Q.   But you said he showed signs of intoxication.  I mean,
you've done DWI arrests and you're familiar with signs of
intoxication; are you not?

A.   That's correct.

Q.   And he exhibited some of those signs?

A.   More so when he was on the side of the road with Deputy
Spence than whenever I was interviewing him.

Q.   Tell this jury what types of signs of intoxication that
he showed on the side of the road.

A.   I mean he smelled strongly of alcohol.  His speech was
somewhat slurred.  He was -- seemed to be more laid back than
what he did during the interview.

Q.   Did they -- did Timothy tell you specifically how long
they were in the house?

1      A.   Specifically not very long.  I don't remember the exact

2  time frame.

3      Q.   But it wasn't very long?

4      A.   No, sir.

10:25:52AM 5      Q.   Did they tell you whether or not that they got any

6  money that they came to the house for?

7      A.   He said they didn't.

8      Q.   They didn't get anything?

9      A.   No.

10:26:00AM 10     Q.   You don't have any information that they took anything

11  from the house, do you?

12     A.   No, sir, and we didn't find any money on them, in their

13  vehicle or on their person.

14     Q.   Did Timothy ever tell you that he told Vernon, I don't

10:26:25AM 15  want to do this, I'm out, I'm not going to go forward with

16  this?

17     A.   No.

18     Q.   In fact, he told you that he went along with it the

19  entire time; did he not?

10:26:34AM 20     A.   Yes, sir.

21     Q.   Did Timothy mention anything as they drove off about

22  being fired upon?

23     A.   He said that whenever they came out of the house and

24  got in the car, that somebody down the road was shooting at

10:27:06AM 25  them.

1      Q.   Okay.  And did he ever -- did he tell you whether or

2   not they fired back?

3      A.   He said that Vernon was hanging out the window and

4   shooting back.

10:27:15AM 5      Q.   Is that what he said?

6      A.   Something to that effect.

7           MR. BROWN:  May I approach the witness, Your

8   Honor?

9           THE COURT:  Yes.  I tell you what, we need to take

10:27:22AM 10   our mid-morning break.  Why don't you kind of hang on to that.

11   We'll do that as soon as we come back.  We'll take a 15-minute

12   recess.  Go with the bailiff.

13           THE BAILIFF:  All rise.

14           (Jury not present).

10:27:58AM 15           THE COURT:  All right.  Be in recess for 15

16   minutes.

17           (Recess).

18           THE COURT:  We're ready.

19           THE BAILIFF:  All rise for the jury.

10:44:04AM 20           (Jury present).

21           THE COURT:  You may have a seat.  One of the great

22   human traits is always try to get back to that same

23   perspective, you know, that same seat.  If you happen to get a

24   different seat, it's okay.  It's not going to be --

10:44:32AM 25           Years and years and years ago -- I can't believe

1   I'm going to tell you something that happened 35 years ago, but

2   we were doing a trial in Menard.  The men would beat the women

3   into the jury box and were not very chivalrous at all.  And

4   then I figured out why.  They were all trying to get to the

10:44:49AM 5   window where they could spit their tobacco out the window and

6   they were trying to beat the women to the window on that.  We

7   don't have that problem.

8                   We'll continue with our trial.  You were

9   questioning Officer Ledford.  You may continue, Mr. Brown.

10:45:05AM 10                  MR. BROWN:  Thank you, Your Honor.

11      Q.   (BY MR. BROWN) Deputy Ledford, I think we left off

12   where the individuals Vernon Travis and Timothy Scott Pugh had

13   just left the house; is that right?

14      A.   I believe that's correct, yes, sir.

10:45:17AM 15      Q.   And I asked you if you knew whether or not shots were

16   fired at them as they were leaving?

17      A.   That's correct.

18      Q.   And were there shots fired at them?

19      A.   That's what Timothy Pugh said.

10:45:28AM 20      Q.   And I asked you if you knew whether or not there were

21   shots fired back?

22      A.   No, I don't.

23                  MR. BROWN:  May I approach the witness, Your

24   Honor?

10:45:36AM 25                  THE COURT:  Yes.

1    Q.   (BY MR. BROWN) Read that to yourself, please.

2              According to Mr. Pugh, no shots were fired; is

3    that right?

4    A.   That's correct.

10:46:07AM 5    Q.   By either him or Mr. Travis, correct?

6    A.   That's correct.

7    Q.   So you don't have any evidence or any knowledge of

8    anybody shooting, or Timothy Scott Pugh or Vernon Travis

9    shooting, from outside the house to somebody outside the house

10:46:24AM 10   or inside the house, do you?

11   A.   No, sir.

12   Q.   And nobody told you they did that, did they?

13   A.   That's correct.

14   Q.   Did Timothy tell you how he knew Vernon Travis?

10:46:45AM 15   A.   He said that they had been old friends from school.

16   Q.   High school?

17   A.   I believe that's correct.  Clemens High School.

18             MR. BROWN:  I have no further questions of this

19   witness, Your Honor.

10:47:04AM 20             THE COURT:  Do you have anymore questions, Mr.

21   Monroe?

22             MR. MONROE:  Yes, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MR. MONROE:

10:47:10AM 25   Q.   Do you know whether or not -- and you may not know --

1   do you know whether or not a spent .45-caliber shell casing was

2   recovered in evidence from the vehicle?

3       A.   No, I don't.

4       Q.   Okay.  Did Mr. Pugh tell you whether one of the persons

10:47:32AM 5   involved here, Mr. Travis, was wearing a bullet proof vest?

6       A.   Yes, sir, he did.

7       Q.   And who was wearing the bullet proof vest according to

8   Mr. Pugh?

9       A.   Vernon Travis.

10:47:43AM 10      Q.   Did Mr. Pugh tell you where he -- who provided the

11  bullet proof vest?

12      A.   He said that -- that evidently it was in a bag that Mr.

13  Travis had brought with him.

14      Q.   Mr. Travis?

10:47:57AM 15      A.   Yes, sir.

16      Q.   Okay.  Did Mr. Pugh tell you where the guns came from?

17      A.   He said that Vernon Travis gave him a gun.

18      Q.   Did Mr. Pugh tell you whose idea this entire scenario

19  was?

10:48:10AM 20      A.   He said it was Vernon Travis' idea.

21      Q.   Did Mr. Pugh tell you how many times he thought that

22  Vernon fired back at the shot that came from the bedroom?

23      A.   I believe he said three times.

24      Q.   And was Vernon -- Mr. Pugh tell you whether Vernon was

10:48:38AM 25  outside the bedroom when he fired the shots or inside the

1   bedroom?

2        A.   Outside the bedroom.

3        Q.   Did you ever actually go to the crime scene itself?

4        A.   No, I didn't.

10:48:49AM 5        Q.   All right.  When all of this was going on, what's

6   happening among -- there is a lot of law enforcement people out

7   there.  What was going on?

8        A.   We were communicating with each other over the radio,

9   you know, trying to set up a perimeter to search for who turned

10:49:06AM 10   out to be Mr. Pugh.  We were looking for evidence, looking for

11   guns, shell casings, just anything that might have been left

12   behind.

13        Q.   There was a lot of activity?

14        A.   Yes, there was.

10:49:20AM 15        Q.   And you had a lot of people involved?

16        A.   Yes, sir, there was.

17        Q.   Do you have any idea how many people you may have

18   talked to while you were out there at different times?

19        A.   I talked to troopers or a trooper.  I talked to several

10:49:34AM 20   deputies, the chief deputy, warrant deputies.  There was just

21   an enormous amount of people out there.

22        Q.   Did you deliberately with the intent to mislead someone

23   omit anything from your report?

24        A.   No, sir.

10:49:50AM 25             MR. MONROE:  I pass the witness.

 1              MR. BROWN:  No further questions of this witness,

 2   Your Honor.

 3              THE COURT:  Thank you.  You may step down,

 4   Officer.

10:50:00AM  5              Your next witness, Mr. Monroe?

 6              MR. MONROE:  We call Captain Twiss.

 7              THE COURT:  Captain Twiss, you're reminded you're

 8   still under oath.  For the record, would you state your full

 9   name?

10:50:42AM 10              THE WITNESS:  Carol Twiss.

11              THE COURT:  Mr. Monroe.

12                   CAPTAIN CAROL TWISS,

13   having been previously sworn, testified as follows:

14                   DIRECT EXAMINATION

10:50:43AM 15   BY MR. MONROE:

16      Q.  Captain Twiss, when I had you on the stand earlier, we

17   have the State's exhibits there earlier of photographs.  And

18   let me just ask you generally, did I offer into evidence all

19   the photographs that were taken in this case?

10:50:56AM 20      A.  No, sir.

21      Q.  Do you have any idea how many total photographs were

22   taken?

23      A.  No, sir.

24      Q.  All right.

10:51:02AM 25              MR. MONROE:  May I approach the witness, Your

1    Honor?

2                THE COURT:  Yes.

3        Q.    (BY MR. MONROE) I'll hand you what's been marked as

4    State's Exhibit 32, 33, 34, 35, 36?

10:51:23AM 5        A.    Yes, sir.

6        Q.    And 37 and ask you to look at those and identify them.

7        A.    These are photographs that were taken at the residence

8    of Mr. Wilkinson of the door to his bedroom and his mattress.

9                MR. MONROE:  The State would offer --

10:51:52AM 10        Q.    (BY MR. MONROE) And do these photographs reasonably and

11    accurately portray the items depicted in the photos --

12        A.    Yes, sir.

13        Q.    -- at the time?

14        A.    Yes, sir.

10:52:02AM 15                MR. MONROE:  State would offer photographs 34

16    through -- 32, let me see my numbers again -- 32 through 37.

17                (State's Exhibit Nos. 32-37 offered).

18                MR. BROWN:  May I take this witness on voir dire,

19    Your Honor?

10:53:19AM 20                THE COURT:  Yes.

21                MR. BROWN:  Thank you.

22                     VOIR DIRE EXAMINATION

23    BY MR. BROWN:

24        Q.    Captain Twiss?

10:53:25AM 25                MR. BROWN:  May I approach the witness?

1        THE COURT:  Yes.

2        MR. BROWN:  Thank you.

3        THE COURT:  Do you have your microphone back on?

4        MR. BROWN:  Excuse me, Judge.

10:53:32AM 5    Q.   (BY MR. BROWN) Who took State's Exhibit Number 33?

6    A.   Investigator Vasquez was manning the cameras, I

7 believe.

8    Q.   Then he was the one taking the photos of the house and

9 the perimeter view and so forth that we talked about earlier?

10:53:46AM 10   A.   He was taking photographs.  Mark Fields was probably

11 the one in charge of the crime scene and he may also have taken

12 some of the photographs.

13   Q.   Do you know if this is on the inside or outside of the

14 door personally?

10:53:58AM 15   A.   That picture is on the inside of the door.

16   Q.   Okay.  And --

17   A.   Inside of the bedroom.

18   Q.   Inside of the bedroom door.  32?

19   A.   This one is the out -- inside of the bedroom.  Yeah,

10:54:24AM 20 that's inside of the bedroom.

21   Q.   And there is some -- a picture in -- sorry, State's

22 Exhibit 34 where it shows I guess some material that is torn on

23 one side.  You don't know what caused the abrasion on the left,

24 do you?

10:54:47AM 25        MR. MONROE:  Your Honor, I just think we're

1    exceeding the voir dire here.  And so, I mean I haven't

2    finished the witness.  Does he have an objection?

3              THE COURT:  Yeah, the predicate for the pictures

4    is very limited.  So why don't you contain yourself to the

10:55:05AM  5    predicate for the photographs.

6              MR. BROWN:  Yes, sir.  At this time, we have no

7    objections to these pictures.

8              THE COURT:  All right.  It's 32 through 37; is

9    that correct, Mr. Monroe?

10:55:11AM 10              MR. MONROE:  Yes, Your Honor.

11              THE COURT:  32 through 37 are admitted.

12              (State's Exhibit Nos. 32-37 admitted).

13                   DIRECT EXAMINATION (Resumed)

14    BY MR. MONROE:

10:55:17AM 15        Q.  Officer Twiss, you say there were a lot of pictures

16    taken?

17        A.  There were.

18        Q.  Possibly by more than one photographer?

19        A.  Yes.

10:55:27AM 20        Q.  An impression may have been laid and left with the jury

21    as to whether or not you attempted to take photographs of

22    damage to a bed from bullets that may have been fired outside

23    the bedroom.  Do you recall that line of questioning?

24        A.  Correct.

10:55:42AM 25        Q.  Is it fair to say that these exhibits show that y'all

1    did, in fact, take photographs of the bed and damage to the

2    bed?

3         A.   Yes.

4         Q.   And let me show you State's Exhibits 36 and 37

5    specifically and point out to you -- what I'm pointing at, what

6    does that appear to be?

7         A.   A bullet fragment.

8         Q.   A what?

9         A.   A bullet -- the end of the bullet as it comes out of

10   the casing.

11        Q.   And that indicates that's where the bullet ended up?

12        A.   Correct.

13        Q.   Not originated from?

14        A.   Correct.

15        Q.   So what would your law enforcement experience tell you

16   was where the bullet came from and where it ended up?

17        A.   Correct.  It came out -- it came into the room.

18        Q.   And ended up in the bedroom?

19        A.   Ended up in the bedroom.

20        Q.   And that's the bullet you tried to test?

21        A.   I believe so.

22        Q.   And it was inconclusive?

23        A.   Correct.

24        Q.   All right.

25             MR. MONROE:  Request permission to publish the

1    photographs to the jury?

2                    THE COURT:  Yes.

3                    MR. MONROE:  Pass the witness.

4                    THE COURT:  Do you have any questions?

10:56:54AM 5          MR. BROWN:  I do, Judge, and I'm going to need

6    those photos.  I'm sorry.

7                    THE COURT:  Let's get the photos back.  We'll give

8    them back to you in just a second.  Hand them to Mr. Brown.

9                    MR. BROWN:  Thank you, Judge.

10:57:05AM 10                  CROSS-EXAMINATION

11   BY MR. BROWN:

12      Q.   Which photo did you say the fragment was still attached

13   to?

14                   MR. BROWN:  May I approach, Your Honor?  I'm

10:57:33AM 15  sorry.

16                   THE COURT:  Yes.

17                   THE WITNESS:  It can be seen in that photo.

18      Q.   (BY MR. BROWN) Which one is that?  That is State's

19   Exhibit 36?

10:57:46AM 20     A.   36.

21      Q.   36?  And this is the fragment that you're referring to?

22      A.   Yes, sir.

23      Q.   You're not trying to say that these marks on the

24   mattresses are in relation to the shots, are you?

10:57:58AM 25     A.   Those marks is where the rods was pointing to, here and

1    here.

2        Q.    Okay.  But there is no indication that there is a

3    bullet fragment on either one of these places, is there?

4        A.    No.

10:58:12AM  5        Q.    Okay.  And again on State's Exhibit 34, there appears

6    to be some wood that's been chiseled?

7        A.    Splintered wood, yes, sir.

8        Q.    There is another mark.  You're not trying to indicate

9    that that was where a second bullet went, are you?

10:58:33AM 10        A.    I'm not sure if the bullet traveled this way or across.

11        Q.    Regardless, there was only one bullet found; is that

12    right?

13        A.    Yes.

14        Q.    Okay.  So we don't know where the other bullets are, do

10:58:47AM 15    we?

16        A.    No.

17                    MR. BROWN:  No further questions.

18                    THE COURT:  Do you have any questions, Mr. Monroe?

19                    MR. MONROE:  No further questions, Your Honor.

10:58:54AM 20                    THE COURT:  All right.  Thank you, ma'am.  You may

21    step down.

22                    Your next witness, Mr. Monroe?

23                    MR. MONROE:  Your Honor, at this time, the State

24    will rest.

10:59:03AM 25                    THE COURT:  All right.  Are you ready to go

1    forward, Mr. Brown?

2                MR. BROWN:  The defense rests, Your Honor --

3                THE COURT:  All right.

4                MR. BROWN:  -- this portion of the case.

10:59:10AM 5                THE COURT:  All right.  Ladies and Gentlemen, this

6    is all the evidence you're going to hear with regard to this

7    guilt/innocence phase of the trial.  I need to do a couple of

8    things with the attorneys to make sure we have our charge ready

9    to go for you.  So will you step out with the bailiff and we'll

10:59:25AM 10   get you back in here in a few minutes.

11               THE BAILIFF:  All rise for the jury.

12               (Jury not present).

13                    OBJECTIONS TO THE CHARGE

14               THE COURT:  Okay.  So y'all have a seat.

11:00:03AM 15               We have both of you rested and closed.  The State

16   did a proposed charge.  Mr. Brown, did you have an opportunity

17   to review that proposed charge?

18               MR. BROWN:  I did, Your Honor.

19               THE COURT:  Do you have any objections to the

11:00:19AM 20   charge?

21               MR. BROWN:  I do, Judge.  Yesterday, we were given

22   a similar charge and it made the mention of burglary of a

23   habitation with an intent to commit other felony and the

24   prosecution brought it to my attention that they wanted it to

11:00:37AM 25   mirror the indictment and so this new jury charge, although it

1    changed, I don't think it necessarily mirrors the indictment.

2    And what we would request that it says, if we're going to

3    change it from what they gave me yesterday which was, burglary

4    of a habitation with intent to commit other felony, we would

11:01:00AM 5    ask that it say, burglary of a habitation, and attempted to

6    commit or committed the felony offense of aggravated assault

7    with a deadly weapon, because that's how it reads and that's

8    what he pled guilty to.

9           THE COURT:  Yeah.  The one that I have says,

11:01:18AM 10   charged in the indictment of the offense of burglary of a

11   habitation with intent to commit aggravated assault with a

12   deadly weapon.

13          MR. BROWN:  And I guess the language is, attempted

14   to or committed a felony.

11:01:30AM 15   THE COURT:  Any other objections to the proposed

16   charge?

17          MR. BROWN:  No, sir, Your Honor.

18          THE COURT:  All right.  I'll overrule the

19   objections.  And I'm assuming you didn't have an objection to

11:01:40AM 20   your charge, Mr. Monroe?  No objection?

21          MR. MONROE:  The State believes the charge is

22   correct, Your Honor.

23          THE COURT:  All right.  So I have made copies and

24   we'll just -- do y'all both have your final copy?

11:01:53AM 25   MR. MONROE:  We do.

1          THE COURT:  All right.  And I've made -- had Becky

2    make copies of what y'all gave me and what Ms. Coleman gave me.

3    So we'll pass these out and I'll read it to them and I assume

4    brief final argument for the guilt/innocence.  Do y'all want to

11:02:08AM 5    make some argument?

6          MR. MONROE:  I think they're instructed to find

7    him guilty.

8          THE COURT:  Do you want to make an argument at

9    this time?

11:02:14AM 10          MR. BROWN:  We'll reserve, Judge.

11          THE COURT:  All right.  So let -- they might have

12    to run out to the restroom or something.  Let's take about five

13    more minutes, then we'll get them back in here.  I'll read the

14    charge and then we'll let them go out and deliberate.  And if

11:02:31AM 15    y'all in this five minutes have an epiphany that you want to

16    say something, I'm not going to keep either one of you from

17    saying something if you want to say something here as a final

18    argument.

19          All right.  Let's take about five more minutes

11:02:46AM 20    and then we'll come back in.

21          (Recess).

22          (Jury not present).

23          THE COURT:  Did you close, Mr. Monroe?

24          MR. MONROE:  We close.

11:07:56AM 25          THE COURT:  Did you close, Mr. Brown?

             1              MR. BROWN:  We close.

             2              Judge, we probably would like to get a couple of

             3      two or three minute closing if we could.

             4              THE COURT:  That's fine.

11:08:05AM   5              Yes, we're ready.  Yes, sir.

             6              THE BAILIFF:  All rise for the jury, please.

             7              (Jury present).

             8              THE COURT:  All right.  Thank you.  You may be

             9      seated.

11:08:46AM  10              Ladies and Gentlemen, the State and the defense

            11      have both rested and closed.  At this time, it is my

            12      responsibility to read to you the Court's charge and then they

            13      may have some comments after I read the charge to you.  You all

            14      have your own copy.  Would you read along as I give you your

11:09:03AM  15      charge.

            16                          CHARGE TO THE JURY

            17              THE COURT:  Ladies and Gentlemen of the Jury:

            18              The Defendant, Vernon Lee Travis, stands charged

            19      by indictment with the offense of burglary of a habitation with

11:09:10AM  20      intent to commit aggravated assault with a deadly weapon,

            21      alleged to have been committed on or about September 5, 2013.

            22      To this charge, the defendant has pleaded guilty and he has

            23      persisted in entering such plea, notwithstanding the Court, as

            24      required by law, has admonished him of the consequences of the

11:09:27AM  25      same; and it plainly appearing to the Court that the defendant

1    is sane, and that he is not influenced to make this plea by any

2    consideration of fear, nor by any persuasive or delusive hope

3    of pardon prompting him to confess his guilt, said plea is by

4    the court received, and the jury are instructed to find the

11:09:43AM 5    defendant guilty as charged in the indictment.

6                   After you retire to the jury room, you should

7    select one of your members as your Presiding Juror.  It is his

8    or her duty to preside at your deliberations, vote with you,

9    and when you have unanimously agreed upon a verdict, to certify

11:09:56AM 10   to your verdict by using the appropriate form attached hereto,

11   and signing the same as Presiding Juror.

12                  No one has any authority to communicate with you

13   except the officer who has you in charge.  During your

14   deliberations in this case, you must not consider, discuss, nor

11:10:12AM 15   relay any matters not in evidence before you.  You should not

16   consider nor mention any personal knowledge or information you

17   may have about any fact or person connected with this case

18   which is not shown by the evidence.

19                  After you have retired, you may communicate with

11:10:24AM 20   this court in writing through the officer who has you in

21   charge.  Do not attempt to talk to the officer who has you in

22   charge, or the attorneys, or the Court, or anyone else

23   concerning any questions you may have.

24                  After you have reached a unanimous verdict, the

11:10:37AM 25   Presiding Juror will certify thereto by filling in the

1   appropriate form attached to this charge and signing his or her

2   name as Presiding Juror.  Following argument of counsel, you

3   may retire to consider your verdict.

4           And then if you go back to the verdict form,

11:10:50AM 5   Instructions:  Use the one of the below listed forms which

6   correctly states your verdict and cross out the other form.

7           The first verdict form is, We the jury find the

8   Defendant, Vernon Lee Travis, III, not guilty of burglary of a

9   habitation with intent to commit aggravated assault with a

11:11:05AM 10  deadly weapon as charged in the indictment.

11          And Jury Verdict Number 2, We the jury find the

12  Defendant, Vernon Lee Travis, III, guilty of the offense of

13  burglary of a habitation with intent to commit aggravated

14  assault with a deadly weapon as charged in the indictment, a

11:11:19AM 15  first degree felony.

16          Any argument by the State, Mr. Monroe?

17          MR. MONROE:  Just briefly, Your Honor.

18          THE COURT:  Yes.

19                     CLOSING STATEMENT

11:11:27AM 20          MR. MONROE:  Ladies and Gentlemen, I mentioned at

21  the beginning of this trial, once the plea is entered, it's a

22  little different than what you normally see at a contested

23  guilt or innocence case.  Actually the Defendant has pled

24  guilty.  The instructions say go out and find him guilty, but

11:11:44AM 25  there really is no more needs to be done at this stage of the

trial than that.  I'm not even sure why we have the not guilty

verdict form on there, other than that's the form they give us

and that's one of those things that the legislature in its

infinite wisdom decided they needed to do.  So your guess is as

good as mine.  But I would just ask you to find him guilty.

When you deliberate, step out, select a foreperson, whoever

doesn't duck under the chair fast enough, and find the

Defendant guilty and we'll proceed on to the punishment stage

of the trial.  Thank you.

THE COURT:  Mr. Brown, comments or argument?

CLOSING STATEMENT

MR. BROWN:  Thank you.

Ladies and Gentlemen, I know that Vernon has pled

guilty.  He told you he was going to plead guilty, but it is

important to us that all of you hear the true facts of this

case and that was for the length of cross-examination.  There

were things that were said one day that potentially came back

and were changed another day.  And there was some things that

one officer said that she told an officer and that officer is

saying, no, that didn't happen.  There were things about people

being intoxicated and not intoxicated, so we want you to get a

picture proper of exactly what happened, why it happened, and

what was going on and I think that's important that everybody

get that picture.  And that's why I asked in the beginning that

you listen to all the evidence before making a decision because

1    if you would have listened to the first officer come in here

2    and testify, you had a completely different picture painted

3    than what we finished up with today I believe.

4              And so I ask that you listen to all the evidence

11:13:20AM  5    before making a decision on the punishment aspect of the case.

6    I'm sure you're going to go back there as the Judge instructed

7    to find him guilty, but then you listen to all the evidence in

8    this case when deciding punishment.

9              Thank you.

11:13:33AM 10         THE COURT:  Anything else, Mr. Monroe?

11             MR. MONROE:  Nothing further, Your Honor.

12             THE COURT:  Officer Van Klaveren, this is the

13   original charge.  It has a paper clip on it.  It's the only one

14   that's been signed by me.  Y'all have your copies.  When you go

11:13:46AM 15   back and elect your foreperson, they'll get that charge that's

16   been signed by me and that's the one that you'll sign and give

17   to the bailiff whenever you've reached your verdict.

18             Good luck.  Would you go with the bailiff?

19             THE BAILIFF:  All rise for the jury.

11:14:04AM 20         (Jury not present).

21             THE COURT:  Have a seat.  When the jury comes

22   back, are you going to be ready to go, Mr. Monroe?

23             MR. MONROE:  I believe so.

24             THE COURT:  Mr. Brown, will you be ready to go

11:14:33AM 25   when they come back?

1            MR. BROWN:  Yes.

2            THE COURT:  All right.  We'll be in recess until

3   we have communication from the jury.

4            MR. MONROE:  Just as long as we're on the record

11:14:36AM 5   here, the State will be invoking the rule on punishment just so

6   the Court knows to do that when they come back.

7            THE COURT:  Right.  So if somebody wants to hear

8   the verdict, they can come in.

9            MR. MONROE:  Yes.

11:14:47AM 10           THE COURT:  But then talk to your witnesses about

11  going outside until it's their turn to testify.

12           MR. MONROE:  Well, I would like them all put under

13  the rule.

14           THE COURT:  I'll do that and I should do that in

11:14:57AM 15  front of the jury, so remind me of it when we get started

16  again.

17           MR. BROWN:  We'll ask that the State witnesses be

18  subjected to the same.

19           THE COURT:  We'll do that.  Absolutely.  All

11:15:07AM 20  right.  We'll be in recess until we hear from the jury.

21           (Recess).

22           THE COURT:  Officer is lining up the jury.

23  They're coming in here in just a couple of moments.

24           THE BAILIFF:  All rise.

11:20:15AM 25           (Jury present).

1          THE COURT:  All right.  You may have a seat.  Who

2     was elected foreman of our jury?

3          FOREMAN:  I was, sir.

4          THE COURT:  Has your jury reached a verdict?

11:20:54AM 5     FOREMAN:  Yes.

6          THE COURT:  And is it unanimous?

7          FOREMAN:  Yes, it was.

8          THE COURT:  Would you please hand the jury form to

9     the bailiff?

11:21:03AM 10     Thank you.

11                         VERDICT

12          THE COURT:  All right.  Would you please stand,

13     Mr. Travis?

14          This is the verdict of the jury.  We the jury find

11:21:13AM 15     the Defendant, Vernon Lee Travis, III, guilty of the offense of

16     a burglary of a habitation with intent to commit aggravated

17     assault with a deadly weapon as charged in the indictment, a

18     first degree felony, signed by Mr. Charles Collie, the foreman

19     of the jury.

11:21:30AM 20     You may be seated.

21          Would you like to have the jury polled, Mr.

22     Monroe?

23          MR. MONROE:  The State would not require that.

24          THE COURT:  Would you like to have the jury

11:21:38AM 25     polled?

TERI THOMAS, CSR, RPR, CMRS

1             MR. BROWN:  No, Your Honor.

2             THE COURT:  All right.  Thank you.

3             Now, we're going to move into the punishment phase

4       of the trial.  I've consulted with the attorneys and they're

11:21:44AM 5   ready to go right into the punishment phase of the trial.

6             There had been a request for the witnesses to be

7       under the rule.  The witness rule is that the witnesses have to

8       stay outside until it's their turn to testify.  So does the

9       State have any witnesses present in the courtroom that you can

11:21:59AM 10  call up to the Bench?

11            MR. MONROE:  Naomi Weatherly.

12            THE COURT:  Okay.  Ms. Weatherby (sic), and do you

13      have any witnesses that you're going to be calling, Mr. Brown?

14            MR. BROWN:  Yes.

11:22:08AM 15  THE COURT:  If you're going to be a witness, I

16      need y'all to come up here and give your name to the Court

17      reporter.

18            Ma'am, if you'll give your name to the Court

19      reporter.

11:22:17AM 20  WITNESS:  Naomi Weatherly.

21            THE COURT:  Is she going to be your first witness,

22      Mr. Monroe?

23            MR. MONROE:  Yes, she is.  We have some witnesses

24      who are not in the courtroom.  Would you like me to gather

11:22:26AM 25  them?

            THE COURT:  If they're in the courthouse, it would
be nice.  And you can step over there because that's going to
be where you'll be sitting down here in a little bit.

            Would you give your names to the court reporter?

11:22:36AM  Dawn, D-a-w-n, Brown.

            Jenna, J-e-n-n-a, Rodriguez.

            Anissa Gonzalez, A-n-i-s-s-a, Gonzalez with a "z."

            Randy Kennedy.

            Vernon Travis, Jr.

11:23:07AM  John Roache, like the bug with an "e" on the end.

            THE COURT:  Give your name to the court reporter,
please.

            Amber Wilkinson.

            Wylie Wilkinson, W-y-l-i-e.

11:23:32AM  THE COURT:  And then you already have Ms. Twiss,
Captain Twiss, Officer Ledford, you have their names already.
And if you have any other witnesses that are not here, if you
spot them, be sure and have them leave the courtroom and tell
them the witness rule has been invoked.

11:23:48AM  For all you folks other than the police officer,
the ones that have not been sworn before, would you raise your
right hand, please.

            (All witnesses sworn).

            THE COURT:  All right.  Let the record reflect
11:24:00AM  that all those folks that have given their name to the Court

1   reporter have been sworn.  The witness rule means that you have

2   to stay outside until it's your turn to testify.  You cannot

3   talk to anybody about your testimony or anybody elses'

4   testimony while this case is in progress.  Now, you can talk to

11:24:15AM 5   the attorneys, but if you talk to an attorney about your

6   testimony, make sure there are no other witnesses around, that

7   y'all are off away from other folks.

8               So I think Ms. Weatherly is going to be the first

9   witness.  Everybody else is going to need to step out of the

11:24:31AM 10   courtroom.

11               And, Ms. Weatherly, before you have a seat, did

12   you want to make opening statements before you call our first

13   witness?

14               MR. MONROE:  Briefly.

11:24:46AM 15               THE COURT:  Why don't you have a seat out there in

16   the audience and we'll get you up here in just a second.  I'm

17   going to let you stay in here for the opening statement.

18               So Mr. Monroe, opening statement.

19                          OPENING STATEMENT

11:25:01AM 20               MR. MONROE:  This is really what we're here for,

21   to determine what's the appropriate punishment for this act.

22   You've heard the facts.  I mean, there is some discrepancies

23   over what I consider to be minor details, but the overall act I

24   think is pretty clear.  So that's what this is for.  We'll

11:25:19AM 25   present you on behalf of the State things that we feel like are

1   important that you need to consider, and I'm sure the defense

2   will do the same thing and then the call will absolutely be

3   yours and yours alone.

4           There is no burden of proof here.  There is no

11:25:37AM 5   standard to be set by either side.  It is whatever your

6   feelings about this case are and what punishment you think this

7   particular set of facts merits.  And that's what we'll be

8   asking you to do.  And I thank you.

9           THE COURT:  Mr. Brown?

11:25:55AM 10           MR. BROWN:  Yes, sir, Your Honor.

11                 OPENING STATEMENT

12           MR. BROWN:  Good late morning, Ladies and

13   Gentlemen.  What I believe the evidence is going to show in

14   this punishment aspect of the case is who Vernon Travis is.

11:26:07AM 15   You've heard some of the facts surrounding the case, what

16   happened.  As the prosecutor said, there has been some

17   discrepancies, from two officers that were there, from

18   witnesses that were there.  I anticipate there is probably

19   going to be a few more.  However, you're going to learn more

11:26:25AM 20   about Vernon Travis than you've heard up to this point in time.

21   And I anticipate the evidence is going to show that he was born

22   and raised in San Antonio; that through his adult or adolescent

23   years, childhood years, he was around his family.  He played

24   basketball with his uncles.  He was around his mom.  He went to

11:26:45AM 25   high school there in San Antonio and actually graduated in

three years.  Finished high school one year early.  I believe
that the evidence and testimony is going to come out that not
only did he graduate in three years, he signed a waiver at the
age of 17 to go to the military.  His mom had to sign it.  He
signed it.

          You're going to hear evidence and testimony that
while he was in boot camp, that 9/11 happened and by the time
he was 18 years old, should have been in high school, he was in
Iraq, okay.  And you're going to hear that he went over there
as an Air Force -- member of the Air Force, that he didn't go
with his squadron.  He actually volunteered or told them he
would go because the lady that was supposed to go was pregnant.
You're going to hear evidence and testimony of that.  He said,
I'll go.  I'll take her place.  Somebody had to, and he did it.
But he goes over there by himself with the Air Force with an
Army brigade.  Okay.  So he goes over to Iraq.  And what he is
supposed to be doing is his main duty you're going to hear is
going to be through the post office, he was delivering post
mail.  You're also going to hear as an 18 year old, he was
given the duties of driving off base military personnel from
Iraq and that he was in charge of being stationed where they
were building towers.  You're going to hear that.  He's going
to tell you about that.

          You're going to hear that he came back and before
he left and just shortly after he came back, he received some

1   awards, awards for achievement awards, awards for being a good

2   soldier, a person that was responding to authority and so

3   forth.  And then when he gets back, you're going to see that

4   ultimately he was discharged from the military under honorable

11:28:42AM 5   conditions.  And those conditions were he couldn't keep his

6   room tidy.  He couldn't keep the bathroom shelf clean.  He

7   couldn't put on his uniform properly.  He didn't have his

8   uniforms in order as they requested, things that he was able to

9   do prior to going.  You're going to see his certificate of

11:29:03AM 10   awards.  You're going to see that.

11          You're going to hear that he was discharged from

12   the military because of these issues without any exiting

13   concerning for his wellbeing, whether or not he was suffering

14   from anything, whether or not what was causing these, what

11:29:19AM 15   was -- what was the issue behind this if you were fine before

16   and you're coming back as an 18-year-old, 19-year-old, what's

17   the problem now.  It wasn't ever done.  He's going to tell you

18   that.  He is going to tell you that he was discharged under

19   honorable conditions, but he was discharged.

11:29:39AM 20          He's going to tell you -- you're going to hear

21   about his work history, that he worked for the school district

22   in San Antonio, the Judson San Antonio School District as a

23   teacher's assistant.  He wasn't a certified teacher but he was

24   a teacher's assistant, assistant teacher to actually special

11:29:56AM 25   needs kids.  They were kids that had to wear, I guess, kind of

1  the padding and so forth that would create a lot of problems

2  within the district and he was assigned to that.  The kids

3  you're going to hear were favorable to him and liked him.

4      He left from there and went to another school

11:30:15AM 5  within the district and became the tardy administrator,

6  attendance administrator, excuse me, and he worked there for a

7  couple of years.  And you're going to hear throughout this time

8  he was struggling.  He wasn't a big drinker.  Obviously he was

9  strong when he went in the military.  When he came out, you're

11:30:36AM 10  going to hear that he started having problems with alcohol;

11  that he would drink to blackouts.  You're going to hear

12  testimony of that.  And not only blackouts, but also taking

13  pills, pills that you get addicted to.  I'm sure everybody has

14  heard of Xanax, Vicodin, those types of pain pills that people

11:30:56AM 15  get addicted to these things.  And you're going to hear

16  testimony that not only was he addicted to them, he was taking

17  so many that he barely could function.

18      You're going to hear ultimately that he worked at

19  an Olive Garden.  He showed up for work and he would show up

11:31:11AM 20  and I believe the manager is going to tell you, he would show

21  up and he would show signs of being hung over.  He would smell

22  of alcohol, that he would show up and do his job.  He didn't

23  have much aspirations other than that.  It was all he could do

24  to keep that job.

11:31:29AM 25      You're going to hear that he transferred up to

Dallas.  His mom who you're going to hear from was suffering

from her own medical issues and he transferred up there with

Olive Garden to be with her, to try to assist her when he

barely could even take care of himself, but he did that to try

to assist her.

        You're going to hear testimony before he moved or

right about that time that he had a child with his fiancée.

You're going to hear about that relationship with his child,

how he would come back from Dallas for a few days, a week at a

time, once a month, how he made sure she was properly clothed,

had all the necessities that she needed.

        You're going to hear testimony about who Vernon

Travis is, who he was before and who he was after and what led

him to being here today and you're going to hear the whole

thing.  I anticipate after you hear everything, all of the

facts, not only about what happened, what you've heard to this

point in time, you learn more about him when he gets up there

and tells you.  He has a right not to do it.  He wants to get

up there.  Y'all saw him during voir dire.  He pled guilty.

He is sitting there knowing now because you're going to hear

testimony that he's been diagnosed with PTSD, finally.  You

heard the guy out there, it took 47 years for him or 27 years,

whatever he said.  Ten years later, he's lost ten years of his

life and he's looking at losing even more years of his life

because of this.  You're going to hear about that.  You're

1    going to hear from a doctor that's evaluated him, that has

2    seen him, has seen him address that issue.

3                You're going to hear from Vernon Travis, just as I

4    did while he was watching that 11 minute video of him sitting

11:33:18AM   5    in that room, you're going to hear from him, the difference

6    between him then and now, because now he knows what the problem

7    is and he's taking proper medication.  He's finally seen what

8    the issue was that was causing him to live the life he was.

9    Finally.

11:33:35AM   10                And I think after you hear all the evidence of who

11    he is, the facts surrounding them, that you will come back with

12    a just punishment for him.

13                Thank you.

14                THE COURT:  Thank you.  Your first witness, Mr.

11:33:49AM   15    Monroe.

16                MR. MONROE:  The State will call Naomi Weatherly.

17                THE COURT:  Ms. Weatherly, if you'll step up here

18    to the witness stand please.  Ms. Weatherly, you've been

19    previously sworn; is that correct?

11:34:03AM   20                THE WITNESS:  Yes, sir.

21                THE COURT:  Would you have a seat and state your

22    full name.

23                THE WITNESS:  Naomi Weatherly.

24                THE COURT:  How do you spell your last name?

11:34:15AM   25                THE WITNESS:  W-e-a-t-h-e-r-l-y.

1           THE COURT:  Mr. Monroe?

2           MR. MONROE:  Yes, Your Honor.  If it please the

3 Court.

4                   NAOMI WEATHERLY,

11:34:19AM 5 having been previously duly sworn, testified as follows:

6                 DIRECT EXAMINATION

7 BY MR. MONROE:

8     Q.   Ms. Weatherly, what is your business profession and

9 occupation?

11:34:23AM 10     A.   I work with Tarrant County Adult Probation as a

11 probation officer.

12     Q.   And how long have you been employed in that capacity?

13     A.   About two and a half years.

14     Q.   And what are your general responsibilities as a

11:34:33AM 15 probation officer in Tarrant County?

16     A.   My responsibility is to supervise people that have been

17 placed on probation, make sure that they go to any class that

18 they need to go to, basically go over their conditions with

19 them, telling them what they need to do and just making sure

11:34:50AM 20 that they're successful on probation.

21           MR. MONROE:  Your Honor, may we approach the

22 bench?

23           THE COURT:  Yes.

24           (Bench conference).

11:35:04AM 25           MR. MONROE:  I just want to announce the intention

1   to go into the prior conviction on behalf of the defendant.  I

2   think a motion in limine required me to approach the bench on

3   that so I'm doing that now.

4                MR. BROWN:  Can I see the document?

11:35:33AM  5                MR. MONROE:  Yeah.

6                MR. BROWN:  Okay.

7                THE COURT:  You may proceed.

8                (Bench conference ended).

9        Q.   (BY MR. MONROE) Ms. Weatherly, let me just ask you, do

11:35:45AM 10   you know a gentleman named Vernon Travis?

11       A.   Yes, sir.

12       Q.   And do you see him in the courtroom here today?

13       A.   Yes, sir.

14       Q.   Which person is he?

11:35:54AM 15       A.   He's right there, sir.

16       Q.   All right.  The one in the middle?

17       A.   Yes, sir.

18       Q.   All right.  How did you have an occasion to become

19   acquainted with Mr. Travis?

11:36:05AM 20       A.   He was on my caseload on probation.  He was on

21   probation out of Arizona and his case was transferred to

22   Tarrant County where he was living and he was placed on my

23   caseload.

24       Q.   And was the probation a felony probation or a

11:36:19AM 25   misdemeanor probation?

1       A.   A felony probation.

2       Q.   And what state was the conviction from?

3       A.   Arizona.

4       Q.   And as part of your probation, did you acquire a copy

11:36:28AM 5   of the actual judgment and conviction from the State of

6   Arizona?

7       A.   Yes, sir.

8       Q.   Let me hand you what's been marked State's Exhibit 38

9   and ask if you can look at that and whether or not you can

11:37:01AM 10  identify it without talking about the contents?

11      A.   Yes, sir.

12      Q.   And what does that appear to be?

13      A.   The indictment for his sentence that he was placed on

14  probation for and a copy of his conditions of probation from

11:37:33AM 15  Arizona.

16      Q.   From the State of Arizona?

17      A.   Yes, sir.

18      Q.   And does it appear on the back that it has a mark of a

19  certified copy?

11:37:41AM 20  A.   Yes, sir.

21           MR. MONROE:  We offer State's Exhibit 38 into

22  evidence.

23           (State's Exhibit No. 38 offered).

24           MR. BROWN:  We have no objection to 38.

11:37:50AM 25           THE COURT:  All right.  State's 38 is admitted.

1              (State's Exhibit No. 38 admitted).

2       Q.    (BY MR. MONROE) Now tell the jury how something like

3    this happens.  You have an offense committed in another state

4    and they're on probation and you're going to watch them.  Tell

11:38:04AM 5    us how that works.

6       A.    What happens is if somebody gets an offense from a

7    different state but they live in a different state and they get

8    placed on probation, through the Interstate compact, they can

9    be transferred to the other state for courtesy supervision,

11:38:20AM 10   which means that I was watching his case, make sure that he was

11   doing what he was supposed to do and I report any violations

12   back to Arizona.  Arizona still had jurisdiction over his case,

13   so any kind of sanctions or anything like that would have to go

14   through that jurisdiction.

11:38:36AM 15      Q.    When can you tell that or can you tell from your record

16   as to when this underlying -- first of all, what was the

17   underlying offense?

18      A.    The offense was transportation of marijuana for sale, a

19   Class 2 felony which was knowingly transporting for sale a

11:38:51AM 20   usable amount of marijuana weighing approximately more than

21   four pounds.

22      Q.    How much did it weigh?

23      A.    More than four pounds.

24      Q.    Transporting more than four pounds of marijuana?

11:39:05AM 25      A.    Yes, sir.

1    Q.   And do you know what the date of this offense was?

2    A.   On or about April 17, 2009.

3    Q.   2009?

4    A.   Yes, sir.

11:39:12AM 5    Q.   And do you know what the date of the conviction is?

6    A.   He was placed on probation -- let me get that date for

7    you -- on April 12, 2010.

8    Q.   All right.  Now, when you placed Mr. Travis on

9    probation here in Texas, are Texas probation terms that

11:39:47AM 10    you all generally use the same as terms that are in another

11    state?

12    A.   We have our own set of probation conditions that

13    somebody will sign when they get to Texas.

14    Q.   So meaning that the probation conditions that a

11:40:00AM 15    probationer in Texas normally goes by an out-of-state courtesy

16    supervised probationer will also have to go by those?

17    A.   Yes, sir.

18    Q.   And did you do that in this case?

19    A.   Yes.

11:40:12AM 20            MR. MONROE:  May I approach the witness again,

21    Your Honor?

22            THE COURT:  Yes.

23    Q.   (BY MR. MONROE) I hand you what's been marked as

24    State's Exhibit 39 and ask if you can identify that?

11:40:21AM 25    A.   These are the set of conditions that Mr. Travis signed

1    when he came to Texas.

2        Q.   And you gave me these this morning?

3        A.   Yes, sir.

4             MR. MONROE:  I offer State's Exhibit --

11:40:30AM 5     Q.   (BY MR. MONROE) Does that purport to be the signature

6    of Mr. Travis?

7        A.   Yes, sir.

8        Q.   And was it signed in your presence?

9        A.   No, sir.

11:40:36AM 10     Q.   In front of another officer?

11       A.   Yes, sir.

12            MR. MONROE:  I offer State's Exhibit 39.

13            (State's Exhibit No. 39 offered).

14            MR. BROWN:  We have no objection to 39, Your

11:41:03AM 15    Honor.

16            THE COURT:  State's Exhibit 39 is admitted.

17            (State's Exhibit No. 39 admitted).

18       Q.   (BY MR. MONROE) Technically, is Mr. Travis still under

19   your supervision?

11:41:10AM 20    A.   No, his probation has expired.

21       Q.   All right.

22            MR. MONROE:  Request permission to publish the

23   exhibit to the jury?

24            THE COURT:  You may.  You may.

11:41:23AM 25            MR. MONROE:  I pass the witness.

1                    CROSS-EXAMINATION

2   BY MR. BROWN:

3       Q.   Ms. Weatherly, I just have a few questions for you.

4   You were not his first officer, were you?

11:41:33AM 5    A.   No.

6       Q.   And how long did you actually supervise him?

7       A.   I took over his case at the beginning of 2012.

8       Q.   Okay.  So that would have been almost two years?

9       A.   Yes, sir.

11:41:47AM 10   Q.   Okay.  But you didn't have any problems with him being

11  disrespectful to you, did you?

12      A.   No, sir.

13      Q.   He never showed you any tendencies of violence or

14  anything of that nature, did he?

11:41:58AM 15   A.   No, sir.

16      Q.   In this particular case, there wasn't any allegations

17  that he used any firearms or weapons, was there?

18      A.   Not that I can recall.

19      Q.   Now, up until he got arrested for this case, he hadn't

11:42:14AM 20  had any violations of his probation, had he?

21      A.   No, sir.

22      Q.   So he was complying with what you were asking him to

23  do?

24      A.   Yes, sir.

11:42:20AM 25   Q.   He was reporting once a month?

1    A.   Yes, sir.

2    Q.   Was he required to do community service hours?

3    A.   He had 24 hours of community service that he completed

4    in August 2010.

11:42:32AM 5          MR. BROWN:  Judge, may I get the documents from

6    the jury real quick?

7          THE COURT:  Yes, sir.

8          MR. BROWN:  Sorry.

9          THE COURT:  That's fine.  Officer Van Klaveren he

11:42:43AM 10   can get them.  We'll get those back to you.

11          MR. BROWN:  Thank you.

12    Q.   (BY MR. BROWN) And he was always gainfully employed

13    while reporting to you; was he not?

14    A.   Yes, sir.

11:43:01AM 15    Q.   And where was he working at?

16    A.   He worked at the Olive Garden when I first got his case

17    and then he was working at the Cheesecake Factory.

18    Q.   And did you verify his employment?

19    A.   Yes, he brought check stubs in to verify his

11:43:17AM 20   employment.

21    Q.   And he always had a pay check stub?

22    A.   Yes, sir.

23    Q.   Was he always polite with you?

24    A.   Yes, sir.

11:43:22AM 25    Q.   Respectful of you?

1        A.   Yes, sir.

2        Q.   Did you ever have any problems with him?

3        A.   No, sir.

4        Q.   Do you know whether or not he was in the military?

11:43:31AM 5        A.   Yes, sir.

6        Q.   Do you know when he was in the military?

7        A.   It was not something that we ever had discussed in my

8   office.  I knew he was in the military but not any specifics

9   about it.

11:43:40AM 10        Q.   Do you know if his military stint happened prior to

11  this case?

12        A.   Yes, sir.

13        Q.   You never gave him any treatment for any alcoholism or

14  drugs, did you?

11:44:02AM 15        A.   No, sir.

16        Q.   You never gave him any assessments to determine

17  whether or not he was suffering from any mental issues, did

18  you?

19        A.   No, sir.

11:44:14AM 20             MR. BROWN:  No further questions, Your Honor.

21             THE COURT:  Any questions?

22             MR. MONROE:  Yes, Your Honor, just a few.  With

23  that line of questioning, I do.

24                      REDIRECT EXAMINATION

11:44:21AM 25  BY MR. MONROE:

1      Q.   You would -- it's my understanding that at the

2  beginning of his probation, you would actually meet with him

3  once a month?

4      A.   Yes, sir.

11:44:34AM 5      Q.   And then later did that frequency change?

6      A.   Yes.  When somebody on probation is in compliance,

7  their frequency of reporting is changed to every three months

8  and the month in-between, they mail in their report forms and

9  their probation fees.

11:44:48AM 10      Q.   So about how long did you see him monthly?

11      A.   Probably for maybe two months and then he was put

12  directly on the mail reporting.

13      Q.   So then after that it would have been quarterly?

14      A.   Yes, sir.

11:45:00AM 15      Q.   So you didn't see him very often?

16      A.   No, sir.

17      Q.   When you did see him and when you first did the intake

18  with him, did he ever mention to you that he felt he was

19  suffering from post-traumatic stress disorder?

11:45:18AM 20      A.   No, sir.

21      Q.   Did he ever mention to you that he thought he had any

22  emotional issues whatsoever?

23      A.   No, sir.

24      Q.   Have you ever dealt with the probationers who were

11:45:30AM 25  suffering from post-traumatic stress disorder?

1    A.   Yes, sir.

2    Q.   How often?

3    A.   Maybe only a couple since I've been a probation

4 officer.

11:45:39AM 5    Q.   So you have a little experience in it?

6    A.   Yes, sir.

7    Q.   Did you see any indications of that in your

8 observation?

9         MR. BROWN:  Objection.  Judge, she's not qualified

11:45:48AM 10 to make a determination of whether or not he suffered from

11 post-traumatic stress disorder.

12         THE COURT:  Overruled.

13    Q.   (BY MR. MONROE) I'm only asking about symptoms, I'm not

14 asking you to diagnose.

11:46:00AM 15    A.   That would be difficult.  I'm not a psychiatrist, so I

16 would not feel comfortable making any kind of a diagnosis on

17 that.

18    Q.   Anything obvious?

19    A.   Anything -- my -- when he came to visit for probation,

11:46:16AM 20 it was maybe a 10, 15-minute appointment, so nothing real

21 obvious would have jumped out at me.

22    Q.   And fair enough.  Your time with him is pretty limited,

23 right?

24    A.   Yes, sir.

11:46:27AM 25    Q.   I mean, you're not spending the day?  You're not going

 1   into family history?

 2       A.   Yes, sir.

 3       Q.   All right.  Now, you said you never had any problems

 4   with him?

11:46:40AM  5       A.   Yes, sir.

 6       Q.   Did he have -- well, let me back up.

 7            According to -- I'll ask for the exhibits.

 8            MR. BROWN:  Right here.  I'm sorry.

 9       Q.   (BY MR. MONROE) State's Exhibit 39, I'll hand that to

11:47:04AM 10   you, that's the terms and conditions of probation in Texas?

11       A.   Yes, sir.

12       Q.   What is condition -- let me see -- is there a condition

13   regarding leaving the county?

14       A.   Yes, sir.

11:47:31AM 15       Q.   What is that condition?

16       A.   The condition reads:  Remain within Tarrant County,

17   Texas, unless a supervision officer authorizes you to leave.

18       Q.   So if a person while he's under your supervision leaves

19   the county for any reason, he's violated that term of

11:47:47AM 20   condition?

21       A.   Yes, sir, without permission.

22       Q.   Did you ever ask permission for Mr. Travis to leave

23   Tarrant County?

24       A.   No, he never asked for permission to leave the county.

11:48:01AM 25       Q.   Did he indicate to you when he talked to you that he

1   was complying with all those terms and conditions?

2        A.   Yes, sir.

3        Q.   He told you that he was doing what he was supposed to

4   do?

11:48:12AM 5      A.   Yes, sir.

6        Q.   What about condition (b).  Read that to the jury.

7        A.   Condition (b) is, Avoid injurious or vicious habits and

8   abstain from the illegal use of controlled substances,

9   marijuana, cannabinoids or excessive consumption of any

11:48:34AM 10  alcoholic beverage.  Submit to an assessment for substance

11  abuse and attend and successfully complete treatment.

12       Q.   So if one of your probationers was taking controlled

13  substances without a prescription, that's a violation of the

14  terms of probation, isn't it?

11:48:51AM 15     A.   Yes, sir.

16       Q.   If one of your probationers is drinking alcohol to

17  excess, that's a violation?

18       A.   Yes, sir.

19       Q.   And did Mr. Travis ever admit to you either of those?

11:49:06AM 20     A.   No, sir.

21       Q.   And either one of those would have been a violation?

22       A.   Yes, sir.

23       Q.   And if it happened more than once, every time it would

24  have been a violation?

11:49:13AM 25     A.   Yes, sir.

1    Q.   And you relied on Mr. Travis to tell you the truth?

2    A.   Yes, sir.  We also had him submit random urinalysis

3 testing.

4    Q.   And you relied on him to be forthright with you?

11:49:29AM 5    A.   Yes, sir.

6    Q.   Now, did he ask for permission to come to Kerr County,

7 Texas, on September 5th, 2013?

8    A.   No, sir.

9    Q.   You know now that he came to Texas on September 5,

11:49:43AM 10 2013?

11   A.   Yes, sir.

12   Q.   Is that a violation of probation?

13   A.   Yes, sir.

14   Q.   He did not have permission?

11:49:48AM 15   A.   He did not have permission.

16   Q.   What is the first requirement on probation, the very

17 first one?

18   A.   The very first condition is, commit no offense against

19 the laws of this state or any other state or of the United

11:50:00AM 20 States.

21   Q.   All right.  Would burglary of a habitation violate

22 provision number one?

23   A.   Yes, sir.

24   Q.   Would aggravated assault with a deadly weapon violate

11:50:14AM 25 provision number one?

1    A.   Yes, sir.

2    Q.   Would possession of a firearm by itself, just being in

3  possession of a firearm, a felony, would that violate the

4  conditions of probation?

11:50:25AM 5    A.   Yes, sir.

6    Q.   Being in possession of body armor would also violate

7  his probation; would it not?

8    A.   Yes, sir.

9    Q.   So each and everyone of those events by themselves

11:50:36AM 10  shows noncompliance with those; does it not?

11    A.   Yes, sir.

12              MR. MONROE:  Pass the witness.

13              MR. BROWN:  May I approach the witness, Your

14  Honor?

11:50:48AM 15              THE COURT:  Yes.

16                   RECROSS-EXAMINATION

17  BY MR. BROWN:

18    Q.   The prosecutor brought up an issue with the controlled

19  substance, submit to an assessment for substance abuse.  You

11:51:02AM 20  never had him submit to an assessment to determine whether or

21  not he had a substance abuse problem, did you?

22    A.   When someone is first placed on probation, they

23  complete a self-report evaluation for substance abuse and he

24  answered that assessment as having no problems.

11:51:17AM 25    Q.   But you never made or followed up with an assessment

1   for him, did you?

2       A.   We don't normally do another assessment if his UA's are

3   all clean.

4       Q.   Okay.  Were all his UA's clean?

11:51:29AM 5       A.   Yes, they were.

6       Q.   You didn't specifically go over this list with Mr.

7   Travis, did you?

8       A.   No, sir, the intake officer went over that.

9       Q.   And you're not sure how they explained it to them, are

11:51:41AM 10   you?

11      A.   No, sir.

12      Q.   And you don't know if he understood each and everyone

13   of these (a) through (m) list, do you?

14      A.   No, sir.

11:51:48AM 15           MR. BROWN:  No further questions, Your Honor.

16           MR. MONROE:  Nothing further.

17           THE COURT:  Those exhibits, we'll give those back

18   to the jurors.  I think they were looking at them.

19           MR. BROWN:  Yes, sir.

11:51:58AM 20           THE COURT:  Thank you, ma'am.  You may step down.

21   Will this witness be allowed to be excused?

22           MR. MONROE:  We ask that she be excused to allow

23   to return to Tarrant County.

24           THE COURT:  Any objection, Mr. Brown?

11:52:11AM 25           MR. BROWN:  No objection.

1          THE COURT:  All right.  You can go on back to Fort

2     Worth.

3          Your next witness, Mr. Monroe?

4          MR. MONROE:  Does the court want to -- our next

11:52:17AM  5     witness would be Amber Wilkinson.

6          THE COURT:  It's ten till twelve.  The time got

7     away from me.  Thank you for pointing that out.  So let's take

8     our lunch break and let's start back up at 1:15.  Ladies and

9     Gentlemen, if you'll go with the bailiff.

11:52:30AM 10          THE BAILIFF:  All rise for the jury.

11          (Jury not present).

12          THE COURT:  All right.  We will resume at 1:15.

13          (Lunch recess).

14          THE COURT:  We're ready for the jury.

01:16:50PM 15          (Jury present).

16          THE COURT:  All right.  Let's have a seat.  Ladies

17     and Gentlemen of the Jury, when we stopped for lunch, the State

18     was presenting its case in chief on the punishment phase of the

19     trial.

01:17:03PM 20          You can call your next witness, Mr. Monroe.

21          MR. MONROE:  The state will call Amber Wilkinson.

22          THE COURT:  Ma'am, I swore you in earlier, did I

23     not?

24          THE WITNESS:  Yes, sir.

01:17:25PM 25          THE COURT:  You're reminded you're under oath.

1    Would you state your full name?

2              THE WITNESS:  Amber Briana Wilkinson.

3                    AMBER WILKINSON,

4    having been first duly sworn, testified as follows:

01:17:33PM 5                  DIRECT EXAMINATION

6    BY MR. MONROE:

7        Q.   Amber, where are you from?

8        A.   Houston, Texas.

9        Q.   All right.  And we've heard your name summoned here.

01:17:45PM 10   Everybody is probably familiar with who you are.

11              Let me direct your attention back to September of

12   2013.  Where were you living then?

13       A.   351 Madrona Drive.

14       Q.   All right.  And was that a residence that belonged to

01:18:02PM 15   you?

16       A.   No, I had just moved there two months prior.

17       Q.   And where did you come from?

18       A.   Houston.

19       Q.   All right.  And whose residence is that?

01:18:12PM 20       A.   My brother's.

21       Q.   What is his name?

22       A.   Wylie Wilkinson.

23       Q.   Did you move there by yourself?

24       A.   No, just me and my little boy, a three-year-old.

01:18:22PM 25       Q.   What is his name?

1     A.   Brennan.

2     Q.   What is Brennan's birthdate?

3     A.   September 1st.

4     Q.   What year was he born?

01:18:35PM 5     A.   2010.

6     Q.   So he's going to be four?

7     A.   Yes, sir.

8     Q.   Let me direct your attention back to September 5, 2013,

9     and ask you if you remember that day?

01:18:47PM 10    A.   Yes, sir.

11    Q.   Can you tell the jury what happened on that day?

12    A.   Our door was kicked in and we had a gun put in mine and

13    my son's face.  Our dogs were pistol-whipped and my brother was

14    shot at.

01:19:20PM 15    Q.   That's a pretty big -- a pretty big day.  Do you mind

16    if I ask you some more questions about it?  May I call you

17    Amber?

18    A.   Yes.

19    Q.   Let's start off with the first thing you said, your

01:19:34PM 20    door was kicked in.  Tell me where you -- well, let me back up.

21    Who was there in the home?

22    A.   It was our dogs, my brother, me and my son.

23    Q.   All right.  And where in the house were you?

24    A.   I was sitting at the kitchen table.

01:19:50PM 25    Q.   All right.  And was your son there with you?

1    A.   He was in his room.

2    Q.   All right.  And where was your brother?

3    A.   He was sitting directly like in front of me on the

4  couch.

01:20:00PM  5    Q.   All right.  What's the first thing that you remember

6  noticing out of the ordinary on that day?

7    A.   A white guy kicking our door in.

8    Q.   I guess that would be out of the ordinary?

9    A.   Yeah.

01:20:17PM 10    Q.   Can you describe that?  I mean, was it loud?

11    A.   Yeah, it was loud because our dogs were going crazy.

12    Q.   All right.  What did you do when that started to

13  happen?

14    A.   I jumped up and ran to my son's room.

01:20:31PM 15    Q.   Did you have any idea what was going on really?

16    A.   No, sir.

17    Q.   All right.  So you went to where the room that your son

18  was already in or did you take him with you?

19    A.   No, he was already in there.  I just ran to his room.

01:20:44PM 20    Q.   And what did you do when you got to his room?

21    A.   I laid down on top of him.

22    Q.   Why did you do that?

23    A.   Because I was scared for my life.

24    Q.   Why were you scared for your life?

01:20:57PM 25    A.   Because people just don't kick your door in to come say

hi.

Q.   Are you aware of and you may not be -- do you know what your brother did?

A.   All I know is he ran to his room.

01:21:09PM   Q.   Okay.  Once you got to your -- to the room where your boy was, could you still see --

A.   Yes, sir.

Q.   -- down the hall?

A.   Yes, sir.

01:21:17PM   Q.   What did you see?

A.   I seen a white man standing at the hallway with his gun pointed down the hallway telling me just to stay down.

Q.   All right.

A.   Then I had seen either a black or a Hispanic male go 01:21:39PM towards the kitchen and was screaming where the drugs and the money was and we didn't know.  There was no drugs or money there.  So I just stayed laying.

Q.   What's the next -- what's the next thing that happened?

A.   I know that one of them came down the hallway with a 01:22:04PM gun and that's when he put it in mine and my son's face -- well, not right in our face but this far from us.

Q.   You have your hands out and the court reporter can't take down your gestures.  So 2 or 3 feet?  I don't want to put words in your mouth but how far?

01:22:22PM   A.   Probably 3 or 4 feet.

1    Q.   Do you remember which one of the two it was?

2    A.   Yes, sir.

3    Q.   Which one?

4    A.   Not the white guy.

01:22:31PM 5    Q.   And did he -- where did he point the gun?

6    A.   At mine and my son's face.

7    Q.   And when you say right in yours and your son's face,

8    what --

9    A.   Well, I was laying on top of my son and like our faces

01:22:45PM 10   were -- I had my face on his, but he was trying to get out from

11   under me because one of the dogs were crying because he had got

12   hit with a pistol and that's my little boy's -- everything is

13   his dogs.

14   Q.   Did the man who pointed the gun that got close -- I'm

01:23:12PM 15   going to call him the close man, okay?

16   A.   Yeah.

17   Q.   Did he say anything to you?

18   A.   Where is your brother at.  Tell him to open the door.

19   Q.   What did you say to him?

01:23:21PM 20   A.   I just started screaming his name and we didn't hear

21   nothing so we thought he was dead.

22   Q.   You started screaming your brother's name?

23   A.   Yeah.

24   Q.   What's the next thing you did?

01:23:33PM 25   A.   Just laid there, laid on top of my son and praying to

1  God that if we did get shot, that I would catch the bullet and

2  not hit him.

3      Q.   Did you notice anything distinctive about what any of

4  these people were wearing?

01:23:51PM 5   A.   Not really.  I know that the -- I don't really remember

6  what the white guy was wearing.  I know that the other guy had

7  a vest on.

8      Q.   The black guy?

9      A.   Yeah.

01:24:03PM 10  Q.   When we talk about a vest, are you talking about some

11  sort of bullet proof vest --

12     A.   Yes.

13     Q.   -- or like a vest of a suit?

14     A.   No, like a bullet proof vest.

01:24:13PM 15  Q.   Okay.  What's the next thing you remember happening?

16     A.   Gunshots.

17     Q.   From whom?

18     A.   I was in the back room.  I know that the black guy had

19  shot towards my brother's room.  Like the door was shut, but he

01:24:31PM 20  had shot off a couple of shots and I thought my brother was

21  dead and I figured we would be next, you know.

22     Q.   So you're sure you saw who fired the gun?

23     A.   Yes.  Yes.

24     Q.   And do you know whether your brother fired a gun?

01:24:48PM 25  A.   I mean I didn't see him fire one, but I'm pretty sure

1    that he fired a warning shot.

2        Q.    All right.  Do you know what came first, if you

3    remember?

4        A.    No, sir.  I was in the back room, so I don't know

01:25:01PM 5    really.

6        Q.    Well, a shot came from inside his room and then you saw

7    the black guy?

8        A.    I saw the black guy shot.

9        Q.    What's the next thing that happened after the gun fire?

01:25:18PM 10        A.    At that point I really don't know because I tried to

11    scoot back.  I want to say maybe they left, but I'm not really

12    sure because I mean I stayed back there with my little boy

13    until my brother came and woke me up from a seizure.  I went

14    into a seizure.

01:25:35PM 15        Q.    Let's talk about that.  Do you have epilepsy?

16        A.    Yeah, but I haven't had a seizure in a long long time.

17    When I get in real stressful situations, I get thrown into

18    them.

19        Q.    Do you believe you had a seizure there?

01:25:49PM 20        A.    No, I know I did.

21        Q.    Do you have any idea how long you were out for the

22    seizure?

23        A.    No.

24        Q.    When you came to from the seizure, was the event

01:26:01PM 25    basically over?

A.   Yeah, my brother woke me up from it and he said that I was trying to like get away from him.

Q.   Can you describe for me the demeanor of the black guy? How was he acting?

A.   Pissed off to say the least.

Q.   And what makes you say -- again, none of us were there and so some of these questions may seem silly to you, so that's why --

A.   He seemed -- he seemed very violent and really pissed off.

Q.   Was he aggressive?

A.   Yes.

Q.   What about the white guy?

A.   He -- he actually called me ma'am.  He told me, ma'am, please, just lay down.  Just lay down.

Q.   Well, was profanity used?

A.   Yes.

Q.   Which words?  And it's okay for you to say.

A.   Get the fuck down, where is the fucking money and the drugs, pretty much just fuck.  Sorry.

Q.   And do you remember -- and that's okay.  The jury understands.  Do you remember which of the two was saying that?

A.   Yes, sir.

Q.   Which one?

A.   Not the white guy.

1    Q.   Did you get a good look at the black guy?

2    A.   Yes, sir.

3    Q.   Could you identify him if you saw him again?

4    A.   Yes, sir.

01:27:44PM 5    Q.   Do you see him in the courtroom?

6    A.   Yes, sir.

7    Q.   I hate to ask but can you point him out?

8    A.   (Indicating).

9    Q.   The gentleman in the middle?

01:27:59PM 10   A.   Yes, sir.

11   Q.   Are you sure?

12   A.   Yes, sir.

13   Q.   Have you seen him since that time?  Is this the first

14   time you've seen him since then?

01:28:10PM 15   A.   Yes, sir.

16   Q.   What was going through your head when that gun was

17   pointed at you?

18   A.   That me and my son were going to die.

19   Q.   Were you saying anything?

01:28:25PM 20   A.   I was praying to God that if -- you know, if a shot

21   would get fired, that hopefully, you know, that I would catch

22   it and it wouldn't go all the way through my son.

23   Q.   How did your -- what was your son doing at that time?

24   A.   He was just screaming for his Uncle Wylie because we

01:28:59PM 25   weren't getting no response.  We thought he was dead.

1      Q.   Was your son scared, too?

2      A.   He's still scared.  I mean, the dogs can't even bark

3   without him running and hiding.

4      Q.   Were you able to tell later on whether or not the dogs

01:29:26PM  5   had been injured in any way?

6      A.   Yeah, they had been pistol whooped.

7      Q.   Did you see that occur or did you hear it?

8      A.   I heard one of them, but I seen him hit Lily.

9      Q.   Lily is?

01:29:40PM 10      A.   Lily is Brennan's dog.

11      Q.   And which one did you see hit the dog?

12      A.   This guy.

13      Q.   The Court can't -- the defendant here today?

14      A.   Yes, sir.

01:29:58PM 15      Q.   You don't have any idea how long you were out?  Have

16   you had any seizures since then?

17      A.   No, but I've had major panic attacks.  I can't sleep.

18      Q.   When you came to, was the episode basically over by

19   that time?

01:30:18PM 20      A.   Yeah, the cops were already there.

21           (Bench conference).

22           MR. MONROE:  In regard to the motion in limine, I

23   would like to propose to offer these two photographs into

24   evidence.  These are the ones that Mr. Brown was saying prior

01:30:58PM 25   to the trial beginning that he wanted to object to and wanted

to approach the bench before I went into any of that.  And I
don't want to show the witness without the Court's permission.
I don't know -- I'm sure she'll identify them, but I want to
abide by the motion in limine.

01:31:17PM 5          MR. BROWN:  Yes.  Judge, under 403, we believe
that the probative value is far outweighed by the danger of
unfair prejudice.  In the particular case, she's already
testified who he was, how old he was, how he was scared, and
it's our position that the State is using this to put on
01:31:30PM 10 sympathy and bias to the jury which is not allowable under the
laws.  In the State of Texas, you're innocent and you've
instructed him not to do that and that's precisely why it's
already been out there and it's in evidence that he was in the
house and he's three years old, and this is evidence that's
01:31:48PM 15 already in evidence as far as the age and the description of
the kid.  And again, we believe this is going to be unfairly
prejudicial to my client.

18          THE COURT:  Okay.  Overrule the objection.

19          (Bench conference ended).

01:32:31PM 20     Q.  (BY MR. MONROE) Are you all right?  I'm going to hand
you a couple of photographs.

22          THE COURT:  The master may have been turned off.

23     Q.  (BY MR. MONROE) I hand you a couple of photographs and
I'm going to ask you some preliminary questions about them, all
01:33:00PM 25 right.  And before I ask you, assuming I am allowed to ask you,

1    what all is in it, all right.

2              So first of all, let me show you what I've marked

3    as State's Exhibit 40 and 41.  Do you recognize that?

4        A.   Yes.

01:33:19PM 5      Q.   Do those photographs reasonably and accurately portray

6    what they purport to show?

7        A.   Yes, sir.

8              MR. MONROE:  We would offer State's Exhibit 40 and

9    41 into evidence.

01:33:35PM 10             (State's Exhibit Nos. 40-41 offered).

11             MR. BROWN:  No further objections, Your Honor.

12             THE COURT:  All right.  40 and 41 are admitted.

13             (State's Exhibit Nos. 40-41 admitted).

14       Q.   (BY MR. MONROE) What are pictures 40 and 41?

01:33:54PM 15     A.   What are what?

16       Q.   What are they?

17       A.   My front door and my little boy.

18       Q.   That's your son?

19       A.   Yes, sir.

01:34:01PM 20     Q.   Was that the one that was there with you?

21       A.   Yes, sir.

22       Q.   The one you were laying on top of?

23       A.   Yes, sir.

24       Q.   These pictures were taken fairly recently?

01:34:10PM 25     A.   Yes.

1      Q.   Is that pretty much about the size he was back then?

2      A.   No.

3      Q.   He's a little bit bigger now?

4      A.   Yeah, he's a lot bigger now.

01:34:21PM  5           MR. MONROE:  Permission to publish the pictures to

6      the jury?

7                THE COURT:  You may.

8                MR. MONROE:  Pass the witness, Your Honor.

9                MR. BROWN:  Judge, I've just been tendered a copy

01:34:46PM 10   of her statement.  Can I have a second to review it.

11                THE COURT:  All right.

12                MR. BROWN:  Thank you.

13                May I proceed, Your Honor?

14                THE COURT:  Yes, you may.

01:36:55PM 15                     CROSS-EXAMINATION

16   BY MR. BROWN:

17      Q.   Is it Ms. Wilkerson or Wilkinson?

18      A.   Wilkinson.

19      Q.   Ma'am, my name is Shawn Brown and I have a few

01:37:04PM 20   questions for you.  If at any time you don't understand my

21   questions or would like me to repeat it, please just ask me to

22   do so.  All right?

23      A.   Yes, sir.

24      Q.   You said that you moved to Kerrville approximately two

01:37:17PM 25   months before this occurred?

1      A.   Yes, sir.

2      Q.   And then prior to that, I guess your brother had been

3   living here for some time; is that right?

4      A.   Yes, sir.

01:37:27PM 5      Q.   And this was your first time, I guess, when you moved

6   with him two months ago to come to the City of Kerrville; is

7   that right?

8      A.   Well, I had come to visit and then I decided -- I came

9   to visit in July and then decided to stay and move here.

01:37:42PM 10      Q.   You came to visit in July and just decided to stay?

11      A.   Yes.

12      Q.   Okay.  And prior to July, you had never been here

13   before?

14      A.   No, sir.

01:37:50PM 15      Q.   And you hadn't seen your brother in quite some time,

16   had you?

17      A.   No, sir.

18      Q.   So prior to July, it had been several years before you

19   had seen your brother; is that right?

01:37:59PM 20      A.   Yes, sir.

21      Q.   You know that your brother told the police that he had

22   smoked dope that morning, don't you?

23      A.   No, sir.

24      Q.   You don't dispute that, do you?

01:38:16PM 25      A.   I don't really know what my brother does.

Q.   Okay.

A.   Dope as in what?

Q.   Marijuana.  I mean you told the police that your brother smokes marijuana, didn't you?

A.   Yes, sir.

Q.   So you know that he does that?

A.   Yes.

Q.   And whatever else he does or did at that time, you didn't have any knowledge of it because you had just moved there with him?

A.   Right.

Q.   You hadn't been there for the two years prior at least since July, correct?

A.   Right.

Q.   So you don't know if he deals in drugs, cocaine, marijuana or any of that, do you?

A.   No, I know he's not a drug dealer.

Q.   Well, you don't have personal knowledge?  You were not there, were you?

A.   No, I wasn't, but I know my brother very well.

Q.   Now, you said that the first thing that happened was somebody kicked in the door.  Do you recall that?

A.   Yes, sir.

Q.   Okay.  And a person that kicked in the door, I believe you told this jury was the white guy; is that right?

1    A.   Right.

2    Q.   Okay.  And he was the first one in the house, correct?

3    A.   Yes, sir.

4    Q.   And I guess you told this jury that he was actually the

01:39:30PM 5   one that kind of came down to the hallway where either your

6   bedroom or your son's bedroom was located?

7    A.   No, he didn't come down the hallway.  He just came --

8   like where the hallway starts, he stopped right there.

9    Q.   So where the living room meets the hallway, that's

01:39:47PM 10   where he stopped?

11    A.   Yes, sir.

12    Q.   And Vernon Travis kind of went to the left toward your

13   brother's room; is that right?

14    A.   He came through past the hallway and went to the

01:39:58PM 15   kitchen, towards the kitchen.

16         MR. BROWN:  May I approach the witness, Your

17   Honor?

18         THE COURT:  Yes, you may.

19    Q.   (BY MR. BROWN) I'm going to show you a diagram that's

01:40:05PM 20   been admitted into evidence already.  It's a copy of it and see

21   if you recognize it to be a layout of the house.

22    A.   Okay.  You're going to have to show me.

23    Q.   Okay.  This door would be the front door.

24    A.   Okay.

01:40:16PM 25   Q.   This is the living room.

1     A.   Okay.

2     Q.   This is the hallway.

3     A.   Okay.  The white guy stopped here.  Vernon went through

4  here to the kitchen.

01:40:24PM 5     Q.   Okay.

6     A.   Then he came back here after the fire -- after the shot

7  was fired and shot through my brother's door.

8     Q.   Okay.  I'll get to that in just a second, but I want to

9  know is this back room right here your son's room?

01:40:40PM 10     A.   Yes, sir.

11     Q.   Will you mark that as son's room?

12     A.   This is the bathroom.

13     Q.   Okay.  Mark that as the bathroom.

14     A.   (Marking).

01:40:55PM 15     Q.   And I guess if you have to mark there where it says

16  son's room, put where the bed is?

17     A.   The bed is right here.

18     Q.   Okay.

19     A.   All his toys are right here and we were laying right

01:41:12PM 20  here.

21     Q.   Okay.  And what room is this?

22     A.   My room.

23     Q.   Okay.  Will you put that on the drawing so I can

24  identify it.

01:41:49PM 25     A.   (Marking).

Q.  Now, what you testified to earlier when the prosecution was asking you questions is that you and your son, your son was laying on the bed and you came and laid on top of him on the bed, do you recall that?

01:42:01PM  A.  No, I didn't say he was laying on his bed.  I said he was in his room.

Q.  Okay.  You said eventually you went into the bedroom and you laid on top of him on the bed; do you recall that?

A.  No.

01:42:12PM  Q.  Okay.  So if you said that, that wasn't necessarily true; is that right?

A.  I never said that I don't believe.  I said that I had went to his room.

Q.  And you said that Vernon Travis ran towards what
01:42:27PM  appears to be the dining room; is that right?

A.  Yes, sir.

Q.  And you said that the white guy stood at the entry of the -- and if you would show the jury on this where everybody was standing, you can use my pen if you don't mind, just kind
01:42:50PM  of where the white guy was standing when they came in.

A.  See the front door?

Q.  Uh-huh.

A.  Right there.

Q.  If you can, show the jury where Vernon Travis ran to
01:43:01PM  when he came into the house?

1    A.   He came in and ran this way.

2    Q.   Okay.  So put a mark where he stopped.

3    A.   I don't know where he stopped.

4    Q.   Or more or less the area that he went to.

01:43:14PM  5    A.   Well, I know he had to went to the kitchen because all

6    the stuff was pulled out of our freezer.

7    Q.   Okay.

8    A.   But as of where I was laying, I couldn't tell where he

9    was over in this area.

01:43:24PM 10    Q.   So basically where you were in the bedroom, you could

11    not see where he was at, correct?

12    A.   Not at that point, no, not until he came and shot.

13    Q.   Okay.  And so when he came into the house, you go into

14    the dining -- he goes into the dining room area, kitchen area

01:43:41PM 15    and you can't see him; would you agree with that?

16    A.   Right.

17    Q.   Okay.  And then you hear a gunshot and it's been

18    established that your brother has shot his gun first; do you

19    agree with that?

01:43:53PM 20    A.   Yes, sir.  Yes, sir.

21    Q.   There is no dispute or confusion about that, is there?

22    A.   No.

23    Q.   Okay.

24    A.   He fired the shot and he yelled that it was a warning

01:44:02PM 25    shot and he had already called the police to get the fuck out

1  of there.  In his words.  Sorry, ma'am.  Sorry.

2      Q.   And then it's your testimony that Vernon fires a couple

3  of return shots?

4      A.   Yes, through my brother's door.

01:44:16PM 5      Q.   You didn't see where he shot at?  You couldn't tell --

6      A.   Well, I could tell where he was pointing at.

7      Q.   Okay.  And you didn't see where your brother's shot

8  exited the room, did you?

9      A.   No, it went in the floor.

01:44:29PM 10      Q.   Did you see him shoot into the floor?

11      A.   No, sir.

12      Q.   So you don't know where the bullet went, do you?

13      A.   No, sir.

14      Q.   Okay.  After he shot -- Vernon Travis shot a couple of

01:44:39PM 15  times, is that when they ran out the door, the front door?

16      A.   I'm really not sure when they left.

17      Q.   Okay.  I believe it was your testimony and in your

18  statement that you said as soon as the shots were fired, the

19  white guy said, Let's get out of here, let's get out of here,

01:44:59PM 20  and they ran out the front door?

21      A.   Well, he had said let's get out of here and then Vernon

22  had asked me how many people were in my brother's room.  I told

23  him and some of his friends because he had a big dog in there

24  and then he said he had seen somebody run and then I don't

01:45:14PM 25  really remember too much after that, but I'm sure they left.

TERI THOMAS, CSR, RPR, CMRS

1   Q.   Okay.  And so the sequence of events, Vernon runs into

2   the dining room area, he's yelling and screaming you say; is

3   that right?

4   A.   (Nods head up and down).

01:45:29PM 5   Q.   Yes?

6   A.   Yes, sir.

7   Q.   And a shot is fired while he's in the dining room area?

8   A.   Yes, sir.

9   Q.   He takes a couple of steps toward Wylie's door and you

01:45:39PM 10   see him return fire a couple of times?

11   A.   Yes, sir.

12   Q.   And then you see him -- you hear them saying we need to

13   get out of here and then they run out the door?

14   A.   Yes, sir.  They ran towards the door and I stayed on

01:45:50PM 15   top of my little boy.

16   Q.   At no point in time did you see Vernon Travis assault

17   one of those dogs, did you?

18   A.   Yes.  In the hallway.

19   Q.   Your testimony right now was that he ran in the dining

01:46:05PM 20   room, a shot was fired?

21   A.   When he came down the hallway and put a gun in our face

22   and Lily came down the hallway to -- because he was yelling,

23   that's when he hit Lily.  That's when my little boy got all

24   pissed off.

01:46:20PM 25   Q.   Okay.  But what you just testified to was that he ran

1    into the dining room first, do you recall that?

2        A.   Yes.

3        Q.   Okay.  And then you said that shots were fired from the

4    bedroom, do you recall that?

01:46:30PM 5    A.   Yes.

6        Q.   And then he returned fire --

7        A.   Okay.  But are you missing out on the part where he

8    came and put a gun in mine and my son's face?

9        Q.   I don't know because I just walked through it with you

01:46:43PM 10   to find out what the events were and that's what you told --

11       A.   I think you're trying to mess me up here because I know

12   what happened.

13       Q.   I'm not trying to mess you up.  I'm trying to let this

14   jury know exactly what happened that particular day.

01:46:55PM 15   A.   I think they know exactly what happened.

16       Q.   Okay.  And now I'm questioning you about that, okay.

17            Now, what color of shirt was Vernon Travis

18   wearing?

19       A.   I don't know because he had a black bullet proof cops

01:47:10PM 20   vest over it.

21       Q.   Okay.  He didn't have the shirt over the vest?

22       A.   No.

23       Q.   If an officer testified to that, would he be lying?

24       A.   I don't know, but he had it over his shirt.

01:47:25PM 25   Q.   Vernon never shot towards the bedroom where you and

1   your son were located, did he?

2       A.   No, sir, he didn't.

3       Q.   He never shot until your brother fired his weapon, did

4   he?

01:47:36PM 5       A.   I'm not sure who shot the first shot.  All I know I was

6   in the back of the house, okay.  Shots were fired.  That was

7   after the gun was already put in our face and my dog was

8   already hit with a pistol.

9       Q.   Well, ma'am, you just testified to this jury that your

01:47:51PM 10  brother shot first.  Are you changing your story again?

11      A.   All -- I mean, I'm pretty sure that my brother fired

12  first.

13      Q.   Okay.  Well --

14      A.   Into the floor, a warning shot for them to get the fuck

01:48:08PM 15  out of our house.

16      Q.   Okay.

17               THE COURT:  Let's try -- let's just try to say --

18               THE WITNESS:  I'm sorry.

19               THE COURT:  Let's just try to say the F word.

01:48:17PM 20               THE WITNESS:  Okay.  The F word.  I'm sorry.

21      Q.   (BY MR. BROWN) Well, this jury needs to know.  Your

22  brother shot first; did he not?

23      A.   Yes.  Wouldn't you shoot, too?

24      Q.   Excuse me?

01:48:31PM 25      A.   Wouldn't you shoot, too, if you were in that situation?

1      Q.   I'm asking the questions, ma'am.

2           THE COURT:  He'll ask another question.  Go ahead,

3    Mr. Brown.

4           MR. BROWN:  Thank you.

01:48:42PM 5      Q.   (BY MR. BROWN) After your brother fired a shot from the

6    bedroom that he was locked in, he jumped out of a window; did

7    he not?

8      A.   I don't know.  I wasn't in there.

9      Q.   Did he ever tell you that he did that?

01:48:57PM 10      A.   Yes, he did.

11      Q.   So he told you that --

12      A.   He --

13      Q.   -- I fired a round and I jumped out the window and took

14    off to the neighbors house?

01:49:09PM 15      A.   No, he took off to go call the cops at the neighbor's

16    house.

17      Q.   At the neighbor's house; is that right?

18      A.   Yes.

19      Q.   Vernon Travis never threatened you or your son that he

01:49:45PM 20    was going to shoot you, did he?

21      A.   Putting a gun in our face was threatening enough.

22      Q.   Well, let's back up to that.  You said that if it

23    happened that he was 3 to 4 feet away; is that right?

24      A.   Yeah, about this far away.

01:49:59PM 25      Q.   You testified to this jury that he came down the

TERI THOMAS, CSR, RPR, CMRS

1    hallway, but you never testified that he came into the bedroom,

2    did he?

3        A.   He didn't have to come into the bedroom.  He was

4    already passed our bedroom or bathroom door.

01:50:37PM  5        Q.   Now, the white guy, his name is Timothy Scott Pugh.  Do

6    you know him?

7        A.   No, sir.

8        Q.   If he told the police that Vernon told y'all to stay in

9    the bedroom, would that be the truth or a lie?

01:51:09PM 10        A.   Vernon was telling me to send my son out.

11        Q.   That's not my question.  The white guy, Scotty Pugh,

12    told the police that Vernon said for you and your son to stay

13    in the bedroom?

14        A.   All I heard was stay down.

01:51:24PM 15        Q.   Okay.  All you heard was stay down; is that right?

16        A.   Yes, sir.

17        Q.   You didn't hear Vernon Travis say get the F out of the

18    bedroom, did you?

19        A.   No, he told me to tell my brother to get the F out of

01:51:37PM 20    the bedroom.

21        Q.   Okay.  So he never told you to send your son out?

22        A.   Yes, he did.

23        Q.   Well, you keep changing your testimony here.  So if

24    Scotty Pugh told the police that Vernon Travis never said to

01:51:50PM 25    send your son out --

A.   Then he would be a lying -- he would be lying because I was told to send my son out, and I said I am not sending him out.  I will come out with him, but I'm not sending him out.

Q.   Really what he said is send your brother out, right?

A.   No.

Q.   He never told you to have your brother come out?

A.   All right.  Yeah, he told me that, too, but he -- you're trying to get me confused, okay, and it's not working.

Q.   Ma'am, I'm not trying to confuse you.  I'm trying to find out what was said.

He told you specifically to have your brother come out; did he not?

A.   Which one are you asking me about, my son or my brother?

Q.   I'm asking about your brother.

A.   Yes, and he also told me to send my son out.  Maybe to use him as leverage, I don't know.

Q.   After the shots were fired, he never ran back into your room, did he?

A.   No, sir.

Q.   Ma'am, you mentioned that the vest was police issued.  How do you know that?

A.   I didn't say it was police issued.  I said it looked like a cops sport proof vest.

Q.   If I heard you say that it was police issued, I was

 1  mistaken?

 2      A.  Police issued?

 3      Q.  Yes, ma'am.

 4      A.  Yes, you must be mistaken.  It looked like a police

01:54:04PM  5  vest.

 6      Q.  Do you know where the vest came from?

 7      A.  No, I don't know whose --

 8      Q.  Do you know what kind of vest it was?

 9      A.  I know it was a bullet proof vest.

01:54:13PM 10      Q.  Okay.  Do you know if it was police issued or not?

11      A.  No, sir, I don't, but it looked like one.

12              MR. BROWN:  I have no further questions.

13              THE COURT:  Any questions?

14              MR. MONROE:  Just -- may I approach the witness?

01:55:28PM 15              THE COURT:  Yes.

16                      REDIRECT EXAMINATION

17  BY MR. MONROE:

18      Q.  Amber?

19      A.  Yes, sir.

01:55:43PM 20      Q.  I want to show you what's been marked and introduced

21  into evidence as State's Exhibit 26?

22      A.  Yes, sir.

23      Q.  And ask you if that looks like what you observed Mr.

24  Travis to --

01:55:58PM 25      A.  Can you open it up?

1    Q.   Yes, sir.

2    A.   Yes, sir.

3    Q.   Does this appear to be what he had on?

4    A.   Yes, sir.

01:56:05PM 5          MR. MONROE:  Pass the witness, Your Honor.

6               THE COURT:  Do you have any questions, Mr. Brown?

7               MR. BROWN:  May I approach the vest?

8                        RECROSS-EXAMINATION

9    BY MR. BROWN:

01:56:37PM 10   Q.   Ma'am, you testified that this vest, you're sure it was

11   a black vest; is that right?

12   A.   Well, I guess I thought it was black, but that's it.

13   Q.   And what color is it?

14   A.   It's Navy blue.

01:56:53PM 15          MR. BROWN:  No further questions.

16              THE COURT:  Any other questions?

17              THE WITNESS:  But that is the vest that I seen.

18              THE COURT:  Do you have any questions?  Do you

19   have any questions, Mr. Monroe?

01:57:09PM 20          MR. MONROE:  Of this witness?

21              THE COURT:  Yes.

22              MR. MONROE:  No further questions, Your Honor.

23              THE COURT:  Thank you, ma'am.  You may step down.

24              Your next witness, Mr. Monroe.

01:57:20PM 25          MR. MONROE:  Your Honor, at this time, the State

1   would rest on punishment.

2               THE COURT:  Are you ready to start calling

3   witnesses or do you need a break, Mr. Brown?

4               MR. BROWN:  Can I have about five minutes, Judge,

01:57:31PM 5   just to figure out the order I need to go?

6               THE COURT:  All right.  Let's take ten minutes.

7   Everybody can get some water or something and we'll take a

8   break for ten minutes.

9               THE BAILIFF:  All rise for the jury.

01:57:41PM 10               (Jury not present).

11               THE COURT:  We're in recess.

12               (Recess).

13               THE COURT:  Scott, do you have them ready to go?

14               THE BAILIFF:  Yes.

02:09:04PM 15               THE COURT:  Okay.  Bring them in.

16               THE BAILIFF:  All rise for the jury.

17               (Jury present).

18               THE COURT:  All right.  You may be seated and Mr.

19   Brown, you may call your first witness.

02:10:13PM 20               MR. BROWN:  They're in the hall.  Would you like

21   me to go get them?

22               THE COURT:  The bailiff will.

23               MR. BROWN:  Doctor John Roache.

24               THE COURT:  Doctor Roache, this is our witness

02:10:48PM 25   stand over here.  I believe I swore you in earlier; is that

1    correct?

2                   THE WITNESS:  Yes, sir.

3                   THE COURT:  I just want to remind you that you're

4    under oath and would you state your name for the record?

02:10:56PM 5        THE WITNESS:  John Roache.

6                   THE COURT:  Mr. Brown.

7                   MR. BROWN:  Thank you, Your Honor.

8                        DR. JOHN ROACHE,

9    having been first duly sworn, testified as follows:

02:11:00PM 10                  DIRECT EXAMINATION

11   BY MR. BROWN:

12       Q.   Doctor Roache, would you please introduce yourself to

13   the jury?

14       A.   I mentioned my name.  I'm a professor of psychiatry and

02:11:09PM 15  also pharmacology at the University of Texas Health Science

16   Center at San Antonio.  I'm also the chief of the Division of

17   Alcohol and Drug Addiction and --

18       Q.   How long have you been with the health science center?

19       A.   So I've been here in San Antonio for 16 years.  Before

02:11:30PM 20  that, I was at the UT system equivalent, the sister medical

21   school in Houston.

22       Q.   Okay.  And where are you originally from?

23       A.   I'm originally from Indiana, but I've been in Texas now

24   for I guess 28 years.

02:11:51PM 25      Q.   Okay.  Where have you gone to school?

1    A.   So I have a Ph.D., a doctorate degree in pharmacology

2  from Purdue University in Indiana and following that, I did a

3  postdoctoral fellowship at Johns Hopkins and also at the

4  National Institute on Drug Abuse in Baltimore, Maryland.  Then

02:12:15PM 5  I came from there to Texas.

6    Q.   Okay.  Have you had any specialized training in these

7  fields of expertise?

8    A.   Yes.  My expertise is in clinical pharmacology and drug

9  abuse.  I do research in the causes and treatments of drug and

02:12:32PM 10  alcohol abuse, dependence and addiction.

11    Q.   And do you have any as it relates to post-traumatic

12  stress disorder?

13    A.   For the last really seven years, I've been increasing

14  doing research in PTSD because of all the other psychiatric --

02:12:52PM 15  I mean, drug use disorder and mental illness are commonly

16  co-morbid conditions in psychiatric illness, and PTSD is unique

17  among those because it has a particularly high prevalence of

18  drug and alcohol misuse in a self-medicating pattern trying to

19  deal with the PTSD.  So I've been doing that work for seven

02:13:18PM 20  years.  I'm the deputy director of the consortium to alleviate

21  PTSD, which is the only DoD funded consortium for the treatment

22  of PTSD.

23    Q.   Have you published any articles or anything of that

24  nature in this field?

02:13:37PM 25    A.   Yes.  So I've been in the field for 30 years,

1    publishing on drug abuse and my PTSD-related work is for the

2    past seven years, increasingly so.

3         Q.   Do you belong to any professional organizations in this

4    field?

02:13:54PM 5    A.   Yes.  I'm a member of the College on Problems of Drug

6    Dependence and also the Research Society on Alcoholism and I'm

7    chairman of the board of the Texas Society in Research on

8    Alcoholism.

9         Q.   Have you previously testified in court as an expert on

02:14:13PM 10    the issues of PTSD, alcohol and drugs?

11        A.   Yes.

12        Q.   And has it been more than once?

13        A.   Yes.

14        Q.   Have you had the opportunity to meet an individual by

02:14:29PM 15    the name of Vernon Travis?

16        A.   Yes, sir.

17        Q.   And do you recognize Vernon Travis here in the

18    courtroom today?

19        A.   Yes.

02:14:38PM 20        Q.   Okay.  And tell the jury kind of how you came into

21    contact with Vernon and what happened as a result.

22        A.   Well, I was contacted initially by his mother and --

23    about possibly being available as an expert witness because I

24    have done that before.  I believe I've also talked with his

02:15:08PM 25    mother and with you about the case and decided that -- I tried

1    to relate what the basis of my expertise might be as pertinent

2    to this case, at which point I agreed to participate as an

3    expert witness and went further and interviewed and met with

4    Vernon.

02:15:32PM 5    Q.   Okay.  Did you review any documents prior to I guess

6    meeting with Mr. Travis?

7    A.   Yes.  Your Honor, I have some notes here I would like

8    to be able to refer to to make sure I get it right.

9              THE COURT:  Sure.

02:15:49PM 10             THE WITNESS:  So I reviewed a medical record from

11    Doctor Delwin Williams.

12             MR. BROWN:  Hold on right there.  May I approach

13    the witness, Your Honor?

14             THE COURT:  Yes.

02:16:14PM 15    Q.   (BY MR. BROWN) I'm going to show you what's been marked

16    as Defendant's Exhibit Number 1 and you made mention of a Dr.

17    Delwin Williams medical diagnosis and see if you recognize that

18    document?

19    A.   Yes, sir.

02:16:43PM 20    Q.   Okay.  And is that a document that you reviewed in

21    preparing to testify here today and reviewed prior to meeting

22    with Vernon Travis?

23    A.   Yes.

24    Q.   After meeting with Vernon Travis, did he confirm, in

02:16:57PM 25    fact, that he met with Delwin Williams concerning his medical

1  diagnosis?

2      A.   Yes.  He told me he met with him on April 3rd.

3      Q.   And were you able to confirm that on the document

4  itself?

02:17:11PM 5      A.   Yes.

6      Q.   Were you able to confirm that this document was, in

7  fact, in relation to Vernon Travis?

8      A.   Yes.

9           MR. BROWN:  Judge, at this time, we would offer

02:17:20PM 10  Defendant's Exhibit 1 subject to any objections.

11           (Defendant's Exhibit No. 1 offered)

12           THE WITNESS:  Should I continue with documents?

13           THE COURT:  No.

14           MR. BROWN:  Hold on real quick.

02:17:36PM 15           MR. MONROE:  Your Honor, the State would object.

16  I think in that the predicate had not been laid for the

17  admissibility of these records.  I think as an expert he can

18  testify to what all he referred to and relied on but the

19  admissibility of the records itself, I don't think the proper

02:17:53PM 20  predicate has been laid.

21           MR. BROWN:  Judge, under the --

22           THE COURT:  I assume it's a hearsay objection?

23           MR. MONROE:  Yes.

24           THE COURT:  And I do know an expert can rely on

02:18:03PM 25  hearsay, but can you offer --

1                MR. BROWN:  Under 901, Judge, I believe he can --

2    he can authenticate the document.  He has authenticated it.  He

3    has said that he's familiar with the document.  He's reviewed

4    it.  He has knowledge surrounding that particular document, so

02:18:24PM  5    I think under 901 that he's able to proffer this into evidence.

6                THE COURT:  Well, I don't know about authenticate

7    like a medical text or something like that, but another --

8    another person's diagnosis, I know he can rely on it.  He can

9    absolutely rely on it, but it's an exception to the hearsay

02:18:44PM 10    rule the fact that he can rely on it on his own, he makes his

11    own professional opinion.

12                MR. BROWN:  We believe under 901, Your Honor, that

13    he can.

14                THE COURT:  Read 902 to me.

02:19:03PM 15                MR. BROWN:  The requirement of authentication or

16    identification as a condition precedent with admissibility is

17    satisfied with evidence sufficient to support a finding that

18    the matter in question is what its proponent claims.  So we

19    offer it.

02:19:19PM 20                THE COURT:  This isn't an authentication issue.

21    What's the exception to the hearsay rule?

22                MR. BROWN:  Judge, that he has specific knowledge

23    of this document.  He's reviewed the document.  He's reviewed

24    it with Vernon Travis; therefore, we believe that it's

02:19:33PM 25    admissible under this --

1          THE COURT:  I think he can talk about it.  He can

2     say that I reviewed some medical reports.  I've reviewed a

3     certain person's medical report, but I'm not sure he can offer

4     somebody elses' medical report that's hearsay, but he can refer

02:19:48PM  5     to it as being part of his diagnosis.

6          I'll sustain the objection.

7     Q.   (BY MR. BROWN) Now, Doctor Roache, after reviewing this

8     medical diagnosis by Doctor Williams, did you find -- or what

9     were the diagnosis from Doctor Williams?

02:20:07PM 10     A.   PTSD, polysubstance use disorder and drug inducement

11     disturbance.

12     Q.   And let's explain that to the jury exactly.  Let's take

13     each one individually and explain to the jury what that means

14     when he's been diagnosed with PTSD.

02:20:25PM 15     A.   Yes.  So PTSD is post-traumatic stress disorder.  It's

16     a condition that occurs in people who've had life-threatening

17     experiences of a traumatic nature.  It doesn't happen in

18     everybody.  It happens in a subgroup.  The percentages vary

19     tremendously.  It's very common in military deployment

02:20:55PM 20     unfortunately because of the constant stress that service

21     members undergo in wartime situation and it manifests itself in

22     a variety of different conditions.  I think I'm rambling, so

23     I'll move on.

24          That's post-traumatic stress disorder.

02:21:17PM 25          There is also polysubstance use disturbance

1    disorder and that refers to the abuse or dependence.  Now,

2    unfortunately the American Psychiatric Association recently

3    changed their terminology just at the end of 2013, 2013.

4    Under the old terminology, we had terms like abuse and

02:21:42PM 5    dependence, and under the new terminology it's all called use

6    disorder.  So use disorders because your life and your social

7    functioning becomes disturbed and disruptive because of a

8    habitual and persistent pattern of drug use.  It's called

9    polysubstance use disorders because it involves two or more

02:22:08PM 10    substances.

11         Q.   And do you know what the two substances were?

12         A.   In Vernon's case, it's alcohol and Xanax.  Xanax --

13    alcohol is familiar to everyone I believe, and then Xanax is a

14    benzodiazepine antianxiety medication that is legally available

02:22:31PM 15    by prescription for the treatment of anxiety disorders.  It has

16    abuse potential and can be used, misused, abused and you can

17    get dependent on it to the extent where you lose self-control

18    of the use and you can have withdrawal reactions if you stop

19    use and that kind of thing.  And then so in Vernon's case, it's

02:22:59PM 20    alcohol and Xanax.

21              The third diagnosis there is drug induced mood

22    disorder.  Now, what that is is a disturbance of your mood

23    patterns and by mood, we're referring to feeling good, feeling

24    depressed --

02:23:19PM 25              MR. MONROE:  Your Honor, if I might, my

1   understanding of the question was originally the first doctor's

2   diagnosis and I think we're going beyond that.

3          MR. BROWN:  I asked what the three were and he's

4   explaining the third one of the three.

02:23:34PM 5          MR. MONROE:  I think he's explaining his own

6   opinions as opposed to opinions of the doctor.

7          THE COURT:  Overruled.  You can continue.

8   Q.   (BY MR. BROWN) You can continue.

9   A.   The mood disturbance is when drug use starts altering

02:23:48PM 10  your mood.  You become moody, you become depressed, you can

11  feel exhilarated and rapid changes between those states and

12  conditions and just generally a disturbed pattern.  That's what

13  a substance use mood disturbance is.

14  Q.   Okay.

02:24:08PM 15  A.   I can --

16  Q.   Okay.  And do you know if he was prescribed any

17  medication?

18  A.   Yes, he was prescribed Hydroxyzine and Sertraline.

19  Q.   And would you explain to the jury what those are and

02:24:22PM 20  what they're used for?

21  A.   Hydroxyzine is a very sedating antihistamine.  Many

22  people with allergies might take an antihistamine and its

23  sedation is a side effect.  This is a drug that because of its

24  heavy sedative effects it's commonly used to help people become

02:24:45PM 25  relaxed, become more sedate and particularly for sleep

disturbance.

            And then Sertraline is called a selective
serotonin reuptake inhibitor.  That's a pharmacological class.
It's used as an antidepressant and an antianxiety agent.

02:25:05PM  Q.   And those are the ones that Vernon Travis are currently
taking; is that right?

            A.   I believe so.

            Q.   Now, when Vernon came to your office, did you have an
opportunity to sit down and -- after you reviewed this medical
02:25:27PM  diagnosis, did you have an opportunity to sit down with him?

            A.   Yes.

            Q.   Tell the jury about that interview and what you did to
further I guess investigate into these issues.

            A.   Well, I met with him for a period of an hour and a half
02:25:43PM  and -- in my office and then separately, I also had a telephone
conversation in follow-up with him.  During that interview, my
intent and purpose was to take -- take a history from him about
his onset of using substances, psychoactive substances to
confirm and determine whether or not he had a substance use
02:26:16PM  disorder and also to valuate the extent which substance
involvement may or may not be associated with PTSD symptoms of
PTSD, and that goes into the issue of his military experiences
of trauma and combat and things that could possibly cause PTSD.

            Q.   Okay.  And through your interview process, did you
02:26:46PM  learn certain things about him personally?

1    A.   Yes.

2    Q.   Okay.  And I guess you want a little history or

3  background, so that helps you evaluate who he is and who he was

4  and where he came from; is that right?

02:27:01PM 5    A.   That's correct.

6    Q.   All right.  And did you learn through the interview

7  that he had graduated from school a year early?

8    A.   Yes.  And those were one of the documents I reviewed

9  were his high school records.

02:27:12PM 10    Q.   Okay.  And once he graduated from school early, did you

11  find that he enrolled in the military at the age of 17?

12         MR. MONROE:  Your Honor, we would object to

13  leading the witness.

14         THE COURT:  Sustained.

02:27:27PM 15    Q.   (BY MR. BROWN) Through reviewing the records, did you

16  find out whether or not he entered the military at the age of

17  17?

18    A.   Yes.

19    Q.   And how did you come to find that?

02:27:38PM 20    A.   He told me when he joined the military.

21    Q.   Okay.  And do you know if he had to sign a waiver to

22  join at that age?

23    A.   I don't know.

24    Q.   Okay.  Do you recall what year and time frame that he

02:27:52PM 25  joined the military?

A.   It was -- he joined the Air Force in 2001 prior to the
occurrence of September 11.

Q.   So he joined boot camp just prior to September 11th?

A.   I don't have my notes exactly the dates of that, but I
believe it happened before September 11th his boot camp
training.

Q.   And do you know if he was deployed after September 11?

A.   Yes.

Q.   Okay.  Do you know where he was deployed to?

A.   He went to Iraq.

Q.   Okay.  And you said that he was in the Air Force; is
that right?

A.   Yes.

Q.   Okay.  And do you know if he was deployed with an Air
Force group or an Army group?

A.   He was a part of an Air Force detachment to an Army
base, an Army group.

Q.   And do you know approximately how long he spent over in
Iraq?

A.   As near as I can tell, it was at least nine months and
maybe approach a year and I don't -- at the time of the
interview, I don't believe he was entirely sure when exactly he
got back.

Q.   Okay.

A.   It was in -- it was after the Christmas holiday from

1    2003 to 2004.

2        Q.   Okay.  And when he came back, did he tell you what

3    happened when he came back?

4        A.   Yes.

02:29:21PM 5        Q.   And what was that?

6        A.   So there was -- there was a rather remarkable change in

7    his behavior.  He started using alcohol in an increasing

8    pattern and he got some prescription pain relievers first on

9    post and then he started a pattern of getting it from other

02:29:55PM 10   service members and people off base and then he began in an

11   increasing trend, a pattern towards using taking Xanax obtained

12   from friends and off the street sources off base.

13       Q.   Okay.  And how -- why would somebody do that that's

14   been diagnosed with PTSD like Vernon Travis?  Why do they drink

02:30:22PM 15   and take Xanax?

16       A.    It's unfortunately -- very common, as I mentioned

17   earlier, it's more common to PTSD than other forms of illness

18   and it's called self-medicating behavior where one of the

19   symptoms of PTSD is anxiety, arousal, interferes with your

02:30:48PM 20   sleep, wake up in the middle of the night and having nightmares

21   or cold sweats.  Those are very common symptoms and patients

22   feel emotionally distressed, disturbed, detached from the

23   people in the world around them and there is an attempt to sort

24   of numb the distress by taking alcohol or other drugs as it's

02:31:21PM 25   kind of a form of escape of the emotional stress and

1   disturbance they are experiencing.

2       Q.   And did you find that Vernon Travis was doing this?

3       A.   Yes.

4       Q.   Using alcohol and drugs?

02:31:33PM 5       A.   Yes.

6       Q.   Did y'all discuss his I guess termination from the

7   military?

8       A.   Yes.

9       Q.   And what did you find after discussing with him why he

02:31:45PM 10  was terminated from the military?

11      A.   Again, I -- one of the records I reviewed were the

12  military -- his military record that showed reports of

13  nonjudicial punishment for minor offenses related to his

14  difficulty in following some of the military code of

02:32:14PM 15  self-discipline, maintaining his -- his dormitory room and his

16  personal appearance and things like that.

17      Q.   Okay.  And so ultimately that's what led to him being

18  discharged under honorable conditions?

19      A.   He started having -- well, there were four instances

02:32:40PM 20  that I saw of discipline from his command about this issue.

21  May I?

22      Q.   Yes.

23      A.   So it basically was reflective in my opinion of a sense

24  of detachment that he was experiencing and feeling out of place

02:33:10PM 25  and on his return, postdeployment feeling that he -- Vernon

1    reported to me feeling out of place, feeling like they were out

2    to get him and, you know, on his case.  He felt increasingly

3    disillusioned about any future military career.  He felt

4    unappreciated having served over in Iraq and coming back to a

02:33:38PM 5    base -- at the Air Force base where there hadn't been a lot of

6    recognition of problems and service members in combat as much

7    by the Air Force as it had been with the Army.  So his Army

8    buddies and colleagues, you know, he felt were welcomed back by

9    America for their service to a greater extent than the Air

02:34:06PM 10   Force was and feeling like nobody appreciated what he had done

11   and what he had been going through.

12       Q.   Did he tell you whether or not he was interviewed,

13   debriefed or counseled when he came back from Iraq?

14       A.   He said that he wasn't.

02:34:29PM 15       Q.   Okay.  And what I mean by counseled is did they talk to

16   him about are you suffering from any medical issues or do you

17   have any issues going on and he said he was not?

18       A.   Yeah, he said he was not.

19       Q.   Okay.  And in looking through the records that you

02:34:44PM 20   reviewed, were you able to determine whether or not he was

21   evaluated, debriefed, or counseled when he was actually removed

22   from the military?

23       A.   Could you rephrase the question please?

24       Q.   Yes, sir.  After looking at his military records, were

02:35:03PM 25   you able to determine whether or not he was counseled or

1  debriefed concerning medical issues, mental issues when he was

2  removed from the military?

3      A.  I saw nothing in the service record to indicate that.

4      Q.  So is it your opinion that he was not properly

02:35:19PM 5  evaluated when discharged from the military?

6      A.  Yes.

7      Q.  Did you find a problem with that concerning or

8  considering the signs that he was showing from prior to going

9  to Iraq and then when he returned?

02:35:40PM 10      A.  So the main signs he was showing to command were the

11  sort of disorderly nature of his behavior.  I attribute most of

12  that to his increasing involvement in the alcohol and other

13  drugs and the -- there is no sign that the military or Mr.

14  Travis recognized that at the time as possibly related to a

02:36:15PM 15  developing PTSD.

16      Q.  And a lot of times, you would agree that people in the

17  military don't get diagnosed with PTSD for quite some time?

18      A.  Yes, it happens way too often.

19      Q.  And --

02:36:30PM 20      A.  And --

21      Q.  Go ahead.

22      A.  All right.  There is -- there has also been reports, I

23  mean it's been in the news and in the scientific literature on

24  the subject that oftentimes its early signs of manifestation

02:36:46PM 25  are conduct disturbances unbefitting of a service member.  And

1  so service members experience disciplinary actions and that's

2  what they see at first.

3      Q.   So is it your opinion that he was actually exhibiting

4  signs and nobody picked up on them?

02:37:04PM 5   A.   Yes.

6      Q.   And is it sometimes difficult for somebody themselves

7  to recognize I'm suffering from PTSD?

8      A.   Yes.

9      Q.   And why is that?

02:37:16PM 10  A.   If from -- from their perspective, they just don't feel

11  the same.  They don't like the same things.  They don't care

12  about stuff in the same way.  Other -- there is a developing

13  pattern of change of values and opinions and beliefs and that's

14  what it gets attributed to.

02:37:40PM 15  Q.   Did you learn through the interview process that he was

16  using the alcohol and drugs to help cope with sleeping issues?

17      A.   Yes, he would frequent -- well, there has been an

18  increasing pattern probably more since his discharge from the

19  military of drinking himself to sleep.

02:38:05PM 20  Q.   When he was sent over via the Air Force with the Army

21  to Iraq, did he make any mention to you concerning a body vest

22  that he was given?

23      A.   Yes.

24      Q.   And tell the jury kind of the circumstances surrounding

02:38:22PM 25  that that you learned from talking with him?

1    A.   So while deployed, we know that there is -- there is

2  constant risk.  Service members know that.  Increasingly the

3  service has prepared its service members with body armor and

4  vests.  Not in the early stages of the middle east conflicts,

02:38:50PM 5  that was less true.  And Vernon invested in personal body armor

6  and started wearing it and particularly when he came back to

7  the U.S.  He continued wearing it on a daily basis feeling just

8  more comfortable with it on and that relates to a just general

9  sense of concern, anxiety, or fear about personal safety.

02:39:24PM 10   Q.   Now, did he relate to you a personal incident when he

11  was over there at Iraq concerning what he was issued here

12  before he left and when he got there what they had to do to

13  modify his jacket?

14   A.   No, sir, I don't remember talking about that.

02:39:41PM 15   Q.   Okay.  You talk about high doses of alcohol and Xanax.

16  Tell the jury what you learned about his drinking and drug use,

17  Xanax use on a daily or weekly basis?

18   A.   In what time frame?  Because I've indicated there is a

19  progressively increasing pattern.

02:40:21PM 20   Q.   We'll start from the beginning to current.

21   A.   Okay.  While still in the military, he began drinking

22  to the point of intoxication, drunkenness with an increasing

23  pattern both on base and off base; began using prescription

24  pills, obtained not from a legal prescription but from

02:40:49PM 25  colleagues and off the street, and that continued for the four

1    months from his postdeployment until his discharge.

2                  Should I continue?

3        Q.   Yes, sir.

4        A.   So once discharged, even at the point of discharge, he

02:41:10PM 5   would have been diagnosable with alcohol dependence and in a

6    substance -- in a substance use disorder related to the other

7    pills and from that point, once discharged, he drank more

8    heavily.  He started using Xanax on a daily basis and began a

9    pattern of marijuana use that had not been present beforehand.

02:41:40PM 10      Q.   Was there any indication through these interviews or

11   your review of records that he used alcohol, Xanax, or

12   marijuana prior to being enlisted in the military?

13       A.   No.

14       Q.   When you reviewed his military records, did you notice

02:42:01PM 15  prior to being sent over to Iraq that he was receiving awards

16   and certificates for -- for complying and for his service and

17   so forth?

18       A.   His discharge papers from the military acknowledged

19   some honors that he received while in the military.  His high

02:42:21PM 20  school records show a Certificate of Recognition from a

21   congressman as a student in high school.  And -- and I

22   interviewed his mother and she said he was -- you know, I don't

23   know if I'm free to elaborate on that.

24       Q.   Sure.

02:42:50PM 25      A.   She said he was a good kid and an average student.  I

1    believe in his class rankings he was in the top half or about

2    third of his class, a great student and a good kid without any

3    trouble.  And he finished high school in three years.

4         Q.   Well, we all know why we're here.  We're here for an

02:43:19PM 5    incident that occurred September 5, 2013.  Did Vernon talk to

6    you at all about what he had done in relation to this?

7         A.   Yes.

8         Q.   And did he relay to you whether or not he had drank or

9    taken any pills during that time frame?

02:43:35PM 10   A.   Yes.

11        Q.   Tell the jury exactly what he drank or what he relayed

12   to you that he drank and the pills that he took.

13        A.   So September 5th was a Thursday and I should add that

14   at that point, he quit using marijuana but he continued a daily

02:43:59PM 15   pattern of taking Xanax during the daytime and drinking himself

16   to sleep at night.  September 5th was a Thursday.  The

17   Wednesday before that, he began taking his usual Xanax.  Had a

18   one litter bottle of rum, consumed the entire thing, which

19   would be the equivalent of about 22 standard drinks.

02:44:34PM 20        Q.   Is that -- that's quite a bit for --

21        A.   That's an awful lot for somebody that didn't have his

22   degree of tolerance and dependence, it would knock us out.  But

23   in an alcohol dependent individual, they develop substantial

24   tolerance to the motor impairing effects of alcohol so that if

02:44:56PM 25   you continue drinking, it doesn't knock you out entirely, which

1   is why one of the problems with self-medicating drug use is

2   because it -- it --

3            Your Honor, I'm very sorry, my phone dinged at me.

4   I really had it off earlier and when I was out there waiting,

02:45:22PM 5   came back on.  I greatly apologize.

6            THE COURT:  It happens to all of us.

7            THE WITNESS:  So I apologize.

8        Q.  (BY MR. BROWN) Okay.  So you were at the point that he

9   had drank a bottle of rum and taken three Xanax bars on the

02:45:47PM 10   Wednesday prior.  And then did he drink anything after that?

11       A.  So then that began on a Wednesday afternoon, continued

12   through the night, at which point he took some more Xanax.  He

13   was with a person -- am I free to say who he was with?

14       Q.  He was with Scotty, the co-defendant in this case; is

02:46:11PM 15   that right?

16       A.  The night before he was with Mike.

17       Q.  Okay.

18       A.  He intended to try to meet up with Scotty when Scotty

19   got off work the next morning and he and Mike were drinking

02:46:25PM 20   through the evening and Mike gave him additional Xanax.  He had

21   three bars.  Xanax bars is the terminology for the dosage form,

22   the pill of Xanax.  That would be equivalent to a bar has like

23   two milligrams of Xanax in it, so he's taking a lot of Xanax,

24   drinking very heavily, and he did this through the night.

02:46:51PM 25       Q.  Now, let me back up.  Did he sleep at all from

Wednesday to now Thursday night?

    A.   From Wednesday, at this point I'm in Thursday morning.

    Q.   Yes.

    A.   No sleep.

    Q.   Okay --

    A.   He and Mike have been up drinking and he's taking Xanax.

    Q.   Okay.  And we're talking five or six bars of Xanax at this point in time and a bottle of rum?

    A.   Yeah.

    Q.   Okay.  And what happened next?

    A.   Then Scotty was getting off work so he and Mike went over to Scotty's house and before they left, Mike gave Vernon more Xanax.

    Q.   How many?

    A.   He wasn't sure.  He thought about six.

    Q.   Okay.  And still hadn't slept at this point in time when he shows up at Scotty's house?

    A.   Right.

    Q.   Okay.  And did they continue drinking when Scotty gets off?

    A.   Yeah, so at that point he finishes off his bottle of rum and was sharing Mike's bottle.

    Q.   Okay.  And ultimately did Vernon and Scotty get in a car and drive to Kerrville some time that morning?

1    A.   Yes.

2    Q.   Okay.  And this was after drinking a bottle and a half

3   or whatever and taking 10 or 12 Xanax bars?

4    A.   Yes.

02:48:21PM 5    Q.   Now would that make anybody highly intoxicated?

6    A.   Well, most of us it would totally knock us out.  We

7   would pass out, but in a tolerant individual who is chronically

8   using these drugs, as I said, this tolerance to the sedating

9   and motor impairing effect is very pronounced but tolerance to

02:48:49PM 10   the intoxicating effect in the sense of altering your

11   sensations, your cognitive abilities, there is less tolerance

12   there, so he was intoxicated, impaired.

13    Q.   And did he tell you that he was driving -- what he was

14   going to do in Kerrville once he got there?  Are you familiar

02:49:10PM 15   with the details and if not, that's okay?

16    A.   So the -- when Mike and Scotty and Vernon were

17   together, they concocted a plan.  I don't know if you want me

18   to go into the details of that conversation.

19    Q.   Sure.

02:49:32PM 20    A.   Yeah.  So they're sitting around drinking, partying,

21   quote end quote, and Mike said that he had -- he had this -- he

22   knew this guy that owed him a bunch of money and that he wanted

23   -- he had been trying to collect it.  He had been unable to

24   collect it and that he wanted Scotty and Vernon to go with him

02:50:03PM 25   as backup to try to collect on this debt and promised Scotty a

         1    bunch of money.  And Scotty needed money and promised Vernon

         2    some money and obliterate a debt that Vernon owed Mike for

         3    drugs.

         4         Q.   For the Xanax bars that he gave him?

02:50:23PM 5         A.   For the Xanax bars and he owed Mike money for past

         6    debt.

         7         Q.   You have reviewed Doctor Williams' diagnosis; is that

         8    correct?

         9         A.   Yes.

02:50:42PM 10        Q.   You agree with that diagnosis?

         11        A.   Yes, entirely.

         12        Q.   And that is in regards to the PTSD diagnosis as well as

         13   the drug abuse diagnosis?

         14        A.   Yes.

02:51:00PM 15        Q.   And you came to that conclusion as well?

         16        A.   Yes.

         17                  MR. BROWN:  Pass the witness, Your Honor.

         18                  THE COURT:  Mr. Monroe.

         19                       CROSS-EXAMINATION

02:51:55PM 20   BY MR. MONROE:

         21        Q.   Doctor Roache, my name is Scott Monroe and I'm the

         22   District Attorney for the 198th Judicial District in Kerr

         23   County.  I don't believe we've met before?

         24        A.   No, I don't think so.

02:52:27PM 25        Q.   I noticed at various times during your testimony and

1    responses to Mr. Brown that you would refer to either some

2    notes or documents that you had in your hands there?

3        A.    Yes.

4        Q.    And did you occasionally use those to refresh your

02:52:41PM 5    memory here today?

6        A.    Well, I wanted to be sure to testify to the truth, so I

7    did.

8        Q.    Absolutely.  Absolutely.  Can I have those documents,

9    please?

02:52:52PM 10       A.    These are the documents I referred to.

11       Q.    And anything you've got there.  Thank you.

12                  Did you have other documents that you reviewed

13    other than the medical records?

14       A.    Yes.

02:53:14PM 15       Q.    Did you review the military records?

16       A.    Yes.

17       Q.    And did you review those again today before or before

18    you came and testified today?

19       A.    I reviewed them originally.  I -- the only re-review

02:53:29PM 20    that I did today was to check to see that indeed I had seen

21    something in that record as to his accomplishments or awards

22    that he received in the military.  That's the only thing I

23    looked at related to that.

24       Q.    Did you actually have some military records in your

02:53:54PM 25    possession?

 1      A.   I had a .pdf document that was sent to me by the

 2   defense attorney.

 3      Q.   Do you have a copy of that with you?

 4      A.   Not with me.

02:54:05PM 5    Q.   No?  Do you recall what it looked like?

 6      A.   I believe I would recognize it if I saw it.

 7      Q.   Okay.

 8      A.   I don't know what you're asking exactly.

 9      Q.   Okay.

02:54:17PM 10        MR. MONROE:  May I approach the witness, Your

11   Honor?

12             THE COURT:  Yes.

13      Q.   (BY MR. MONROE) Do either of those documents look

14   familiar to you?

02:54:31PM 15   A.   Not that one.  I believe I've seen this one, yes.

16      Q.   All right.  And this formed part of the basis for some

17   of the opinions that you've rendered here today?

18      A.   Yes.

19      Q.   It was a fact that you took into consideration?

02:55:01PM 20   A.   Yes.

21      Q.   All right.  And let me just ask you a question about

22   this.  I want to identify it.  Is this something that you've

23   prepared?

24      A.   Yes, I prepared that.

02:55:19PM 25   Q.   You prepared it?

1    A.   Yes, for defendant's counsel.

2    Q.   All right.  But you prepared it yourself?

3    A.   I did.

4    Q.   Did you discuss with Mr. Travis this offense?

02:55:46PM 5    A.   Yes.

6    Q.   What did he tell you he had done?

7    A.   Regarding the offense or his plan or?

8    Q.   The offense.

9    A.   So the offense itself, he said he went in a car with

02:56:05PM 10   Scotty to a place.  They were led there by Mike in another car

11   for the purpose of backing up Mike to collect a debt, a debt --

12   he was wearing his personal body armor which he always wore,

13   and that Mike had given him a gun because, you know, just going

14   into the situation for the purpose of being intimidating.

02:56:39PM 15   Q.   All right.  And what else did he say?

16   A.   That he -- Scotty kicked in the door.  He followed

17   Scotty in.

18   Q.   All right.  What else?

19   A.   That inside, he saw somebody go into the back bedroom

02:57:04PM 20   or I don't know if back is the right word, but in the bedroom,

21   and he closed the door.  He went up to the door, pounded on the

22   door.  He observed there was a woman and a child across the

23   room over by Scotty.  He said -- told him to get out of the

24   way.  There was a shot fired.  His first reaction was for his

02:57:28PM 25   personal safety of, you know, did I get hit.  And he reacted by

TERI THOMAS, CSR, RPR, CMRS

1  firing suppressant fire which was consistent with his military

2  training to create kind of a, you know, a sense of diversion.

3  He fired a suppressant fire almost automatically without even

4  thinking about it.  And when he knew going into the house that

02:58:01PM 5  things were going -- seemed to be going wrong because Mike had

6  left the scene, didn't come in with them, Scotty was kicking in

7  doors and there was a shot fired feeling like we got to get out

8  of here, and I believe they left the premises rather quickly

9  after that.

02:58:19PM 10      Q.   Did he tell you that he had been within 3 or 4 feet of

11  a woman and her three-year-old son and he pointed a gun at

12  their head?

13      A.   No, I don't believe that he said 3 or 4 feet or that he

14  pointed it at their head.

02:58:38PM 15      Q.   I guess --

16      A.   It was in his hand, I know that.

17      Q.   Are you condoning that behavior?

18      A.   No, sir.

19      Q.   A serious, serious offense; is it not?

02:58:59PM 20      A.   Yes, sir.

21      Q.   State of Texas only recognizes one grade of offense

22  higher than that one and that's capital murder.

23      A.   Okay.

24      Q.   It's a serious offense.  Are you saying that because he

02:59:15PM 25  has post-traumatic stress disorder, he committed all those

1    crimes?

2        A.   No.

3        Q.   Okay.  You're just saying he happened -- that he

4    committed those crimes also to suffer from post-traumatic

02:59:30PM 5    stress disorder; is that correct?

6        A.   I'm saying that he had post-traumatic stress disorder

7    which led to a pattern of self-medicating drug use.

8        Q.   And there you go, that's what I am talking about.  I'm

9    way more familiar with substance abuse that I even care to

02:59:51PM 10   admit.  And we're clearly self-medicating, heavily

11   self-medicating in this case; are we not?

12       A.   Yes.

13       Q.   But that didn't cause him to go commit a burglary or an

14   aggravated assault with a deadly weapon, did it?

03:00:08PM 15       A.   No.

16       Q.   Did he tell you how long this event had been planned?

17       A.   He told me it was planned that morning at Scotty's

18   house with Mike.

19       Q.   That no previous plans had been made?

03:00:30PM 20       A.   Correct.

21       Q.   Okay.  Let me back up and go into some other areas.

22   What was your understanding about when he entered the military?

23       A.   Well, you took my notes but it was in 2001.

24       Q.   I'm sorry.  I apologize to you.

03:01:08PM 25       A.   And I believe it was rather quick -- I mean like he

```
 1   graduated in May and he had gone through boot camp before

 2   September 11th, so it was fairly quick in there after

 3   graduation.

 4        Q.   Boot camp would be basic training, correct?

 5        A.   Yes, but it -- I mean, I believe he had been through

 6   that.

 7        Q.   And this would have been 2011 -- I mean 2001, that's

 8   when 9/11 was, correct?

 9        A.   Yes.

10        Q.   And he did this, entered the military and completed his

11   training prior to 9/11?

12        A.   Well, sir, I don't -- I didn't -- I apologize if I've

13   led the idea that I went into great detail about his military

14   training.  We didn't.

15             MR. MONROE:  May I approach the witness again,

16   Your Honor?

17             THE COURT:  Yes.

18        Q.   (BY MR. MONROE) I'll hand you, Doctor, what's been

19   marked as State's Exhibit 42 and this is the document you told

20   me that you recognized?

21        A.   Okay.

22        Q.   And a copy of that document was provided to you by the

23   defense?  You didn't obtain it yourself, did you?

24        A.   Right.

25        Q.   Okay.  So they gave you that?
```

1       A.   Uh-huh.

2       Q.   All right.

3               MR. MONROE:  I offer State's Exhibit 42 into

4       evidence.

03:02:51PM 5            (State's Exhibit No. 42 offered).

6               MR. BROWN:  I don't think the proper predicate has

7       been laid on this document, Judge.

8               MR. MONROE:  Your Honor, this is a document that

9       they provided to their own expert that he relied on and

03:03:13PM 10   testified to and said he recognized it.

11              THE COURT:  I think it's similar to the ruling

12      that I made earlier.

13              MR. BROWN:  Yes, sir.

14              THE COURT:  He can refer to it and you can

03:03:21PM 15   cross-examine him about it just like he did.  You can ask him

16      questions about it.

17              MR. MONROE:  Yeah.  Sure.

18      Q.   (BY MR. MONROE) Let me show it to you.  See where I'm

19      pointing?

03:03:33PM 20   A.   Uh-huh.

21      Q.   It says date entering this period service.  What does

22      it say?

23      A.   2002.

24      Q.   2002?

03:03:41PM 25   A.   Yes, it does.

1    Q.   Military basic training six weeks, what date?

2    A.   July 2002.

3    Q.   2002.  After 9/11?

4    A.   Yes, sir.

03:04:06PM  5    Q.   What exactly were you able to corroborate with the

6    military records that you learned from Mr. Travis?

7    A.   So I said earlier, we didn't spend a lot of time

8    talking about his training.  We did not.  He told me that he

9    entered the military in 2001.  He did.  What I looked at and

03:04:39PM 10    focused my attention on in the military service record was that

11    the conduct disorder problems were occurring after his return

12    from Iraq.  That's what I focused my attention on, not the

13    dates of entering service.

14    Q.   He was not in the military apparently at the time of

03:05:03PM 15    9/11, correct?  That's what it appears?

16    A.   That's what the document you showed me suggests.

17    Q.   So you're not suggesting that any PTSD he might have

18    acquired came as a result of being in Iraq during 9/11?

19    A.   No, I didn't say that he was in Iraq in -- on

03:05:26PM 20    September 11th.  He was in Iraq in 2003.

21    Q.   The impression I got was that you were under the

22    impression that he was actually in the military when 9/11

23    occurred.  Isn't that what you said?

24    A.   Vernon told me that he joined the Air Force --

03:05:41PM 25    Q.   My question is, is that what you said?  Did you say you

1  thought he was in the military?

2      A.   I did say that.

3      Q.   And now we know that's incorrect?

4      A.   Yes.

03:05:51PM 5   Q.   Do you know whether or not at any time after Mr. Travis

6  returned from Iraq whether or not he had a valid prescription

7  from any physician for Xanax?

8      A.   Would you rephrase the question one more time?

9      Q.   Are you aware whether or not after Mr. Travis' return

03:06:16PM 10  from Iraq he had a valid prescription for Xanax from a licensed

11  physician?

12     A.   I am not aware that he did.

13     Q.   All right.  As far as you know, he did not?

14     A.   I believe that he did not.

03:06:28PM 15  Q.   Xanax is a controlled substance, is it not?

16     A.   Yes.

17     Q.   All right.  And depending on the amount of Xanax one

18  possesses, it can be a felony.  Are you familiar with that?

19     A.   I -- yeah, I would have -- I think that's true.  I

03:06:49PM 20  wouldn't be prepared to testify an amount for a felony charge.

21  I'm not sure.

22     Q.   You were saying that he took Xanax daily?

23     A.   Yes.

24     Q.   And basically for a number of years apparently?

03:07:07PM 25  A.   Yes.

1    Q.    Certainly in 2010, 11, 12, as far as you know?

2    A.    Yes.  I said there is an increasing pattern.

3    Q.    But I mean I think you testified and I'm not trying to

4    put words in your mouth --

03:07:29PM 5    A.    Yeah, I think it was probably daily, yes, as near as I

6    can tell in 2010.

7    Q.    And Xanax is a benzodiazapine?

8    A.    Yes.

9    Q.    How long does it stay in the blood stream?  How long

03:07:43PM 10   does it stay in the bloodstream?

11   A.    How long does it stay in the bloodstream?  It's

12   half-life is about 10 to 15 hours.  It would show in the

13   bloodstream with a toxicology test for probably at least one

14   day and probably two, depending on individual metabolism.

03:08:07PM 15   Q.    If you were taking the quantity that you said he said

16   he was taking?

17   A.    Uh-huh.

18   Q.    It would be in there longer than that, wouldn't it?

19   A.    Only a little because half-life, the way the biologic

03:08:21PM 20   process works, it -- it's eliminated half of it all the time.

21   So by having a lot in there, it only extends it a little bit,

22   another half-life or two.

23   Q.    But if you take it daily, it's maintained in the

24   bloodstream, right?

03:08:37PM 25   A.    Because each day you're taking some, right.

1    Q.   Sure.  Right?

2    A.   Yes.

3    Q.   His probation officer testified that he had taken a

4  couple of UA's and he passed them?

03:08:50PM 5    A.   Yes.

6    Q.   How do you think he did that?

7    A.   By not taking it like the day before.

8    Q.   Manipulating the probation officer.  That's what he

9  did, right?

03:09:01PM 10    A.   Yeah, he didn't want to get detected.

11    Q.   Sure.

12    A.   Very common.

13    Q.   And you said it's my understanding that you met with

14  him for an hour and a half and then you had a phone

03:09:23PM 15  conversation with him?

16    A.   Yes.

17    Q.   And how long was the phone conversation?

18    A.   About a half hour.  I didn't really track it.

19    Q.   Is it possible, Doctor, that you were manipulated in

03:09:38PM 20  any way?  Is that even possible?

21    A.   So -- you know, logically, I would say yes.

22    Q.   And we're all human?

23    A.   Well, if -- you know, what we try to do is ask

24  questions in such a way that we get the information that only

03:10:02PM 25  somebody who had been there and done that knows how to answer

1    that question.

2        Q.   Do you expect a patient to be honest with you or no?

3        A.   Sure.  But I mean, it depends.  It really depends on

4    the circumstances.

03:10:24PM 5        Q.   As a matter of fact, when you're dealing with a patient

6    with a substance abuse problem, don't you find that pretty

7    regularly they won't be honest with you?

8        A.   It depends.

9        Q.   And a lot of them will really minimize their drug uses;

03:10:38PM 10   will they not?

11       A.   All humans minimize their weaknesses.

12       Q.   And it's even magnified when you have a substance abuse

13   problem; would it not?

14       A.   I wouldn't say that.

03:10:50PM 15       Q.   Okay.  Fair enough.

16       A.   I mean he --

17       Q.   You didn't get manipulated?  I'm asking, you didn't

18   get --

19       A.   I don't believe I've been manipulated.

03:11:13PM 20       Q.   All right.  What life-threatening experiences did Mr.

21   Travis describe to you that he had been involved in in Iraq?

22       A.   In his case, I -- there was a bomb that went off near

23   him.  There was a general state of arousal on the base.  There

24   were the constant sounds of, you know, a military base in Iraq

03:12:04PM 25   with you could hear bombs in the background.  You could hear

1    alerts and sirens and observe the troops, you know, reacting,

2    so it was a constant state of arousal.

3        Q.   When did you see him, Mr. Travis?  Can you look at the

4    date?

03:12:31PM 5        A.   April 14th of this last month.

6        Q.   April 14th of 2014?

7        A.   Yes.

8        Q.   When did the United States invade Iraq, do you know?

9        A.   You know, I -- I don't want to misstate the facts and

03:12:59PM 10   that's not what I am here to testify to.  I can't say exactly.

11       Q.   I'm here to find out how long the defendant was with

12   you.  That may not be important to you, but it's important to

13   me.  Can you understand why that might be important to me?

14       A.   Sure, I can tell you --

03:13:16PM 15       Q.   Can you tell me --

16            MR. BROWN:  Judge, I'm going to object to him

17   being argumentative with the witness.

18            THE COURT:  Start over again.  You got a question?

19       Q.   (BY MR. MONROE) Do you understand why it's important to

03:13:27PM 20   me to determine how honest the defendant was with you?

21       A.   Yes.

22       Q.   And you understand how it may be important to the jury

23   to know how honest the defendant was with you?

24       A.   Yes.

03:13:40PM 25       Q.   Because they're going to evaluate this behavior; do you

1    understand that?

2       A.   Yes.

3       Q.   I understand you are not telling the jury that

4    post-traumatic stress disorder is an excuse for this behavior

03:13:53PM 5    whatsoever?

6       A.   I'd probably take exception to the use of the word

7    "excuse," but I'm not saying it caused it.

8       Q.   Certainly there are a lot of veterans who will suffer

9    from post-traumatic stress disorder that do not commit criminal

03:14:10PM 10   offenses?

11      A.   Correct.

12      Q.   Do not point guns at other people?

13      A.   Yes.

14      Q.   Or discharge firearms through doors?

03:14:18PM 15      A.   Yes.

16      Q.   Would it surprise you to learn that the United States

17   invaded Iraq on March 20, 2003?

18      A.   No, it wouldn't surprise me.  I believe I stated that's

19   when he was there, was in 2003.

03:14:46PM 20           THE COURT:  Are you about to go into a new area,

21   you think?  Let's take a break.

22           MR. MONROE:  Yeah, I've got a little more.

23   Probably a good time to take a break.

24           THE COURT:  Yeah, let's take a break.  Let's take

03:14:57PM 25   about a 15-minute recess and we'll start back up.

1          THE BAILIFF:  All rise for the jury.

2          (Jury not present).

3          THE COURT:  We're in recess for 15 minutes.

4          (Recess).

03:29:24PM 5          THE COURT:  All right.  Did you have something

6     that you wanted to take up, Mr. Monroe?

7          MR. MONROE:  Yes, Your Honor.  I'd like to seek

8     permission from the Court to explore an avenue of

9     cross-examination with Doctor Roache.  I might need to do this

03:29:45PM 10    at the bench.

11          (Bench conference).

12          MR. MONROE:  Doctor Roache testified that it was

13    relayed to him by the defendant that it was planned basically

14    the night before and what I propose to do, I've marked these as

03:30:13PM 15    State's Exhibit 43, 44 and 45, is to show these to Doctor

16    Roache and ask him to review them and without commenting on

17    their contents to ask if this changes his opinion on whether or

18    not this event was solely planned the night before.

19          I'll state for the record these are text messages

03:30:38PM 20    that we just got off the phone of the co-defendant about five

21    days ago.  I don't think they would have been admissible, but

22    until the doctor stated that the defendant told him that this

23    was only planned the night before, this clearly show that it

24    was planned well in advance of that.  I'm not going to ask him

03:30:59PM 25    to read them; I'm just going to ask him if it changes his

opinion.  If he says no, he says no.  I'm just going to show

them to him.  He can rely on hearsay.  It's clearly hearsay.  I

cannot introduce them through him, I agree, but I think I can

show them to him, ask him to look at them, and ask him if it

03:31:17PM 5    changes his opinion.

MR. BROWN:  First and foremost, it was just given

to us and not in a timely fashion.  Secondly, they have not

been authenticated.  Who sent these?  Who was the sender of

these texts?  Who was the recipient of these texts?  Who

03:31:33PM 10   sent -- which side is who?  Who sent the side on the right?

Who sent the side on the left?  It has not been authenticated

who sent them, who received them, if this was even Vernon

Travis who sent these.  There has been no authentication.

Because the prosecutor says it, does not make it evidence in

03:31:51PM 15   this case.

MR. MONROE:  He may say no.  He may say no.  His

name is --

COURT REPORTER:  One at a time, please.

MR. BROWN:  Well, I don't care if it's his name or

03:31:56PM 20   not.  There has been no evidence whatsoever to establish who

sent these and who received them.  There is no authentication.

Zero.

THE COURT:  I'll let you do what you just told me

you were going to do.  You don't show them to the jury.  You

03:32:08PM 25   let him read them and then you ask him, Do you still think it

was planned the night before.

MR. MONROE:  That's all I want to ask him.  I won't go into anything else unless I approach the bench and ask for permission.

THE COURT:  And the problem we have is when we have somebody that basically testifies for the defendant, and then they invoke their Fifth Amendment rights, but then you use somebody to get their testimony.

Case law is pretty clear that you kind of open the door for the person that's trying to give their story.  They're kind of hoping for everything at that point.  It shows that maybe the story they're trying to tell for the defendant might have holes in it so it gives them a lot of leeway.  I mean that's a big danger putting somebody on the stand that's going to say what the defendant said.

MR. BROWN:  I understand that, Judge.

THE COURT:  You ran into it with the capital murder case you had over in Bandera a few years ago.

MR. MONROE:  I sure did.

MR. BROWN:  Judge, there was never a question asked if it was his expert opinion as to whether or not this was preplanned or premeditated or anything of that nature.  And secondly, this has not been authenticated that it's my client's statement.  So if we're going on a prior inconsistent statement by my client, it hasn't been authenticated that this is even

1   his statement.

2            THE COURT:  That's the reason why I'm not going to

3   let the jury see it.

4            MR. MONROE:  I'm not going to even have him

03:33:18PM 5   identify it.

6            THE COURT:  You can see if he still stands by the

7   story that it was done the night before after he looks at it

8   himself without them seeing it.

9            MR. BROWN:  So my objection is overruled?

03:33:32PM 10            THE COURT:  It's overruled.  Objection is

11   overruled.

12            (Bench conference ended).

13            THE COURT:  All right.

14            MR. BROWN:  Judge, just real quick?

03:33:47PM 15            THE COURT:  Yes.

16            MR. BROWN:  Let me come up there.

17            (Bench conference).

18            MR. BROWN:  Again, it's asking for an opinion from

19   an expert that he hasn't given him a previous opinion on.  It's

03:33:59PM 20   not -- it's something that he told him.  He didn't give an

21   opinion as to whether or not he believed it was true or not

22   true.

23            Again, I think that this goes to it's inadmissible

24   based on the fact that he hasn't given an opinion as to that.

03:34:15PM 25   I think it's going to confuse them and the jury is going to

1    want to know what did he just review to make him change his

2    opinion or not change his opinion.

3              THE COURT:  I'll give you an analogy I think that

4    you've had before.  The person or the defendant says he never

03:34:29PM 5    owned a gun in his life and a third-party says the defendant

6    told me that he never owned a gun in his life.  Then you've got

7    a picture of the person holding the gun and you show it to

8    them.

9              You take this huge risk whenever a person wants to

03:34:42PM 10   start telling the story when he tells the jury, He told me that

11   he planned this the night before.  And he's opened himself up

12   to questioning.  If you're going to lay that story out through

13   a third-party, then that third-party is going to get questioned

14   about where they got that information.  You can't leave that

03:34:56PM 15   with the jury and say then you can't come back and attack it.

16             If he's going to tell that story, you're going to

17   open him up in order to say who told you that, how could it be

18   true, was it really a Saturday night.  I mean all those things

19   become very relevant.  There is just lots of case law.

03:35:16PM 20             MR. BROWN:  I understand, but this isn't a picture

21   with him holding a gun.  There is nothing identifying that he

22   sent those -- that my client sent those texts.

23             THE COURT:  Well, if you want to get into that,

24   then maybe you can show it to the jury, but I'm not going to

03:35:28PM 25   let the jury see it.  I'm going to limit him to let him just

take a look at it and say after he looked at this do you still
believe the story that it was done the night before.

        MR. BROWN:  He has no context of these text
messages.  He doesn't know who it was sent to or who it was
sent from, so how is he going to be able to give an opinion on
a piece of evidence that he's never seen before?

        THE COURT:  He may be able to say I don't know.
But I mean once he tells the story that the defendant told me
this, then I think he's opened himself up to say, let's go back
and look at the defendant's story he told you.  I mean he's
told the story and he's told the jury this is what he told me.
So at this point, the State can come back and question what was
told by the defendant to this witness.

        MS. COLEMAN:  It's part of 107, Your Honor.

        THE COURT:  107, yeah.

        MR. BROWN:  I understand that, Judge, but again he
has not reviewed this evidence.  He's never seen it before.  He
doesn't know who the two people are that are even texting one
another.

        THE COURT:  That happens all the time if somebody
says something and then all of a sudden look at this letter
that you've never been seen before.

        MR. BROWN:  Well, it's signed by him, it's a
signature.  There is an identifying feature on that document
which on this there is nothing to identify to show --

1          MR. MONROE:  There is Trey Travis at the top of

2     the screen.  That's something to identify him.  You told the

3     jury that he went by Trey.  You told them that.

4          MR. BROWN:  I understand that, but what is it to

03:36:48PM  5     say that he -- at which point who sent which message?

6          THE COURT:  I overrule the objection.

7          (Bench conference ended).

8          THE COURT:  Bring them in.

9          THE BAILIFF:  All rise for the jury.

03:37:07PM 10     (Jury present).

11          THE COURT:  All right.  You may have a seat.

12          Mr. Monroe, you may continue with your

13     cross-examination of Doctor Roache.

14          MR. MONROE:  Yes, Your Honor.  May I approach?

03:37:48PM 15          THE COURT:  Yes.

16     Q.    (BY MR. MONROE) Doctor Roache, you testified earlier

17     that the defendant had relayed to you that this event on

18     September 5th had been planned entirely the night before?

19     A.    I believe I said the morning of.

03:38:00PM 20     Q.    Okay, the morning of.  I'm going to show you some

21     things to look at.  I'm not asking you to read them aloud.  I'm

22     asking you to not do that.  I would like for you to look at

23     them, in the capacity of an expert witness just review them,

24     and I have a few questions for you after that.  All right?

03:38:17PM 25          I've marked these as State's Exhibit 43, 44, 45.

TERI THOMAS, CSR, RPR, CMRS

1        Does this change your opinion as to whether this

2   event was planned solely the morning before?

3        A.   No.

4        Q.   All right.

03:39:22PM 5        THE COURT:  Do you have your microphone on?

6        Q.   (BY MR. MONROE) Tell me, Doctor -- and I've just got a

7   little bit more.  The two medications that you currently have

8   Mr. Travis taking, Hydroxyzine is that --

9        A.   Yes.

03:39:56PM 10        Q.   And I didn't get the second one?

11        A.   Sertraline.

12        Q.   Sertraline?

13        A.   Yeah.  S-E-R-T-R-A-L-I-N-E.

14        Q.   And these medicines are designed to assist with someone

03:40:13PM 15   with PTSD in what way?

16        A.   The Sertraline is FDA approved for the treatment of

17   PTSD.  It's an antidepressant, also helps anxiety and it's been

18   proved by the FDA for that purpose.  Hydroxyzine is used for

19   anxiety and/or sleep or both particularly in patients who have

03:40:39PM 20   substance use problems or disorder because benzodiazapine is

21   like Xanax, they're addictive and Hydroxyzine is not.

22        Q.   So there is -- fortunately there is no substantial risk

23   of either of these two drugs being abused?

24        A.   Correct.

03:41:01PM 25        Q.   Will these two drugs prevent someone from committing a

1    criminal offense?

2        A.   No.

3        Q.   All right.  And do these two drugs administer

4    themselves to a patient, or will the patient still have to take

03:41:14PM 5    them in order for them to be effective?

6        A.   Did you ask is the question going to be used together

7    or what's your question?

8        Q.   Let me rephrase it.  That's fair.  Let me rephrase it.

9             It's still going to require that the patient

03:41:30PM 10    actually take this medicine?

11        A.   For them to be effective.

12        Q.   For them to be effective?

13        A.   Yes.

14        Q.   And there is no way you can guarantee this jury or

03:41:40PM 15    anyone else that Mr. Travis or any of your patients would

16    continue taking the medication at any given moment?

17        A.   Was the question could I guarantee it?

18        Q.   Can you?

19        A.   No.

03:41:58PM 20        Q.   All right.  You mentioned early on, and I just had a

21    couple more things, that you have written some papers and have

22    you written any papers specifically dealing with PTSD?

23        A.   Yes.

24        Q.   And can you just give me the names of the articles or

03:42:14PM 25    names of the magazines or the periodicals that they were

1    published in?  Or have there been so many that you can't

2    remember?

3        A.   Well, let's see.  My first couple were like a number of

4    years ago and I'm sorry, I don't remember specifically but they

03:42:29PM  5    were about emotional control with PTSD and PTSD as a cause of

6    cognitive impairment and as a cause of alcohol self-medication

7    behavior.  Those were earlier articles.

8        Q.   All right.

9        A.   Recently -- more recently, I published papers as part

03:42:55PM 10    of the consortium that I'm deputy director of where PTSD is

11    being treated in service members.  I don't remember the exact

12    titles of those articles.  And most recently, we're submitting

13    a paper to the Journal of the American Medical Association very

14    specifically in using cognitive therapy to treat PTSD.

03:43:21PM 15        Q.   Do you by chance have a -- I've never been able to

16    pronounce the two word, "curriculum's -- what's the second?

17        A.   Curriculum vitae.

18        Q.   Vitae, okay, that has a listing of all of them?

19        A.   I do.  I didn't bring it with me.

03:43:39PM 20        Q.   Is it possible that I could --

21        A.   The attorney has it.

22        Q.   Could I possibly -- you don't have to do it right

23    now -- sometime at the conclusion of the trial or whatever, can

24    you send me one of those?

03:43:49PM 25        A.   Sure.

1    Q.   Were you present when Amber Wilkinson testified?

2    A.   No.

3    Q.   Is it possible for someone who has had a gun pointed at

4    their head to have PTSD?  Could that cause PTSD?

03:44:24PM 5    A.   It's possible, yes.

6    Q.   That she felt that her life was in danger?

7    A.   Yes.

8    Q.   How about a mother protecting her child and having a

9    gun pointed at the two of them, could that cause PTSD?

03:44:36PM 10   A.   Yes.

11   Q.   What about seeing your pet pistol-whipped, could that

12   cause PTSD?

13   A.   Possibly.

14        MR. MONROE:  I'll pass the witness.

03:44:50PM 15        MR. BROWN:  May I approach the witness, Your

16   Honor?

17        THE COURT:  Yes.

18                  REDIRECT EXAMINATION

19   BY MR. BROWN:

03:44:57PM 20   Q.   Read Paragraph 19 to yourself and let me know if it's

21   consistent with what Vernon told you about when the plan was

22   devised to come to Kerrville, Texas?

23   A.   Could you rephrase the question, please?

24   Q.   Yes, if Paragraph 19 is consistent with what Vernon

03:46:15PM 25   Travis told you about coming up to Kerrville and when he

1    discussed that with Timothy Scott Pugh?

2        A.   No.

3        Q.   Okay.  There was some talk about whether or not PTSD

4    could cause somebody to commit this crime.  Do you remember

03:46:39PM  5    that line of questioning?

6        A.   Yes.

7        Q.   And that was from the prosecutor?

8        A.   Yes.

9        Q.   Tell the jury how maybe not PTSD causes it but the side

03:46:48PM 10    effects of the alcohol and drugs would cause you to lower your,

11    I guess, defense mechanisms and so forth?

12        A.   Yes.  So PTSD doesn't cause one to do this.  The drugs

13    don't cause one to do this, but under the influence of drugs,

14    you have an impaired cognitive functioning.  Particularly with

03:47:18PM 15    these drugs, you have limited cognitive flexibility is the term

16    that's used in the scientific field and it refers to sort of

17    weighing your options, looking at alternative considerations

18    and trying to make a decision, you know, is this the thing to

19    do or should I do that instead.  It's just considering in

03:47:46PM 20    making decisions and there is an impairment of both a narrowing

21    focus, you know, without the kind of view of alternatives.

22    There is impaired impulse control, so acting on just, you know,

23    just an impulse to do something rather than stopping and

24    thinking, wait, should I do it.  There is impaired decisional

03:48:15PM 25    balance and executive function; again, terms in the field that

    1   refer to decision-making capacity.

    2       Q.   Now, you've told this jury what Vernon had to drink and

    3   the Xanax pills that he took.  Would that affect what you just

    4   described to the jury?

03:48:33PM 5     A.   Absolutely.

    6       Q.   And you think that affected him on that night?

    7       A.   Yes, I do.

    8            MR. BROWN:  I have no further questions, Your

    9   Honor.

03:48:46PM 10                  RECROSS-EXAMINATION

   11   BY MR. MONROE:

   12       Q.   It may sound like I'm splitting hairs and I apologize

   13   to you in advance for that.  Now, there is a real important

   14   distinction.  You told the jury what Vernon told you he had had

03:49:00PM 15   to drink the night before and what drugs he had taken the night

   16   before.  That's correct, is it not?  You did not independently

   17   corroborate that?

   18       A.   I --

   19       Q.   That's a simple question.  Did you tell the jury what

03:49:15PM 20   Vernon told you or did you tell the jury what you have personal

   21   knowledge of?

   22       A.   I'm familiar with what he told me and what I've seen in

   23   the record.

   24       Q.   You didn't see how many drugs he took that day, Doctor.

03:49:27PM 25   You're not trying to say that, are you?  This is not that bad.

1       A.    No, I wasn't there that day.

2       Q.    So you don't know how much he took?

3       A.    I know what the pattern is.

4       Q.    Okay.  And that's fair for you to know the pattern, but

03:49:41PM 5   to this jury, I want you to tell them, do you know for a fact

6   how many drugs he took that night?

7       A.    No, sir.

8       Q.    Okay.

9             MR. MONROE:  May we approach the bench, Your

03:49:51PM 10  Honor?

11            THE COURT:  Yes.

12            (Bench conference).

13            MR. MONROE:  They just showed the doctor a piece

14  of paper and asked him if it was consistent with the timing

03:50:07PM 15  of -- I don't remember exactly the timing of the events.  I

16  think I can ask him the same thing.  I'll show him these papers

17  and the same thing I showed him before and ask him if that's

18  consistent with the time of the planning.  I don't remember

19  exactly the --

03:50:21PM 20            MR. BROWN:  That's the same question he asked

21  concerning the --

22            MR. MONROE:  I asked if it changed his opinion --

23            COURT REPORTER:  Whoa, one at a time.

24            THE COURT:  Go ahead.

03:50:26PM 25            MR. MONROE:  I said, I asked him an opinion if it

changed his opinion as to when it was planned.  He said, No.

He then asked a question about the timeline and I think I

can --

        MR. BROWN:  I didn't --

        THE COURT:  Wait until he finishes.

        MR. BROWN:  I'm sorry.

        MR. MONROE:  I can come back and ask the same

question, show it to him and say -- he asked if it was

consistent with the timeline.  That's what he asked him, Is it

consistent with the sequence of events that Mr. Travis told

him.  I think I can show him those exhibits and ask the same

question, Are these consistent with the sequence of events that

Mr. Travis told you.  That's all I want to do.

        THE COURT:  And not show them?

        MR. MONROE:  And not show them to the jury.

        MR. BROWN:  But he's already asked that question

and that's why we followed up with another document.  He

pointed to the time at the top of the text message himself.

        MR. MONROE:  I asked if it was consistent with the

sequence of events and asked if it changed his opinion.  You

asked --

        MR. BROWN:  The free planning or consistency, I

mean, we're splitting hairs with word terminology here, Judge.

He's already asked that question.  It's the same thing.

        THE COURT:  I'm not sure it's helping anybody, but

1    I'm going to let you do it as long as you don't show the jury.

2              Go ahead.

3              (Bench conference ended).

4              THE COURT:  Mr. Monroe, go ahead.

03:52:06PM 5              MR. MONROE:  May I approach the witness?

6         Q.   (BY MR. MONROE) Doctor Roache, the same admonition.

7              COURT REPORTER:  I'm sorry, I can't hear you.

8              MR. MONROE:  I have a hearing aid and to me, I'm

9    booming, so I apologize because I can hear myself very well.

03:52:27PM 10        Q.   (BY MR. MONROE) This is the same documents I showed you

11   a minute ago.  The question is, are these consistent with what

12   Mr. Travis told you as far as the timing of the planning of

13   this event?  Are these documents a yes or no answer?

14        A.   Yes.

03:52:46PM 15        Q.   They are consistent?

16        A.   Yes.

17        Q.   They're still consistent?

18        A.   Yes.

19        Q.   Okay.  That was just the morning of?

03:52:54PM 20        A.   That's what he told me and that's consistent.

21              MR. BROWN:  Judge, may we approach?

22              THE COURT:  Well, let's see.  Are you just going

23   to point to something?

24              MR. MONROE:  Yes.

03:53:06PM 25              THE COURT:  Okay.  As long as you just point to

1    something.

2                    THE WITNESS:  Yeah.  Yeah, it's still.

3                    MR. MONROE:  Okay.  Okay.  I pass the witness.

4                    MR. BROWN:  No further questions, Your Honor.

03:53:39PM 5         THE COURT:  All right.  May this witness be

6    excused?

7                    MR. BROWN:  Judge, we ask if he can be excused

8    because he's got a flight to catch.  He was supposed to leave

9    at three.

03:53:47PM 10        THE COURT:  Mr. Monroe, any objection?  All

11   witnesses have to stay until the trial is over unless y'all

12   want to both agree to let him go.

13                   MR. BROWN:  I understand.  Judge, he's --

14                   MR. MONROE:  Your Honor, we don't have any

03:54:00PM 15   objection to this witness being excused.

16                   THE COURT:  All right.  You can leave the

17   courthouse.

18                   MR. BROWN:  Thank you, Judge.

19                   THE COURT:  Your next witness, Mr. Brown?

03:54:13PM 20        MR. BROWN:  I call Anissa Gonzalez.

21                   THE COURT:  Come up to this table.  Did I swear

22   you in earlier today?

23                   THE WITNESS:  Yes, you did.

24                   THE COURT:  I remind you you're under oath.  Would

03:54:51PM 25   you state your name?

1         THE WITNESS:  Anissa, Gonzalez.

2         THE COURT:  How do you spell your first name?

3         THE WITNESS:  A-N-I-S-S-A.

4         THE COURT:  All right.  Mr. Brown.

5         MR. BROWN:  Thank you, Your Honor.  May I proceed?

6         THE COURT:  Yes.

7                   ANISSA GONZALEZ,

8    having been first duly sworn, testified as follows:

9                   DIRECT EXAMINATION

10   BY MR. BROWN:

11     Q.  Would you please introduce yourself to the jury.

12         THE COURT:  Is your microphone on?

13         MR. BROWN:  Sorry, Judge.

14         THE WITNESS:  My name is Anissa Gonzalez.

03:55:06PM 15   Q.  (BY MR. BROWN) Where do you currently reside, Anissa?

16     A.  In Dallas, Texas.

17     Q.  Do you mind if I call you Anissa?

18     A.  No.

19     Q.  All right.  Thank you.  Are you from Dallas, Texas,

03:55:15PM 20   initially?

21     A.  Yes.

22     Q.  Tell this jury a little bit about your education.

23     A.  I went to Sunset High School in Dallas and a little bit

24   of community college and that's pretty much it and I got into

03:55:27PM 25   the restaurant business.

1    Q.   Okay.  And are you married?

2    A.   No.

3    Q.   Do you have any kids?

4    A.   No.

03:55:32PM 5    Q.   Okay.  You said you got into the restaurant business.

6    Tell this jury a little bit about your work history.

7    A.   I've been in the restaurant business since I was 18

8    years old, started as a server, and been managing restaurants

9    since I was 25 years old.

03:55:48PM 10    Q.   Okay.  And where do you currently work?

11    A.   The Olive Garden.

12    Q.   And what is your position with the Olive Garden?

13    A.   I'm the service manager.

14    Q.   And which Olive Garden are you at right now?

03:56:01PM 15    A.   Right now, I'm at the one in north Arlington.

16    Q.   Did you ever have the opportunity to meet Vernon

17    Travis?

18    A.   Yes, I did.

19    Q.   Tell the jury how you came into contact and how you got

03:56:14PM 20    to know him?

21    A.   Well, I was working at the south Arlington location and

22    one of my close friends was general manager for the Olive

23    Garden in San Antonio.  And she told me that I would be getting

24    a transfer from her restaurant.  His name is Vernon Travis.

03:56:27PM 25    She said he was excellent and that he would be --

1           MR. MONROE:  Your Honor, I want to object to what

2   the other restaurant manager would say is hearsay.

3           THE COURT:  Sustained.

4       Q.   (BY MR. BROWN) Don't tell us specifically, but through

03:56:36PM 5   your conversations what did you learn about Vernon as far as

6   his work capabilities and so forth?

7       A.   That I have a team member transferring and that he was

8   going to be dependable and temporarily at my restaurant.

9       Q.   You say temporarily, what do you mean by that?

03:56:52PM 10       A.   Well, I was told that he was moving to the

11   Dallas/Mansfield area to help out his mother.  She had a

12   medical condition so he was going to be temporarily (sic).

13       Q.   And did it end up being temporary?

14       A.   No, it didn't.

03:57:04PM 15       Q.   How long did he work at your store for?

16       A.   He worked at my store -- well, at the restaurant that I

17   was at, I believe -- I honestly don't know the full amount that

18   he was work -- being there, but he was working with me for

19   three and a half years.

03:57:18PM 20       Q.   Okay.  And did you get transferred out of the store

21   before he left the Olive Garden?

22       A.   Right.  He was still -- he was still employed with

23   Olive Garden when I was transferred to the north Arlington

24   location.

03:57:29PM 25       Q.   And tell this jury how he interacted and how he

performed his job there at the south Arlington store.

A.   Well, he was one of my team members, the service manager, so he was just always an excellent team member.  He would come in, he was dependable, reliable.  He was one of those team members that if I needed a server, I could always call him in and ask him, you know, to fill in if I had, you know, a hole in the floor, he would help out.  He was the type of team member that we promoted.  I ended up asking him if I could promote him to a bartender because, you know, he was very reliable.  And in the restaurant business, you have one bartender, you know -- and so it's one of those positions that you can't call in or you can't miss because we only have that one bartender scheduled.  So it's a pretty dependable position, and I asked him if he wouldn't mind cross-training and he did.  And he's just always a dependable reliable team member.

Q.   And did you ever have any comments or how was he with customers?

A.   Oh, yeah, he got excellent guest comments.  He would get occasionally, you know, table so and so wants to speak to you and it was just, you know, Vernon took excellent care of us type of thing.

Q.   Did he ever show you any problems with alcohol or show up hungover or drunk to work?

A.   Well, I mean being a restaurant manager for so many years, I mean servers tend to come into work or you'll hear,

1   you know, so-and-so had a party, and so-and-so was there, so

2   yeah.  So I would hear, you know and I would know sometimes

3   that Vernon would come in probably hung over and -- but he was

4   one of those team members that came in, you know, hung over but

03:59:11PM 5   still did the job.

6       Q.   So he would still show up?

7       A.   Yeah.

8       Q.   Did he ever act in a violent manner towards you or

9   anybody there at the restaurant?

03:59:22PM 10       A.   No.

11       Q.   And you know why we're here?  I mean this is a pretty

12   serious crime, would you agree?

13       A.   Yes, sir.

14       Q.   Did you ever know him to carry guns on him?

03:59:32PM 15       A.   No.

16       Q.   Okay.  Did he -- did you ever know him to wear --

17            MR. BROWN:  May I approach, Your Honor?

18            THE COURT:  Yes.

19       Q.   (BY MR. BROWN) This has been entered into evidence.

03:59:57PM 20   It's a bullet proof vest.  Did you ever see him wear anything

21   that you knew of like this?

22       A.   I -- I did know that he wore that or something like

23   that, but, you know --

24            MR. MONROE:  Your Honor, the witness is

04:00:11PM 25   nonresponsive now.

1                   THE COURT:  Listen to the question very closely.

2     Just answer the question.  Will you restate the question?

3           Q.  (BY MR. BROWN) Did you ever see him wear a bullet proof

4     vest like this?

04:00:22PM 5     A.  No.

6           Q.  Working in the restaurant industry, did you ever see

7     him wear maybe a back brace or something you thought was a back

8     brace?

9           A.  Yes.

04:00:32PM 10     Q.  Tell the jury about that.

11           A.  Well, I just put my arm around him one time and I felt

12     it.  And I just assumed it was a back brace.  I didn't know

13     what it was.

14           Q.  So you knew he wore something?  You're not sure if it

04:00:45PM 15     was a back brace or --

16                   MR. MONROE:  Objection.  Leading the witness.

17                   THE COURT:  Sustained.

18           Q.  (BY MR. BROWN) When you felt him, you're not sure what

19     it was?

04:00:51PM 20                   MR. MONROE:  Same objection.

21                   THE COURT:  Sustained.  Don't suggest the answer.

22                   THE WITNESS:  Yeah, when I felt it, I --

23                   THE COURT:  Wait until you get another question.

24           Q.  (BY MR. BROWN) Do you know if Vernon was ever in the

04:01:02PM 25     military?

1    A.   Yes.

2    Q.   And do you know if he ever went to Iraq?

3    A.   Yes.

4    Q.   Is that through conversations you had with him?

04:01:10PM 5    A.   No, just hearsay.

6    Q.   Okay.  You mentioned that he moved to Dallas.  Do you

7    recall approximately what year it was?

8    A.   2008, 2009.

9    Q.   Okay.  And do you know why he moved to Dallas?

04:01:25PM 10   A.   Yes, to help his mother.

11   Q.   And when you say help his mother, what do you mean?

12   Tell the jury.

13   A.   She had a medical condition and he was here to help her

14   out I believe financially.

04:01:38PM 15   Q.   Do you know if Vernon has any children?

16   A.   Yes.

17   Q.   How many?

18   A.   One.

19   Q.   And is it a male or female?

04:01:47PM 20   A.   Female.

21   Q.   Do you know approximately how old this child is?

22   A.   Seven, six or seven.

23   Q.   Six or seven?

24   A.   Yeah, I don't know for sure.

04:01:56PM 25   Q.   So while he was working for you, where was the child?

TERI THOMAS, CSR, RPR, CMRS

1      A.   San Antonio.

2      Q.   And did he ever come to you and ask to be able to come

3 to San Antonio to visit the child?

4      A.   Yes.  I was a -- I did the scheduling, so in order to

04:02:11PM 5 get days off, he would have to put in a request with a reason

6 and that was usually the reason.

7      Q.   What was the reason?

8      A.   That he needed time off to drive to San Antonio to see

9 his daughter.

04:02:22PM 10      Q.   And how frequent was that?

11      A.   Once a month, at least.  Once a month, sometimes more.

12      Q.   And for what kind of duration?

13      A.   Usually it was about a week.  I would say four to five

14 days.

04:02:54PM 15           MR. BROWN:  I have no further questions of this

16 witness, Your Honor.

17                       CROSS-EXAMINATION

18 BY MR. MONROE:

19      Q.   What years did Mr. Travis work with you that you just

04:03:05PM 20 described?  What years was this?

21      A.   I believe it was 2009 to 2012 because I was there for

22 about three and a half years.  So I want to say about three

23 years.

24      Q.   What information did he share with you about his

04:03:20PM 25 criminal charges in Arizona?

A.   None.  I didn't even know about them.

Q.   This is the first you've heard about them?

A.   Yes, it is.

Q.   He didn't tell you that he had been convicted of a felony?

A.   Never.

Q.   For illegal drugs?

A.   Never.

Q.   It surprises you to learn that?

A.   It did.

Q.   Are you just now hearing that?

A.   Yes.

Q.   Did you ever feel like -- and I assume you on days he worked, you got to observe him pretty closely; is that correct?

A.   Yes.

Q.   Did you ever feel like he had a drinking problem?

A.   Yes.

Q.   You did?

A.   Well, yeah.  I have a lot of servers that have, you know -- I mean, if I can say, I mean I call them functioning alcoholics.  I have a lot of servers that come in and, you know, I can tell that they party the night before and they come in and they do their job.  You know, it's unfortunate but that kind of goes with the territory of being a server.

Q.   All right.  It does?

1    A.   Yeah, I mean I guess you don't know the business, but

2    yeah, that's what they do after work.

3    Q.   I certainly don't --

4    A.   They go to the closest bar and then you hear stories

04:04:31PM 5    the next day and you know why somebody called in.

6    Q.   And you trained him -- you had him cross trained to be

7    a bartender knowing that?

8    A.   Yes, because he was dependable.

9    Q.   He's a functioning alcoholic?

04:04:46PM 10    A.   Some of my certified trainers are functioning

11    alcoholics.

12              MR. MONROE:  Okay.  No further questions.

13              THE COURT:  Any other questions, Mr. Brown?

14              MR. BROWN:  No further questions, Your Honor.

04:04:56PM 15              THE COURT:  You may step down.

16              MR. BROWN:  Judge, she's from the Dallas area and

17    I, again, ask that she be released and be able to go back to

18    Dallas.

19              THE COURT:  Any objection, Mr. Monroe?

04:05:06PM 20              MR. MONROE:  No, Your Honor.

21              THE COURT:  All right.  You can go back to Dallas.

22    Thank you.

23              MR. BROWN:  Thank you.

24              THE COURT:  Your next witness?

04:05:15PM 25              MR. BROWN:  Randy Kennedy.

1          THE COURT:  Mr. Kennedy, did I swear you in this

2     morning?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  You're reminded you're under oath.

04:05:42PM 5     Have a seat and tell us your full name.

6          THE WITNESS:  My name is Randy Leonard Kennedy.

7          THE COURT:  Mr. Brown is going to start out the

8     questioning.

9          MR. BROWN:  Thank you, Your Honor.

04:05:49PM 10               RANDY L. KENNEDY,

11     having been first duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13     BY MR. BROWN:

14       Q.  Mr. Kennedy, do you mind if I call you Randy?

04:05:56PM 15       A.  No, sir.

16       Q.  Would you please introduce yourself to this jury?

17       A.  Yes, my name is Randy Leonard Kennedy.  I'm from

18     Leesville, Louisiana.

19       Q.  And are you related to Vernon Travis?

04:06:06PM 20       A.  Yes, I am.

21       Q.  How is that?

22       A.  He's my nephew.

23       Q.  And tell the jury a little bit about yourself, about

24     your history and line of work and so forth.

04:06:15PM 25       A.  Okay.  I graduated from high school, Leesville High

1    School in 1984.  Upon graduation, I went to college at

2    University of Southwestern Louisiana on a basketball

3    scholarship.  After that, I held various jobs until I actually

4    went into the military in May of '89 and September of '91, I

04:06:39PM 5    was medically discharged.  Actually my unit got deployed to

6    Kuwait.  During a field training exercise, I sustained some

7    injuries and my unit went on and went ahead and I was not

8    allowed to go.  Then I found out later that some of my battle

9    buddies what we called them, actually was -- they were, you

04:07:03PM 10   know, killed in action, so we came back stateside.  And when we

11   came back stateside, they advised me that you know, I was unfit

12   for the military due to the injuries.

13       Q.   Tell the jury about your injuries.  How did you -- what

14   injuries did you sustain and how?

04:07:21PM 15      A.   Actually I was a 13 Bravo, which is a cannon crewman,

16   artillery crewman --

17            MR. MONROE:  Your Honor, may we approach?

18            THE COURT:  Yes.

19            (Bench conference).

04:07:38PM 20            MR. MONROE:  I don't see how his injuries are

21   relevant to anything in this case today.  If he wants to try to

22   qualify him as some sort of expert for his injuries is

23   irrelevant.  If he wants to sit here all day long and say

24   whether he's got post-traumatic stress disorder is absolutely

04:07:55PM 25   irrelevant to this and I object.

1          MR. BROWN:  Judge, I want him to introduce himself

2     to this jury.  He said he was injured.  I told him to show that

3     he wasn't injured overseas, he was actually injured here.  I

4     think it left an impression that maybe he went and he was

04:08:06PM  5     injured.

6          He's trying to introduce himself to the jury.

7     We're not going into great detail on it.  I just wanted him to

8     establish how he was injured and so forth and he was ultimately

9     discharged from the military because of those injuries, and I

04:08:22PM 10     think that's a foundation for them to know.

11          THE COURT:  Is that going to have something to do

12     with his testimony that he was discharged?

13          MR. BROWN:  From the military because of his

14     injury and he was given a disability.

04:08:31PM 15          THE COURT:  How is that going to be relevant?

16          MR. BROWN:  Well, get to know him a little bit and

17     know who he is.  And, you know, I mean it's the same as an

18     introduction of where he we went to school, what his education

19     is.  He was in the military.  He was a police officer.  I think

04:08:44PM 20     that's relevant for them to get to know who he is and they can

21     determine his credibility as a witness and I think that goes to

22     it.

23          THE COURT:  Well, let's be very specific.

24          MR. BROWN:  Yes, sir.

04:08:53PM 25          THE COURT:  You can ask him, Were you in the

1    military?  Yes.  Were you discharged?  Yes.

2              MR. BROWN:  Fair enough.

3              THE COURT:  And let's keep it to that.

4              MR. BROWN:  Yes, sir.

04:09:00PM 5              THE COURT:  And then move on to whatever you're

6    going to use him for.

7              MR. BROWN:  Yes, sir.  Thank you.

8              (Bench conference ended).

9              THE COURT:  Turn your microphones back on and you

04:09:13PM 10   may continue, Mr. Brown.

11             MR. BROWN:  Thank you, Your Honor.

12        Q.   (BY MR. BROWN) You were mentioning that you left the

13   military because you were unfit for conditions.  After the

14   military, what did you do next?

04:09:25PM 15        A.   I became the deputy sheriff with the Vernon County

16   Sheriff's Office.

17        Q.   Okay.  And how long were you with them?

18        A.   Fifteen years.

19        Q.   Did you retire from the sheriff's department?

04:09:37PM 20        A.   Yes, I did.

21        Q.   And did you have any other law enforcement or any other

22   jobs?

23        A.   Yes, sir.  I became a detective for several years.  And

24   after a detective, I became a narcotic agent, and then from

04:09:49PM 25   there I became a special federal agent with the FBI task force.

1      Q.   And how long were you with the special FBI task force?

2      A.   Three years.

3      Q.   Is that where you retired from?

4      A.   Yes, sir.

04:09:59PM 5      Q.   You obviously know the reason why we're here.  Your

6  nephew has been charged with a very serious crime.

7      A.   Yes, sir.

8      Q.   Tell this jury your relationship with Vernon Travis as

9  a kid growing up.

04:10:17PM 10      A.   We would have family gatherings, you know.  We call him

11  Trey, so if I say Trey, just forgive me.

12           We would have family gatherings, and you know, at

13  first, Vernon, you know, he was very outgoing, family oriented

14  and just being -- being himself.  I noticed a change when he

04:10:38PM 15  came back from war.  He drank a lot, excessively.  He pretty

16  much stayed off to himself and that just wasn't him at all.

17  That's just not his character.

18      Q.   Did he seem to be withdrawn from the family?

19      A.   Yes.

04:10:55PM 20      Q.   Would he come to as many family functions as he did

21  prior?

22      A.   They -- the few that I went to, he was there.

23      Q.   Okay.  And would he interact with the family?

24      A.   Before or after?

04:11:08PM 25      Q.   After.

1    A.    No, sir.

2    Q.    Were you recently diagnosed with PTSD?

3    A.    Yes, sir.

4    Q.    Tell the jury about that.

04:11:30PM 5         MR. MONROE:  Your Honor, I object as to relevance

6    as to whether or not this man has been diagnosed with all due

7    respect.  He's the defendant, not this witness, so I object to

8    relevancy.

9         THE COURT:  What's the relevance?

04:11:44PM 10         MR. BROWN:  Judge, I think he can show he maybe

11   had the same signs or symptoms as Vernon from the military,

12   from the war.  I think that would show -- he can testify to

13   that as well his own personal experiences, as well as

14   testifying what he sees in Vernon because of his own

04:12:01PM 15   experience.

16         MR. MONROE:  Well, I disagree.

17         THE COURT:  I'm going to sustain the objection.

18   Q.    (BY MR. BROWN) Now, after he came back from the

19   military, how much interaction did you have with him?

04:12:16PM 20   A.    Just family gatherings.

21   Q.    Okay.  Prior to him going to the military, would he

22   come out to Louisiana and visit with you?

23   A.    Yes.

24   Q.    Okay.  And this is at the family functions and

04:12:31PM 25   gatherings?

1     A.   Yes, sir.

2     Q.   Okay.  And describe what kind -- do you know if he

3 graduated from high school early?

4     A.   No, sir, I don't.

04:12:41PM 5     Q.   Okay.  And do you know if he enlisted in the military

6 early?

7     A.   Yes.

8     Q.   Okay.  And when you say yes, did he have to sign a

9 waiver at the age of 17 to actually get into the military?

04:12:55PM 10     A.   I don't know about that.

11     Q.   Do you know if Vernon has been diagnosed with PTSD?

12     A.   No, sir.

13     Q.   You don't know if he has or not.

14     A.   No, sir.

04:13:07PM 15     Q.   You haven't seen any medical documentation about that?

16     A.   No, sir.

17     Q.   Did you see signs of PTSD in Vernon Travis?

18          MR. MONROE:  Your Honor, I object to that

19 question.

04:13:51PM 20          THE COURT:  Sustained.

21     Q.   (BY MR. BROWN) Was Trey or Vernon involved in any youth

22 activities or programs growing up as a kid?

23     A.   Basketball.

24     Q.   Okay.  And did he play I guess high school basketball

04:14:11PM 25 or basketball as a kid growing up?

1    A.   Yes, sir.

2    Q.   Was he a member of any of the churches that you're

3  aware of?

4    A.   Yes, sir.  He was a member of our church which is Ellen

04:14:24PM 5  Burr Baptist Church.

6    Q.   Okay.  Would you classify him as a leader among his

7  classmates?

8    A.   Yes, sir.

9    Q.   Prior to him going to the military, did you know of him

04:14:34PM 10  getting into any trouble?

11    A.   No, sir.  No, sir.

12    Q.   Did you know after he came back from the military that

13  he was arrested and charged with possession of marijuana in

14  Arizona?

04:14:50PM 15    A.   No, sir.

16    Q.   When you found out about this particular case and that

17  Trey had been arrested for it, were you surprised?

18    A.   Yes, sir.

19    Q.   Had he ever shown any violent tendencies growing up as

04:15:03PM 20  a kid?

21    A.   No, sir, not at all.

22    Q.   Did you know him to carry guns?

23    A.   No, sir.

24         MR. BROWN:  I have no further questions, Your

04:15:13PM 25  Honor.

                    CROSS-EXAMINATION

BY MR. MONROE:

    Q.   Mr. Kennedy, first of all, thank you for your service

in the military.

    A.   Okay.

    Q.   When you would see Mr. Travis at family gatherings

after he came back, how many times do you think that might have

been?

    A.   A few.  I mean, it's like on a monthly basis.  Maybe

once a month.  When we would have family gatherings, like

family reunions, cookouts, if they were in town, things like

that, yes.

    Q.   So once a month or so?

    A.   Yes, sir.

    Q.   It wasn't like once a year, it was more often than

that?

    A.   Yes, sir.

    Q.   And when you would see him, would you go up and shake

his hand, give him a hug?

    A.   Yes, sir.

    Q.   Which one?

    A.   Oh, we do it all.

    Q.   Do it all?

    A.   Yes, sir.

    Q.   Did you ever notice him wear a bullet proof vest?

1      A.   No, sir.

2      Q.   Never felt it?

3      A.   Felt it?

4      Q.   Did you feel of it?

04:16:10PM 5   A.   Oh, no, sir.

6      Q.   Had he been wearing one of those vests at the time you

7  gave him a hug, you would have noticed it?

8      A.   Oh, yes, sir.

9      Q.   You had to wear one before, hadn't you?

04:16:19PM 10  A.   Oh, yes, sir.

11     Q.   Many, many times?

12     A.   Yeah.

13     Q.   They're not easy to wear?

14     A.   No.

15     Q.   They're hot and they're heavy?

16     A.   Yes, sir.

17     Q.   You would have noticed it?

18     A.   Yes, sir.

19          MR. MONROE:  Pass the witness.

04:16:28PM 20       MR. BROWN:  No further questions, Your Honor.

21          THE COURT:  All right.  Thank you.  May this

22  witness be excused, Counsel?

23          MR. MONROE:  Yes.

24          MR. BROWN:  Yes.

04:16:34PM 25       THE COURT:  If you want to leave the courthouse,

1   you may.

2               THE WITNESS:  Thank you.

3               THE COURT:  Thank you.

4               Your next witness, Mr. Brown?

04:16:40PM 5     MR. BROWN:  Yes, Judge.  Jenna Rodriguez.

6               THE COURT:  Ma'am, I think -- did I swear you in

7   this morning?

8               THE WITNESS:  Thank you, sir.  Sorry?

9               THE COURT:  Were you sworn in this morning?

04:17:56PM 10    THE WITNESS:  Oh, yes, sir.

11              THE COURT:  You're reminded you're under oath.

12  And would you state your full name?

13              THE WITNESS:  Jenna Rodriguez.

14              THE COURT:  Mr. Brown.

04:18:04PM 15    MR. BROWN:  Thank you, Your Honor.

16                   JENNA RODRIGUEZ,

17  having been first duly sworn, testified as follows:

18                   DIRECT EXAMINATION

19  BY MR. BROWN:

04:18:07PM 20   Q.   Do you mind if I call you Jenna?

21   A.   Yes, sir.

22   Q.   Would you please introduce yourself to the jury?

23   A.   Hi.  My name is Jenna.  I am Vernon's daughter's

24  mother.  We've been together on and off about eight years so we

04:18:24PM 25  have a six year old little girl.

1     Q.    And where do you currently reside?

2     A.    I currently live with my parents in Cibolo, Texas.

3     Q.    All right.  How did you meet Trey?

4     A.    I actually met him down the street from my parents

04:18:40PM 5  house at the CVS through mutual friends.  CVS is like a little

6     market like Walgreens.

7     Q.    And did y'all meet each other in passing or did someone

8     have y'all meet there together or how did that happen?

9     A.    We actually met through mutual friends, so just people

04:19:01PM 10 we went to school with at Clemens.

11    Q.    And when did y'all meet?  Do you recall when?

12    A.    January 11, 2006.

13    Q.    Okay.  And do you know -- when you met him, do you know

14    what he was doing for work?

04:19:17PM 15 A.    Yes.  He was special needs assistant at Paschall

16    Elementary for the Judson District.

17    Q.    And when you say special needs, what do you mean?  What

18    was -- what did he do?

19    A.    He worked with children with disabilities, handicapped.

04:19:36PM 20 They were ages six to eight or nine.

21    Q.    Okay.  And do you know what he did after that for work?

22    A.    He was an attendance clerk for Kirby Middle School.

23    Q.    And while he was the attendance clerk at Kirby Middle

24    School, is that when y'all had your child?

04:19:58PM 25 A.    Yes, it was.

Q.   And it's a little girl?

A.   Yes, sir.

Q.   What's her name?

A.   Kirstyn Travis.

Q.   And she's seven years old?

A.   She will be seven in July.  Yeah, my little blond curly hair baby girl.

Q.   And explain to the jury what kind of father Trey is to Kirstyn.

A.   He's an amazing father.  And I know where he was special needs.  When I found out I was pregnant, I didn't have any hesitation.  We were only 18 and 21 when we met, so I was going to college.  He was always there.  Even though we were supposed to get married, I wanted to finish college and we were on and off.  It would have been nine years next January.  He's always there.  Financially, maybe he couldn't be there every time I needed help, but if he couldn't be there financially, he was there physically and I would take that every day together.

Q.   Ultimately I believe he moved up to Dallas; is that right?

A.   Correct.  A little after she was two, he moved up to Mansfield/Arlington area.

Q.   Would he come back on a regular basis to visit with you and the child?

A.   He would, yes.  When he went up there, he was back

1  within two weeks for Thanksgiving and then Christmas, so --

2      Q.  Do you know why he moved up to the Dallas/Fort Worth

3  area?

4      A.  Well, his mother needed him.  She had some anxiety

04:21:48PM 5  issues going on.  Goodness, it was more of I needed to go to

6  school, he needed to calm down, so we just kind of went our

7  separate ways just to go through so I could finish college and

8  focus on school and he could take care of his mother.

9      Q.  Did he come back while he was taking care of his mother

04:22:16PM 10  to make sure you all's child had her needs met?

11      A.  Yes, absolutely.  Every other week, he was here for

12  four or five days.

13      Q.  Did you notice whether or not Trey had an issue with

14  drinking?

04:22:35PM 15      A.  Yeah.  I thought it was just because we were young.

16      Q.  Tell this jury about his drinking habits.

17      A.  Well, since he worked Monday through Friday at the

18  school, it was Friday, Saturday.  When we met, I think he was a

19  little bit of a bad boy that I was immediately attracted to but

04:23:04PM 20  blackout drunk and knowing his family, kind of seeing he would

21  drink Bacardi 151 like it was nothing, I kind of just assumed

22  it was just us being young.

23      Q.  Do you know if he smoked marijuana during that time

24  frame?

04:23:23PM 25      A.  He did.

1    Q.   Okay.  And ultimately did he I guess stop or slow down

2    his marijuana smoking?

3    A.   He did.

4    Q.   And when was that?

04:23:33PM 5    A.   When I was pregnant.

6    Q.   Do you know if he had an issue or problem or addiction

7    to prescription pills Xanax?

8    A.   Yes.

9    Q.   Tell the jury about that.

04:23:48PM 10    A.   He would mix Xanax with hard liquor.  It was E & J and

11    Red Bull and Vodka and Red Bull.

12    Q.   And do you know how frequently he would use the pills?

13    A.   Well, he didn't work during the summers so I remember,

14    goodness, that would be a Tuesday or a Wednesday night.

04:24:14PM 15    Friday, Saturday, just it wasn't -- I thought he was young.

16    That's why he would mix them and just kind of go off and do

17    guys nights.

18    Q.   Did he do it quite a bit?

19    A.   He did.

04:24:31PM 20    Q.   Okay.  And you said that he would drink to blackouts.

21    What do you mean?  Tell -- explain that to the jury.

22    A.   He wouldn't stop.  It -- I would always say, you know,

23    be home by two and he would come in around four.  He didn't

24    really just have a casual social drink.  It was if he was

04:24:55PM 25    drinking, he was drinking, it was for days.

1    Q.   And then he would ultimately pass out?

2    A.   Yeah.  Yes, sir.

3    Q.   Do you know Timothy Scotty Pugh who was arrested with

4    him?

04:25:14PM 5    A.   I do.

6    Q.   And did he live in you all's neighborhood?

7    A.   No, sir.  He lived in town.

8    Q.   How do you know Scotty Pugh?

9    A.   I went to school with him, but I didn't know him that

04:25:31PM 10   well in school.  I knew him through Trey's brother.

11   Q.   You knew Trey got arrested in Arizona for a marijuana

12   case; do you not?

13   A.   I do.

14   Q.   Do you know that he was placed on probation for that?

04:25:58PM 15   A.   Yes, sir.

16   Q.   And you obviously know why we're here today.  He's been

17   charged with a pretty serious crime; is that right?

18   A.   Correct.

19   Q.   And you know that him and Scotty Pugh, Scotty Pugh

04:26:09PM 20   kicked in the door and they ran in with guns.  Do you know

21   that?

22   A.   I was made aware.

23   Q.   Do you think he would have done that had he known a

24   child was inside the house?

04:26:19PM 25   A.   Absolutely not.

TERI THOMAS, CSR, RPR, CMRS

1          MR. MONROE:  Your Honor, I object to speculation.

2          THE COURT:  Sustained.

3     Q.   (BY MR. BROWN) Do you know whether or not Trey knew a

4     child was in the house?

04:26:35PM 5          MR. MONROE:  Judge, I would like to take the

6     witness on voir dire.

7          THE COURT:  All right.  You may.

8               VOIR DIRE EXAMINATION

9     BY MR. MONROE:

04:26:41PM 10     Q.   Do you have personal knowledge of Trey, personal

11    knowledge?

12    A.   I was not there.

13         MR. MONROE:  My objection is based on hearsay.

14         THE COURT:  Sustained.

04:26:54PM 15               DIRECT EXAMINATION (continued)

16    BY MR. BROWN:

17    Q.   Do you know if Trey graduated from high school early?

18    A.   I think he did.

19    Q.   And when I say early, it was three years instead of

04:27:04PM 20    four?

21    A.   Correct.

22    Q.   And do you know if he enrolled in the military shortly

23    thereafter?

24    A.   Yeah, absolutely.

04:27:12PM 25    Q.   But that was before you knew him; is that right?

1      A.   That is, yes.

2      Q.   You didn't know Trey until after he had come back from

3   the military; is that right?

4      A.   Correct.

04:27:50PM 5           MR. BROWN:  We'll pass the witness, Your Honor.

6                    CROSS-EXAMINATION

7   BY MR. MONROE:

8      Q.   Ms. Rodriguez?

9      A.   Yes.

04:28:12PM 10      Q.   When did you learn about the charges in Arizona?

11      A.   Goodness, probably after they happened.

12      Q.   Okay.  About that time?

13      A.   Yeah.

14      Q.   All right.  And you may have said this and I missed it

04:28:26PM 15   if you did.  What do you do for a living?

16      A.   I work at USAA for life and health insurance.

17      Q.   USAA?

18      A.   Yes, sir.

19      Q.   All right.  And how long have you been there?

04:28:37PM 20      A.   Four months.

21      Q.   Prior to that, where did you work?

22      A.   I was a college counselor for the University of

23   Phoenix.

24      Q.   All right.  In September of 2013, where were you

04:28:49PM 25   working then?

1      A.   In Phoenix, Arizona.

2      Q.   In Phoenix, Arizona?

3      A.   Correct.

4      Q.   You were living out there?

04:28:58PM 5      A.   I was out there, yes.

6      Q.   Where were you living when Mr. Travis was placed on

7   probation from Arizona?  Were you in Arizona or were you in

8   Texas?

9      A.   I was only in Arizona a few months.  I was in Texas --

04:29:16PM 10      Q.   Okay.  So when did you return to Texas?  When did you

11   come back to Texas from Arizona?  What period of time was that?

12      A.   Last Halloween.

13      Q.   Halloween of 2013?

14      A.   I graduated from college at UTSA in 2012 and I took a

04:29:36PM 15   position in Phoenix, Arizona.  I was only there for a few

16   months coming back here then.

17      Q.   I'm with you.

18      A.   Okay.  Sorry.

19      Q.   So were you primarily living in the San Antonio area

04:29:53PM 20   while Mr. Travis was on probation?

21      A.   Correct.  Schertz, Converse.

22      Q.   And you said that he would regularly come to visit you

23   when he was on probation?

24      A.   Yeah.

04:30:10PM 25      Q.   Were y'all -- and I'm not going to get into detail on

1    this, were you affectionate with each other?

2         A.   Correct.

3         Q.   You would embrace on occasions?

4         A.   Embrace?

04:30:23PM 5    Q.   Embrace, hug.

6         A.   Oh, absolutely.  I loved this man.  Of course.

7         Q.   Anything unusual happen?

8         A.   Unusual about what?

9         Q.   The hugs.

04:30:32PM 10   A.   No.

11        Q.   Did you ever feel him wearing a bullet proof vest?

12        A.   I've seen him wear it a couple of times --

13        Q.   A couple of times?

14        A.   -- no.

04:30:44PM 15   Q.   Did you ever notice him on when you were hugging him?

16        A.   We were in Louisiana hunting but --

17        Q.   When did you become aware of the problem with the

18   Xanax?

19        A.   I never knew -- I'm not a medical expert so I can't say

04:31:03PM 20   when is too much, but I've always -- he's always taken them.

21        Q.   Were you aware whether or not he ever had a valid

22   prescription for it?

23        A.   I wasn't.

24        Q.   As far as you know?

04:31:17PM 25   A.   No.

1      Q.   As far as you know, he did not have a valid

2  prescription?

3            MR. BROWN:  I object, Your Honor.  It calls for

4  speculation.  She said she doesn't know.

04:31:26PM 5            THE COURT:  Sustained.

6      Q.   (BY MR. MONROE) Did he ever tell you whether or not he

7  had a valid prescription for Xanax?

8      A.   No.

9            MR. MONROE:  I pass the witness.

04:31:34PM 10            MR. BROWN:  I have no further questions.

11            THE COURT:  Thank you.  You may step down.

12            MR. BROWN:  Your Honor, may we approach real

13  quick?

14            THE COURT:  Yes.

04:31:50PM 15            (Bench conference).

16            MR. BROWN:  Judge, I've had about all I can have

17  today.  I'm sorry, my diabetes is kind of kicking in and I

18  apologize.  If the Court wants to continue on, I can try to get

19  another witness in, but I've probably got maybe three or maybe

04:32:05PM 20  four witnesses left.

21            THE COURT:  Are we going --

22            MR. BROWN:  No, I'm spent.  I apologize, the

23  driving, getting up early and everything.  I apologize.

24            THE COURT:  Can we get you a little sugar, give

04:32:24PM 25  you a little break?  You know, what I'd hope we could do is put

1    on four short witnesses, let's get them in and let you argue in

2    the morning and let the jury go out.

3                 MR. BROWN:  I've got probably three short and one

4    long.  You know, if the Defendant decides to testify, I imagine

04:32:37PM 5    he's going to take a long time with the cross-examination as

6    well.  I anticipate that's going to last --

7                 THE COURT:  Who is our long one, do you mind?

8                 MR. BROWN:  The defendant if he decides to

9    testify.

04:32:48PM 10                THE COURT:  You haven't made a decision yet?

11                MR. BROWN:  I've anticipated that he's going to

12   testify.  I told the jury he is and he says he wants to.  I

13   haven't talked to him about changing his mind, but I anticipate

14   him testifying.

04:33:03PM 15                THE COURT:  Can you get some crackers or something

16   and nibble in here and do the three short ones in here and make

17   a decision whether or not you're going to call him?

18                MR. BROWN:  Okay.  I've got a bar in my bag.

19                THE COURT:  Can you go get him some crackers?

04:33:19PM 20                MR. BROWN:  Judge, I've got a bar in my bag if I

21   can eat it.

22                THE COURT:  If you want a coke or something.

23                MR. BROWN:  Yeah.

24                THE COURT:  Let's do the three short ones and then

04:33:31PM 25   you can take a break and you can decide what you want to do.

1           MR. BROWN:  We want to do those right now?

2           THE COURT:  Yes.

3           MR. BROWN:  Okay.

4           (Bench conference ended).

04:33:41PM 5           THE COURT:  Your next witness, Mr. Brown?

6           MR. BROWN:  I call Vernon Travis, Jr.

7           THE COURT:  Did you have a -- Mr. Brown, do you

8 have a bar or something you want to nibble on?

9           Sir, I think I swore you in this morning; is that

04:34:32PM 10 correct?

11           THE WITNESS:  You did, sir.  Yes, you did.

12           THE COURT:  Thank you.  I'll remind you you're

13 under oath.

14           Would you have a seat and tell us your full name?

04:34:43PM 15           THE WITNESS:  Yes, sir.  My full name is Vernon

16 Lee Travis, Jr.

17           THE COURT:  Go ahead, Mr. Brown.

18           MR. BROWN:  Thank you.

19                VERNON LEE TRAVIS, JR.,

04:34:51PM 20 having been first duly sworn, testified as follows:

21                    DIRECT EXAMINATION

22 BY MR. BROWN:

23     Q.   Would you please introduce yourself to the jury?

24     A.   My name is Vernon Lee Travis, Jr.  I am Vernon Travis,

04:35:00PM 25 Trey's father.  I am from Leesville, Louisiana.  I'm sad to be

1    here and have you guys here under these conditions, but I just

2    want to say that I've --

3            MR. MONROE:  Your Honor, he needs a question.

4            THE COURT:  We have to do this by question and

04:35:17PM  5    answer.

6            THE WITNESS:  I'm sorry.

7            THE COURT:  Mr. Brown is going to ask you some

8    questions.  Thank you, sir.

9            THE WITNESS:  Good.  Thank you.

04:35:23PM 10    Q.   (BY MR. BROWN) When was your son born?

11    A.   He was born in 1984.

12    Q.   And where?

13    A.   Monroe, Louisiana.

14    Q.   And who is his mom?

04:35:33PM 15    A.   Dawn, Dawn Brown.

16    Q.   Are y'all still together?

17    A.   We're divorced.

18    Q.   When did y'all divorce?

19    A.   1989.

04:35:40PM 20    Q.   So five years after he was born?

21    A.   Yes, sir.

22    Q.   And did y'all live in Louisiana while y'all were

23    married?

24    A.   Yes, sir.

04:35:48PM 25    Q.   And after the divorce, where -- where did everybody go?

A.   Shortly after the divorce, I -- I was -- I was PCS.  I was in the Army, so I was reassigned to Fort Ord in California and actually Dawn moved from Louisiana.  She remained there at that point until 1996, then they relocated in 1996.

Q.   To where?

A.   To Alabama.

Q.   Okay.  Do you know approximately when they moved to the San Antonio area?

A.   I'm going to probably say somewhere around '98, '99.

Q.   Shortly after Alabama?

A.   Shortly after Alabama, yes.

Q.   At the time you and Dawn divorced until '96 or '98, did you have a bunch of contact with Trey?

A.   Most of our contact was over the phone.  During the summers, I had visitation with them, with him and his brother during the summer.  I would either come over and pick them up or we would meet between San Antonio or Alabama or Louisiana and they would spend several weeks with me in the summer.  And then most of it was -- a lot of it was communication; birthdays, holidays communication.

Q.   And when did you reconnect with him I guess on a more regular basis more than just the summers?

A.   Actually our connection kind of started -- in 2001, he had contacted me about going and joining the military and we discussed that and what his options were and, of course, I was

Army and he wanted to go Air Force but that was a disagreement

but he made it.  But then he was kind of delayed and got in,

actually into the service I think in 2002.  And he would always

call me and tell me about a lot of his communication with his

chain of command and how good it was going and that it was a

good idea.  And then, from there, we kind of kept in contact.

Most of it was on the phone because he was being deployed.  In

2003, I think he actually deployed to Iraq.

Q.   I want to back up a little bit.  You said y'all talked

in 2001 about him actually enlisting in the military.  Do you

know if he graduated from the high school early?

A.   Yes, he -- he -- he was one of those kids that really

did well in school and he was -- he was advanced.  So he

actually graduated I think half a year, if not a year earlier

than he should have.  And that's why we had a problem of

getting him into the service because his age wouldn't allow him

in.  And he got turned back at the med station twice, yes, sir.

Q.   Okay.  And I'm sorry, I don't understand the process.

You mentioned that he was turned back.  Did he attempt to

enlist in 2001 or did he enlist in 2001 and they didn't accept

him until 2002?

A.   Well, the way -- yes, yes, that's what happened.

Q.   Explain to the jury because I'm confused on that issue.

A.   Anytime you have kids now that are juniors and seniors

in high school, the recruiters are going out and recruiting

them to join the military knowing that their age they're not

old enough to join, but they get a commitment, basically sign a

contract that says when you do graduate or you turn of age,

you're committed to come in.  Well, Vernon was not old enough

04:39:19PM at the time and I think the -- and he -- well, we actually

tried to sign a waiver and we couldn't get it waived to get him

in.  So he was turned back in 2001 and then actually, the

actual date of entry I think was in 2002 was when he actually

entered the Air Force.

04:39:38PM     Q.  So he signed the paperwork in 2001 but wasn't actually

admitted until 2002?

     A.  Yes, I'm almost certain that's exactly what this -- he

graduated in 2001 so it was between graduation and 2002 when he

was trying to get in and he ended up having to get deferred

04:39:58PM back to 2002.

     Q.  Prior to his deployment through his high school years,

did y'all have much interaction?

     A.  Yes, I -- I mean we talked a lot and most of our

interaction was during his time in the summers.  He would let

04:40:15PM me know about his grades because they normally got good grades.

I made sure I sent them money, kind of rewarded them for the

good things.  And I always worried when I left because I was

leaving two kids and two boys with -- with my ex-wife and our

agreement was that as long as she was in Louisiana, that they

04:40:37PM would spend time with my dad and my brothers.  And that's --

1    our interaction, they would call me when they were at the

2    grandparents.  We would talk and I would keep track of what

3    they were doing.

4        Q.   Okay.  Ultimately I guess he was finally accepted in

04:40:53PM  5    the military in 2002, and do you know if he was ever sent

6    overseas?

7        A.   Yes.  He was actually deployed, I want to say in -- I

8    want to say mid-2003, 2 -- actually I know it pretty well

9    because I looked it up, to Kirkut, Iraq, which is where he was

04:41:21PM 10    actually stationed on a forward operating base there.

11        Q.   And you mentioned that he was -- I guess he enlisted as

12    an Air Force -- in the Air Force?

13        A.   Yes, sir.

14        Q.   And do you know if that's who he actually went over to

04:41:35PM 15    Iraq with?

16        A.   Actually, he did not do that because -- and just the

17    way it goes, in the -- throughout war now, but more so today,

18    we conduct more joint-type operations between the branches of

19    the service.  So he was actually an airman assigned to an Army

04:41:53PM 20    forward operating base which is not something an airman ever

21    expects to do, but he's forward.

22        Q.   Okay.  Do you know what his job descriptions were while

23    he was in Iraq?

24        A.   Well, I know he was part of a mail service clerk team,

04:42:11PM 25    but he also was required to provide security at the operating

base and security as they -- you know, they built the different

towers and systems they put up and to transport equipment and

mail throughout the operating bases.

Q.   Do you know approximately how long he was in Iraq?

A.   I think it was about eight months, six to eight months

if I remember correctly.

Q.   And when he came back, did you have any interaction

with Trey?

A.   Yes, I did, but it kind of started I mean immediately

when he got back because we were expecting him back and he

didn't contact us immediately.  And we started getting a little

concerned and come to find out that his -- most of his command

had departed Iraq and we were -- redeploying through Germany

and he ended up in Germany with no chain of command and nobody

to take care of him.  The Army left him there with no chain of

command, so he literally got a ticket home on his own credit

card to get home from over there.  And it bothered him when he

got back.

Q.   Ultimately he makes it back to San Antonio; is that

right?

A.   Yes.

Q.   Do you need a second?  Do you need some water?

A.   Yeah.  Excuse me.  Thank you, sir.

Q.   Are you ready?

A.   Yeah.

Q.   We were at he made it back to San Antonio.  Where was he assigned to when he came back stateside?

A.   When he came back, he came back to Randolph Air Force Base here in San Antonio.

Q.   And that's where he was assigned?

A.   Yes.

Q.   And do you know whether or not he experienced any problems when he came back from Iraq?

A.   Yes.  It kind of started immediately and he -- I don't know why he was reprimanded for it actually using his credit card to get himself home from Germany, which was the first thing he called and talked to me about.  And I told him, okay, that's the way we do business, you know, you've got to tighten up and just handle your business.

And then he, you know, started calling me more often because he was constantly getting reprimanded for cleanliness, his appearance and he would just see -- he called me and say, Hey dad, they're just really driving me hard here. Again, I said, hey, son, get your head up and tighten up and focus on what you've got to do.  That's the military way, you know.  There is no excuse, you get it done.  Then he said, Dad, I'm trying.  I can't stay focused anymore.

And then shortly thereafter they literally just kicked him out -- I don't understand how they did it because they put him out of the service but they put him out under

1   those conditions and they labeled it as a general discharge, a

2   general honorable discharge, which, you know, as an officer and

3   a leader, you know, you -- I was trained to recognize the

4   symptoms and the issues -- not symptoms.  I couldn't tell you

04:46:06PM 5   what he was having or what the problems were, but you don't

6   send a soldier to combat and then he comes back totally

7   different, completely different than what he was when he went.

8            When you -- and I'll tell you, everyone of us

9   that deploy and I don't care what you want to call it, but not

04:46:25PM 10   one of us ever leave home and come back the same person that

11   left.  You don't, but you don't have those issues.  You don't

12   have these extreme changes.  There may be little issues that

13   you figure out and work a soldier or an individual through,

14   but he was having severe problems and just when they put him

04:46:47PM 15   out, it was not a good way to send him out and without even

16   doing any type of exams that I know of.  And I asked him, did

17   he get an exit exam or a physical and he said, no, Dad, they

18   just gave him his discharge papers and told him to leave the

19   base.

04:47:07PM 20   Q.   So as far as you know what he reported to you, he did

21   not get any exams concerning his mental wellbeing or anything

22   of that nature?

23   A.   Not that I -- I mean, what I understood was he did not

24   get any type of medical physicals or anything when he left.

04:47:28PM 25   Q.   How would you describe I guess his personality when he

1   came back?  Was he self-destructive?  Tell the jury how you saw

2   him when he came back.

3       A.   Well, when I -- when he -- when the first time I came

4   and visited him, he wasn't Trey.  He was drinking.  He was --

04:47:54PM 5   and he never would drink in front of me.  He wouldn't do that.

6   He did.  You know, what are you doing.  I'm okay, dad.  And

7   then just -- and he would just eventually -- he would be around

8   and we would say, where did Trey go and he would disappear.  I

9   mean he would go off to himself.  And we have a large family

04:48:15PM 10  and just a couple of years ago, we had close to 450 family

11  members at our reunion and he was there and it just -- I just

12  -- it wasn't the same and everybody there that saw him was like

13  what's wrong with him.  Why is he not talking?  Why is he in

14  his corner?  Why is he just disappearing?  There was -- and it

04:48:39PM 15  was totally self-destruction and I could tell it but I didn't

16  know what was causing it.  And it was -- he was just on a -- it

17  wasn't focused at anybody, it was him.  He was on his own.

18      Q.   When he got back, do you know if he got a job with the

19  school district?

04:49:00PM 20      A.   Yes, he worked I think in the Schertz School District

21  for about three years and he worked as an attendance aide and

22  he also worked with special needs kids for three years.

23      Q.   When you came to see him and he had been released from

24  the military, did you see how he kept his room or his

04:49:33PM 25  apartment?

1       A.    Yes.  It was horrendous and I had addressed it with him

2   a couple of times and I said, you know, son, you don't have to

3   be this way.  I mean it was -- I mean if I give a good example,

4   it was like the show of horrors.  It was just, you know,

04:49:51PM 5   expensive clothes just thrown in a room, just everywhere.  It

6   was -- there was no organization.  It was -- and he couldn't

7   explain why and he just couldn't explain it.  I'm like, why.  I

8   mean, because he wasn't this way growing up.  He was a very

9   neat, very organized kid and he took a lot of respect in his

04:50:14PM 10   appearance and his clothes.  It was just -- it was -- and

11   everything and it was just not the same.  It was -- it was --

12   sad to go see your son's house and you go down and get an

13   apartment -- or go down to get a hotel room because you're not

14   going to stay there.

04:50:31PM 15       Q.    Have you ever met his girlfriend or fiancée at the time

16   Jenna?

17       A.    Yes.

18       Q.    And did you realize they had a child together and did

19   you spend anytime with them?

04:50:43PM 20       A.    Yes, I remember when they met and when he first brought

21   her home and later on they called me and told me that they were

22   going to -- that I was going to be a grandparent, and I know

23   her very well.

24       Q.    Tell the jury how he is as a father to his child.

04:51:03PM 25       A.    Well, if there was one thing that I know he focused on

1    and that kept him grounded, it was Kirstyn and she -- I mean,

2    she loved him and he loved her and they were constantly

3    together.  When they were together -- you know, she wouldn't be

4    separated from him and he wouldn't be separated from her.  I

04:51:30PM 5    mean, and I even went to the point to try to help him to bring

6    him back to Louisiana.  And I told him, I said, son, I've got

7    several jobs that you're going to be able to get, had them

8    lined up for him, and I said, but what you're going to have to

9    do, you're going to have to come stay with me until you get

04:51:49PM 10   going, get on your feet and then you can bring your family.

11   And that was, oh, no, dad, I can't do that.  I've got to stay.

12   I said, okay, here is your opportunity, but that's how he was.

13   He sacrificed an opportunity to have some pretty decent jobs

14   because he didn't want to be separated from his child.

04:52:10PM 15   Q.    Were you aware that he was arrested in Arizona for a

16   marijuana charge?

17   A.    Yes, I was.

18   Q.    And that he was placed on probation?

19   A.    Yes.

04:52:22PM 20   Q.    And I think ultimately he moved to Dallas.  He

21   transferred up there with the Olive Garden.  Do you know why he

22   did that?

23   A.    Well, his mother had gotten pretty sick and she was by

24   herself up there and she needed help and he -- he told me, he

04:52:42PM 25   said, Dad, I've got to go.  Mom needs my help and I asked him

about Kirstyn.  And he said, Well, I'll manage because Jenna

and him had decided that she would bring her there and vice

versa and when he had a chance, he would come back down here,

but it was -- I mean, that was the way he was.  He was -- he

was all about taking care of others and his mother and his

daughter and his brother and that was his focus.

    Q.   And you obviously know why we're here today?

    A.   Yes.

    Q.   Are you surprised?

    A.   Very surprised.

    Q.   Why?

    A.   Because I never saw it coming.  I saw -- my concern was

that he was going to hurt himself, that it was going to be --

because nothing he ever did was even remotely addressing or

focused on anybody else or trying to hurt anybody else.  I

mean, his problem was simply self-destructing and I just -- I

mean, this is something that I never saw coming and would have

never expected it from him because he wasn't -- he wasn't

raised that way.  And I mean he's -- he's a well-mannered kid

and he was taught and he knew well that it was yes, sir, no,

sir, yes, ma'am, and he was going to respect his elders.  And

to see him do what he's accused of doing and have done is just

sad.  I mean, I just didn't expect it.

        But he -- he talked to me about it afterwards and

I -- and we discussed what he was -- what his options were and

1   what he was going to do and he was going to face this and we

2   were going to get through it.

3       Q.   Did he tell you he was going to accept responsibility

4   for it?

04:54:35PM 5    A.   Totally he did.  He said, Dad -- I asked him what

6   happened and he explained it to me and he said I did it and

7   I've got to take the responsibility for it.  No matter how bad

8   it is, I'm going to have to deal with it because I am guilty of

9   this.

04:54:50PM 10   Q.   You know he's looking at a prison sentence?

11      A.   Yes.

12      Q.   Upon his release from prison, do you have a support

13  system or something planned for Vernon?

14      A.   Well, yes.  I mean totally we do and it's been in place

04:55:07PM 15  and one of the things that we were working on even before this

16  happened was that he would come back to Louisiana and live with

17  me and get established, and my brother who unfortunately

18  couldn't be here today has -- he runs his own concrete

19  finishing business and he had to return for a job.  And he was

04:55:30PM 20  over in Iraq as well.  And he's got his -- so he was waiting

21  and he had asked him several times to come down for employment.

22  So whatever day it is, you know, I'll be there, you know, to

23  pick my son up and take him home and put him in a safe place,

24  in a place where he'll be actually afforded a lot of

04:55:53PM 25  opportunities because I'm right there at a military base where

I work at now and we have a VA clinic.  We have that support

there that he needs.  I mean, he needs help and it's in place.

Q.   He's been diagnosed with PTSD, which I'm sure you're

aware of.  Would you ensure that he properly takes his

04:56:15PM  medication as prescribed?

A.   Oh, yes, sir, most definitely we would.

Q.   Would you make sure that he had a place to live?

A.   Yes, sir.  Trust me, I have plenty of room and he'll be

there as long as he needs to be there.

04:56:30PM  Q.   Now knowing kind of what the issues are with Trey,

would you make sure to take him to the VA or any other location

to address any additional issues you may see arise from the

future?

A.   Oh, without a doubt.  That's -- I mean that's one of

04:56:47PM  the things that I -- I'm clearly aware of as a service member

of the VA and it's all the things that are available.  Even,

you know, after serving in the military, that's one of the

things -- and I -- I was -- I've had my medical issues, but it

wasn't as severe as some of the veterans that I've seen and

04:57:09PM  I've just actually never chosen to use the VA, not because it's

wrong but because I've been well off and God has blessed me

with good jobs.  And so I need that kind of care for those that

need it.  One day I will, one day I'll be to the point where I

can't work and I'll have to go to the VA.  It's there.  It's

04:57:31PM  right there in the neighborhood.  It's not something that he

1   would be neglected an opportunity to go to.

2       Q.   That's in Louisiana?

3       A.   Yes, sir.

4            MR. BROWN:  I have no further questions of this

04:57:40PM 5   witness, Your Honor.

6                      CROSS-EXAMINATION

7   BY MR. MONROE:

8       Q.   Mr. Travis, my name is Scott Monroe and I'm District

9   Attorney.  Do you understand the job that I'm charged with?

04:58:00PM 10      A.   Yes, sir.

11      Q.   All right.  First of all, thank you for your service in

12   the military.

13      A.   Thank you, sir.

14      Q.   You do that and some of us don't have to and I

04:58:10PM 15   appreciate it.

16            I guess the question I have and I'm not going to

17   ask you to say bad things about your boy.  He's been home for

18   nine years.  Did no one ever suggest to him to seek out the

19   VA, the resources available to him as a veteran to help with

04:58:36PM 20   this prior to April of 2014?  You did, didn't you?

21      A.   No, sir, I've never actually used the VA.

22      Q.   I mean, you were aware that they had some things

23   available to people that were suffering?

24      A.   Yes, I did, but the only reason I -- the only way I

04:58:55PM 25   really knew that was during my exit interviews and all my exit

1   paperwork out of there, I was given that opportunity and was

2   pointed to that direction that it was available, yes, sir.

3       Q.   It didn't cross anybody's mind to suggest that for the

4   entire nine year period?

04:59:12PM 5   A.   No, sir.  No, sir.  It's -- because -- and me myself,

6   I'm saying as a veteran now because -- are you -- have you lost

7   a limb?  Have you been shot?  So I'm really thinking more along

8   physical needs to go to the VA and not -- it never occurred to

9   me that he had a psychological need because he was healthy,

04:59:37PM 10   strong, and --

11       Q.   And I'm not going to pick on you about that, but you

12   did say that you could tell immediately when he came back he

13   was changed?

14       A.   Yes, sir.

04:59:46PM 15       Q.   And it was a psychological change.  Physically he was

16   the same, wasn't he?

17       A.   Yes, sir.

18       Q.   So it was a psychological change.  And it is what it

19   is, I apologize to you.

05:00:00PM 20            MR. MONROE:  I don't have any further questions,

21   Mr. Travis.

22            THE COURT:  Any other questions?

23            MR. BROWN:  No further questions.

24            THE COURT:  You may step down, Mr. Travis.

05:00:11PM 25            Counsel, can y'all come up to the bench for just a

 1    moment.

 2                    (Bench conference).

 3                    THE COURT:  Let's think about tomorrow if we

 4    recess right now and you've got a couple more witnesses maybe.

05:00:30PM 5    So can we get this to the jury you think some time tomorrow

 6    morning?

 7                    MR. BROWN:  I think by lunch would be like real

 8    easy.

 9                    MR. MONROE:  That's my take, but the only thing if

05:00:47PM 10    we have witnesses like this, absolutely, we can.  But if the

11    defendant takes the stand, we're going to be here a while and

12    I'm probably going to have extensive cross-examination and be

13    calling witnesses as rebuttal.  If he takes the stand, no, we

14    will not.

05:01:03PM 15                    THE COURT:  Well, I'm not going to put any

16    pressure on you about that position.  I'm trying to think about

17    -- I know you're coming in from San Antonio, but my thought is

18    if you think you're going to call him, I want to get started

19    early.

05:01:18PM 20                    MR. BROWN:  We can get started early then.

21                    THE COURT:  Start at 8:30 instead of nine.

22                    MR. BROWN:  I'll get here as quick as I can.

23    Judge.  I'll be here.

24                    MR. MONROE:  We'll be here.

05:01:30PM 25                    THE COURT:  So let's start at 8:30 in the morning.

1   You get the charge.

2              MR. BROWN:  I'll look at it tonight, yes, sir.

3              THE COURT:  And if he doesn't take the stand,

4   we'll easily do it and if he does, we'll just handle what we've

05:01:44PM  5   got to handle.

6              I've got a civil docket in the morning I'm going

7   to try to -- I may have a couple of uncontested divorces, I'll

8   step out and do it real quick.  It just takes me a couple of

9   minutes.  We'll start at 8:30 in the morning.

05:01:58PM 10              Is that okay, Teri?

11              MR. BROWN:  Thank you, Judge.

12              (Bench conference ended).

13              THE COURT:  Ladies and Gentlemen, we're winding

14   down, but we're not quite finished yet.  So I told you I'd hope

05:02:09PM 15   we get through today, but we're going to get through tomorrow.

16   Hopefully we can get this case to you tomorrow morning, maybe

17   noon at the latest where you can go back and give us your

18   decision.

19              So we're going to recess for the evening and I

05:02:24PM 20   would like to start at 8:30 tomorrow morning.  So if any of

21   y'all have kids or something or you need to run by the office,

22   I hope you can get them there a little earlier and get to the

23   office and start at 8:30.

24              And so if you'll go out for the evening and then

05:02:37PM 25   be back here a few minutes early, we'll start by 8:30, I would

1   appreciate it.  Remember the instructions I've given you.  You

2   may be excused for the evening.

3               THE BAILIFF:  All rise for the jury, please.

4               (Jury not present).

05:03:14PM  5               THE COURT:  All right.  Counsel, anything else

6   this evening?  All right.  We'll see you 8:30 in the morning.

7               MR. BROWN:  Yes, sir.  Thank you, Judge.

8

9               (End of proceedings).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2    THE STATE OF TEXAS      )
     COUNTY OF KERR          )

3

4            I, Teri L. Thomas, Deputy Official Court Reporter

5    in and for the 198th District Court, Kerr County, State of

6    Texas, do hereby certify that the above and foregoing contains

7    a true and correct transcription of all portions of evidence

8    and other proceedings requested in writing by counsel for the

9    parties to be included in this volume of the Reporter's

10   Record, in the above-styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by me.

12           I further certify that this Reporter's Record of

13   the proceedings truly and correctly reflects the exhibits, if

14   any, admitted by the respective parties.

15           I further certify that the total cost for the

16   preparation of this Reporter's Record is $See Vol 4 and was

17   paid by Mr. Gary F. Churak, Attorney for the Defendant.

18           WITNESS MY OFFICIAL HAND this the 30th day of

19   November, 2014.

20                         /s/ Teri L. Thomas
                           Teri L. Thomas, Texas CSR #1789
21                         Expiration Date:  12/31/2015
                           Deputy Official Court Reporter
22                         132 Oak View Drive
                           Boerne, Texas 78006
23                         Telephone:  (210)415-8111
                           Facsimile:  (830)249-7317
24                         Email:  tthomasnunley@gmail.com

25