REPORTER'S RECORD<br>
VOLUME 4 OF 5 VOLUMES<br>
TRIAL COURT CAUSE NO. B13-637<br>
COURT OF APPEALS NUMBER 04-14-00560-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | KERR COUNTY, TEXAS |
| | ) | |
| | ) | |
| VERNON LEE TRAVIS, III | ) | 198TH JUDICIAL DISTRICT |

*********************

TRIAL ON THE MERITS

*********************

On May 8, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before a jury and the Honorable Stephen B. Ables, Judge presiding, 198th District Court, held in Kerrville, County of Kerr, Texas;

Proceedings reported by machine shorthand.

1                    A P P E A R A N C E S

2


3    ATTORNEY FOR THE STATE OF TEXAS
        Mr. Scott Monroe
4        SBOT NO. 14272700
              DISTRICT ATTORNEY
5                  and
        Ms. Donnie Coleman, Assistant District Attorney
6        SBOT:  04558600
              402 Clearwater Paseo, Suite 500
7              Kerrville, Texas 78028
              Telephone:  (830) 315-2460
8              Facsimile:  (830) 315-2461

9

ATTORNEY FOR THE DEFENDANT
10        Mr. Shawn C. Brown
        SBOT NO. 24003613
11            and
        Mr. Brian Orihel
12        SBOT NO. 24079087
              LAW OFFICE OF SHAWN C. BROWN
13            540 S. St. Mary's Street
              San Antonio, Texas 78205
14            Telephone:  (210) 224-8200
              Facsimile:  (210) 224-8214

15

16

17

18

19

20

21

22

23

24

25

CHRONOLOGICAL INDEX
VOLUME 4
TRIAL ON THE MERITS

MAY 8, 2014                                               PAGE    VOL

PROCEEDINGS                                                 5      4


| WITNESSES | DIRECT | VD | CROSS | REDIRECT | RECROSS | VOL |
|---|---|---|---|---|---|---|

PUNISHMENT PHASE
DAWN BROWN
  BY MR. BROWN              6                                       4
  BY MR. MONROE                            25                        4

VERNON LEE TRAVIS,
III
  BY MR. BROWN             37                                       4
  BY MR. MONROE                           102                       4

                                                         PAGE    VOL
DEFENDANT RESTS                                           181     4

STATE CLOSE                                               181     4

DEFENSE CLOSES                                            181     4

OBJECTIONS TO THE CHARGE                                  182     4

CHARGE TO THE JURY ON PUNISHMENT                          182     4

PUNISHMENT PHASE
CLOSING STATEMENT
  MR. MONROE                                             186     4

CLOSING STATEMENT
  MR. BROWN                                              189     4

CLOSING STATEMENT
  MR. MONROE                                             204     4

JURY QUESTION

VERDICT                                                   218     4

REPORTER'S CERTIFICATE                                    222     4

EXHIBIT INDEX
VOLUME 4
TRIAL ON THE MERITS

| NO. | STATE'S | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 42 | CERTIFICATE OF RELEASE | 172 | 172 | 4 |
| 43 | TEXT MESSAGES | 110 | 110 | 4 |
| 44 | TEXT MESSAGES | 110 | 110 | 4 |
| 45 | TEXT MESSAGES | 110 | 110 | 4 |
| 46 | INDICTMENT FROM ARIZONA | 104 | 104 | 4 |
| 47 | PHOTO OF BIG MIKE | 106 | 106 | 4 |
| 48 | VERNON LEE TRAVIS' CELL PHONE | | | 4 |

| NO. | DEFENDANT'S | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 1 | DR. DELWIN WILLIAMS' MEDICAL RECORDS | 97 | 97 | 4 |
| 2 | CERTIFICATE FROM THE U.S. HOUSE OF REPRESENTATIVES FOR RECOGNITION FOR GRADUATING | 41 | 41 | 4 |
| 3 | PHOTO | 53 | 53 | 4 |
| 4 | PHOTO | 53 | 53 | 4 |
| 5 | PHOTO | 53 | 53 | 4 |
| 6 | WRITE-UP | 56 | 56 | 4 |
| 7 | CERTIFICATE FOR TIME IN IRAQ | 58 | 58 | 4 |

P R O C E E D I N G S

THE BAILIFF:  All rise.

(Jury present).

THE COURT:  Good morning, thank you.  You may be
seated.  Thanks for being here early this morning.  This is
kind of a critical time.  Usually when you come in at this time
is when the bailiffs run back and eat your doughnuts.

When we stopped yesterday, we had moved into the
punishment phase, the State had rested and the defense started
calling their witnesses.

And I think we're ready for your next witness, Mr.
Brown.  Who would you like to call?

MR. BROWN:  Yes, Your Honor.  We will call Dawn
Brown.

THE COURT:  Good morning, Ms. Brown.  If you'll
step over here to this table, that's our witness stand.

Ms. Brown, I believe I swore you in before the
trial started; is that correct?

THE WITNESS:  Yes, sir.

THE COURT:  So you're reminded you're under oath
and would you have a seat and tell us your full name.

THE WITNESS:  Okay.  My name is Dawn Michelle
Brown.

THE COURT:  All right.  Mr. Brown is going to
start asking you some questions.

1          MR. BROWN:  Thank you, Your Honor.

2                   DAWN BROWN,

3     having been first previously sworn, testified as follows:

4                   DIRECT EXAMINATION

08:37:03AM  5     BY MR. BROWN:

6          Q.  Ms. Brown, would you please introduce yourself to the

7     jury?

8          A.  My name is Dawn Brown and I'm Vernon Travis' mother.  I

9     was Dawn Travis Brown and now I'm Dawn Brown.

08:37:19AM 10          Q.  Do you mind if I call you Dawn?

11          A.  I don't mind.

12          Q.  Thank you.  Dawn, where do you currently reside?

13          A.  I live in Mansfield, Texas.

14          Q.  Is that in the Dallas/Fort Worth area?

08:37:30AM 15          A.  Yes, it's south of Dallas.

16          Q.  What is your profession?

17          A.  A 28-year educator, from teacher to principal and now

18     for Federal Programs and Student Interventions Director for

19     Burleson I.S.D.

08:37:42AM 20          Q.  And how long have you held that position?

21          A.  I've been there for -- this is my third year there.

22          Q.  And give us a little background.  Tell us a little bit

23     about Trey as a kid growing up.

24          A.  As a kid growing up, Trey was small and so the -- he

08:37:59AM 25     was smaller than everyone else and I sent him to school I think

1    a little bit earlier than he should have, so he got the cutoff

2    on his birthday so he struggled a little bit in first and

3    second grade, but then he caught up because his mom was a

4    teacher and we worked really hard.  And so he was -- he just

08:38:19AM 5    worked really hard and got where he needed to be to the point

6    that he accelerated and ended up graduating from high school a

7    year early.

8         Q.   Now when you say a year early, do you recall what age

9    he was when he graduated from high school?

08:38:33AM 10        A.   He was 16 going on 17.  Because I let him in early on

11   the front end and he passed all the way and then he got out as

12   a junior, it made him two years younger than everybody else or

13   most kids that were seniors.

14        Q.   Okay.  And describe to the jury what type of things he

08:38:50AM 15   did as a kid growing up.  Was he a basketball player?  Did he

16   play baseball?  What types of things did he do?

17        A.   Everybody liked him and they all felt they needed to

18   take care of him because he was smaller than everybody else and

19   so -- because they found out he was good, that he was a good

08:39:06AM 20   basketball player, always picked for teams; but his goals,

21   because he wanted to get out of high school earlier, the

22   extracurricular got on the backside because he wanted to do

23   what his father, his grandfather, and his great grandfather had

24   done and that was to serve the country.  And so we had the

08:39:24AM 25   Army, Navy, and then he went Air Force.

1          Keep talking?

2     Q.   I'll stop you there.

3     A.   All right.

4     Q.   So you say that was his goal from the time he was

08:39:33AM 5  growing up as a kid.  I mean that's what his aspirations were

6     was to join the military and follow in the foot steps of other

7     family members?

8     A.   Right.  Because his father and I were divorced early

9     and he was just very, very proud of his dad and anybody that he

08:39:48AM 10  ever talked to had served the country and that's what he wanted

11    to do, too.

12    Q.   Now, what did he do and what did y'all do as a family

13    to help him as he got to his later years of high school to make

14    sure that he could join the military?

08:40:04AM 15  A.   Well, I had to move once or twice to get him in

16    districts that you could get all your credits in the

17    appropriate time to graduate as a junior and so we moved, like,

18    two times; but also in order for him to get out, he had to sign

19    that he was going to be a third year grad and we didn't realize

08:40:23AM 20  being a third year grad, you also got a scholarship from the

21    State of Texas and so that made it even more enticing.  And,

22    too, he went to summer school.  I paid for him to be

23    accelerated by taking a class early so that he could be that

24    third year grad.

08:40:40AM 25  Q.   Okay.  And as far as preparing him, what were the steps

1    that he had to take to start the process for the military?  Was

2    there testing that he had to do?

3         A.    Yes, he had to take the Armed Forces Vocational

4    Aptitude, I think it's called, Battery.  The reason I know this

08:40:57AM 5    is because I worked with the ROTC people as an assistant

6    principal and I thought, okay, the Air Force is kind of like a

7    civilian.  He would get a career where he would learn some

8    skills and become a computer somebody and so he scored high and

9    his aptitude is high with computers and so that was the route

08:41:14AM 10   we thought.  We thought that would be good so then he could

11   transition out into a civilian job and have a vocation.

12        Q.    And you said he graduated in May of 2001.  Was it some

13   time there shortly after that that y'all signed a contract to

14   commit him to the military?

08:41:30AM 15        A.    Yes, he scored so high that I didn't have to push very

16   hard for the recruiters to go -- to get him.  Most kids were

17   qualifying for the Army and the Air Force score had to be

18   higher and he had that score.  And so we were being contacted

19   more than we were contacting them.  And the recruiters were

08:41:48AM 20   good.  They would be gung ho and they got me gung ho, and you

21   know, I thought, okay, I found a good place for my son and you

22   know I was helping other people's kids and they're --

23             MR. MONROE:  Your Honor, if we can keep to

24   question and answer, it would be good.

08:41:58AM 25             THE COURT:  Yeah.  Why don't you do it question

1   and answer please.  Thank you.

2              MR. BROWN:  Okay.

3       Q.   (BY MR. BROWN) Do you recall at one point in time he

4   actually signed a commitment contract to enter the Air Force?

08:42:09AM 5    A.   He did.  He signed a commitment.  He turned 16 at --

6   and he wasn't old enough to get in, so they put him on a

7   deferred plan and --

8       Q.   Hold on.  When did he sign a contract to agree to go

9   into the military?

08:42:26AM 10   A.   I think it was in June.

11      Q.   June of 2001?

12      A.   June of 2001, yes.

13      Q.   Just after he graduated from high school?

14      A.   Yes.

08:42:34AM 15   Q.   Okay.  Now, you mentioned to the jury because he was 16

16  they wouldn't allow him to go in so he was on a -- what did you

17  call it, a deferred?

18      A.   Yes, it was deferred entry or delayed entry where you

19  sign a paper you're coming when you're old enough, you're ours.

08:42:50AM 20  So he was in -- keep talking?

21      Q.   Hold on.

22      A.   Okay.

23      Q.   Okay.  After he signed that contract and agreed to go

24  in at a later date, did he still have contact with the military

08:43:02AM 25  with physical training classes on the weekends?

TERI THOMAS, CSR, RPR, CMRS

1    A.   Yes.  Every weekend, he was required to go to physical

2  training and then they learned something out of a manual that

3  was like basic military things, so basically they were

4  practicing so they would be ready when they got in.

08:43:19AM 5    Q.   Okay.

6    A.   Okay.

7    Q.   Now, when he was doing these weekend physical training

8  exercises, when was he supposed to sign for his actual job in

9  the military?

08:43:32AM 10    A.   I was told by the recruiter that he would go right in,

11  but there had to be a job and so that delayed some and so we

12  thought it would be August and it ended up, he had already made

13  the commitment, he couldn't get out, you know, and so -- I

14  don't think -- I don't know if I'm answering the question, but

08:43:56AM 15  he wasn't able to take over a job yet, but he could not get out

16  of the commitment.  And there were other recruiters after him

17  that were offering better deals.

18    Q.   Okay.  So he signs with them?

19    A.   Yes.

08:44:09AM 20    Q.   And then he signs a delayed entry program?

21    A.   (Nods head up and down).

22    Q.   And I guess 9/11 hits at some point in time from the

23  time he signs his paperwork until the time he actually gets

24  assigned his job?

08:44:25AM 25    A.   He couldn't sign.  He wasn't 18.  I signed a waiver.

Then he signed for his commitment.  He had already committed
but he signed a contract; and before his assignment came up,
all of a sudden we had a war.

Q.  All right.  And once I guess 9/11 hit, did you attempt
to try to get him out of the contract and the agreements that
y'all had signed?

A.  I did because there had been a war -- that was the last
thing on my mind, there hadn't been a war in years, you know,
and in my mind it was Vietnam, but that is not what I wanted
him to go in and do.  I wanted him to go in and get an
education.  I had that in my mind because I help everybody
elses' kids and then the next thing I know there is a war and
the recruiter told me, oh, nobody is going.

MR. MONROE:  Your Honor, can we keep to a
question and answer.

THE COURT:  Yeah.  We need to just listen to the
question and answer it very specifically, all right.  So listen
real close.

Q.  (BY MR. BROWN) If you'll listen to my question and
answer it, Dawn, and then I'll follow-up with another question.
Is that all right?

A.  Yes.

Q.  Have you ever testified before?

A.  No.

Q.  Are you nervous?

TERI THOMAS, CSR, RPR, CMRS

1    A.   Yes.  And I'm an English teacher.  I talk a lot.

2    Q.   Are you nervous?

3    A.   Yes, sir.

4    Q.   Okay.  Just answer the question and it will go a little

5    bit better.

6    A.   Yes, sir.  Okay.

7    Q.   Ultimately did his entry date in the military, was it

8    June of 2002?

9    A.   Yes.

10   Q.   Okay.  And do you know if he served in Iraq?

11   A.   Yes.

12   Q.   Okay.  Do you know what his -- do you know when he left

13   for Iraq?  If you don't know the dates, that's okay but --

14   A.   I don't know the exact date.

15   Q.   Okay.  But you know he did a tour of duty in Iraq?

16   A.   Yes.

17   Q.   Okay.  Whose idea was it, did you feel, in signing the

18   waiver and getting I guess Vernon into the military just after

19   high school?

20   A.   I pushed him.

21   Q.   And what do you mean by you pushed him?

22   A.   It was a family tradition.  He was smart and when he

23   was younger, he had goals to be a police officer and he just

24   really wasn't showing me any direction, so I talked him into

25   getting an education through the military.

1    Q.   And you testified that he had said that he wanted to

2  follow in the foot steps of family members, but are you saying

3  you pushed him into that path just after high school?  I mean

4  as soon as he graduated?

08:47:08AM 5    A.   No, it was really prior because he wasn't telling me

6  what he wanted to be when he grew up, and I was trying to guide

7  him like anybody else.

8    Q.   And what was your purpose for pushing him towards the

9  military?

08:47:21AM 10   A.   My purpose was for him to gain an education that would

11 make him have a successful life as a civilian once he -- if he

12 did not make that a career.

13   Q.   And was there any tension for him, you know, to be --

14 to grow up from a kid to gaining experience or becoming a man?

08:47:46AM 15   A.   Yes.

16   Q.   Okay.  And ultimately, he came back from Iraq and is

17 that what you found, that he had transformed from this boy or

18 kid to a man?

19   A.   He came back with a different posture and a yes,

08:48:07AM 20 ma'am/no, ma'am but very little communication.

21   Q.   Did you notice anything else about his demeanor or

22 behavior that had changed from prior to the military to when he

23 came back from Iraq?

24   A.   When he came back, he slept a lot and I thought they

08:48:26AM 25 don't sleep in the Air Force, so why is he sleeping all the

time.

Q.   And let me back up.  We were talking about, do you know what his duties were while he served in Iraq?

A.   Yes.

08:48:38AM  Q.   And what were those duties?

A.   He worked in a mail facility that -- they had to guard specific parts of the mail facility and towers and there were oil fields and his main responsibility was to take Iraqi civilians on and off the installation in a jeep and get back. 08:49:02AM And there were oil fields and all those and so he was alone taking these people on a daily basis in and out assuming that they were friendly Iraqis.

Q.   Now, I'm going to jump forward.  He came back from the military and did he go straight to the barracks, or where did 08:49:23AM he go when he came back?

A.   No, when he came back, he came to my house.

Q.   Okay.  And how long did he stay with you for?

A.   About three weeks.

Q.   And did you have a conversation with him about him 08:49:34AM needing to go to the barracks and him not sleeping at your house?

A.   I said, they have a barracks for you there.  You are a man, you have served your country.  You need to be on the barracks with all the other soldiers because I lived right 08:49:49AM outside the base, but the whole point was, be a man, be a man.

1    Q.   And then ultimately did he go back to the barracks?

2    A.   Yes, he did.

3    Q.   And did he start having, I guess, issues maintaining

4    his room there at the barracks and get written up several times

08:50:06AM 5   for that?

6    A.   Yes.

7    Q.   And did that ultimately lead to him being discharged

8    from the military because he was keeping unfit quarters?

9    A.   Yes, he was not keeping his quarters to the standard of

08:50:18AM 10  the military.

11   Q.   And that was the reason for the general honorable

12   discharge?

13   A.   Yes, general discharge under honorable conditions.

14   Q.   And when he was discharged, explain kind of what his

08:50:33AM 15  demeanor or how his personality was at that point in time?

16   A.   Just quiet.  He didn't want to discuss anything that he

17   -- he just didn't want to discuss anything.  He didn't want to

18   talk about anything.

19   Q.   Did he seem withdrawn?

08:50:54AM 20  A.   Yes, and I thought he was withdrawn because they're not

21   allowed to talk about stuff that they see.  That's how his dad

22   was when he came back.

23   Q.   Did you notice any changes in regards to alcohol

24   consumption?

08:51:10AM 25  A.   He didn't drink in front of me, but he would come in

1   stumbling at odd hours and go to bed and just sleep until it

2   was time to go back to work.

3       Q.   And ultimately after he was discharged from the

4   military, what was his I guess next job?

08:51:33AM 5    A.   His next job was -- I worked for Judson I.S.D. and I

6   was the principal at the time and I knew that his record was

7   clean.  He was a soldier.  We did his resume, sent it out and

8   he got a job as a special education aide with a certificate as

9   a special education aide and with a certificate of an education

08:51:54AM 10  aide and they did a background check and all that.  He was

11  good.

12      Q.   And explain to the jury what that means as a special

13  education aide.  What was he in charge of?

14      A.   Well, he was an aide to a teacher for special needs

08:52:06AM 15  students, students that are -- these are actually -- they're

16  called severe and profound.  You have to feed them.  They're

17  noncommunicative.  They're stronger than they think they are,

18  but most -- a lot of nonverbal communication.

19      Q.   Okay.  And how long did he work in that position?

08:52:25AM 20   A.   I think he was in that one maybe three years because he

21  got a promotion.

22      Q.   Okay.  And he was promoted from that job to what?

23      A.   He went from an elementary special needs aide to an

24  attendance clerk in a middle school.

08:52:42AM 25   Q.   Okay.  And was that within the same district?

1    A.   Yes, it was in Judson I.S.D.

2    Q.   Okay.  And do you recall how long he maintained that

3  job?

4    A.   It had to have been two years because I know he was

08:52:54AM  5  there about five years altogether.

6    Q.   Ultimately did he leave, I guess, the school district

7  and find a new job?

8    A.   Yes, he left the school district and found a new job.

9    Q.   Okay.  And what line of work did he get into after

08:53:10AM 10  that?

11    A.   After that, I believe he started working with the

12  restaurant business.

13    Q.   Okay.  Would that be the Olive Garden?

14    A.   Yes, sir.

08:53:19AM 15    Q.   Okay.  At some point in time after he was out of the

16  military, did he have a child?

17    A.   Yes, he did.

18    Q.   Okay.  And do you recall what year that was?

19    A.   Let's see, I'm the worse with dates.

08:53:37AM 20    Q.   If you don't know, that's fine.

21    A.   I don't know the year she was born.

22    Q.   Do you know approximately how old she is?

23    A.   She's six.

24    Q.   Okay.  And explain to the jury the type of father that

08:53:51AM 25  Vernon is to his daughter.

08:54:19AM

          A.   I wish that he -- he was the father that I wish Trey
had had.  So anything he missed coming up with a single parent,
he made sure his baby had.  And he's just wonderful with her.
He provides her with everything she needs.  He takes her
places.  They're like twins.

          Q.   Ultimately I believe you -- did you move to the Dallas
area sometime around that time frame?

          A.   I moved -- my parents had cancer and I kept flying up
there and I couldn't afford it, so I picked up and moved and
found an education job up there to take care of my parents.

          Q.   Okay.  And I believe somewhere around 2009, and I'm not
exactly sure of the year, but Vernon ended up moving up to the
Dallas area with you; is that right?

          A.   That's right.

          Q.   And tell the jury why he moved up there with you.

          A.   I didn't know that the type of responsibility that goes
along with taking care of your elderly parents, and daddy was
going to VA and mom was with cancer, and I was falling apart.
I couldn't keep my life together while trying to take care of
their lives and he offered to come and spend time with me to
help me adjust to my new living conditions.

          Q.   And you were suffering from stress and depression as
well at the time and that's why he came up; is that right?

          A.   While -- it's embarrassing.

          Q.   It's okay.  You don't need to discuss that.

1       A.   I ended up having chronic depression watching the news

2  all the time and not knowing if my kid was one of those being

3  blown up and so I was out of sorts.

4       Q.   Now, while he was living with you in the Dallas area,

08:55:58AM 5  would he still come back to the San Antonio area on a regular

6  basis to see his child?

7       A.   Yes.  And then he would bring her up and when he would

8  go to work, I would watch her and we just took turns being

9  there for each other.

08:56:26AM 10      Q.   You know why we're here today.  I mean, I'm sure Trey

11  has had discussions with you about it; is that right?

12      A.   About what?

13      Q.   About why we're here today, this case.

14      A.   Yes, sir.

08:56:40AM 15      Q.   Okay.  And he's never told you that he wasn't

16  responsible, that he wasn't guilty of this crime, did he?

17      A.   No.

18      Q.   And he's accepted responsibility from the first time to

19  discuss this with you; has he not?

08:56:51AM 20      A.   Yes.

21      Q.   I want to back up just a little bit.  You -- you were

22  in the courtroom when the video was played; is that right?

23      A.   Yes.

24      Q.   I mean, tell the jury what you saw on that video.

08:57:11AM 25      A.   That wasn't my Trey.  That wasn't my son.  That was

like as -- many times I'm a strict parent.  I was a

disciplinarian at school.  I had to correct everybody elses'

kids and I'm looking at mine doing everything that I taught

them not to do and he wasn't in his right mind.  It didn't look

08:57:34AM 5  like his eyes, the things he was saying.  He's not

argumentative.  He may not like what I say, but he always says

yes, ma'am.  He doesn't even argue.  I was so proud that I got

them through school with no problem, and you think you're done

raising them and then this happens.

08:57:54AM 10  Q.  You mentioned, did he appear to be under the influence

of drugs or alcohol to you?

A.  He was.  His eyes were -- he -- he articulates better

than that and so he was like blah, blah, blah -- he doesn't --

he's respectful enough.  That showed to me that was somebody

08:58:16AM 15  elses' kid.  I don't know who that was because I mean -- I have

seen him tipsy, but never belligerent and it just wasn't my

kid.

Q.  I mean, did Trey tell you that him and a guy by the

name of Scotty came up to Kerrville and kicked in the door to

08:58:43AM 20  collect money from a drug dealer?

A.  Yes, he did.

Q.  He never told you that he wasn't involved?

A.  No.

Q.  Do you know if prior to that day he had ever been to

08:59:02AM 25  Kerrville?

1      A.   No.

2      Q.   Do you know if since that day, he's ever been to

3  Kerrville?

4      A.   No.

08:59:11AM 5      Q.   Other than for court?

6      A.   No, except for court.  I didn't even know that he knew

7  where Kerrville was.

8      Q.   When was the first time that you were able to get

9  Vernon or you had Vernon go for counseling or go to the VA?

08:59:39AM 10      A.   He -- I kept telling him, you have the VA benefits and

11  why don't you use them and his paperwork was -- so we're

12  looking for this DT14 that he could never find.  I said bring

13  me everything you have and let me go through it.  And I finally

14  found the paperwork that he needed to be seen by the VA and

09:00:03AM 15  that was like around January.

16      Q.   January of what year?

17      A.   That was -- well, from the beginning we were trying for

18  the whole year.  He would --

19      Q.   When was the first time he actually went to the VA?

09:00:14AM 20      A.   He went to the VA and he sat, because that's what you

21  do.  Like last year, I want to say like starting in June.

22      Q.   When was the first time he was seen by the VA?

23      A.   I can't remember.  He called me and told me that he

24  finally got to see somebody.

09:00:35AM 25      Q.   Okay.

1      A.   Because --

2      Q.   If I told you it was January 2014, would you have a

3  reason to dispute that?

4      A.   No, because I know we went like six months and finally

09:00:46AM  5  he got in because he was just sitting at the VA office and they

6  would say somebody is going to come see you, and no one would

7  ever.  And I would say go sit again, go sit again.

8      Q.   And then ultimately when he went to the VA, did they

9  set him up with a counselor?

09:01:03AM 10      A.   No.  They said, oh, this is not where you go for this.

11  We have satellites for mental issues in Arlington, so all of --

12           MR. MONROE:  Your Honor, I'm going to object to

13  hearsay here.

14           THE COURT:  Sustained.

09:01:17AM 15      Q.   (BY MR. BROWN) Did they send you to another location?

16      A.   They did.

17      Q.   And was that location in Arlington?

18      A.   Yes, it was.

19      Q.   And was that because of the issues they believe Vernon

09:01:25AM 20  was suffering from?

21      A.   Yes.

22      Q.   Okay.  And ultimately when he made it to Arlington, did

23  he see a counselor there?

24      A.   Yes, he did.

09:01:32AM 25      Q.   Okay.  And do you know approximately how many times he

1    saw this counselor, if you know?

2         A.   I don't know how many times.

3         Q.   Was it more than once?

4         A.   Yes.

09:01:39AM 5    Q.   Okay.  Ultimately after the counselor saw him more than

6    one time, did he send Vernon over for a mental evaluation?

7         A.   He sent him to an emergency room for a mental

8    evaluation.

9         Q.   Okay.  And is that when he saw Doctor Delwin Williams?

09:01:55AM 10   A.   Yes.

11        Q.   Okay.  And is that when he was diagnosed with the PTSD?

12        A.   Yes.

13        Q.   Okay.  And I guess a couple of other issues:  Alcohol

14   dependency, drug dependency and stuff like that?

09:02:09AM 15   A.   Depression.

16        Q.   Depression.  Was he -- and I guess was that sometime at

17   the beginning of April 2014?  If you don't know --

18        A.   It was like March or April, in there.

19        Q.   And after he was diagnosed by Doctor Williams, did he

09:02:29AM 20   also go see a Doctor Roache?

21        A.   Yes.

22        Q.   Okay.  And did Doctor Roache I guess talk to him and

23   interview him concerning not only his PTSD but how the drugs

24   and alcohol related to his PTSD?

09:02:43AM 25   A.   Yes.  Yes.

1      Q.   As far as you know, has Trey been compliant with his

2   medication since he's been diagnosed with PTSD?

3      A.   Yes, he has.

4      Q.   Okay.  And has Trey related to you what his plans are

09:03:16AM 5   when he's ultimately released from jail?

6      A.   His --

7           MR. MONROE:  Your Honor, I'll object to a hearsay

8   response.

9           THE COURT:  Make sure it's not hearsay.  Sustain

09:03:28AM 10   the objection.

11      Q.   (BY MR. BROWN) Do you know if Trey has plans for when

12   he's released from jail?

13      A.   Yes.

14      Q.   And have those discussions been made between him and

09:03:40AM 15   his father for him to go to Louisiana?

16      A.   Yes.

17      Q.   And do you believe that his father would be a good

18   support system for him in maintaining visits with the VA and

19   providing him a stable home and job?  Is that a yes?

09:04:01AM 20      A.   Yes, to do what I failed to do.

21           MR. BROWN:  I have no more questions of this

22   witness, Your Honor.

23           THE COURT:  Mr. Monroe.

24                     CROSS-EXAMINATION

09:04:11AM 25   BY MR. MONROE:

1    Q.   Mrs. Brown?

2    A.   Yes, sir.

3    Q.   No one here suggests --

4         THE COURT:   Is your microphone on?

09:04:35AM 5    Q.   (BY MR. MONROE) So no one here is suggesting that you

6    failed to do anything, okay?

7         When did Trey begin taking medications for the

8    first time approximately?

9    A.   The self-medicating or the --

09:04:53AM 10   Q.   No, the prescribed meds from Doctor Roache or Doctor

11   Williams.

12   A.   It was March or April, whenever Doctor Williams, he

13   gave him a prescription.

14   Q.   So just in the last 30 or 45 days?

09:05:10AM 15   A.   Yes, sir.

16   Q.   Did anyone ever suggest to Trey when he came back and

17   you saw the changed boy way back then to seek help from the VA?

18   A.   No.

19   Q.   The jobs in Judson Independent School District, the

09:05:53AM 20   aide and then the other job that he had, did he ultimately

21   leave those jobs voluntarily or was he asked to leave, the

22   second one?

23   A.   He was asked to leave the second one.

24   Q.   He was discharged, was he not?

09:06:11AM 25   A.   They call it voluntarily resign.

1      Q.    Right.  Was he drinking excessively then?

2      A.    I don't know because he didn't live with me.

3      Q.    Okay.  Fair enough.  When did he begin living with you

4   again?

09:06:32AM 5   A.    When he came to Dallas.

6      Q.    And approximately when was that?

7      A.    I got there in 2008, so I think he came 2009 or 10,

8   very shortly after I left there.

9      Q.    And at that time, was he drinking pretty heavily then?

09:06:56AM 10   A.    It would be an assumption on my part because --

11      Q.    Let me ask you, did you observe signs of drinking?

12      A.    I never observed him drinking because -- but, yes,

13   there were signs that he was drinking.

14      Q.    Was it every few days, every day, what --

09:07:17AM 15   A.    I believe every day.

16      Q.    Every?  Did he ever talk with you about drinking?  Did

17   you ever raise that with him about the drinking?

18      A.    I couldn't because I was drinking.

19      Q.    All right.  My wife is a hospice nurse and I understand

09:07:42AM 20   very well the difficulty you went through with your parents so

21   no one here is going to embarrass you for that either, okay?

22   It's not something that any of us request.  We understand that.

23           Were you aware at any time that he was abusing

24   Xanax?

09:08:03AM 25   A.    No.

1     Q.    What was your understanding about what happened out in

2   Arizona?

3     A.    My understanding of Arizona is he was just riding with

4   a friend and there was an amount of marijuana in the vehicle

09:08:30AM 5   and that friend said it was his, but because Trey was in the

6   vehicle, they were charged with the same thing.

7     Q.    Do you know what the name of that friend was by any

8   chance?

9     A.    Yes, I do.

09:08:41AM 10     Q.    What's his name?

11     A.    Michael.

12     Q.    Michael?

13     A.    Mike.

14     Q.    Do you know his last name?

09:08:47AM 15     A.    I don't know the last name.

16     Q.    Was this someone that was from Arizona?  Was it a

17   friend from Arizona or a friend from Texas?

18     A.    A friend from Texas who had family in Arizona.

19     Q.    So Trey and Mike were together in Arizona when they got

09:09:05AM 20   the possession charge?

21     A.    Yes.

22     Q.    Were you aware that it was an amount of marijuana in

23   excess of four pounds?

24     A.    No.

09:09:14AM 25     Q.    Would that surprise you that it was that great a

1   quantity?

2       A.   I don't know what a lot or a little marijuana is.

3       Q.   That's a lot.

4       A.   Okay.  I mean, I don't know.

09:09:26AM 5   Q.   When he came back to Texas, you were aware that he was

6   on courtesy probation in Texas from Arizona?

7       A.   Yes.

8       Q.   Did it ever occur to you that the excessive drinking

9   was, in fact, a violation of his probation?

09:09:46AM 10  A.   Never.  You're telling me that now.  I never knew.

11      Q.   And that's what I am asking you what you knew.

12      A.   I still don't know.

13      Q.   I certainly understand.  You have another son; do you

14  not?

09:10:08AM 15  A.   Yes, I do.

16      Q.   And what is his name?

17      A.   Anthony Travis.

18      Q.   And is he older or younger than Vernon?

19      A.   Three years younger.

09:10:16AM 20  Q.   Three years younger?

21      A.   Yes, sir.

22      Q.   And what does he do?

23      A.   He's a police officer.

24      Q.   And where is he?  Where is he a police officer?

09:10:24AM 25  A.   He's now at the University of Incarnate Word.

1       Q.   Okay.  Where was he a police officer around September

2   of 2013?

3       A.   Last year?

4       Q.   When this event occurred.

09:10:53AM 5       A.   At the University of Incarnate Word.

6       Q.   University of Incarnate Word?

7       A.   He's been there a couple of years.

8       Q.   Was he ever in Poteet?

9       A.   Years ago, uh-huh.

09:11:04AM 10       Q.   And approximately -- do you remember approximately when

11   he was a police officer in Poteet?

12       A.   The older I get, time just -- gee.

13       Q.   Well, let's orient it this way.  Was he a police

14   officer in Poteet before you moved to Dallas or was it after --

09:11:25AM 15   or while you were there?

16       A.   I believe he was in Poteet after I was in Dallas.

17       Q.   All right.  Okay.  So within the last 3 or 4 years

18   then?

19       A.   I have to like reason in my head.  He needs to work

09:11:48AM 20   five years for the babies to get a free education, and I think

21   he's like in the fourth year.

22       Q.   I got you.  Is Anthony here with you all today?

23       A.   No, sir.

24       Q.   When you talked to Trey about what happened here in

09:12:25AM 25   Kerrville in September, you said he admitted to you what he had

1  done?

2      A.  Yes.

3      Q.  Did he admit to you that he had a gun?

4      A.  He just told us a story, like not an admission but this

09:12:42AM 5  is what happened.

6      Q.  Did he include in the story that he had a gun?

7      A.  Yes.

8      Q.  Did he include in the story that he fired the gun?

9      A.  Yes.

09:12:54AM 10      Q.  Did he include in the story that he was wearing body

11  armor?

12      A.  It seems like I read that someplace like that was --

13  like I already knew some pieces so -- we never got a chance to

14  sit and do this whole story thing.

09:13:18AM 15      Q.  All right.  So bits and pieces?

16      A.  Yes, sir.

17      Q.  Where did he keep the body armor when he was living

18  with you?

19      A.  He -- I don't know because first of all I never even

09:13:29AM 20  knew what body armor was until I found out it was a vest and

21  that's been since this has been going on.

22      Q.  You never saw it?

23      A.  Well, I never -- okay, sometimes he just look like he

24  had on more clothes than others so I never saw what -- I just

09:13:50AM 25  never questioned sweaters and bulky, so I wasn't looking for

1    anything.  And you know, when kids go out -- I mean, not kids,

2    but when grown people go out, they go out like the witching

3    hour.  When I'm going to bed, they go out and they come in at

4    4:00, you know, things like that.

09:14:04AM 5         Q.   I understand?

6         A.   So I'm not paying attention.

7         Q.   We understand.  Doctor Roache testified that his

8    initial contact -- I think this is what he said, that his

9    initial contact in this was with you?

09:14:26AM 10         A.   Yes, it was.

11         Q.   And tell me a little bit about that.  How did you learn

12    about Doctor Roache?

13         A.   I learned about Doctor Roache through researching

14    around the military, especially around Fort Sam and I saw an

09:14:42AM 15    article where this person was doing clinical trials.  And I

16    thought, well, you know, I think something might be wrong with

17    Trey after this incident and so my attempt was to get him

18    involved in the trial.

19         Q.   I got you.  And just -- so it was actually you?  Did

09:14:59AM 20    you employ Doctor Roache on behalf of Trey?

21         A.   I did.

22         Q.   Okay.  And just out of curiosity, how much did you have

23    to pay Doctor Roache?

24              MR. BROWN:  I'm going to object, Your Honor, for

09:15:12AM 25    relevance.

1          THE COURT:  Overruled.

2          THE WITNESS:  I have to discuss my finances here.

3     Q.  (BY MR. MONROE) That's all I'm going to ask you is how

4     much did you pay Doctor Roache.  Just to answer your question,

09:15:28AM 5  the rest of the finances are not important.

6     A.  I'm broke.

7     Q.  I just want to know how much you paid.

8     A.  He charges $250 an hour.

9     Q.  Right.  So what do you think your total bill to him

09:15:41AM 10  was?

11    A.  Well, based on the way he had to do yesterday, I

12    haven't calculated it yet, but I was watching the clock and I

13    don't have a choice.  This is my baby.

14    Q.  I understand.  And no one is taking you to task on

09:15:55AM 15  that.  No one at all.  I just knew that it was expensive and

16    just curious how much it was.  $250 an hour for how many hours

17    he was here?

18    A.  Yes, sir.

19    Q.  Some of them charge a rate for courtroom time, but he

09:16:09AM 20  was still hourly as far as you know?

21    A.  Right.  It was like $250 an hour, plus his expenses.

22    Q.  Right.

23    A.  Since he's right down in Boerne, I didn't -- you know,

24    yeah.

09:16:20AM 25  Q.  Did he make you give him a retainer?

1      A.   Yes.

2      Q.   How much retainer did you have to give him?

3      A.   750.

4      Q.   750, okay.

09:16:39AM 5      A.   I'm sorry.  You know, I need to back up.  It didn't go

6    to him.  It went to the University of Texas Health Career

7    something something.

8      Q.   The payments were made to the school?

9      A.   The payment is made to the school.

09:16:53AM 10      Q.   All right.  I got you.

11                MR. MONROE:  I pass the witness.

12                MR. BROWN:  I have no further questions of this

13    witness, Your Honor.

14                THE COURT:  Thank you, ma'am.  You may step down.

09:17:09AM 15                Ladies and Gentlemen, I need to do two civil

16    matters and Officer Van Klaveren said he has guarded the

17    kolaches and the doughnuts.  So if y'all can take just a brief

18    break, I'll do these two civil matters and get you right back.

19                THE BAILIFF:  All rise for the jury.

09:17:28AM 20                (Jury not present).

21                (Recess).

22                THE BAILIFF:  All rise.

23                (Jury present).

24                THE COURT:  All right.  Everyone may have a seat.

09:33:28AM 25    Mr. Brown, you may call your --

1          MR. BROWN:  We call Vernon Travis, Your Honor.

2          THE COURT:  Who was your next witness, Mr. Brown?

3          MR. BROWN:  We call Vernon Travis, Your Honor.

4          THE COURT:  All right.  Mr. Travis.  Mr. Travis,

09:34:02AM 5  would you raise your right hand.

6               VERNON LEE TRAVIS, III,

7  having been first duly sworn, testified as follows:

8          THE COURT:  Have a seat and tell us your full

9  name.

09:34:13AM 10         THE WITNESS:  Vernon Lee Travis, III.

11         THE COURT:  All right.  Hang on just a second.

12         Mr. Brown, would you come up here and Mr. Monroe?

13         (Bench conference).

14         THE COURT:  Mr. Brown, I just want to make sure

09:34:32AM 15 that you explained to your client that he has the right to

16 remain silent and does not have to take the stand.

17         MR. BROWN:  If you would like to call him up,

18 Judge, we can do it on the record, but I have explained it to

19 him.

09:34:45AM 20         THE COURT:  This is kind of a formality, but I

21 want to make sure that you understand that you don't have to

22 take the stand?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  You understand that you have a right

09:34:54AM 25 under the Fifth Amendment of the constitution and the Texas

constitution that you cannot be compelled to testify against

yourself?

THE DEFENDANT:  Yes, sir.

THE COURT:  You cannot be compelled to give

anything that might be incriminating.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And do you still wish to testify in

this case?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Thank you.  Go back to the

witness stand.

Is there anything else you want to put on the

record with your client?

MR. MONROE:  Maybe one other thing.

THE COURT:  One more thing.

MR. MONROE:  As long as we're all here, since Mr.

Travis has elected to take the stand, I want to announce to the

Court my intention to go into extraneous offenses with him

including the elements of all of the other charges he has been

indicted for and anything else that might have arisen out of

this offense.  I'm just announcing it right now so everybody

knows.

MR. BROWN:  And, Judge, if we were given notice of

that, then we would ask that they approach on anything that we

were not given notice of.  If he's talking about other things

1  that have arisen out of this transaction, then I'm not aware of

2  it.

3         MR. MONROE:  I have no idea what else I might find

4  out from this defendant, but I cannot give notice of it.

09:36:01AM 5         THE COURT:  I think the rules change when he

6  decides to take the stand.  At that point, you can question him

7  about anything once he takes the stand, but let's wait and see

8  what he says.

9         MR. BROWN:  All right.  Thank you.

09:36:14AM 10         MR. MONROE:  Thank you.

11         THE COURT:  Go back to your seat.

12         (Bench conference ended).

13         THE COURT:  Let's kind of get back on track.

14  State your name for the record.

09:36:27AM 15         THE WITNESS:  Yes, sir.  Vernon Travis, III.

16         THE COURT:  Mr. Brown, you can proceed.

17         MR. BROWN:  Thank you, Your Honor.

18                 DIRECT EXAMINATION

19  BY MR. BROWN:

09:36:34AM 20    Q.  Vernon, at times do you go by a nickname Trey?

21    A.  Yes, sir, Vernon Trey.

22    Q.  Is that because you're the third?

23    A.  Yes, sir.

24    Q.  And at times I call you Trey, I'm referring to you; is

09:36:45AM 25  that right?

1     A.   Yes.

2     Q.   Is it okay that I call you Trey?

3     A.   Yes, sir.

4     Q.   Would you please introduce yourself to the jury and

09:36:52AM 5    tell them where you currently reside.

6     A.   Vernon Lee Travis, III.  I reside in Arlington, Texas.

7     Q.   And who do you reside in Arlington with?

8     A.   Now no one.  I don't live with anybody in Arlington now

9     so --

09:37:08AM 10    Q.   Okay.  And do you have any brothers and sisters?

11    A.   Yes, I have one full brother, two half brothers and

12    sisters.  That's all I have.

13    Q.   And where were you born at?

14    A.   Monroe, Louisiana.

09:37:22AM 15    Q.   And how long did you reside in Louisiana?

16    A.   Till I was about 13.  So about 13 years.

17    Q.   Okay.  And while you were in Louisiana, did your

18    parents live with you?  Did they get divorced?

19    A.   They got divorced.

09:37:37AM 20    Q.   And who did you reside with after the divorce?

21    A.   My mother, Dawn Brown.

22    Q.   The lady that just previously testified?

23    A.   Yes, sir.

24    Q.   And ultimately, did you end up in San Antonio, Texas?

09:37:50AM 25    A.   Yes, we did.

Q.   Tell the jury a little bit about who you were, what you did as a kid, a teenager and so forth.

A.   I always was an athlete.  I loved sports.  My mom told you earlier that I was small but I was good, you know, so that's one thing I always watched Michael Jordan.  I wanted to be like Jordan, like most kids say.

My whole family, from uncles to dads all did military and police work and I wanted to join the military at one point in time.  With that being said, I kind of changed my tone from sports to try to graduate.  I wanted to get out of school early, you know.  My mom was very strict, you know, and I was like, hey, I want to do my own thing, you know.  So she was like, hey, you're either going into college or you're going into the military.  She pushed education very strong on me and I love her for that, but you know, I messed up joining the military.  And I'm sorry, I didn't mess up.  I joined the military and that's about it right there.

Q.   Okay.  And you said you graduated early.  Do you recall how old you were when you graduated?

A.   Yes, sir, I was 16.

Q.   And to graduate at 16, did you start school I guess early as well?

A.   Yes.  Yeah.  I don't remember.  I was very young, you know, kindergarten.  I was raised going through K-1 and up so I kind of had a head start on a lot of people.  From there, I was

about four when I started kindergarten.  I was young as a

freshman in high school, so I didn't get to do a lot of things,

but yeah.

Q.  Okay.  And at what point in time I guess during your

09:39:39AM educational career did you say, okay, I'm going to ramp this up

and graduate early?

A.  My freshman year.  Like I say, I played varsity as a

freshman.  I did a lot of things, that my goal like I saw was

first academics.  I had to turn around in my life at that time.

09:39:59AM I was young, but I was telling my mom, I was like, wow, I'm 16

in college, I can't even do anything.  And she was like, if you

go to college, you have to study in the first place.  You know,

and I had my mind set, you know, everybody else is going to be

older than me.  I just felt like living in the dorm style

09:40:16AM environment at the time at age 16, school was important, so I

honestly felt like I wouldn't be able to do it, you know.

          MR. BROWN:  Okay.  May I approach the witness,

Your Honor?

          THE COURT:  Yes, you may.

09:40:41AM Q.  (BY MR. BROWN) I'm going to hand you what's been marked

as Defendant's Exhibit No. 2 and ask you if you recognize this

document?

A.  Yes.

Q.  Okay.  And does it fairly and accurately depict what it

09:40:59AM purports to be?

1    A.   Yes, it is.

2              MR. BROWN:   Judge, subject to any objections, we

3    offer to admit Defendant's Exhibit No. 2.

4              (Defendant's Exhibit No. 2 offered).

09:41:13AM 5         MR. MONROE:   No objection.

6              THE COURT:   Defendant's Exhibit 2 is admitted.

7              MR. BROWN:   Thank you, Judge.

8              (Defendant's Exhibit No. 2 admitted).

9    Q.   (BY MR. BROWN) Tell the jury what Defendant's Exhibit 2

09:41:23AM 10   is.

11   A.   Prior to my graduation, I got a letter from or a

12   certificate pretty much from -- I'm going to have to look at

13   it, it was so long ago, but from the U.S. House of

14   Representatives, you know.  This is a Congressional Recognition

09:41:40AM 15   for graduating.  That's what I received.

16   Q.   And did it establish that you were class of 2001?

17   A.   Yes, yes, class of 2001.

18             MR. BROWN:   Judge, may I show it to the jury?

19             THE COURT:   Yes.

09:41:53AM 20         MR. BROWN:   Thank you.

21   Q.   (BY MR. BROWN) Now, while you were in high school, did

22   you start preparing towards the end of your high school career

23   for entering the military?

24   A.   Yes, sir.

09:42:15AM 25   Q.   Okay.  And prior to graduating from high school at the

age of 16, did you take some sort of entrance exam to see how

you scored?

    A.   Yes, I took the entrance exam.

    Q.   And explain to the jury what that particular test is.

    A.   It's pretty much all different levels of math, history,

computer knowledge, things like that that show you what you

would be good for certain courses, to show what you're good at.

Some people can only do certain levels of things, you know.

Try to keep everybody in a secure place where you know you're

taken care of if we're fighting for --

    Q.   And do you recall how you scored on that test?

    A.   I don't remember the exact number.  I scored very high

what I was told at the time and, you know, and I had choices

where I wanted to go at the time.

    Q.   And while you were still in high school at the age of

16, were you talking to recruiters about joining the military?

    A.   Yes, I was.

    Q.   Okay.  And ultimately, which branch of the military did

you choose to sign with?

    A.   I remember Sergeant Miller convinced me, you know, the

Air Force is the best bet for you.  You know, you can go to

school while you're in the military.  You get great training,

you know, the job, pretty much get a job -- if you decide not

to stay, you'll be able to get a job anywhere you want to as

long as you go to school with us; not school, but come to us.

1   Q.   Now, did you sign with them before you graduated from

2   high school or after you graduated from high school?

3   A.   I believe I graduated high school already.

4   Q.   And so at the age of 16, you signed a contract with the

09:43:55AM 5   Air Force?

6   A.   Yes, sir.

7   Q.   Okay.  And when you signed that, that was in 2001, did

8   they take you immediately into the Air Force at that time?

9   A.   Oh, no.  I was too young.

09:44:03AM 10   Q.   Okay.  And what did they call it?  Is it a delayed

11   entry or what is it called?

12   A.   Yes, it's called a delayed enlistment.  Pretty much you

13   can be delayed because of age or because of job and I was

14   delayed because of both because the job that I wanted, I scored

09:44:18AM 15   high so I got a choice in jobs and I couldn't get it because of

16   that and because of my age.  There were two reasons, two

17   factors that held me from going in at the age of 16.  I guess

18   age was the first part.

19   Q.   And I guess you turned 17 the following August after

09:44:35AM 20   you graduated, right?

21   A.   Yes.

22   Q.   And will they allow you and I guess a parent to sign a

23   waiver to allow you to enter at the age of 17?

24   A.   Yes, I was allowed to sign in, not enlist, but sign in

09:44:47AM 25   to commit to the military.  That's my commitment date and that

1   would be then.

2       Q.   Okay.  After you signed your contract at some point in

3   the summer, did you do physical training with the military even

4   before you had signed, I guess, to the specific job that you

09:45:03AM 5  were going to get?

6       A.   Yes.  I'm not familiar with recruitment offices but

7   they get young kids, young guys, men and women.  And on Fridays

8   and Saturdays, they take you on military basis nearby, show you

9   around, a little bit of PT, some personal training.  They give

09:45:23AM 10  you books for you to study, of who you salute, who you don't

11  salute, the ranks, just kind of to prepare you when you get

12  ready for basic training, to prepare.  When you enlist, pretty

13  much people go straight in.

14      Q.   And did you -- when were you supposed to sign I guess

09:45:39AM 15  the paperwork accepting your particular job after y'all did the

16  waiver at your 17th birthday?

17      A.   When -- when -- it was September 11th when it happened.

18  My mom called me on the phone and she was like, turn on the TV.

19  We lived right outside of Randolph Air Force Base at the time

09:45:57AM 20  and I hear planes going everywhere.  She was like, don't go.  I

21  need to call the recruiter.  I don't want you going in.  You

22  know, and that day, they stopped it.  Everything shutdown

23  anyway, so I couldn't do it.  I can't go in because I'm not

24  committed until I sign that paper.  I mean, you can go in and

09:46:16AM 25  say I commit to you, but until you go in and are sworn in,

1    you're not committed 100 percent, I put it that way.  You're

2    not 100 percent committed.

3       Q.   And that was the day you were supposed to sign for your

4    particular job?

09:46:28AM 5    A.   Yes.

6       Q.   And did that get in the way because of 9/11 and did you

7    ultimately sign a couple of months after that?

8       A.   Yes.  Yes, I did.  That delayed my first job that I

9    wanted.  My mom came back and talked to the recruiter.  She

09:46:41AM 10   said I want a job that he's not going to deploy.  And I was

11   young so I went with mom.  And you know, she wanted a job where

12   I'm not going to deploy anywhere, so they said, okay, sign it.

13   We signed the paperwork right then and there.

14      Q.   And what was the job for that you signed for?

09:46:58AM 15   A.   It's 3AO.  It's almost -- it's kind of like the

16   information manager, that's what you would call it regular

17   term.  It's 3AO job, so it's information manager, which took me

18   by transfer to Keesler Air Force Base in Mississippi.

19      Q.   Okay.  And when was that job to become available?  I

09:47:16AM 20   know you signed in 2001?

21      A.   Right.

22      Q.   But when was the job to be available for you to

23   actually start?

24      A.   Well, I want to say I started -- I went to basic

09:47:24AM 25   training in say it was June of 2002.  That's when I'm

1   committed, you know, you still -- you get people that go in and

2   say, I don't want you to do stuff for me, but my official date

3   would have been some time in June of 2002.

4       Q.   So you signed sometime at the end of 2001 indicating

09:47:44AM 5   that you're accepting this job and actually your first start

6   date was June of 2002?

7       A.   Yes, sir.

8       Q.   And where did you do your basic training at?

9       A.   Lackland Air Force Base.

09:47:55AM 10       Q.   In San Antonio?

11       A.   Yes, sir, San Antonio, Texas.

12       Q.   And how long was that for?

13       A.   I want to say it was six weeks, six weeks I want to

14   say.

09:48:05AM 15       Q.   Did you -- where were you first stationed after you

16   completed basic training?

17       A.   You go to tech school afterwards, but my first base

18   would have been Randolph Air Force Base and that's I guess I

19   want to say Live Oak, Texas, was the city.

09:48:25AM 20       Q.   And how long were you there?

21       A.   My whole -- my whole time in the military, say two

22   years.

23       Q.   At what point in time did you get deployed to Iraq?

24       A.   2003.

09:48:37AM 25       Q.   Okay.  And were you deployed through the Army?

1   Through -- I know you said you were in the Air Force but

2   explain that situation to the jury.  How you were deployed?

3       A.   Well, what happened was there was somebody in front of

4   me to go, a pregnant woman then, so she automatically can't go.

09:48:57AM 5   There was the next person lined up, another female and you

6   know, my mom was upset a little bit.  You know, I felt like I

7   needed to go.  I felt like I was the most stable person at the

8   time who could do that.  And you know, the military persons as

9   well, you're going to request -- you should request at the time

09:49:13AM 10   to move up the ranks.  My whole thing was the military was

11   going to be my life.  So I was going to go ahead and deploy

12   now, keep that back, you know, and that's when I went.  I went.

13   Is that the question, I'm sorry?

14       Q.   Yes, sir.

09:49:24AM 15       A.   Okay.

16       Q.   And do you recall and if you don't, that's okay, but do

17   you recall when you were deployed?

18       A.   No, I just know it was 2003.  I was there during the

19   holiday times.

09:49:35AM 20       Q.   Well, explain that to the jury, the holiday times.

21       A.   Well, it's -- I don't know if you're familiar with it,

22   but it's called Ramadan.  At that time, it's a Holy -- all the

23   area there is familiar with Holy Land.  So soldiers die here

24   for their country, people there die for their God pretty much.

09:49:54AM 25   So if they die, they go to a better place, things like that.

It's not all about -- at that point in time, it's not all about

terrorists doing things, it's about for your country the same

way it is for us Americans, but for them it's hurting somebody.

That's pretty much how we saw it ourselves.

09:50:12AM   Everyday we would hear mortar fire, explosions,

things like that.  You know, every soldier, they had things --

like I say, every soldier that was killed, you know, they would

have marks for it, you could see the marks.  So you knew -- it

was just -- it's just -- I don't know -- something.

09:50:27AM   Q.   Was it difficult?

A.   Yes, sir.

Q.   How old were you when you made it through Iraq?

A.   I was 18.

Q.   And tell this jury what your job descriptions were,

09:50:44AM what you did while you were stationed in Iraq.

A.   Being a 3A, you were pretty much supposedly limited on

what you can do.  So going to Iraq, I was not prepared mentally

or equipment wise.

Excuse me a second.

09:51:13AM   My job was supposed to be strictly mail, which

would be convoying mail going place to place, you know.  We're

making sure everybody gets their mail.  Me being detached from

the Air Force to an Army bridge or Army base they would call

it I guess in Kirkuk, Iraq, my job description changes, so I

09:51:38AM was more of a floater.  So they would have me, you know, drive

an F-350, pick up soldiers -- not soldiers but pick up Iraqis

from outside the base and some people from Turkey.  Not

everybody was from Iraq, so don't think it was just Iraqis but

Turkey, people from the ages of 13 to 35, get 6 to 8 of them,

put them in a vehicle and drive to a certain location where

they dig and build towers.  That's about it on the duty wise.

    Q.   Did you ever see or have any friends that were injured

or lost their lives while you were over there?

    A.   Yes, sir.  Yes.

    Q.   Tell the jury a little bit about that.

    A.   All right.  I told you about Ramadan.  I had a close

friend of mine, they got caught with a bayonet (phonetic).

They did it with a surprise, with turkey, things like that for

Christmas.  You know, it's supposed to be kind of a surprise

thing for everybody when you come back, you know, to your base,

you get a nice big, you know, family-type meal, but they were

ambushed.

            Excuse me.

            All right.  I'm sorry.  Sorry about that.

            What's the question?

    Q.   I'll go to the next question.  I'm sorry.  How long

were you in Iraq for?

    A.   I believe six to eight months.

    Q.   And you mentioned to this jury that you went over with

the Army.  Were you -- I guess, were you the only one from the

1    Air Force that was sent over from your group?

2        A.   Yes, I met with people from Fort Bragg.  I met them in

3    Germany and people from Vicenza, Italy, Army (phonetic).

4        Q.   And when you returned, tell the jury I guess the

09:54:42AM 5   circumstances surrounding your return from Iraq and kind of how

6    that happened.

7              THE COURT:  Is your microphone on?

8              MR. BROWN:  Sorry, Judge.

9              THE WITNESS:  Sorry.

09:54:58AM 10   Q.   (BY MR. BROWN) If you would explain to the jury kind of

11   the circumstances surrounding your return from Iraq.

12       A.   We have a command center.  Armies, they go through

13   brigades when they go places so they all know each other.

14   They're all group.  They all have a first sergeant.  They have

09:55:17AM 15   people that they go towards for issues.  Me, I had to speak

16   with our first sergeant and plus we had a tech sergeant that

17   was an Air Force gentleman.  I'm not sure where he was from,

18   but that's where I was supposed to report to.

19             Well, the tech sergeant, he was sent back home.  I

09:55:33AM 20   was still there.  The brigade was leaving and I was still

21   there, so I didn't know what to do.  I couldn't get ahold of my

22   back home command, period, so I felt like I was stuck and had

23   the Korean Army coming in so it wasn't military.  It wasn't

24   Army anymore.  And like I said, I was confused.  I tried to get

09:55:59AM 25   ahold of people for two days, but I only had two days before

they were leaving.  So what I did is I got on the plane with
the Army and went to Germany.  In Germany, I bought my own
ticket back with my German travel card and flew back to the
states and --

09:56:16AM  Q.  And when you came back to the states, did you go
directly to the barracks or where did you go?

A.  I went to my mom's house.

Q.  Looking for some comfort?

A.  The military has a say, you know, they leave no man
09:56:32AM behind and I felt like that's what happened, so I just --

Q.  How long did you stay at your mom's house?

A.  About three weeks.

Q.  And while you were there, I mean, did you go out and
run around town or --

09:56:51AM A.  No.  I just slept.  Stayed in the room, just -- I
didn't want to --

Q.  How old were you when you returned from Iraq?

A.  I might have still been 18.  I might have been 19.  I'm
not 100 percent positive of my age at the time.

09:57:11AM Q.  And ultimately, did you end up back at the barracks?

A.  Yes.  I just kind of showed -- I surprised them when I
showed up.

Q.  And when you showed up, did you get back in and you
were back on the ground as an Air Force cadet?

09:57:30AM A.  Yes.

1    Q.   Okay.  And did you start having problems, I guess,

2  maintaining or keeping things in order as you're supposed to?

3    A.   Yes.

4    Q.   Tell the jury a little bit about that, about the

09:57:51AM  5  write-ups you were receiving and so forth.

6    A.   Well, when I got back, I was confused on why I had no

7  contact, no -- nothing, you know, everybody around was getting

8  care packages.  You know, the only person I could talk to was

9  my mom.  That was the only person I had the number memorized.

09:58:09AM 10  So that was the only person I could get ahold of from time to

11  time.  And we had a change of command in my squadron when I got

12  back.  I had no idea.  So no one kept tabs on me, knew where I

13  was at, knew what was going on with me.  You know, I walk in in

14  uniform like another day to go to work.  Nobody says welcome

09:58:30AM 15  back, nobody says anything to me, like I was never there.  I

16  guess I was kind of -- I was upset, you know.  I was -- had hit

17  probably a low.  So I had room inspections, you know, and they

18  would say, hey -- they would tell me, we're coming this day to

19  check your room out.  The smallest thing is, I wouldn't close a

09:58:56AM 20  cabinet door, you know.  I'd go -- during lunch go home and

21  what do I say, like leave the TV on, or, you know, just nothing

22  like malicious or anything, you know, just terrible -- but

23  things I knew I could do, I just didn't do it and I don't know

24  why I didn't do it because it was the simplest things but --

09:59:21AM 25           MR. BROWN:  May I approach the witness, Your

TERI THOMAS, CSR, RPR, CMRS

1    Honor?

2                    THE COURT:  Yes, you may.

3                    Just a second.

4                    (Discussion off the record).

10:01:22AM 5         THE COURT:  All right.  You may proceed, Mr.

6    Brown.

7                    MR. BROWN:  Thank you, Your Honor.

8        Q.   (BY MR. BROWN) I'm going to hand you what's been marked

9    as Defendant's Exhibit 3, 4 and 5 and ask if you recognize

10:01:34AM 10  these photos?

11       A.   Yes.

12       Q.   Do they fairly and accurately depict what they show in

13   these photos?

14       A.   Yes, sir.

10:01:46AM 15        MR. BROWN:  We would offer Defendant's Exhibit 3,

16   4 and 5 subject to any objections.

17                   (Defendant's Exhibit Nos. 3-5 offered).

18                   MR. MONROE:  No objection, Your Honor.

19                   THE COURT:  3, 4 and 5 are admitted.

10:02:05AM 20        MR. BROWN:  Thank you, Judge.

21                   (Defendant's Exhibit Nos. 3-5 admitted).

22       Q.   (BY MR. BROWN) Now, you mentioned that there were some

23   things you were unable to comply with and Defendant's

24   Exhibits 3, 4, and 5 have been entered into evidence.  Explain

10:02:16AM 25  to the jury what Exhibit No. 3 is, please.

1      A.   It says the bedding area.  I don't know if you're

2  familiar with military dorms, but it's a pretty small little

3  area.  You have a sink and you know, a mini fridge under it and

4  a microwave, whatever you would like to have, and there is

10:02:37AM 5  glass behind it.

6      Q.   And the countertop appears to have some items on it.

7  Is this part of the reason that you were written up for not

8  keeping your room in order?

9      A.   Yes.  On this one, it was because there was a smudge --

10:02:53AM 10  a smudge on the window.

11      Q.   On the mirror?

12      A.   Yes, on the mirror.  You can't really depict it from

13  that, but that's what that was for.

14      Q.   And Defendant's Exhibit No. 4?

10:03:04AM 15      A.   This is a Futon I had.  It has throw pillows on it and

16  a suitcase on the floor.

17      Q.   And were you also written up about that?

18      A.   Yes.

19      Q.   And Defendant's Exhibit Number 5?

10:03:18AM 20      A.   That's just my closet door.  I didn't close it, but I

21  had already came home from work and it's not -- before -- well,

22  I don't know if I should explain that -- but yeah, I'm sorry --

23  it was already after work, uniform is hanging up in the closet

24  but it wasn't closed.

10:03:41AM 25      Q.   So they cited you for not closing your closet?

         1       A.   Yes.

         2       Q.   And these are the types of --

         3            MR. BROWN:  May I publish these to the jury, Your

         4   Honor?

10:03:50AM   5       THE COURT:  Yes, you may.

         6       Q.   (BY MR. BROWN) And these are the types of write-ups

         7   that you had that led ultimately to your dismissal; is that

         8   right?

         9       A.   Yes, sir.

10:04:08AM  10       Q.   Now, you did receive some certificates and I think that

        11   while you were in the military, they gave you some awards and

        12   certificates; did they not?

        13       A.   Yes, sir.

        14       Q.   And it seems like that maybe you were getting

10:04:27AM  15   certificates of maybe the same time frame as maybe you were

        16   getting some of these write-ups?

        17       A.   No.  The certificates came before the write-ups.  The

        18   write-ups came on my way out the door.

        19       Q.   Okay.  And --

10:05:05AM  20            MR. BROWN:  I'm going to -- may I approach the

        21   witness, Your Honor?

        22            THE COURT:  Yes.

        23       Q.   (BY MR. BROWN) I'm going to show you a document that's

        24   dated April 30 of 2004 and ask if you recognize that document?

10:05:36AM  25       A.   Yes, sir.

1    Q.   And is that I guess the physical write-up concerning

2    the photos that we just showed the jury?

3    A.   Yes.  Yes, sir.

4    Q.   And read paragraph one to yourself and then in your own

10:05:52AM 5    words tell the jury basically what you were being reprimanded

6    for.

7         MR. MONROE:  Your Honor, I would ask that the

8    document be admitted into evidence.

9         THE COURT:  Yeah.  Before we read from it, we need

10:06:03AM 10    to have it admitted.

11        MR. BROWN:  Offer Defendant's Exhibit No. 6

12    subject to any objections.

13        (Defendant's Exhibit No. 6 offered).

14        MR. MONROE:  No objection.

10:06:35AM 15        THE COURT:  That's Number 6; is that correct?

16        MR. BROWN:  Yes, Your Honor.

17        THE COURT:  Number 6 is admitted.

18        MR. BROWN:  Thank you.

19        (Defendant's Exhibit No. 6 admitted).

10:06:42AM 20    Q.   (BY MR. BROWN) Tell the jury basically -- you don't

21    have to read from it.  I'm going to provide it to them here in

22    just a minute, but tell me what it says.

23    A.   Pretty much that I was warned that my room was messy

24    the day prior, that I was told or counseled to go clean it.

10:07:02AM 25    And they said when they came to the room for a random

inspection, which is not supposed to happen while you were in

the room, that I was still cleaning it and I got a letter of

reprimand while I was still cleaning the room that they said

needed to be clean.

10:07:23AM              MR. BROWN:  May I provide this to the jury?

                        THE COURT:  Yes.

Q.    (BY MR. BROWN) And this is in regards to what we've

shown the jury the pictures and now this is the letter that

kind of confirms the pictures; is that right?

10:07:34AM   A.    Yes, sir.

Q.    When you came back from Iraq, I know you went to your

moms for three weeks but when you showed up at the base, did

anybody ever attempt to counsel you about what you had seen or

what you had done in Iraq?

10:07:47AM   A.    No.  I think because I had an Army buddy meet me when I

got back, he was there waiting for me when I got back, but

there was a debriefing process that the majority of people get

when you -- well, Army-wise you get a debriefing.  The Air

Force, I didn't receive anything like that, so the normal what

10:08:12AM   happened out there, things like that was never given to me.

        Like I said, I came in three weeks after the fact

that I came back to the states they had no idea.  So I went to

work -- the next day, I went to work normal and I just went to

work every day until I was out.

10:08:39AM              MR. BROWN:  May I approach the witness, Your

1    Honor?

2                    THE COURT:  Yes.

3        Q.   (BY MR. BROWN) I hand you what's been marked as

4    Defendant's Exhibit No. 7 and ask if you recognize that

10:09:00AM  5    document?

6        A.   Yes.

7        Q.   Okay.  And is this a fair and accurate copy of what it

8    purports to be?

9        A.   Yes, it is.

10:09:35AM 10                    MR. BROWN:  I offer Defendant's Exhibit 7 subject

11    to any objections.

12                    (Defendant's Exhibit No. 7 offered).

13                    MR. MONROE:  We have no objection to Number 7.

14                    MR. BROWN:  Thank you.

10:09:55AM 15                    THE COURT:  7 is admitted.

16                    (Defendant's Exhibit No. 7 admitted).

17        Q.   (BY MR. BROWN) Now, is this a certificate for your

18    time -- if you read the paragraph under Accomplishments for

19    your time in Iraq?

10:10:06AM 20        A.   Yes.  That's right.

21        Q.   And it appears -- you said that you believe you were

22    there in 2003; is that right?

23        A.   Yes, sir.

24        Q.   And it looks like that maybe it was November of 2003

10:10:13AM 25    through March of 2004?

1      A.   Yes.

2      Q.   Okay.  And so you said six or eight months.  It's about

3  five months?

4      A.   Yes, sir.

10:10:20AM 5  Q.   Okay.  And you were discharged I believe approximately

6  three months later in June of 2004; is that right?

7      A.   Yes, sir.

8      Q.   And the notice that we've just showed the jury about

9  the complaints actually happened in April, which was about a

10:10:37AM 10  month after you had come back; is that right?

11     A.   Yes, sir.

12          MR. BROWN:  Judge, may we offer to publish?

13          THE COURT:  Is it Number 8?

14          MR. BROWN:  It's Number 7.

10:10:49AM 15          THE COURT:  And you may publish it.

16          MR. BROWN:  Thank you.

17     Q.   (BY MR. BROWN) So the military gave you a certificate

18  saying that you had done a great job while you were in Iraq and

19  did things that you were asked to do; is that right?

10:11:05AM 20     A.   Yes, sir.

21     Q.   And then shortly thereafter, they remove you from the

22  military for being unable to follow the rules after you came

23  back from Iraq?

24     A.   Yes, sir.

10:11:18AM 25     Q.   And I may have cut you off.  You did not receive any

1    counseling or any debriefs concerning your time in Iraq?

2        A.    No, sir.

3        Q.    Several months later when you were ultimately

4    discharged from the military, did you receive any counseling or

10:11:43AM 5    debriefs to see how you were as you were being exited from the

6    military?

7        A.    No, sir.  They told me if I needed help to go to the

8    VA's office.

9        Q.    At that point in time, did you know if you needed help

10:11:58AM 10    for anything?

11        A.    No, sir.

12        Q.    Did you know that you were suffering from PTSD?

13        A.    No, sir.

14        Q.    Did you even know what PTSD was?

10:12:05AM 15        A.    I was familiar with it, yes, sir.

16        Q.    Now, upon leaving the military, I guess in June of

17    2004, what was your next line of work?

18        A.    I started working at -- for Judson Independent School

19    District.

10:12:29AM 20        Q.    And what did you do?

21        A.    First, I was a special education aide for special needs

22    kids.

23        Q.    Tell the jury a little bit about that job.

24        A.    One -- one of my -- it was -- I enjoyed the job.  I

10:12:46AM 25    think I communicated well with the kids, special needs -- and

1   not special needs, but I've always had that.  I just enjoy

2   kids, so it was -- I enjoyed it because the kids would respond

3   to me more than they respond -- me being a young male actually

4   I think -- most of the people aren't young males, but they

10:13:08AM 5   respond to me more like an up-brother figure or a family member

6   compared to a teacher, so I didn't have all the disciplinary

7   problems or issues like some other people would have.

8       Q.   How long were you at that job?

9       A.   I want to say I was there for two years.

10:13:27AM 10       Q.   And did you ultimately get promoted from that job

11   within the district?

12       A.   Yes.  I became an attendance clerk at Kirby Middle

13   School.

14       Q.   How long did you do that one for?

10:13:41AM 15       A.   That one I did for a -- I want to say a year, a year I

16   think it was.

17       Q.   Throughout this time period while you were working for

18   the school district and so forth, tell the jury about your

19   drinking habits.

10:13:53AM 20       A.   I drank a lot, starting off at the elementary school

21   with the special ed kids.  I didn't drink at work.  I didn't do

22   that, but I would be up all night and I would take pills before

23   I would go to work, you know, because I felt like that's what I

24   needed so that's what I did.  I worked with no problem.  I had

10:14:16AM 25   no issue with working.  It was just, you know, you could

1    sometimes smell the alcohol.  I -- nobody really noticed until

2    the teacher there quit and so it was me and a substitute

3    teacher about four months in and one of the substitute teachers

4    brought it to the principal's attention, and the principal

10:14:37AM 5  spoke with me about it and I just told her I had a long night,

6    you know, and that was it, you know, and kind of go on the next

7    day.  Got a new substitute the next day.  So it wasn't like you

8    had the same person, so it was kind of like I found ways to

9    cope with my job and be able to do that at the same time.

10:14:56AM 10     Q.   You mentioned taking pills and you also smoked

11    marijuana; did you not?

12        A.   Yes, I did.  The marijuana started after working at the

13    -- at the elementary school.  Before that, I did smoke a little

14    bit, but before I started working at the school, it was during

10:15:13AM 15  that summer of -- I remember that's when I kind of introduced

16    myself to marijuana because I had heard, you know, it would

17    calm you down.  It was a calming thing, so I tried that.

18        Q.   Were you having problems sleeping at night then?

19        A.   Yes.

10:15:28AM 20     Q.   And is that a reason why you were drinking and taking

21    pills?

22        A.   Well, yes.  I would try not to sleep.  You know, that

23    was my fear.  I didn't want to sleep, you know.  The way I

24    would sleep would be like I say, when I worked at the

10:15:42AM 25  elementary school, there is play desks.  I slept on desks

1  there.  Just to make sure I'm there at work on time, I would be

2  there early, so when I would finish doing whatever I was doing

3  at four in the morning, I would be at school, you know, sleep

4  there.  You know, I was just prepared for the school bus to get

10:16:01AM 5  there.  The special ed kids, they don't walk to class.  You

6  have to go get them.  Just a bad place.

7      Q.  Did you smoke marijuana or take pills or drink before

8  you entered the military?

9      A.  No.

10:16:17AM 10      Q.  Did you take pills or smoke marijuana or drink before

11  you were sent over to Iraq?

12      A.  No, sir.

13      Q.  And you've been arrested a couple of times for small

14  marijuana cases; is that right?

10:16:34AM 15      A.  Yes, possession of marijuana.

16      Q.  Personal use, zero to two ounces?

17      A.  Yes.

18      Q.  The prosecutors brought up the fact that you had an

19  Arizona marijuana case; is that right?

10:16:46AM 20      A.  Yes.

21      Q.  Tell the jury about that.

22      A.  I was guilty of it.  I can sit here and say the

23  marijuana wasn't mine.  It wasn't.  I was paid $250 to ride

24  with a friend there, you know.  I say a friend, Big Mike, you

10:17:04AM 25  know, so we went there.  We came back and got stopped in

           Arizona.  I happen to be the one driving.  I think the laws are

           different in every state and, you know, he admitted that it was

           his and then, you know, they said, well, you were driving.  Do

           you know it's in the vehicle.  I told them no.  They said,

10:17:22AM  well, hey, you know, both -- even though he says it's his,

           you're both guilty, so --

               Q.   Did you take responsibility for it?

               A.   Yes, I did.

               Q.   You were placed on probation?

10:17:32AM      A.   Yes, I was.

               Q.   After you worked as the attendance clerk for the school

           district, what did you do next?

               A.   After the attendance clerk?

               Q.   Yes.

10:17:49AM      A.   I started working at Olive Garden.

               Q.   And what did you do for Olive Garden?

               A.   I was a server/bartender.  I started serving first,

           then started bartending.  They knew I was good with alcohol and

           so, you know, it was kind of an easy promotion for me, but

10:18:04AM  that's where they put me at.  I did that for I would say four

           years, four or five years.

               Q.   And were you continuing your drinking and pill taking

           through this time period as well?

               A.   Yes.  It kind of -- it increased because like I say, I

10:18:23AM  was behind the bar.  I can't say I didn't sit there and drink.

You know, you're allowed to have a cup there.  I'm the only

bartender.  I'm still functioning well.  You know, if anything,

it felt like people enjoyed being around me.  You know, it just

helped me out.  It helped me to work in those kind of

environments, you know.  It's difficult.  You know, for me it's

difficult being in crowds unless I'm drinking.  I can't go out

in bars without drinking.  I have to -- in crowds, I have to

drink.

    Q.  I guess for the time frame you were working in San

Antonio, did you ultimately have a child?

    A.  Yes, I did.

    Q.  And how old is she?

    A.  She's six.

    Q.  And where does she currently reside?

    A.  Schertz, Texas.

    Q.  And has she been a big part of your life?

    A.  A tremendous part of my life.  Tremendous.

    Q.  And tell the jury your relationship with your child.

    A.  That's my baby.  It's -- everyday I went there when I

was able to be with her, you know, enjoyed every moment with

her.  I wanted to be there to give her a bath, help her with

her bath.  You know, she's too old to give her a bath now.

But, you know, I wanted to put her to bed.  I wanted her to

wake up in the morning to see me.  You know, we enjoyed times

together.  You know, we had fun.  You know, she -- when she was

about four, I think it was, she learned my phone number so she

just called me randomly, and nobody knows she called me.

Daddy, when are you coming to town.  So we had -- me and her,

she's my buddy.  You know, she likes the Kindle, like a Kindle,

she played it all the time.  If it's me and her, she doesn't

care about the Kindle.  You know, so I mean we have this

connection where we do -- she keeps me going.  That's how I can

say it.  My only lifeline was my child.

Q.   You were engaged to the mom and you saw Jenna come in

here and testify; is that right?

A.   Yes, sir.

Q.   And ultimately you moved -- did you move to Dallas?

A.   Yes, sir.

Q.   And why did you move to Dallas?

A.   My mom was sick.  It was hard for me.  Me and Jenna at

the time had already split up, but I was here so I could see my

daughter all the time.  You know, I stayed busy.  My mom was

sick and I had to make a big decision, you know.  And I thought

if I was there, it would help me as well, you know, like slow

me down from my drinking; like, cut the pills, cut the people

out in my life that were pretty much the suppliers of those

things and I got -- so I moved there when she was, like I say,

she was sick so I moved there.

Q.   And did it slow down the drinking or the pills?

A.   No.  At first I started drinking more.  You know, you

heard my mom when she spoke.  She let you know she had a

drinking issue or she had, you know, but there is where I

became a bartender for the Olive Garden.  I stayed with the

same company, I just transferred.  But, I just -- you know, I

drank, met friends, you know, working, going out to bars after

work with everybody.  You find out that you're not the only one

that takes pills or wants pills.  And the drinking, I got to

the point where I was like, when I was drinking I was like I

want pills and back into the situation.  You know, from

going -- I would just drink, drink, drink to knock myself out

and I need the pills again to just kind of keep myself going I

felt.

     Q.   Did you come down to San Antonio when you moved to

Dallas to see your daughter?

     A.   Yes.

     Q.   And how frequent would you do that?

     A.   I -- at first I would come, you know, twice a week.  I

was -- I could not be around her.  You know, we have an ice

storm, I'm driving my car sliding in the ice just to get to

her.  From there, it was like every other two weeks.  First, it

was twice a week, then it became once a week.  You know, I had

to kind of pull myself -- I couldn't afford to keep doing that,

you know.  And then it turned once a month and then, you know,

slowly it started to make it twice a month.  Again, I was

starting to make more money when I got my new job and I was

1    able to afford to go down there and see her more.

2        Q.   You obviously know why we're here today, is that right,

3    Trey?

4        A.   Yes, sir.

10:23:11AM 5        Q.   September 5, 2013, do you remember that day?

6        A.   Yes, sir.

7        Q.   Let me back up a little bit before that.  When was the

8    first time somebody told you that they may need your assistance

9    in this particular issue?

10:23:41AM 10        A.   In Kerrville, it would be September 4th or 5th.

11        Q.   Okay.  What about the first time that they contacted

12    you in regards to helping out or assisting at a meeting?

13        A.   I want to say it was my birthday.  I had just turned 29

14    when I got the phone call, so it was the 24th or the next day.

10:24:05AM 15    It was the 24th or 25th.  That's what it was for that.

16        Q.   And you got a call from an individual saying that he

17    needed help or what was?

18             MR. MONROE:  Your Honor, I just object to leading

19    the witness.

10:24:18AM 20             THE COURT:  Sustained.

21        Q.   (BY MR. BROWN) How did you learn about needing

22    assistance on the 24th or 25th of August?

23        A.   Big Mike, that's the contact.  That's the person that

24    when I came from Dallas to San Antonio, that's the only person

10:24:35AM 25    I would get pills from.  I mean at the point I would need them,

1    I would call him.  And every time I came to visit, you know, I

2    would get pills from him.

3         Q.   And Big Mike was the guy that supplied you the Xanax

4    pills that you took?

10:24:47AM 5    A.   Yes, sir.  Yes, sir, but he got ahold of me saying,

6    hey, you know, just come with me.  I'll give you some pills

7    later, just come with me.  It's not going to be anything major.

8    I'm going to have a meeting and that was it, a meeting.  But

9    not in Kerrville, it was supposed to be in the San Antonio

10:25:01AM 10   area.

11        Q.   And after that conversation, did he call you again and

12   say -- well, what was the next conversation you had with him?

13        A.   The next conversation we had was probably I want to say

14   about early September -- late August, early September -- but he

10:25:18AM 15   had called to say, hey, never mind, don't worry about it.  And

16   I told him, hey, I'm already in Windcrest (phonetic).  I plan

17   on seeing my daughter anyway, so he just pretty much canceled

18   the whole thing.

19        Q.   And when you came in to see your daughter there during

10:25:35AM 20   that time frame of beginning of September, end of August, did

21   you make contact with Big Mike again?

22        A.   Oh, yeah.  What I would do is I would contact him

23   before I saw my daughter all the time just because I don't want

24   my daughter, you know, seeing me doing that, period, so I

10:25:49AM 25   contacted him the day when I was on the way here, which would

             1    be -- I want to say it was -- I believe it was a Monday or

             2    Tuesday I want to say it was.

             3        Q.    Okay.  When you got to San Antonio, did you see Big

             4    Mike?

10:26:02AM   5        A.    Yes, I did.  That's the first person I went to.

             6        Q.    And did y'all -- tell the jury what y'all did.

             7        A.    Well, Jenna, who y'all met earlier, prior, she was

             8    coming into town from Arizona on Friday, so I was with Mike and

             9    Mike said, hey, you know, let's go have some drinks, go to the

10:26:21AM  10    bar.  I was like, cool, you know, let's go.  And we started

            11    drinking and, like I say, I was pimping him my Xanax.  He was

            12    just kind of giving them to me.  I was like, all right.  You

            13    know, we drank and drank and he gave me pills.  Actually, I

            14    was -- pretty much I was the one that did most of the drinking,

10:26:44AM  15    but --

            16        Q.    And you say he gave you pills.  I mean how many pills

            17    do you think you took over, you know, that 48-hour time period?

            18        A.    I remember I took three when we started -- first at the

            19    bar I took three, I remember that.  I remember it was about

10:27:03AM  20    11:00.  So around 2:30, I took two more and he gave me six or

            21    eight more.

            22        Q.    Did you sleep at all that night?

            23        A.    No, we were -- no.

            24        Q.    And I guess during this drinking and taking the pills,

10:27:19AM  25    did the conversation come up again about meeting this

individual?

A.   Yes, it did.  It did.  At this point, we had already been at Scotty Pugh's house and -- or Timothy and we were drinking and he brought to my attention, he said, well, you know, I never met up with that guy.  And we -- I wasn't thinking about it.  I'm drinking and me and Tim, Tim and I, we were talking and didn't really pay attention and he brought it up again, and he said, you know, the offer still stands.  For Tim, he said, if y'all want to go with me, you know, I don't remember the amount of money he offered Timothy and he said he'll wipe off my debt.  And I looked at him, like what debt do I have.  And I guess those pills that he was giving me he really wasn't giving me, you know.  And I feel like I was set up for that, but I did it.  That's what happened.

Q.   Did you agree to do it?

A.   Yes.

Q.   And did he tell you all y'all were going to go in -- did he even tell you the person's name?

A.   No, we didn't know -- I'm sorry.

Q.   Did you know the person's name?

A.   No, sir.

Q.   Had you ever been to the house before?

A.   No, sir.

Q.   Was it your intention to go in there and shoot your gun or anything of that nature?

1    A.   No, not at all.

2    Q.   Had you known there was a child inside the house, would

3 you have ever entered the house?

4    A.   No, not even thought about it.

10:28:55AM 5    Q.   Even in the state of mind you were in?

6    A.   No.

7    Q.   So ultimately this Big Mike talks to you and Scotty and

8 says, let's go and do you -- does Scotty go to work and then

9 y'all meet up with him again later?

10:29:12AM 10    A.   No, we met up with Scotty.  We had already had a drink

11 and Scotty had worked that night.  Me and Scotty were going to

12 talk regardless.  I told him we were going to talk so --

13    Q.   Did you send him a text message and or call him and

14 said hey, I need to talk after you get off work?

10:29:28AM 15    A.   No, we --

16         COURT REPORTER:  Whoa.  One at a time.

17         THE WITNESS:  I'm sorry.

18         We texted a couple of times.  I called him though

19 in between.  Text message is kind of hard if you're going to

10:29:35AM 20 meet somebody.  It's just like I say, I called him at work and

21 it was back and forth.  We talked.

22    Q.   (BY MR. BROWN) Ultimately, did you and Scotty meet up

23 to drive up to Kerrville?

24    A.   We didn't really have to meet up because like I say,

10:29:55AM 25 Mike brought me to Scotty's house while we were there.  Like I

1    say, it was probably between five and seven in the morning, and

2    you know, Scotty was off work so we were just sitting there

3    drinking.  So we went together, me and Mike.

4        Q.   Was Scotty drinking with you at five or seven in the

5    morning?

6        A.   Yes, he started drinking with me as well.

7        Q.   Had you slept at all at that point in time?

8        A.   No.

9        Q.   Were you still drinking?

10       A.   Yes.

11       Q.   Were you still taking pills?

12       A.   Yes.

13       Q.   Ultimately did you drive up to Kerrville with Scotty?

14       A.   Yes, I did.

15       Q.   And before you left the house, there has been talk of a

16   bullet proof vest.  Did you put that bullet proof vest on?

17       A.   Yes, I did.

18       Q.   And let me back up a little bit about the bullet proof

19   vest.  When you got out of the military, did you get a bullet

20   proof vest?

21       A.   Yes, I did.

22       Q.   And where did you get it from?

23       A.   I got it from the Eisenhauer Flea Market.  I don't know

24   if you know where it was.  It's in San Antonio, Texas.

25       Q.   And was it that particular --

1    A.   No, it wasn't that vest.

2    Q.   What did you do with that one?

3    A.   I sold it.  I needed the money.  I had to sell it so --

4    Q.   Where did you get that bullet proof vest from?

10:31:13AM 5    A.   It's a friend of mine, Kristie.  She had a vest in her

6    garage, I don't know who it was from, but I asked her.  She was

7    fine with me having it.  So I got it from her.  I didn't have

8    to pay for it, so --

9    Q.   And do you remember when you came into possession of

10:31:25AM 10   that vest?

11   A.   I want to say it was almost right before I moved to

12   Dallas, you know.  My whole thing was I needed money so I could

13   start moving, so I don't know exactly at the time.  I don't

14   remember if I moved in 2009 or 2010, but one of those.  I'm

10:31:46AM 15   sorry, I don't know the exact date.

16   Q.   All right.  But you got that before you moved?

17   A.   Yes, I got that one before I moved to Dallas.

18   Q.   Did you put that bullet proof vest on here in San

19   Antonio before you left or when you got to Kerrville?

10:32:03AM 20   A.   Oh, I put it on in San Antonio.

21   Q.   Okay.  Was that at Scotty's house?

22   A.   Yes.

23   Q.   Okay.  And tell the jury, I guess, what you were

24   wearing and how that came about, how you put that vest on.

10:32:17AM 25   A.   Well, like I say, the only time I would really wear a

1   vest if like if I'm going somewhere, I'm going to a bar, I wear

2   it to work, things like that.  Not around the house.  If I'm

3   hanging around with friends at the house, I don't wear it.

4   That occasion, I was wearing a gray shirt.  You know, I had the

10:32:33AM 5   vest with me, I had a gray shirt on and I think y'all saw a

6   video of me.  I always put the vest on.  I always wear a vest

7   under a shirt but you can't wear a vest under a T-shirt.  So I

8   asked Scotty for a shirt, which he gave me.  I don't know if we

9   have a picture of the greenish colored shirt.  And I put it

10:32:51AM 10   over the vest buttoned up because that's just how I wear it.  I

11   don't wear a vest on the outside, period, because that's not

12   how you wear a vest walking around in public.

13       Q.   So you put the vest on over the gray shirt that we saw

14   in the video?

10:33:06AM 15       A.   Yes.

16       Q.   And then Scotty actually gave you a shirt to put on

17   over the vest?

18       A.   Yes.

19       Q.   At his house?

10:33:12AM 20       A.   Yes.

21       Q.   So there was no doubt that he knew that you had a vest

22   on?

23       A.   Yes.

24       Q.   Where did you get the guns from?

10:33:22AM 25       A.   Mike gave them to me.  Big Mike, he had a bag that had

1  the guns in it.  I don't know if I go into detail, but --

2      Q.   Is that where you got the guns from?

3      A.   Yes.

4      Q.   And is that where Scotty got his gun from was from that

10:33:39AM 5  bag?

6      A.   Yes.

7      Q.   Those weren't your guns that you brought from Dallas?

8      A.   No.

9      Q.   You don't own a gun?

10:33:45AM 10  A.   No, I don't.

11      Q.   While y'all were driving up to Kerrville, were y'all

12  still drinking?

13      A.   Yes.

14      Q.   And who was drinking, you and Scotty?

10:33:58AM 15  A.   Yes, we both were.

16      Q.   And y'all were in the same car?

17      A.   Yes.

18      Q.   Who was driving?

19      A.   Scotty was.

10:34:05AM 20  Q.   What were y'all drinking?

21      A.   I want to say it was Captain Morgan.

22      Q.   Whisky?

23      A.   I want to say it was rum, spiced rum.

24      Q.   Okay.  Now when you got to the house, did you go

10:34:28AM 25  straight to it or what happened?

1          A.   As we got there, we had stopped and Mike, that's when

2     he gave us the bag of guns.  He said, hey, you know, take

3     these.  You shouldn't have any issues.  You're not going to

4     hurt anyone.  Just tell them, you know, you're going to collect

10:34:49AM 5     the money and they should give it to you.  You shouldn't have

6     to use any weapons, anything like that, but --

7          Q.   So Big Mike told you where the house was and he gave

8     you the guns?

9          A.   Yes.  Yes, we followed him to the house.

10:35:04AM 10          Q.   You followed Big Mike to the house?

11          A.   Yes, sir.

12          Q.   So when Scotty told the investigating officers that

13     y'all didn't have a map, you didn't have a GPS, that's why?

14          A.   Yes.  Yes, sir.

10:35:19AM 15          Q.   And he said that he didn't think you had ever been to

16     the house.  Had he ever been to the house before?

17          A.   No, he hasn't because if I remember correctly, when he

18     said we're going to Kerrville, I didn't know where it was at.

19     Scotty was like -- Scotty was like, that's a distance from

10:35:36AM 20     here, you know, saying how far it was and we're probably going

21     to stop and get gas.  That's what he told Mike at the house.

22          Q.   And did y'all ultimately stop and get gas?

23          A.   Yeah, we stopped at I believe it was a Shell station.

24          Q.   So y'all stopped.  Mike gives you the guns.  Did he

10:35:56AM 25     point out the house to you?  Like, did y'all drive by it or how

did that occur?

A.   We drove by -- we were on the phone with him at the time, on the speakerphone.  He's like -- he calls and says, well, this is the street.  You know, it's a long road and he -- he goes, that's the guy outside.  And so me and Scotty, we go around, turn around, we get out of the car.  The guy is pretty much in the house already.  I believe he's running into the house.  I didn't see exactly how he got in, but we turned around and he was in the house.

Q.   Let me stop you right there.  Did Mike tell you why the guy owed him money?

A.   No, he didn't give us a specific reason why he owed him money.

Q.   Do you believe it was related to drugs?

A.   Yes.

Q.   So you turn around, you don't see anybody.  You never saw a child in front of the house or outside the house, did you?

A.   No.  No, sir.

Q.   Had you seen a child out in front of the house or outside of the house, would you have gone into the house?

A.   No, sir.

Q.   Y'all get up to the front door, who kicks in the door?

A.   Scotty does.

Q.   And let me back up for a second.  There was some talk

1    from the lady that was inside the house mentioning a black

2    bullet proof vest.  Is there a reason why you think she

3    mentioned black?

4        A.   Well, me and Scotty both had vests on.  He had a black

10:37:23AM  5    vest on when he was over her.  I had a blue vest on.  It was

6    under a shirt, so I don't know how she can correlate me having

7    a black vest on.

8        Q.   Okay.  So there was a black vest, but you weren't the

9    one wearing it?

10:37:38AM 10        A.   Right.

11        Q.   And Scotty was?

12        A.   Right.

13        Q.   So he was wearing a vest as well as you were?

14        A.   Yes, sir.

10:37:43AM 15        Q.   Okay.

16             THE COURT:  Let's see if you can kind of mark your

17    place and let's take about a ten-minute recess and then we'll

18    start back up.

19             Ladies and Gentlemen, if you'll go with the

10:37:52AM 20    bailiff.

21             THE BAILIFF:  All rise for the jury, please.

22             (Jury not present).

23             THE COURT:  We're in recess.

24             (Recess).

10:51:34AM 25             THE BAILIFF:  Rise for the jury, please.

1          (Jury present).

2          THE COURT:  Thank you.  Have a seat.  Mr. Brown,

3     you may continue with your examination of Mr. Travis.

4          Mr. Travis, have a seat.

10:51:38AM 5          THE WITNESS:  Yes, sir.

6          MR. BROWN:  Thank you, Your Honor.

7     Q.  (BY MR. BROWN) I believe where we left off, Trey, was

8     concerning the vest and both of y'all were wearing vests; is

9     that right?

10:51:52AM 10    A.  Yes, sir.

11    Q.  And ultimately you make it to the residence in

12    Kerrville.  And who was the person that kicked in the door?

13    A.  Scotty did.

14    Q.  Okay.  And did both of y'all have a firearm in your

10:52:07AM 15   hand when you kicked in the door?

16    A.  Yes, sir.

17         MR. BROWN:  May I approach the witness, Your

18    Honor?

19         THE COURT:  Yes.

10:52:18AM 20   Q.  (BY MR. BROWN) I'm going to show you a diagram and it's

21    been admitted into evidence as State's Exhibit Number 24.  I

22    had Amber Wilkinson draw the rooms on it, and I'm going to ask

23    you if you recognize the layout of the house in State's

24    Exhibit 24?

10:52:36AM 25   A.  Yes, sir.

1    Q.   Okay.  And I'm going to hold it up and hopefully the

2  jury can see from there.  With a pen, if you can show me the

3  front door -- the front door of where Scotty kicked in the

4  door?

10:52:59AM  5    A.   Right here.

6    Q.   So the pictures that show the front porch would be

7  right in front of that?

8    A.   Yes, sir.

9    Q.   Okay.  And when the door was kicked in, did you and

10:53:09AM 10  Scotty immediately come into the house?

11    A.   Yes, we did.

12    Q.   Okay.  And tell the jury where Scotty went to in

13  relation to this diagram?

14    A.   Scotty went to the right.

10:53:20AM 15    Q.   Okay.  And when you say to the right, there appears to

16  be a hallway?

17    A.   Yes, a hallway.  He went into the hallway.

18    Q.   How far in?  Did he go in the hallway or just the front

19  of the hallway?

10:53:31AM 20    A.   Yes, he was in the hallway.

21    Q.   Okay.  And where did you go?

22    A.   I went to the left.

23    Q.   Did you come up here in this -- is this the kitchen

24  area?  I believe she marked this as the kitchen and dining room

10:53:41AM 25  area.

1    A.   I remember I went to the dining -- looked in the dining

2    area, but I didn't go in there.  I was at the door here.

3    Q.   Okay.  At any point in time, did you go down the

4    hallway?

10:53:52AM 5    A.   No, sir.

6    Q.   Okay.  Did you ever go down towards where the woman and

7    child were?

8    A.   No, sir.

9    Q.   The first time that you realize there is a woman and

10:54:02AM 10   child in the house, was that after you were already inside the

11   house?

12   A.   Yes.  Well, once we got in the house, the gentleman ran

13   to the door and we saw a woman that went that way.  So Scotty

14   went to where the woman was at, which she wasn't in there.  She

10:54:17AM 15   was right here.

16   Q.   In the hallway?

17   A.   In the hallway.

18   Q.   And did you, when you saw -- when you turned around and

19   noticed that they were there, did you say anything in that

10:54:28AM 20   direction?

21   A.   Well, I looked back -- I heard the -- first, I was

22   banging on this door and told him to come out.  And when I

23   turned back and she was screaming, I saw there was a little boy

24   right there.  I told Scotty, make sure you get him in the back

10:54:44AM 25   room and that's when the gunshot came out.

1    Q.   So when you turned around and say, make sure you get

2  him in the back room --

3    A.   Right.

4    Q.   -- that's when the shot was fired?

10:54:50AM 5    A.   Right.

6    Q.   And where were you standing, just outside the door?

7    A.   No, I was sitting right there by the dining area.

8    Q.   Okay.  And you heard her testify when she was showing

9  you the diagram on this particular document, do you remember

10:55:03AM 10  that?

11    A.   Yes, sir.

12    Q.   Okay.  And the way she went through and showing on the

13  document, that's actually how things happened; is that right?

14    A.   The placement of the areas?

10:55:12AM 15    Q.   Yes.  Yes.

16    A.   The living room and bedroom, yes.

17    Q.   And when she was describing how you came in and how

18  Scotty came in on this particular document, she never mentioned

19  that you ran down the hallway, did she?

10:55:23AM 20    A.   No, sir.

21    Q.   And that's because it didn't happen, did it?

22    A.   No, sir.

23    Q.   You testified, I believe, right now that you told the

24  lady and the child to get in the back room?

10:55:33AM 25    A.   Right.  Well, I looked back and that's when I saw the

1    kid.  I looked at Scotty and said, get him in the back room.

2    And the room, I was talking about this room because this

3    bedroom door was closed.

4        Q.   So you couldn't even get in there because the door was

10:55:47AM  5    closed?

6        A.   Right.  Like I said, I looked down the hall.  I was

7    standing right here in the little corner and that door was open

8    but this one was closed and --

9        Q.   So you told him to get in that room?

10:55:56AM 10        A.   Right.  I said, get him in the room.

11        Q.   And it's actually a bathroom but it was a room when you

12    saw a door that was open?

13        A.   I didn't --

14             COURT REPORTER:  Whoa, whoa, whoa.

15             THE COURT:  A little slower.

16             THE WITNESS:  Sorry.  I didn't know it was a

17    bathroom because I was in the hallway, so I just --

18        Q.   (BY MR. BROWN) So you had no idea what it was because

19    you never went down there?

10:56:11AM 20             MR. MONROE:  Your Honor, I object to leading the

21    witness.

22             THE COURT:  Sustained.

23        Q.   (BY MR. BROWN) Now, you mentioned that you told him to

24    go in the back room.  When you did that, what happened next?

10:56:19AM 25        A.   That's when a gunshot came through the door.

Q.   Okay.  And is that when Officer Ledford testified that Scotty told him he heard a shot that came through the door?

A.   Right, because I turned and looked -- because I had already told Scotty to go into the room with the child.  So I looked back to make sure because I wasn't sure -- I saw the bullet go through.  You know, it didn't hit me, so I was looking back to see if it went back that direction.  And they hadn't even been in the room yet.  It was just kind of like at them and Scotty telling me, it was kind of all at the same time.  I looked back and Scotty looked at me to make sure I was okay.  And I was like, we've got to go.  I looked at myself and that's when I returned fire.  And what I was trying to do is suppress the way to get out.  You do a suppress fire.  So I did one, I believe.  I thought it was both in the door, but I got one in the wall, but I was shooting at a downwards angle.  And once I stopped shooting, that's when my clip in the gun that I had, the .45 that they showed everybody, when I shot it, the clip fell out.  So once the clip fell out, the spring broke and you can't recock.  I don't know if you know much about weapons, but you cannot recock a gun without the spring in it.  The bullets won't stay.  So what I was doing is picking up the bullets off the ground at this time because everything had fell out.  And I saw a gentleman run across the front door and that's when I was like -- that's when me and Scotty ran out the front.

1      Q.   And was there any confusion as to who shot first?

2      A.   No, not at all.

3      Q.   Who shot first?

4      A.   The person in the bedroom.

10:57:50AM 5      Q.   And do you even know what his name is?

6      A.   No, sir.

7      Q.   Ultimately I think you learned later that his name was

8   Wylie Wilkinson?

9      A.   Yes, sir.

10:58:02AM 10      Q.   Do you remember ever seeing a dog?

11      A.   No, sir.

12      Q.   Did you ever pistol-whip a dog or kick a dog or hit a

13   dog or anything like that?

14      A.   No, sir, not at all.

10:58:11AM 15      Q.   Did you or Scotty or anybody else shoot from outside

16   the house to inside the house?

17      A.   No.

18      Q.   Okay.  And that would be consistent with the individual

19   who is in the bedroom that said that didn't happen either?

10:58:32AM 20      A.   Yes, sir.

21      Q.   A little while ago, you took some medication.  You had

22   the bailiff come over and give you some medication.  What was

23   that medication?

24      A.   I'm not 100 percent of what the name of it is.

10:59:00AM 25      Q.   What's the purpose?

1    A.   Just calms me down, just kind of.

2    Q.   Did it work.  Are you calmer?

3    A.   Yeah, I'm fine.  Yes, sir.

4    Q.   When you and Scotty left the house, what did you do

10:59:18AM 5 next?

6    A.   We hopped in the vehicle and as he reverses, we saw a

7    vehicle already outside.  It was an SUV.  And I don't know if

8    the SUV fired at us or not, but so we went speeding down the

9    street.  But right not even two houses down, I'll say there was

10:59:41AM 10 a state trooper.  And I saw a state trooper, so I told Scotty,

11   hey, you know.  Scotty looked at me, you know, something about

12   my career, what am I supposed to do.  I told him, I said, I

13   don't know, just give me your gun.  So he gave me his gun.  I

14   threw both guns out of the window.  And he pulled over, you

10:59:59AM 15 know.  We were like -- at this time, we're talking it over.

16   Are we going to run or are we going to stay, so I threw the

17   guns out and I hopped out of the car and ran.  This is all

18   about three or four houses or car-length miles away, or a

19   quarter mile, all in the same area.

11:00:15AM 20  Q.   When y'all kicked in the door, was it ever your

21   intention to fire a gun?

22   A.   No, sir.

23   Q.   Was it your intention to get in there quick and get out

24   quick?

11:00:25AM 25  A.   Yes, sir.

1    Q.   Tell the jury why you threw the guns out the window.

2    A.   Well, my fear was as soon as we got out of the vehicle,

3    we were going to get shot at.  I mean, that's just -- because

4    when we turned the corner, the police officer saw me with a

11:00:42AM 5    weapon in my hand.  I know he saw me with a weapon in my hand.

6    And anybody knows, you saw a shooting just happened, you saw a

7    guy with a gun, if we just hop out of the car normally --

8    because I mean, I couldn't process it all at the time.  The

9    first thing that pops into my head was throw out the guns,

11:01:01AM 10   something is going to happen to you, you know, and that's what

11   I did.

12   Q.   Were you still intoxicated at this point in time?

13   A.   Yes, I was.

14   Q.   When you pulled the car over, did Scotty run one

11:01:13AM 15   direction and you ran another with y'all's bullet proof vests?

16   A.   We both ran in the same direction in I think it is a

17   wooded area that we were in.  And once we got in the wooded

18   area, we kind of split off from there.

19   Q.   And did he still have the bullet proof vest with him?

11:01:32AM 20   A.   Yes, he still had it on.

21   Q.   And ultimately did you come walking out of the woods?

22   A.   Yes.  It wasn't on the same road that the incident

23   happened.  Like I say, I'm not from here, so when it comes to

24   pointing out exactly what street, I couldn't tell you.  But I

11:01:47AM 25   remember I was walking in the woods and I was getting kind

TERI THOMAS, CSR, RPR, CMRS

1    of -- I thought I was going to pass out.  I was kind of -- I

2    stopped running.  I took the vest off.  With the shirt that was

3    on it, I took it all off at the same time because -- I don't

4    know if you're familiar with the vest.  If you take it off,

11:02:04AM  5    it's still inside the shirt.  I put that down and was just kind

6    of a little delusional.  I just walked -- I heard a -- when I

7    heard a car coming, I walked that direction and met y'all down

8    the street.

9        Q.   And was there an officer standing there on the street

11:02:19AM  10    when you walked out?

11        A.   There was a gentleman across the street and there was

12    an officer to the right of me, but there was a gentleman right

13    across the street.  Yes, sir.  I think he -- it was his house

14    possibly and he saw me and I walked out, and I turned and saw

11:02:31AM  15    the officer and started walking towards the officer.

16        Q.   Did you follow the officer's commands when he

17    approached you?

18        A.   Yes, sir.

19        Q.   Did you tell him that you had thrown the guns out the

11:02:49AM  20    window?

21        A.   No, we didn't -- he didn't ask me any questions like

22    that.  He just kind of went through my pockets.  I think he

23    might have asked where are they, where are the guns, because in

24    my pockets, I had the bullets from where the clip broke.  All

11:03:04AM  25    the bullets were in my pocket still.

Q.   Okay.  Did you still have your bullet proof vest with you or did you tell them where that was?

A.   No, I had taken it off.  Before even that, I don't believe the officer knew anything about a bullet proof vest.  Like I said, it was like under the shirt, so I don't think anybody knew there was a bullet proof vest until they found the bullet proof vest.  We didn't have a conversation about what happened.

Q.   So when you first came out, there wasn't a conversation about what just occurred?

A.   No.  No.

Q.   Ultimately they take you into custody.  Did they take you -- where did they take you?  To the jail or where?

A.   The drive -- I want to say it was the -- I want to say it was the jail.  The jail.  I was -- I was intoxicated.  I really -- I think the heat possibly -- I don't know.  I can't explain how my body and everything was feeling.  I was -- I was out of it, so I can't tell you 100 percent sure if I was at the jail, the Court.  I don't know where I was at that point.

MR. BROWN:   I'm sorry, I'm a diabetic and I have to check my blood sugar.

Q.   (BY MR. BROWN) When you got to the jail or the location they took you to, is that when they did the recorded statement on the video?

A.   Yes.

1    Q.   And you saw that here in the courtroom?

2    A.   Yes, sir.

3    Q.   Describe what you saw in that video.

4    A.   I can't explain it.  I've -- you know, it was an

11:04:42AM 5   out-of-body experience.  That's what that is right there.  I

6   have never -- I didn't know I could be like that.  Just -- I

7   can't understand what I was saying in the video, just from

8   listening from there.  I was trying to recall in my head what

9   did I say, but I really don't remember.  Like I say, I know I

11:04:59AM 10   did commit a crime.  I know I did that, you know, but

11   everything I told him, that's -- I don't know what I was

12   saying, you know.

13   Q.   You were talking about a guy raping young females and

14   stuff like that.  Do you have any idea where that came from?

11:05:14AM 15   A.   I have no idea.  My intent really was not even supposed

16   to talk to them I don't think.  I really don't know why I did

17   that, you know.  It's -- I really can't explain it.

18   Q.   Were you still intoxicated at that point in time?

19   A.   Yes, sir.

11:05:44AM 20   Q.   You know you committed a pretty serious crime, don't

21   you?

22   A.   Yes, sir, I know I did.

23   Q.   Is there any -- at any point in time since your arrest

24   that you've come in here, told anybody, I didn't commit this

11:06:00AM 25   crime?  I'm not guilty of it or anything of that nature?

1     A.   No, sir.  No, sir.

2     Q.   Has it been your intention since day one, since you

3  came out of your drunken stupor with the pills and everything

4  to accept responsibility for this case?

11:06:16AM 5     A.   Yes, I understand.

6     Q.   I guess shortly after your arrest, did you finally make

7  it to the VA to get counseling?

8     A.   Yes.  I was still hesitant because I felt like, you

9  know, I really didn't have a problem.  I just thought, you

11:06:43AM 10  know, I didn't think I had a problem at all.

11          What really got me to go to the VA was because

12  I -- you know, my mom was like, you need to see a counselor.

13  You've got something that you need to get off your chest.  And

14  I was kind of like, oh no, I'm fine, do my normal get back to

11:06:57AM 15  drinking, the normal things I would do.  And so my chest, I

16  started getting chest pains real bad.  And I went to my

17  counselor that I started seeing at the time.  The first time I

18  ever talked about Iraq was with him.

19     Q.   Let's back up.  When was the first time that you met

11:07:13AM 20  with the counselor about Iraq?

21     A.   I can't -- I don't remember the exact -- I don't

22  remember.  It was like four months ago maybe.

23     Q.   Maybe the end of the year, the beginning of the year

24  time frame?

11:07:24AM 25     A.   Yes, I would say that.  Yes.

           Q.   Okay.  And who was the counselor you were seeing?

           A.   Randy.

           Q.   Do you remember what his last name was?

           A.   I think it was Kahan, Randy Kahan.

11:07:34AM 5    Q.   And where was Randy located?

           A.   Pantego, Texas, specifically.  It was on the outskirts

of pretty much the Arlington area.

           Q.   And was he through the VA?

           A.   Yes, he was through the VA.

11:07:46AM 10   Q.   Tell the jury how you came into contact with Randy and

how that come about.

           A.   Well, I had never touched the VA paper -- my paperwork

ever.  I've never seen to them.  I never touched any of my

benefits, period; from the GI bills, anything, and I went to

11:08:00AM 15 him and he kind of -- what they do they guide you, you know --

he can do a little counseling, but they guide you on things for

me to do to better yourself.  I pretty much -- I told him my

situation, you know, let him know what I did and started off

with from Iraq -- well, went from a kid, to Iraq, to what I had

11:08:20AM 20 done since then and he said that he can see there is a downward

spiral and I -- I didn't see it myself because I mean, I think

for me, while I felt like I was okay -- you know, if I felt

bad, I just take more of whatever substance I had.  I would

take more of it compared to -- I never thought of it as an

11:08:42AM 25 issue.  And when I had the chest pains, he told me that I

1   needed to go to this -- to the ER.  They sent me to I want to

2   say it's JSP because --

3       Q.   What is JSP?

4       A.   It's a hospital, but it's based off of income as well.

11:08:59AM 5  Because my VA benefits hadn't kicked in yet because I just

6   started doing the paperwork for it.  So I went there and saw

7   Doctor Williams.

8       Q.   And when you say there, that's the emergency room?

9       A.   Yes, the emergency room at the JSP.

11:09:14AM 10     Q.   And the counselor that you were seeing recommended you

11  go there immediately?

12      A.   Well, yes.  Well, actually he recommended me to go to

13  a -- check and see about consultation for a rehab facility and

14  because I told him I didn't have a problem, but he told me, you

11:09:31AM 15  have one.  Just go and get the consultation, see what they say,

16  go from there.  When I got there, that's when they started

17  asking me more questions and I told him, well, yeah, I do have

18  that chest pain that I talked to the counselor about.  And they

19  referred me directly to the ER saying, you know, for any kind

11:09:50AM 20  of treatments or any kind of thing we have done, we need to get

21  your heart checked out first.

22      Q.   So your counselor sent you to a rehab, the rehab sent

23  you to the emergency room?

24      A.   Yes, directly to the emergency room.

11:10:02AM 25     Q.   And tell this jury what you were telling the counselor

about your drinking issues and your pill issues.

  A. I just -- I told him how much I took.  I told him, you
know, from the pain medication, things like that, they ask you
about the daily usage, how much do you use.  He said I had a
polysubstance abuse, something like that.  I don't remember the
exact words for it, but he described the medication, that he
said, you know, I was trying to do cold turkey on some stuff
and he just said the pills that I take for the anxiety, they
kind of count -- they kind of act the side effects, so I won't
be having -- I won't have, I can't think of the words for it.

  Q. Withdrawals?

  A. No, he says you will still get some withdrawals but you
get like a scratch -- like scratch my arms.  It's like little
ticks that could happen, but he said it's not something that is
addictive that can work in place of like the Xanax that I was
trying to take that wasn't prescribed to me.  He said it's
pretty much that's not addictive and the dosage like -- I
thought I knew what I was doing, but I didn't, you know.

  Q. Okay.  And how many times do you think you saw this
counselor?

  A. Once a week.

  Q. For how many weeks?

  A. I was going to say, whenever we started from there,
unless I had court, then I missed it.  Those court dates, I
know I did.

1    Q.   When you were referred to the emergency room, is that

2    where you ultimately came across Doctor Williams?

3    A.   Right.  When I got there, I told them about my chest

4    pains and they said, well, what were you coming here for.  From

11:11:42AM 5    the beginning, I told him where I just came from.  They had

6    given me a little paper saying what I was there for.  They said

7    you can go to the mental health and they can do all that here.

8    You don't have to go back and forth.  So that's when I went to

9    the mental health and that's when he told me about the chest

11:11:59AM 10   pains were probably from anxiety.  And he asked me how long it

11   was going on and said the anxiety and stress can cause that,

12   and then we got into it something about the PTSD he was saying

13   I was suffering from.

14          MR. BROWN:  May I approach the witness, Your

11:12:11AM 15   Honor?

16          THE COURT:  Yes.

17   Q.   (BY MR. BROWN) Let me show you what's been previously

18   marked as Defendant's Exhibit Number 1.  Do you recognize this

19   document?

11:12:20AM 20   A.   Yes, sir.

21   Q.   And what is this document?

22   A.   It's pretty much just saying what I was treated for

23   while I was there, what his diagnosis was.

24   Q.   And when you say his diagnosis, who are you referring

11:12:34AM 25   to?

A.   I'm sorry, Doctor Williams, his diagnosis.

Q.   And what was his diagnosis?

A.   Let me read it because I don't understand it all.

Your diagnosis was a drug induced mood disorder, PTSD, and polysubstance abuse.

Q.   Okay.  And this was -- miraculously, you got diagnosed with PTSD because the rehab actually sent you to be diagnosed?

A.   Right.  My counselor, he told me, he said he felt I had that, but he's not a -- but he cannot diagnose that.  So he sent me to a different place, but they sent me somewhere else and JPS is where I end up going because like I say, I don't have medical insurance so I need to go somewhere.

Q.   And what was the date of the diagnosis?

A.   What's that --

MR. MONROE:  Your Honor, I'd request before he testify from the contents that you offer it.

MR. BROWN:  We offer Defendant's Exhibit No. 1, Your Honor.

THE WITNESS:  Subject to any objections.

(Defendant's Exhibit No. 1 offered).

MR. MONROE:  No objection.

THE COURT:  Defendant's Exhibit 1 is admitted.

(Defendant's Exhibit No. 1 admitted).

Q.   (BY MR. BROWN) Now, I'm sorry, we were on the -- what was the date that you were diagnosed?

1     A.    April 3, 2014.

2     Q.    And were you prescribed medication?

3     A.    Yes, sir.

4     Q.    And what were you prescribed?

11:14:24AM 5     A.    Vistaril, and where is the other one at, Zoloft.

6     Generic versions of those, but that's the name for them.

7     Q.    And what were those prescribed for?

8     A.    The Vistaril is for post-traumatic disorder and the

9     Zoloft for drug induced mood disorder.

11:14:48AM 10     Q.    And is that the same thing as depression?

11     A.    Yes, sir.

12             MR. BROWN:  May I publish to the jury, Your Honor?

13             THE COURT:  Yes, you may.

14     Q.    (BY MR. BROWN) Do you notice some change in your own

11:15:25AM 15     life since you've been diagnosed and been taking medication

16     just in the last month?

17     A.    Yes.  Yes, sir.

18     Q.    Tell the jury what changes you've noticed just in the

19     short period of time.

11:15:37AM 20     A.    The biggest thing for me is the remorse for, you know,

21     the victims that -- with my situation right now, for my family.

22     Before, it was kind of like I didn't have feelings or emotions,

23     you know.  Like I told y'all, I love my daughter, you know.  I

24     loved her but when it came to emotions or anything else in the

11:16:00AM 25     world, it's kind of -- it's the only thing I had that I felt

and I apologize for breaking down and things like that.  It's
just, you know, I -- ten years of my life is just, you know, it
was a blur, you know.  I see it, I lived it and it's kind of
like my potential prior military to me was just unbelievable.
You know, and now I'm here, you know, leaving in handcuffs, so
I never realized all that until this happened.  It's sad to say
that it took this to happen.  And I'm sorry that it happened
but for me, I needed it to happen.

     Q.    Because you've been prescribed this medication, does it
help you, I guess think more clearly?

     A.    Yes, yes, I think quite clearer.  My thing, you know,
like for working purposes, you know, working in a restaurant is
fast pace, just a lot of people.  I don't know if it's anxiety
or what, but for awhile I couldn't do that.  I cannot do that
at some point in time without drinking or pills, you know.  I
just couldn't do it.

          I really didn't notice a difference until, you
know, I went to the store with my cousin and I'm sitting there
and I'm in line and there is like three people beside me and
it was like, I didn't take my medicine this morning.  It was
like just as needed.  I just felt hot.  I was bothered.  I
didn't want to be there.  And then it was like, go ahead take
your medication, you know.  It's kind of like, I know it's
coming now.  Before, I didn't give myself a chance to know
something bad was happening.  I just drank, took pills, just

1    lived what I felt was a normal life at the time, which --

2         Q.    Did you do that to numb the sensation going on in your

3    own head?

4         A.    Yes.  I want to say yes, that's what it was.  After

11:17:56AM 5    doing it so long, it's a way of life so it's hard for me to be

6    like, well, because this is the reason why, this is why.  It

7    was just for me to function properly, that's what I had to do.

8    If I didn't, I'd get migraines.  You know, if I didn't drink,

9    I'd get migraines.  If I didn't -- I felt like I needed that to

11:18:15AM 10    survive.

11         Q.    Okay.  Are you sorry for what you did November 6, 2013

12    -- I'm sorry, September 5, 2013?

13         A.    Yes, sir.

14         Q.    Are you remorseful?

11:18:44AM 15         A.    Very.

16         Q.    You were here crying when we first started these

17    proceedings.  Is that some of the emotion that you can now show

18    that you weren't able to show in the past?

19         A.    Yes.  Yes, sir.

11:18:59AM 20         Q.    When you get out of jail, do you have a plan in place?

21         A.    Yes, sir.

22         Q.    Do you have a support system in place?

23         A.    Yes, sir.

24         Q.    What is that support system and what is that plan?

11:19:13AM 25         A.    Well, I'm going to do concrete with my uncle.  From

1    there, I want to go into the VA's office and there is an Army

2    base called Fort Polk and there is a lot of other soldiers that

3    deal with the same thing I do and we don't see it.  We go out,

4    we drink, you know, we -- we do things that we normally would

11:19:36AM 5    never do, but I want to be kind of that person to say, hey, you

6    know, look what I've been through.  Look what I've done.  Look

7    what I have in life and now look at what I have to look forward

8    to now.  But you know, I don't feel this is the end for me but

9    I know I needed this, you know.  I hate to say that y'all are

11:19:54AM 10   here for that, but I needed this.

11       Q.   Are you -- you said in Louisiana, do you plan on moving

12   out there with your father and family that lives there?

13       A.   Yes, with my dad.

14       Q.   They would provide you a good support system?

11:20:10AM 15       A.   Yes, sir.

16       Q.   Make sure you make your doctor's appointments with the

17   VA?

18       A.   Yes, sir.

19       Q.   And continue with your treatment, whatever that may be?

11:20:18AM 20       A.   Yes, sir.

21       Q.   Take your medication properly?

22       A.   Yes, sir.

23       Q.   Will we ever find you in a situation like this again?

24       A.   No, sir.

11:20:29AM 25            MR. BROWN:  Pass the witness, Your Honor.

1          MR. MONROE:  May we approach the bench, Your

2     Honor?

3          THE COURT:  Yes, sir.

4          (Bench conference).

11:20:45AM 5          MR. MONROE:  I couldn't anticipate much of a cross

6     before he took the stand.  I just ask that the Court would

7     entertain letting us go to lunch a little earlier, let me

8     gather my thoughts, and I would be a little more consistent and

9     hopefully a little shorter if we do that.

11:21:03AM 10          MR. BROWN:  I'd ask that we go for 20 or 30

11     minutes.  My concern is I want to get done today and I don't

12     want to take any chances.

13          THE COURT:  Here is my problem.  I've got a civil

14     case that seven attorneys are coming at noon for me to do it

11:21:20AM 15     during the lunch break.  If we break now, you know, I would

16     have to take like a two-hour lunch break in order to do it.

17          Scott, I think I'm going to need you to keep on

18     going.

19          MR. MONROE:  Okay.

11:21:34AM 20          THE COURT:  All right.

21          (Bench conference ended).

22                    CROSS-EXAMINATION

23     BY MR. MONROE:

24     Q.   There are a lot of questions I want to ask you.

11:22:20AM 25     A.   Yes, sir.

TERI THOMAS, CSR, RPR, CMRS

|    |    |
|----|----|
| 1  | Q.   We'll start off by -- let's talk about Big Mike. |
| 2  | A.   Yes, sir. |
| 3  | Q.   What's his last name? |
| 4  | A.   I have no idea. |
| 11:22:30AM 5 | Q.   Yes, you do.  Come on, what's his last name? |
| 6  | A.   I really don't know. |
| 7  | Q.   Yes, you do. |
| 8  | A.   No, sir. |
| 9  | Q.   He was your co-defendant in Arizona, wasn't he? |
| 11:22:38AM 10 | A.   Yes, sir. |

1   Q.   We'll start off by -- let's talk about Big Mike.

2   A.   Yes, sir.

3   Q.   What's his last name?

4   A.   I have no idea.

11:22:30AM 5   Q.   Yes, you do.  Come on, what's his last name?

6   A.   I really don't know.

7   Q.   Yes, you do.

8   A.   No, sir.

9   Q.   He was your co-defendant in Arizona, wasn't he?

11:22:38AM 10   A.   Yes, sir.

11   Q.   And he was the same Mike that you were with when you

12   drove out to Madrona; the same guy, right?

13   A.   Madrona?

14   Q.   The one place here in Kerrville, in Kerr County, you

11:22:51AM 15   said his name is Mike?

16   A.   Yes, sir.  Yes, sir.

17   Q.   You followed him out here?

18   A.   Yes, sir.

19   Q.   Same guy?

11:22:57AM 20   A.   Yes, sir.

21   Q.   The same guy, okay.  And you're telling this jury that

22   you don't know his last name?

23   A.   I don't know his last name.

24            MR. MONROE:  All right.  May I approach the

11:23:05AM 25   witness?

1          THE COURT:  Yes.

2     Q.   (BY MR. MONROE) I hand you what has been marked as

3  State's Exhibit 46 and ask if you can identify that?

4     A.   Yes, sir.

11:23:22AM 5     Q.   What is that?

6     A.   That's from Arizona in 2009.

7     Q.   A copy of your indictment?

8     A.   Yes, sir.

9          MR. MONROE:  Offer State's Exhibit 46.

11:23:32AM 10          (State's Exhibit No. 46 offered).

11          MR. BROWN:  No objection.

12          THE COURT:  46 is admitted.

13          (State's Exhibit No. 46 admitted).

14     Q.   (BY MR. MONROE) Let me refresh your memory.  It's got

11:23:42AM 15  the co-defendant information on here in case you needed this.

16     A.   Yes, sir.

17     Q.   Michael Anthony Martin; is that correct?

18     A.   Yes, sir.

19     Q.   That's Big Mike?

11:23:51AM 20     A.   Yes, sir.

21     Q.   You didn't know that though?

22     A.   No, sir.  You just showed me the paper.

23     Q.   You've known him all these years; Arizona, San Antonio.

24  You're going to go with him and on his behalf to commit one of

11:24:05AM 25  the worst crimes that the State of Texas recognizes and you're

1    telling this jury that you did not know his last name?

2       A.   I did not know his last name.

3       Q.   Did all that as a favor to him?

4       A.   No, sir, it wasn't a favor.

11:24:16AM 5    Q.   Was he ever your roommate?

6       A.   No, sir.

7       Q.   What address does it show for you, Mr. Travis?

8       A.   3022 Persimmon Drive.

9       Q.   What address does it show for Mr. Martin?

11:24:33AM 10   A.   3022 Persimmon Drive.

11      Q.   Cibolo, Texas?

12      A.   Yes, sir.

13      Q.   For both of you?

14      A.   Yes, sir.

11:24:40AM 15   Q.   But you still don't know his name?

16      A.   Yes, sir.  I know his first name, not his last name.

17      Q.   I hand you what's been marked as State's Exhibit 47.

18   Do you recognize that?

19      A.   Yes, sir.

11:25:00AM 20   Q.   Who is that?

21      A.   That's Mike.

22      Q.   Does it fairly and accurately portray what Mike looks

23   like?

24      A.   Yes, sir.

11:25:06AM 25          MR. MONROE:  I offer State's Exhibit 47.

```
 1                  (State's Exhibit No. 47 offered).

 2                  MR. BROWN:  No objection.

 3                  THE COURT:  47 is admitted.

 4                  (State's Exhibit No. 47 admitted).

11:25:16AM  5    Q.   (BY MR. MONROE) So this is Big Mike?

 6    A.   Yes, sir.

 7                  MR. MONROE:  Publish to the jury, Your Honor?

 8                  THE COURT:  Yes.

 9    Q.   (BY MR. MONROE) So you're riding in the car in Arizona

11:25:36AM 10  with Big Mike who has more than four pounds of marijuana?

11    A.   Yes, sir.

12    Q.   And it's not yours?

13    A.   Yes, sir.

14    Q.   But you went ahead and take the fall for it or with

11:25:46AM 15  him?  Did you take the fall with him?

16    A.   You have to.

17    Q.   I understand, but --

18    A.   Yes.

19    Q.   No, you could have fought.  You could have done there

11:25:54AM 20  what you're doing here.  You could have fought.  You could have

21  had a trial, couldn't you?

22    A.   No.

23    Q.   You could?

24    A.   Yes, sir.

11:26:01AM 25    Q.   You can always have a trial?
```

1        A.    Yes, sir.  Yes, sir.

2        Q.    And so you and Big Mike stayed in communication?  Y'all

3    were friends?

4        A.    Yes, sir.

11:26:09AM 5   Q.    And you come back here and it's my understanding that

6    this whole thing that happened in Kerrville was at the request

7    of Big Mike?

8        A.    Yes, sir.

9        Q.    A friend that you didn't know his last name?

11:26:23AM 10  A.    Yes, sir.

11       Q.    Who basically asked you and Scotty Pugh -- am I right

12   so far -- you and Scotty Pugh to arm yourself and put on body

13   armor and go to a residence in Kerr County that you know

14   nothing about to break into the residence and to commit theft?

11:26:51AM 15  A.    No, sir.

16       Q.    Okay.  Which part of that did I miss?

17       A.    About the breaking into the residence part.

18       Q.    Well, how were you going to get in?  Were you going to

19   knock on the door?

11:27:01AM 20  A.    As we got there, the gentleman was outside so --

21       Q.    Were you going to go point the gun at him?

22       A.    We did not decide that.  We didn't have a -- we didn't

23   have to decide that.

24       Q.    Okay.  Let's talk about the event in Kerrville.

11:27:28AM 25  A.    Yes, sir.

1    Q.  When did you first have a conversation with your

2  convicted felon friend Big Mike about doing something for him

3  in Kerrville?

4    A.  I want to say it was the 4th, the morning of the 5th.

11:27:44AM  5    Q.  All right.  And how were you communicating with Big

6  Mike?

7    A.  I want to say on a cell phone.

8    Q.  Cell phone?

9    A.  Yes, sir.

11:27:51AM 10    Q.  Are we communicating with him by phone calls or by text

11  messages or both?

12    A.  I want to say it was both.

13    Q.  All right.  When did Scotty Pugh get involved?

14    A.  The 4th.

11:28:04AM 15    Q.  The 4th?

16    A.  The 4th or the 5th.  The morning of.

17    Q.  That's the first time you had any communication with

18  Scotty Pugh about anything like this?

19    A.  In Kerrville.

11:28:15AM 20    Q.  In Kerrville?

21    A.  Yes, sir.

22    Q.  The morning of the 4th?

23    A.  Yes, sir.

24    Q.  And how were you communicating with Scotty Pugh?

11:28:21AM 25    A.  That was from phone calls and text messages.

1    Q.   Okay.

2              MR. MONROE:  May we approach the bench?

3              THE COURT:  Yes.

4              (Bench conference).

11:28:36AM 5              MR. MONROE:  I want to show him the text messages

6    and offer them into evidence, his and Scotty Pugh's, that

7    purport to be from his phone.

8              THE COURT:  I guess you can see if you can lay the

9    proper predicate and he can object.  As far as limine, it's not

11:28:53AM 10   a limine issue.

11             (Bench conference ended).

12   Q.   (BY MR. MONROE) I hand you what's been marked as

13   State's Exhibit 43, 44, and 45 and ask if you can identify

14   that.

11:29:11AM 15   A.   Do you want me to identify it as?

16   Q.   Do you recognize what that is?

17   A.   It's text messages.

18   Q.   Between who?

19   A.   It says me.  It doesn't say who else.

11:29:23AM 20   Q.   Well, do you recognize from reading them?

21   A.   Well, yes.

22   Q.   Text messages from you to whom?  Scotty Pugh, isn't it?

23   A.   Let me read the messages.

24   Q.   Sure.

11:29:43AM 25   A.   Yes, sir.

         Q.   Okay.  Do you recognize them, text messages between you

    and Scotty?

         A.   Yes, sir.  I don't remember the exact words, but I

    notice --

11:29:52AM            MR. MONROE:  Offer State's Exhibit 43, 44, and 45

    into evidence.

              (State's Exhibit Nos. 43-45 offered).

              MR. BROWN:  No objection.

              THE COURT:  43, 44, 45 are admitted.

11:30:04AM         (State's Exhibit Nos. 43-45 admitted).

              MR. MONROE:  Can I publish it to the jury, Your

    Honor?

              THE COURT:  Yes.

         Q.   (BY MR. MONROE) Okay.  This image on the screen is

11:30:54AM State's Exhibit 43, and I'll let you look at the actual exhibit

    so you can verify that that is, in fact, the same one.

         A.   Yes, sir.

         Q.   And this would be the language in the white background

    is text from you to Scotty Pugh and the language in the green

11:31:15AM background is text from Scotty Pugh back to you; is that

    correct?

         A.   Yes, sir.

         Q.   All right.  So this -- the date on this one is

    August 25, 2013?

11:31:26AM      A.   Yes, sir.  Yes, sir.

1     Q.   And you state, "Can u try and get off Monday and

2   Tuesday"; is that correct?

3     A.   Yes, sir.

4     Q.   And then Scotty Pugh responds, and you say, "the 2nd";

11:31:37AM 5   is that correct?

6     A.   Yes, sir.

7     Q.   And he says, "Yea, ill request those 2 days off."

8               And you say, "Do Wednesday also it will be worth

9   it."

11:31:47AM 10     A.   Yes, sir.

11     Q.   Wednesday was the day this offense was committed; was

12   it not?  It was committed on a Wednesday?

13     A.   I believe so.

14     Q.   "Okay cool ill try, ill give you a call when I get

11:31:58AM 15   off."

16               And you say, "Cool"?

17     A.   Yes, sir.

18     Q.   The next text message you have from Scotty Pugh is not

19   the 5th, is it?  It is the 3rd?

11:32:08AM 20     A.   Yes, sir.

21     Q.   "Can you text."

22               He responds, "Yea, we have been non stop today."

23               "What time u getting off."

24               "I'm hoping around 11."

11:32:19AM 25               "Cool call me tonight so I can get u up to

1    speed."

2              "Ok sounds good."

3              "Gloves if u can."

4    A.   Yes, sir.

11:32:31AM 5    Q.   And you're telling this jury that you weren't planning

6    this as early as that text message?

7    A.   Sir, the text message is the time I was telling you

8    about.

9    Q.   My question was, are you telling this jury that you

11:32:44AM 10   were not planning this when you first started texting Scotty

11   Pugh back in August?

12   A.   No, sir.

13   Q.   That's not what you're talking about?

14   A.   No, sir.

11:32:53AM 15   Q.   Different pair of gloves.  Which pair of gloves are you

16   talking about there?

17   A.   I didn't see another pair of gloves.

18   Q.   Well, you asked him, "gloves if you can."  What are you

19   talking about there?

11:33:03AM 20   A.   When you say the second pair of gloves, what are you

21   talking about?  I don't see where it says that.

22   Q.   You say, "gloves if you can."  I said, what are you

23   talking about when you said gloves?  What are you talking about

24   Scotty Pugh about gloves for?

11:33:14AM 25   A.   To get his gloves.

1      Q.   For what?

2      A.   I'm confused on what you're asking me.

3      Q.   What were you having Scotty Pugh to get the gloves for?

4 To commit this offense, right?

11:33:26AM 5      A.   No, the offense we talked about that day we didn't do

6 it that day, no.

7      Q.   So that's a different offense you were talking about?

8      A.   No.  That's -- no.

9      Q.   Which one was it?  You asked him to get gloves, to

11:33:37AM 10 bring gloves with him so you could commit this crime on

11 September 5th; isn't that correct?

12      A.   I went to him and asked for them.

13      Q.   That's what that says, is it not, Mr. Travis?

14      A.   That's not what happened.

11:33:47AM 15      Q.   My question is very simple.  I'll just ask it one more

16 time.  Were you asking Scotty Pugh to bring gloves to

17 participate in this offense?

18      A.   No, sir.

19      Q.   All right.  "What time u get off."

11:33:59AM 20           "I'm hoping before midnight."

21           "Coo."  I assume you meant cool.

22           Here we go, still on September 4th.  "Call me

23 tonight so I can get u up to speed."

24           "Ok sounds good."

11:34:11AM 25           Okay.  This is September.

1       "Gloves if u can."  Now why are you mentioning

2   gloves again if they don't have anything to do with this

3   offense?

4       A.   I'm pretty sure it's the same thing I'm thinking.

11:34:23AM 5   You're reading it over again, twice again.

6       Q.   Okay.  I'm sorry, I believe that's the same text.  I

7   apologize to you.

8       Okay.  "U good by 4."  This is four in the

9   morning?

11:34:35AM 10       A.   Yes, sir.

11       Q.   So you're in San Antonio then?

12       A.   Yes, sir.

13       Q.   And are you with Big Mike when you're sending these

14   texts?

11:34:42AM 15       A.   Yes, sir.

16       Q.   So Big Mike is aware that you're sending these texts?

17       A.   Yes, sir.

18       Q.   And you're asking Scotty Pugh to come where you and Big

19   Mike are and to bring gloves?

11:34:54AM 20       A.   No, sir.

21       Q.   Okay.  So let's see, we're now at September 5th,

22   4:05 a.m., "Call me as soon as your up."

23       Trying to I think you meant leave as early as

24   possible.  You're talking about leaving to go to Kerrville; are

11:35:07AM 25   you not?

1        A.    No, sir.

2        Q.    You're going to go somewhere else?

3        A.    Yes, sir.

4        Q.    All right.  So none of that -- your testimony is that

11:35:13AM 5  none of that had to do with this offense?

6        A.    No, sir.

7        Q.    I thought you said you were going to accept

8    responsibility today?

9        A.    I am, sir.

11:35:24AM 10 Q.    We'll see.

11              Okay.  So you exchanged these text messages with

12   Scotty Pugh and Scotty Pugh joins you and Big Mike?

13       A.    No, sir.

14       Q.    Doesn't he get together with the two of you somewhere?

11:35:45AM 15 A.    No, sir.

16       Q.    What happens then?

17       A.    We went to Scotty's house.

18       Q.    You went to Scotty's house?

19       A.    Yes, sir.

11:35:52AM 20 Q.    You and Big Mike join Scotty?

21       A.    Yes, sir.

22       Q.    I'm sorry.  All right.  The three of you got together?

23       A.    Yes, sir.

24       Q.    And from that point on, did you begin planning this

11:36:03AM 25 trip to Kerrville to commit this robbery?

1      A.   No, sir, we started drinking.

2      Q.   Started drinking.  All right.  You had the vest with

3  you at the time?

4      A.   Yes, sir.

11:36:13AM 5      Q.   And Scotty had his vest with him at the time?

6      A.   Yes, sir.

7      Q.   Where did Scotty get his vest?

8      A.   I have no idea.

9      Q.   All right.  So you just brought those down with you

11:36:22AM 10  coincidentally?

11      A.   No, sir.

12      Q.   Why did you bring them?

13      A.   Are you saying them as plural or are you saying one,

14  sir?

11:36:30AM 15      Q.   Well, did you bring your vest down with you just

16  coincidentally?

17      A.   Yes, sir.

18      Q.   Like you said, you didn't wear your vest around your

19  family and stuff?

11:36:40AM 20      A.   You don't, but if I was in San Antonio, I wasn't just

21  staying with family the whole time.

22      Q.   You knew that it was a violation of probation for you

23  to have body armor, didn't you?

24      A.   No, sir.

11:36:50AM 25      Q.   You know that now?

1       A.   Yes, sir.

2       Q.   All right.  So you and Big Mike and your vest go to

3   Scotty Pugh's house?

4       A.   Yes, sir.

11:37:00AM 5   Q.   And I take it, did you ride in Big Mike's car?

6       A.   Yes, sir.

7       Q.   All right.  Was the bag with the guns visible at that

8   time?

9       A.   The bag itself?

11:37:09AM 10   Q.   Yeah.

11       A.   No, sir.

12       Q.   You couldn't see it?

13       A.   No, sir.

14       Q.   In the trunk or something?

11:37:14AM 15   A.   Yes, sir.

16       Q.   All right.  So you get with Scotty Pugh, you and Big

17   Mike and your vest and you three sit down and concoct this plan

18   to go rob a drug dealer -- what you think is a drug dealer?

19       A.   No, sir.

11:37:30AM 20   Q.   What happened?

21       A.   Like I say, we started drinking.

22       Q.   Well, at some point when you're drinking, you concocted

23   this plan, didn't you?

24       A.   No, sir.

11:37:39AM 25   Q.   Well, when did you concoct the plan?

1      A.   I want to make sure I can talk.

2           Well, when we were there, he had already asked me

3   about the plan.  He was saying -- he said, hey, I got a guy I

4   need to meet.  This is prior to that day.  I got a guy I need

11:37:54AM 5   to meet.  Do you have somebody to help you.  That's what he's

6   talking about in the text messages.

7      Q.   So the August text messages was for you to recruit

8   Scotty Pugh to help you, but Scotty Pugh didn't know what it

9   was?

11:38:06AM 10      A.   Right.  Right.  We both didn't know what it was at the

11   time.  He just said he needed someone.

12      Q.   So you knew something was up with Big Mike on August

13   25.  He wanted you and a friend to get down here?

14      A.   Yes, sir.

11:38:15AM 15      Q.   But you didn't know what it was?

16      A.   Yes, sir.

17      Q.   But would you say that is the beginning of a plan at

18   least by Big Mike?

19      A.   Well, no.  Big Mike did have a plan, but it's not what

11:38:24AM 20   you're saying.

21      Q.   So when did you learn that Big Mike's plan was going to

22   be that you were going to rob somebody?

23      A.   Not until the morning of.

24      Q.   Morning of?  You're talking early in the morning hours?

11:38:36AM 25      A.   Yes, sir.

1    Q.   Well, this wasn't committed until about 3:00 in the

2    afternoon.  That's a long time to think about it.

3    A.   Yes, sir.

4    Q.   So you learned early in the morning that Big Mike

11:38:45AM 5 wanted you and Scotty Pugh to come to Kerrville and rob

6    somebody?

7    A.   No, sir.

8    Q.   Then what were you going to do?

9    A.   He said he needed to collect money.  He said the guy

11:38:56AM 10 knew he owed him money.

11   Q.   I got to tell you, Mr. Travis, I struggle a little bit

12   with the concept of collecting money.  You've got body armor

13   and a pistol.  That doesn't sound like collecting money to me.

14   Is that what you're telling the jury you did?

11:39:11AM 15 A.   Yes, sir.

16   Q.   You're saying that's your story, you're sticking to it?

17   A.   You're asking which part?

18   Q.   You're saying you didn't come down there to rob him;

19   you came down to collect money.  And I'm saying, I've never

11:39:22AM 20 seen anybody collect money with a firearm before.  I call that

21   robbery, don't you?

22   A.   No, sir.

23   Q.   All right.  So that wasn't -- you just had those guns

24   with you, in case whoever this person you were going to collect

11:39:33AM 25 money for, legally decided to get upset with you and maybe

1    tried to keep you from collecting money from him, you brought

2    guns only to protect yourself; is that what you're saying?

3        A.   No, it wasn't for protection.  It was more if you have

4    a gun, the person would just -- you wouldn't have the -- there

11:39:49AM 5    wouldn't be any kind of argument or disagreement.

6        Q.   You betcha.  It's a show of force, isn't it?

7        A.   Well --

8        Q.   Sure it is.  Come on, you can say that.  It's a show of

9    force, isn't it?

11:39:58AM 10        A.   Yes, sir.

11        Q.   If you've got a gun in your hand, they're not going to

12    argue back?

13        A.   Well, not in your hand but --

14        Q.   Well, you had it in your hand, didn't you?

11:40:07AM 15        A.   Not going into the house, no.

16        Q.   You had it in your hand in the house, didn't you?

17        A.   Not going into the house, no.

18        Q.   I said in the house.  You had it in your hand, didn't

19    you?

11:40:17AM 20        A.   Yes, sir.

21        Q.   All right.  And you were prepared to use it as a show

22    of force?

23        A.   No, not use it.

24        Q.   Well, if you display it at all, in some respect you're

11:40:26AM 25    using it, aren't you?

A.   I don't know if I can comment on it, like a marksman on it, but I mean police officers carry weapons every day.

Q.   You were not a police officer, were you?

A.   Police officers going on duty carry weapons every day.

Q.   You are not a police officer, are you?

A.   All right, sir.  Yes, sir.

Q.   You were not doing anything to even besmirch an officer that might be doing his job?  I can't believe you're claiming that.

A.   I'm not claiming that.

Q.   You're telling me you have the right to carry that firearm?

A.   Well, me as a felon, I know I shouldn't had a firearm. Me as a resident of the United States, I'm allowed to carry a firearm.

Q.   No, you're not allowed to carry a firearm.

A.   Not as a felon, no, sir.

Q.   You're right.  You're never allowed to carry a gun.

A.   I already said that, yes, sir.

Q.   And you knew that when you put that gun in your hand, you weren't supposed to have it?

A.   Yes, I did.

Q.   Okay.  Let me back up.  I got ahead of myself.

Let's go back to your meeting where you and Big Mike go to Scotty's house and you begin to plan your trip.

1    A.   Yes, sir.

2    Q.   Tell me what all was said by whom to put together this

3    plan to go rob the residence at the Madrona Drive.

4    A.   Okay.  Like I say, I said I was drinking a little bit,

11:41:44AM 5    but I still do remember some of the events that happened.  We

6    were there and --

7    Q.   Well, wait a minute.  Let me stop you there just for a

8    second.  You were very clear with the jury that you remember

9    everything that happened inside that house even to the point of

11:41:58AM 10    basically calling Amber a liar.  Are you saying now you're not

11    clear on some of it?

12    A.   Oh, no, no, no, I'm clear.  I'm saying on parts of it,

13    I mean the traumatic things you've done, you know what

14    happened.  You're there.

11:42:09AM 15    Q.   You bet.  When you're traumatized, you're going to

16    remember it, aren't you?

17    A.   Well, yes.  You should remember it, yes.

18    Q.   You're going to get it right?

19    A.   Yes.

11:42:17AM 20    Q.   It's photographed in your mind forever?

21    A.   Right.  I agree with that.

22    Q.   You agree?

23    A.   I agree.

24    Q.   So that's why Amber's story is pretty accurate, wasn't

11:42:27AM 25    it?

1      A.   Not at all.

2      Q.   Everybody other than Amber?

3      A.   And other persons.

4      Q.   Go back.  Tell us about the plan.

11:42:33AM 5      A.   Okay.  Like I say, they were talking.  Like I say,

6  hey, you know, I never had the meeting that he wanted me and

7  Scotty to go to the first time was for a meeting in San

8  Antonio.

9      Q.   That he needed gloves for?

11:42:46AM 10      A.   Yes, he said, hey, you know, I want y'all to come with

11  me.  Nothing should happen, but I want to have some tracing

12  done.  He knows that I know how to use a weapon.  He knew

13  Scotty was a big guy so I mean he knew that, you know, me and

14  Scotty would get along.  So I told Scotty about it.  And he

11:43:02AM 15  said, yeah, I'm fine, you know, whenever I get off.  So I asked

16  him, I said, hey, what about the 2nd or 3rd.

17           From there, me and Mike talk about it.  He said,

18  hey, never mind.  He goes, don't worry about it.  We're going

19  to meet up, this and that.  Then he canceled it.  He said the

11:43:18AM 20  guy, you know, is already going to meet me.  I don't need

21  y'all.  It's going to be okay.  And then he said that day, that

22  morning of, he goes, well, he never showed up with the money,

23  which would be I want to say the 4th that he said that or the

24  morning time of the 5th.  He said the guy never showed up.

11:43:35AM 25  This is while we were sitting at Scotty's house.  Scotty was

1    clueless as to what was happening at that point.  And he just

2    kept saying over and over again and then he goes, well, hey,

3    Scotty, you know, if you want to pay me this money.  And he

4    said, you know, I'll wipe your debt off.  And I was just trying

11:43:50AM 5    to figure out what debt I had to him.  And like I say, he was

6    giving me pills, so I mean I had a debt to him.  It wasn't

7    financial gain for me other than -- well, I guess it was

8    financial if I had to give him money.

9        Q.  Let me stop you right there and I want to regroup a

11:44:06AM 10   little bit.

11       A.  Yes, sir.

12       Q.  Make sure I understand you so far.

13       A.  Yes, sir.

14       Q.  At this point in time, this individual that lived in

11:44:13AM 15   Kerr County, in fact, had not paid Big Mike whatever money he

16   owed Big Mike?

17       A.  Yes, sir.

18       Q.  So Big Mike recruited you and Scotty to -- did you know

19   at that time you were going to follow him here?

11:44:26AM 20       A.  Yeah, that's what -- that's what he said to follow him

21   here.

22       Q.  Follow him here and you and Scotty were going to go

23   extract the money from this guy?

24       A.  Well, what was supposed to happen was -- he said was,

11:44:38AM 25   you know, just wait for him to come outside, you know, and then

1   just run around him, tell him, you know, give me the money you

2   owe.  And if anything, when you say give me the money that he

3   would know what that meant.  Pretty much like -- I guess it was

4   supposed to be a scare tactic or a guarantee if you're going to

11:44:54AM 5   grab something out of it.

6       Q.   Scare tactic is an understatement, wouldn't you agree?

7       A.   No, sir.

8       Q.   So in exchange for doing this, Scotty is going to get

9   some money?

11:45:06AM 10       A.   Yes, sir.

11       Q.   And you're going to get your drug debt wiped free?

12       A.   Yes, sir.

13       Q.   And Big Mike is hopefully going to get the money that

14   he's owed?

11:45:14AM 15       A.   Yes, sir.

16       Q.   And at what point in time did Big Mike bring out the

17   guns that you and Scotty were going to carry?

18       A.   He gave us the guns when we were leaving Scotty's

19   house.  He went to the trunk of his car.

11:45:30AM 20       Q.   Did he advise you while y'all were having this plan

21   that he had some guns that he wanted y'all to carry with you as

22   I think a show of force?

23       A.   Yes, sir.

24       Q.   So somewhere in here you knew guns were going to be

11:45:44AM 25   involved?

1      A.   Yes.  As we were walking to the car, he said here are

2   some guns.

3      Q.   Are you still in?

4      A.   Yes, sir.

11:45:50AM 5   Q.   Okay.  And then you said Scotty had on body armor

6   during this as well as you?

7      A.   Yes, sir.

8      Q.   Where did his body armor come from?

9      A.   I have no idea.

11:45:59AM 10   Q.   I mean, did he have it there in the house apparently?

11      A.   I guess, yes, sir.  I don't know where he got it from.

12      Q.   Okay.  I'm up to where y'all were leaving the house.  I

13   want to make sure I've got the plan.

14      A.   Yes, sir.

11:46:16AM 15   Q.   You and Scotty are going to arm yourselves and put on

16   body armor and you're going to follow Big Mike to Kerrville,

17   Texas, for the purpose of collecting money from Big -- for Big

18   Mike.  You had guns with you to be able to intimidate, I guess?

19           MR. BROWN:  Judge, I'm going to object to the

11:46:46AM 20   prosecutor testifying.

21           THE COURT:  Overruled.

22      Q.   (BY MR. MONROE) And you were going to follow Big Mike

23   down.  He was going to show you which house it was?

24      A.   Yes, sir.

11:47:01AM 25   Q.   You and Scotty were going to go up to collect the

money, correct?

    A.   Yes, sir.

    Q.   You hoped that he would be outside?

    A.   He was outside.

    Q.   Well, not the entire time though?

    A.   Yes, sir.

    Q.   He went back in?

    A.   Yes, sir.

    Q.   But you had hoped that he would be outside the entire time?

    A.   The thing was, we weren't supposed to go inside the house, period.  It was supposed to be him coming outside.

    Q.   Okay.  And when you come down, you're going to collect the money semi-forcefully if you had to from this guy that owed Big Mike money?

    A.   What is semi-force?

    Q.   Well, you had guns with you.  I mean, to me, if somebody comes up to me with a gun, I got to tell you, if they're demanding money from me, whether they say I owe them money or not, I got to tell you I'm going to think I'm being robbed and I think just about everybody in here is going to think the same thing.  So what do you call it?

    A.   Well, I'm just asking -- because I'm saying if I came up and said you owe money and you would say, no, I don't owe money, you would say you don't have to rob me, here is my

1   money.  That's just me.  I could be thinking differently, but

2   that's like I say, my opinion.

3       Q.   Do the people you run around go do that with guns in

4   their hand?

11:48:12AM 5       A.   No, sir.

6       Q.   All right.  You don't think that changes the complexion

7   of this entire event when you have a gun in your hand?

8       A.   Well, I don't have people that do this kind of stuff so

9   I don't know -- you know, I don't know what you want me to say.

11:48:25AM 10  I'm sorry.

11      Q.   Go back to the meeting.  Y'all are leaving Scotty's

12  house and you're going to drive to Kerrville.  Are you with me?

13  That's where we are right now.

14      A.   Yes, sir.

11:48:36AM 15      Q.   All right.  You and Scotty get into Scotty's vehicle;

16  is that correct?

17      A.   Yes, sir.

18      Q.   And what kind of vehicle does Scotty drive?

19      A.   It's a bluish color Crown Victoria, like a green,

11:48:49AM 20  bluish green.

21      Q.   And what do you put into the vehicle with you?

22      A.   Alcohol.

23      Q.   Alcohol and what else?

24      A.   The bag of guns.

11:48:57AM 25      Q.   The bag.  And by this time, you knew what was in the

1  bag?

2      A.  Yes, sir.

3      Q.  You knew it was a violation of your probation to have

4  it?

11:49:04AM 5   A.  Yes, sir.

6      Q.  What else did you put in the bag?

7      A.  Put in the bag?

8      Q.  I mean, what else did you put in the car?  Was there

9  anything else other than you and Scotty and the bag?

11:49:16AM 10  A.  No, sir.

11     Q.  And alcohol?

12     A.  No, sir.

13     Q.  Okay.  And Big Mike gets into Big Mike's car?

14     A.  Yes, sir.

11:49:21AM 15  Q.  And what kind of car does Big Mike drive?

16     A.  It was a red -- I want to say a little red sports car.

17  I don't know the exact model number.

18             COURT REPORTER:  I'm sorry.  I can't hear you.

19             THE WITNESS:  It was a red sports car.

11:49:32AM 20  Q.  (BY MR. MONROE) You understand I'm asking these

21  questions because this is the first time anybody at this

22  table -- yesterday was the first time anybody had ever heard of

23  Big Mike.  You recognize that, don't you?

24             MR. BROWN:  I'm going to object, Your Honor.

11:49:49AM 25  That's not true.  I have discovery here where the person that

1   was inside the house mentions Big Mike in his own statement.

2   That's a misstatement in front of this jury.

3              THE COURT:  It sounded like more of a statement

4   than a question.  Let's have a question.

11:50:04AM 5              MR. MONROE:  All right.

6       Q.   (BY MR. MONROE) This is the first time it's been

7   mentioned that you followed somebody down here named Big Mike

8   who helped you plan this event.  That's correct; is it not?

9       A.   This is the first time I spoke.

11:50:29AM 10      Q.   Okay.  What's Big Mike's telephone number?

11      A.   I don't have -- I don't know.

12      Q.   You don't have it?

13      A.   I don't know.

14      Q.   Is it in your cell phone?

11:50:38AM 15      A.   Probably so.

16      Q.   Okay.  Let's get that cell phone.

17              I'm going to hand you what's been marked as

18  State's Exhibit 46 (sic).

19      A.   Yes, sir.

11:51:40AM 20      Q.   I ask if you can identify that?

21      A.   That's my cell phone.

22      Q.   All right.  Do you have any objection to us turning on

23  that phone and gathering the information out of it?

24      A.   What information do you need out of it?

11:51:54AM 25      Q.   Big Mike's phone number.

1      A.   I'm going to ask why do you need his phone number?

2      Q.   I want to see if his phone number is on there.  Do we

3  have permission to look at your phone?

4      A.   No, sir.

11:52:02AM 5      Q.   We do not?

6      A.   No, sir.

7      Q.   But you're accepting responsibility here today; are you

8  not?

9      A.   Yes, sir.  I am accepting --

11:52:08AM 10      Q.   But we can't look at your cell phone?

11      A.   I am accepting responsibility.

12           MR. MONROE:  We ask for permission to turn the

13  phone on.  Will somebody come up here and let's turn the phone

14  on.

11:52:20AM 15           THE COURT:  I'll tell you what.  Let's go ahead

16  and take the lunch break now.  We'll talk about the phone a

17  little bit on this break.

18           Ladies and Gentlemen, I need you to be back here

19  at 1:15, so if you'll go with the bailiff please.

11:52:36AM 20           THE BAILIFF:  All rise for the jury.

21           (Jury not present).

22           THE COURT:  Before I forget, let's double-check.

23  I thought I had admitted a 46, but let's take a look at that

24  and so don't forget for us to make sure that we don't have a

11:53:15AM 25  duplication.

TERI THOMAS, CSR, RPR, CMRS

1          So are you going to offer -- it hasn't been

2    offered yet.

3          MR. MONROE:  It has been offered and he has not

4    given us permission to search the phone, so I need to get a

11:53:27AM  5    search warrant and I'm going to do that right now and hopefully

6    he'll rethink and not make us do all of that, but that's his

7    call.  And then we'll get the information off the phone if the

8    Court considers and entertains granting it.

9          THE COURT:  I'm not going to put you on the spot,

11:53:41AM 10    Mr. Brown on the record, but you might want to visit when we

11    take this break and see what you're going to have to do about

12    the cell phone.

13          MR. BROWN:  Okay.

14          THE COURT:  All right.  So let's take a break and

11:53:52AM 15    we'll start at 1:15.  Thank you.

16          (Lunch recess).

17          THE COURT:  Travis, if you want to come back to

18    the witness stand, the jurors are about to come in.

19          THE BAILIFF:  All rise for the jury, please.

01:15:56PM 20          (Jury present).

21          THE COURT:  Everyone have a seat.  I think Mr.

22    Monroe, you were cross-examining Mr. Travis and you may

23    continue.

24          MR. MONROE:  Yes, Your Honor.  Thank you.

01:16:40PM 25    Q.   (BY MR. MONROE) Mr. Travis, let's back up a little bit.

1      A.   Yes, sir.

2      Q.   Get back to where we were planning this event.  We're

3   at Scotty Pugh's house, as I understood you?

4      A.   Yes, sir.

01:16:53PM 5      Q.   And it's you, Scotty and Big Mike?

6      A.   Yes, sir.

7      Q.   Anybody else involved?

8      A.   No, sir.

9      Q.   Anybody else present?

01:17:00PM 10      A.   No, sir.

11      Q.   No one else had anything to do with this?

12      A.   No, sir.

13      Q.   All right.  When you came down from Arlington to San

14   Antonio, did you drive yourself or somebody else came back with

01:17:32PM 15   you?

16      A.   Somebody else drove me.

17      Q.   Who drove you?

18      A.   Chinnaprat.

19      Q.   What's his name again?

01:17:44PM 20      A.   Chinnaprat Intong.

21           COURT REPORTER:  I'm sorry, I can't hear you.

22           THE WITNESS:  Chinnaprat.

23      Q.   (BY MR. MONROE) Can you spell the last name?

24      A.   I'm sorry.  I-N-T-O-N-G.

01:17:59PM 25      Q.   And who is -- can I call him Gino?

1      A.   That's fine.

2      Q.   Who is Gino?

3      A.   He's a coworker.

4      Q.   He worked at the Olive Garden with you?

01:18:11PM 5      A.   Yes, sir, and the Cheesecake Factory.

6      Q.   Where did Gino go while all this stuff was going on?

7      A.   He was staying at Erica's Gratch's house.

8      Q.   What is Erica's last name?

9      A.   Gratch.

01:18:35PM 10     Q.   Can you spell that?

11     A.   G-R-A-T-C-H.

12     Q.   Does she live in San Antonio?

13     A.   Universal City area.

14     Q.   What does she do for a living?

01:18:46PM 15     A.   I'm not 100 percent positive.

16     Q.   How might we reach Erica if we want to try to track her

17 down?

18     A.   I don't know really.

19     Q.   And Gino, how might we reach him?

01:18:56PM 20     A.   You can probably call him on his cell phone number.

21     Q.   Do you know that off the top of your head?

22     A.   No, I don't.

23     Q.   Okay.  So the three of you get into two vehicles?

24     A.   Yes, sir.

01:19:11PM 25     Q.   From Scotty's house?

1      A.   Yes, sir.

2      Q.   And that's in Universal City?

3      A.   Yes, sir.

4      Q.   And then you drive to Kerrville?

01:19:19PM 5      A.   Yes, sir.

6      Q.   When you get into the car at Scotty's house, you and

7   Scotty are already wearing body armor?

8      A.   Yes, sir.

9      Q.   All right.  Are the guns in your hands or are they

01:19:33PM 10   still in the bag?

11      A.   They're still in the bag.

12      Q.   All right.  You drive to Kerrville and you are

13   following Big Mike?

14      A.   Yes, sir.

01:19:40PM 15      Q.   Are you continuing to visit with him on the phone?

16      A.   Who is that?

17      Q.   Big Mike?

18      A.   Yes, sir.

19      Q.   Okay.  And is it you talking to Big Mike on the phone

01:19:49PM 20   or is it Scotty talking to Big Mike?

21      A.   I believe it's on the speakerphone.

22      Q.   All right.

23      A.   Yes, sir.

24      Q.   And do you know whose phone it was?

01:19:57PM 25      A.   It was my phone.

1      Q.   Okay.

2      A.   Yes, sir.

3      Q.   What is going to be the plan then?  What have y'all

4 decided if everything goes perfectly?

01:20:07PM 5      A.   Yes, sir.

6      Q.   What are y'all going to do when you get to Kerrville?

7      A.   Pretty much we were going to -- he wanted us to wait

8 for him to come outside, but when we drove by, he was already

9 outside.  So I was on the speakerphone with him and he said,

01:20:21PM 10 that's him.  And then we go, so what do you want to do.  He

11 said, y'all go get him.  So we turned around -- we passed the

12 house when we saw him.  We turned around and drove into the

13 driveway.

14      Q.   Did you only drive by the house one time or did you

01:20:35PM 15 drive by more than once?

16      A.   No, sir, just once.

17      Q.   Okay.  Did Mike drive by the house also?

18      A.   Yes, sir, he did.

19      Q.   Did he only drive by one time?

01:20:45PM 20      A.   I'm not sure because we were out of the vehicle.

21      Q.   Okay.  Were you within eyesight with Big Mike this

22 entire time?  I mean, where you can see his car out in front of

23 you?

24      A.   Yes, sir.  Driving by, yes, sir.

01:20:58PM 25      Q.   So you drive by and somebody is out on the porch?

1      A.    Yes, sir.

2      Q.    And when you drive by, whoever is out on the porch goes

3    into the residence?

4      A.    Yes, sir.

01:21:09PM 5      Q.    And what did you all decide to do then?

6      A.    It was more of once we saw him outside, he was like go

7    get him, so that's when we just turned around and got out of

8    the car.  The guy, I don't believe he was completely in the

9    house yet.  I'm not 100 percent positive, but I think he closed

01:21:28PM 10    the door and then Scotty kicked it in as he was closing it.

11      Q.    So what did "go get him" mean to you?

12      A.    Just go get him, just like don't let him get away.

13    Like went off.

14      Q.    Well, if he went into the house, how were you going to

01:21:42PM 15    get him out?

16      A.    Go after him.  We had to go in the house.

17      Q.    So you had to go in the house?

18      A.    Yes, sir.  Yes, sir.

19      Q.    So the plan had changed?

01:21:50PM 20      A.    Yes, sir.

21      Q.    All right.  So where did you park your vehicle?

22      A.    Scotty pulled up right in front, kind of diagonal,

23    facing the door.

24      Q.    All right.  Parked the vehicle.  And when did you

01:22:03PM 25    retrieve the guns?

1    A.   The guns -- as he said go get them because we had to

2  drive down the street to turn around, we took those out as he

3  was turning around.

4    Q.   Okay.  So when you got out of the vehicle, both you and

01:22:16PM  5  Scotty had the pistols in your hands?

6    A.   Yes, sir.

7    Q.   You were carrying a dark colored Glock; is that

8  correct?

9    A.   Yes, sir.

01:22:24PM 10    Q.   The .45?

11    A.   Yes, sir.

12    Q.   And Scotty was carrying the stainless nine-millimeter?

13    A.   Yes, sir.

14    Q.   And both of them were loaded?

01:22:32PM 15    A.   Yes, sir.

16    Q.   When you went up to the door, what did either you or

17  Scotty do?

18    A.   Scotty kicked the door at that time.

19    Q.   Scotty kicked the door in at that time?

01:22:42PM 20    A.   Yes, sir.

21    Q.   Did you tell him to do that or did he do it on his own?

22    A.   No, sir, he just did it.

23    Q.   Did that surprise you?

24    A.   No, because when we were going up there, he didn't go

01:22:51PM 25  and try to grab the handle.  I mean, it was all happening at

1   once.

2      Q.   And you're still at this point in time in furtherance

3   of trying to collect the debt for Big Mike?

4      A.   Yes, sir.

01:23:01PM 5      Q.   So both of you voluntarily entered into the habitation?

6      A.   Yes, sir.

7      Q.   You did not have permission to go in?

8      A.   No, sir, I did not.

9      Q.   All right.  And you went in there with the intention,

01:23:10PM 10  and you can call it to collect a debt or whatever you want to,

11  but you were going to obtain money from whoever was in there?

12     A.   Yes, sir.

13     Q.   And you were prepared to have your firearms with you as

14  a show of force?

01:23:22PM 15     A.   Yes, sir.

16     Q.   To intimidate him whoever it was?

17     A.   Yes, sir.

18     Q.   Into giving you the money?

19     A.   Yes, sir.

01:23:27PM 20     Q.   Did you know anything about who it was you were going

21  to see?

22     A.   No, sir.

23     Q.   All right.  You said you walked in the door and Scotty

24  went to the right?

01:23:42PM 25     A.   Yes, sir.

1    Q.   And you went to the left?

2    A.   Yes, sir.

3    Q.   All right.  Scotty you said -- I was watching you with

4    the little diagram -- stood basically at the entrance of the

01:23:54PM 5    hallway there where it would go back to where --

6    A.   Yes, sir.  Yes, sir, he was in the hallway.

7    Q.   All right.  And you went into the living area towards

8    the other door --

9    A.   Yes, sir.

01:24:02PM 10    Q.   -- of the bedroom?

11    A.   Yes, sir.

12    Q.   What was going on in that other bedroom that you went

13    towards?

14    A.   That's where the gentleman had ran.  I saw -- I saw the

01:24:12PM 15    woman and the gentleman both go different ways.  We saw them in

16    the house.

17    Q.   So you ran in there and shut the door behind you?

18    A.   Yes, sir, I did.

19    Q.   And did you check the door to see if it was locked?

01:24:24PM 20    A.   No, I did not.

21    Q.   All right.  Are you exchanging words with him?

22    A.   Yes, I was -- well, I wasn't exchanging words, but I

23    was knocking on the door.  He didn't respond.

24    Q.   And were you politely knocking on the door?

01:24:38PM 25    A.   No, sir, I was not.

1    Q.   And were you using the expletives that Amber described

2  you using?

3    A.   I'm sorry, I don't know what you mean.

4    Q.   The profanity.  The F words?

01:24:50PM 5    A.   No, sir.

6    Q.   You didn't use any of that profanity?

7    A.   No, sir.

8    Q.   So she made that up?

9    A.   I don't remember or recall her saying me saying

01:24:57PM 10  anything to the gentleman in the door.

11    Q.   Were you using expletives at any point in there?

12    A.   No, sir.

13    Q.   So she made that up?

14    A.   Yes, sir.

01:25:05PM 15    Q.   All right.  She mentioned that somebody went and opened

16  the freezer.  Did that happen?

17    A.   No, sir.

18    Q.   Okay.  Didn't do that.  Okay.  So you go up to the door

19  and you knock on it?

01:25:19PM 20    A.   Pretty much knock or I was hard knocking.  Let's say

21  more beating on the door than just knocking.

22    Q.   Banging on the door?

23    A.   Pretty much, yes, sir.

24    Q.   All right.  What did you say?

01:25:30PM 25    A.   I was like, I tell him, open the door, you know what I

am here for.  I'm just coming to get the money.  Open the door.

Q.   And what did you think was in there?

A.   I was already told that he was going to have the money there, that it was going to be in that room, so I already knew that he should have it in there and I figure that's why he ran into the room.

Q.   And who told you that?

A.   Big Mike.

Q.   And what did Big Mike tell you about what he thought you were going to find as far as the money in the room?

A.   He just said that he had owed him money over the past -- I don't want to say the exact date because I don't remember how long it was.  So he just said he owed him a sum of money, that he knows how much it is, so he is either going to give that to you or take it from him.

Q.   So as far as you're concerned at this point, you're still in the middle of your three-person plan with yourself, Scotty Pugh and Big Mike to extract money from the owner of this residence by force if necessary?

A.   Yes, sir.

Q.   Okay.  Did the person in the room respond to you in any way?

A.   No, sir, he was quiet.

Q.   All right.  What's the next thing you recall happening?

A.   That's when I heard the lady scream.  She -- first, she

1   said, give him whatever he wants and then she screams and I'm

2   pretty sure -- I don't want to say who said it, but I think

3   Scotty told her to lay down, like -- like, that's why I was

4   trying to look to see what the commotion was and that's when I

01:27:00PM 5   saw the little boy.  And I told, Scotty, tell her to go back to

6   the room.

7       Q.   You never went down that hall?

8       A.   Not once.

9       Q.   Do you think she dreamed that or what?  I mean, she was

01:27:20PM 10  pretty specific you were the one that went down the hall?

11      A.   I didn't, sir.

12      Q.   Okay.  You heard her screaming back in the room.  What

13  is the next thing you did?

14      A.   That's when I turned to go knock on the door again.

01:27:41PM 15  That's when I was beating on the door and that's when the

16  gunshot came through the door.

17      Q.   Okay.  The gunshot actually came through the door?

18      A.   Yes, sir.

19      Q.   Made a hole in the door?

01:27:50PM 20  A.   Yes, sir.

21      Q.   Did I hear you say the bullet fragments struck you?

22      A.   No.

23      Q.   Hold on.  So it came through the door and then what did

24  you do?

01:28:00PM 25  A.   I paused and I took a step back.  I looked at Scotty

1   because I just told him to, you know, send the kid and the

2   woman in the room.  I said send them to the room.  And I looked

3   at him and he had like a shot look, like have you been hit

4   because he can see what I saw, and that's why I suppressed

01:28:18PM 5   fire.

6      Q.   You suppressed fire.  Now you're in someone elses'

7   house?

8      A.   Yes, sir.

9      Q.   That you were not invited into?

01:28:25PM 10      A.   Yes, sir.

11      Q.   You're wearing body armor?

12      A.   Yes, sir.

13      Q.   You've got a gun in your hand?

14      A.   Yes, sir.

01:28:32PM 15      Q.   You're banging on a door?

16      A.   Yes, sir.

17      Q.   What made you think you had the right to return fire?

18      A.   At -- honestly I'm sorry I did.  It just -- it was kind

19   of just, it's hard to say, but a bang bang situation where it

01:28:48PM 20   just happened.  I wish it would have never happened but that's

21   just my way of getting out of situations.

22      Q.   You're blaming that on your PTSD?

23      A.   I don't have --

24      Q.   On post-traumatic stress disorder?

01:29:03PM 25      A.   No, sir, I blame it on the alcohol and the drugs.

          1     Q.   So you turned around in response to after someone had

          2   fired a weapon because you've broken into their home and you're

          3   armed.  You kicked the door in, and I assume this person

          4   probably didn't know who had actually kicked the door in.  Do

01:29:25PM 5   you think he knew?

          6     A.   No, sir.

          7     Q.   All right.  So he doesn't know who is at the door.  And

          8   so you hear gunshots so you think that entitles you to fire

          9   back?

01:29:33PM 10    A.   No, sir, I just -- I can't explain it, but I just fired

         11   back.  It's wasn't like a -- it was like an instant.  I wish it

         12   didn't happen, but it did.

         13     Q.   Sounds like a plan reflex is what it sounds to me, but

         14   you're saying you don't do this, so --

01:29:47PM 15    A.   Plan reflex?

         16     Q.   I mean, yeah, when --

         17     A.   No, sir.  Like I say, it just happened.  It wasn't

         18   something I had planned to do.

         19     Q.   Okay.  And then so when you suppressed fire, you fell

01:30:06PM 20   into your military training at that time, I take it?

         21     A.   I'm not going to say that's what that was, no, sir.

         22     Q.   I wouldn't think training would do it in that respect?

         23     A.   No.

         24     Q.   And you shot how many times?

01:30:18PM 25    A.   Two times.

                      TERI THOMAS, CSR, RPR, CMRS

Q.   Just two times?

A.   Yes, sir.

Q.   Where did you shoot?

A.   I thought I shot both at the -- towards the door.  Like
I say, I saw otherwise that one hit beside the wall after the
fact; but when the situation happened, that's where I thought I
had shot.

Q.   Okay.  So you only fired twice.  You're sure about
that?

A.   Yes, sir, because after the shot that the clip fell
out, the spring broke so I had to stop and pick up the bullets.
And you can't reload it and put it back in after the spring is
broken.

Q.   Okay.  You hear a gunshot, you fire back two times and
the other witnesses have testified three times.  That's a
mistake in your opinion?

A.   Yes, sir.

Q.   What did you do then?

A.   Like I say, the clip fell out and all the bullets fell
out so I picked them up and put them in my pocket.  At that
time, I could hear noise going on, but then I saw someone run
across the front door.  At that point --

Q.   You mean outside the house?

A.   Yes, sir, the front door.  At that point, me and Scotty
ran out the door.

Q.   What did you and Scotty do when you left?

A.   We got back in the vehicle.

Q.   All right.

A.   Yes, sir.

Q.   And then when you got back in the vehicle, where did you go?

A.   We turned -- we backed out and pulled forward and like I say, that's when we saw the police officer.

Q.   All right.  And did you basically run from the police officer?

A.   Yes, sir.

Q.   Okay.  You evaded?

A.   Yes, sir.  Evaded, yes, sir.

Q.   And whose idea was it when you were running from the police officer to discard the weapons?

A.   It was mine.  Before we -- I told him before anything that we needed to -- we can't get out with the weapons.

Q.   And was part of your reason for discarding the weapons, you didn't want the reaction from the police to see you with the weapons?

A.   Yes, sir.

Q.   And also maybe the weapons wouldn't be found?

A.   No, sir.  I think pretty much the police officer was behind us when I threw them out, so he should have been able to see where they were at.

```
          1      Q.   You didn't tell him where they were?

          2      A.   They didn't ask me.

          3      Q.   You didn't tell them on the scene?

          4      A.   No, I'm sorry, I did not.

01:32:47PM 5      Q.   You didn't tell him on the scene where your body armor

          6  was?

          7      A.   No, sir.

          8      Q.   You didn't tell him on the scene what you had been

          9  doing when they asked what you were doing there and you said I

01:32:59PM 10 was just walking around?

          11     A.   No, sir.

          12     Q.   You didn't tell them at the scene?

          13     A.   No, sir.

          14     Q.   You weren't accepting responsibility then?

01:33:02PM 15     A.   No, sir.

          16     Q.   You threw them both out the window?

          17     A.   Yes, sir.

          18     Q.   Did you discharge the weapon from inside the vehicle?

          19     A.   No, sir.

01:33:22PM 20     Q.   Where did the .45-caliber shell casing come from that

          21 was found inside the vehicle?

          22     A.   Sir, it might have fell out of my pocket when I picked

          23 it up because I know, like I said, I didn't have any inside, so

          24 possibly when the shell was on the ground, I picked it up and

01:33:38PM 25 put in my pocket, but I don't know why it would be in the
```

vehicle.

Q.   You don't have an explanation for that?

A.   No, sir, I don't.

Q.   You're sure you didn't discharge the weapon inside the
vehicle?

A.   I'm positive.

Q.   So if somebody said that they felt like you were firing
the weapon back out of the vehicle as y'all fled, that's just
not right?

A.   Yes, sir.

Q.   You said in your direct examination -- let me see if I
can find it -- when you looked at your own video of your
statement that you couldn't explain why you were that way?

A.   Yes, sir.

Q.   The fact of the matter is you lied your tail off in
that video, didn't you?

A.   Yes, sir.

Q.   I mean, you lied from the beginning to the end other
than your name?

A.   Well, after watching it, yes, I did, because that's not
what happened.

Q.   You weren't taking responsibility for your behavior
then, were you?

A.   No, sir, I definitely was not.

Q.   You're saying it was the alcohol and the drugs that

1    caused you to do that?

2        A.   Yes, sir.

3        Q.   Now, it's my understanding that you didn't even think

4    you had a problem with alcohol until a couple of months ago?

01:35:00PM 5        A.   Yes, sir.

6        Q.   So you've now decided retrospectively that it was the

7    alcohol and the drugs that caused you to do that?

8        A.   Yes, sir.

9        Q.   When was the last time you had a drink of alcohol?

01:35:16PM 10       A.   My -- I wouldn't be able to tell you the exact date,

11   maybe four or five weeks ago.

12       Q.   Four or five weeks ago?

13            MR. BROWN:   I think he said four or five months

14   ago.

01:35:33PM 15       Q.   (BY MR. MONROE) Four or five nights ago?

16       A.   No, no, no, no.  Actually I can't recall.  It was

17   before I started taking my medication, so whenever that was.  I

18   don't --

19       Q.   So you were continuing to drink until then?

01:35:44PM 20       A.   Right.

21       Q.   Let's talk a little bit about the Xanax.  When did you

22   first start taking Xanax?

23       A.   Right when I was in the military, about my last couple

24   of weeks in.

01:35:56PM 25       Q.   And did you have a prescription for Xanax?

1       A.   No, sir, I did not.

2       Q.   You know it's a controlled substance?

3       A.   Yes, sir.  Yes, sir.

4       Q.   All right.  So you knew well at that point in time.  So

01:36:07PM 5   you were taking Xanax by the time you came back from Iraq?

6       A.   No, no, not by the time.  After I was back from Iraq.

7       Q.   You started taking Xanax after you got here, back to

8   stateside?

9       A.   Yes, sir.

01:36:19PM 10   Q.   Not when you were over there?

11      A.   No, sir.

12      Q.   Well, were you still in the military when you started

13  taking Xanax?

14      A.   Yes, sir.

01:36:27PM 15   Q.   All right.  So that would have been in 2003, late 2003

16  or early 2004 when you got back?

17      A.   2004.  It was my last two weeks, last two weeks before

18  I was out completely.

19      Q.   You started taking Xanax and how did you acquire your

01:36:45PM 20  Xanax?

21      A.   Off the street.

22      Q.   And Big Mike apparently?

23      A.   Not in the beginning, no.

24      Q.   Not in the beginning?

01:36:53PM 25   A.   No, sir.

         Q.   Well, when did you start acquiring your Xanax from Big

Mike?

         A.   I wish -- I don't have an exact date for it.  2000 -- I

really don't have an exact date, I'm sorry, of that exact year.

01:37:16PM   Q.   You got in trouble in Arizona in what year?

         A.   2009, I want to say it was.

         Q.   Were you using Xanax at that time?

         A.   Yes, sir.

         Q.   Acquiring it illegally?

01:37:29PM   A.   Yes, sir.

         Q.   And so you know -- okay.  When were you put on

probation in Arizona?

         A.   I'm not positive.  I had already moved to Dallas, so I

want to say it was maybe 2010.

01:37:48PM   Q.   Okay.  You got in trouble in Arizona, returned back to

Texas and when you got put on probation, your probation was

transferred to Texas under courtesy supervision?

         A.   Yes, sir.

         Q.   At the time your probation was transferred to Texas and

01:38:01PM when you began probation here in Texas, you were using Xanax?

         A.   Yes, sir.

         Q.   And you continued to use Xanax?

         A.   Yes, sir.

         Q.   You never told your probation officer that you were

01:38:11PM using Xanax?

1      A.    No, sir.

2      Q.    Now, where was your daughter living at that time?

3      A.    2000 and -- when I was in Dallas?

4      Q.    When you came back from Arizona and got put on

01:38:25PM 5  probation in Texas, where was your daughter living?

6      A.    She was living in San Antonio.

7      Q.    How often would you come to see your daughter?

8      A.    I would come at the beginning almost every week.

9      Q.    And you never got permission from your probation

01:38:36PM 10 officer to come back to San Antonio?

11     A.    When I got back, I wasn't directly on probation until

12     -- well, I guess you're right.  No, I didn't.

13     Q.    And you understand now every time you left that county,

14     you violated your probation?

01:38:49PM 15 A.    Yes, sir.

16     Q.    When was the last time you took a Xanax?

17     A.    Maybe about two months.

18     Q.    About the same time you stopped drinking?

19     A.    No, sir, I stopped the Xanax earlier.  I was seeing a

01:39:09PM 20 counselor and he was telling me about, you know, if I was going

21     to stop and what I needed to do and so I did that two months

22     prior.

23     Q.    Did I also hear you say and I may have misunderstood

24     you, you were also taking pain medication?

01:39:25PM 25 A.    That was just in the beginning when I had just got out

of the military.  They prescribed me pain medication.  I had

a -- I felt like I had something dislocated in my back, and

they said it was a strain so they gave me medication and a

shot.

01:39:39PM

Q.   Okay.  You said that the body armor that you had gotten

from the military that you had sold?

A.   No, sir.

Q.   I thought you said that you had gotten some when you

got out of the military and you took it with you and you later

01:39:54PM  sold it?

A.   Say it again, I'm sorry.  In the military everything

that was issued as Air Force, I turned it in.

Q.   You didn't have body armor?

A.   No, not in the military.  No, sir.

01:40:06PM  Q.   Somebody thought you had retained the body armor from

the military, so that's not right?

A.   No, sir.

Q.   So when did you acquire the body armor from Kristie?

A.   Honestly it was right before I moved to the Dallas

01:40:22PM  area, so I'm thinking that's like, I want to say 2009, 2010.

Q.   Who is Kristie?

A.   Kristie?

Q.   Yes.

A.   It's an old girlfriend.

01:40:32PM  Q.   What's her last name?

1    A.   Waite.

2    Q.   Spell it please.

3    A.   W-A-I-T-E.  I'm trying to think.

4    Q.   Is it spelled with a C or K?

01:40:48PM 5    A.   It's with a K.

6    Q.   Where did Kristie get the body armor?

7    A.   Actually I really didn't -- I don't know where she got

8    it from exactly.  She told me I could have it when I asked her

9    for it.

01:41:02PM 10   Q.   And what is Kristie's phone number?

11   A.   It's -- I'm not 100 percent positive, but it's a 704

12   number.  I don't know.

13   Q.   Where is she now?

14   A.   She's in Ohio.

01:41:45PM 15   Q.   I guess I'm a little -- I guess I don't understand.

16   A.   Yes, sir.

17   Q.   Why did you feel like you needed body armor?

18   A.   I just always just kind of worry, just -- I never knew

19   what was going to happen, so I was just very nervous so I just

01:42:10PM 20   felt before anything could happen to me, I'm just going to be

21   protected.

22   Q.   You agree with me that's pretty rare.  Not too many

23   people wear body armor that aren't in law enforcement?

24   A.   I'm not positive.  I can't speak for everybody.  No,

01:42:26PM 25   sir.  I'm guessing, no.

1    Q.   When you fired the gun at the door in the residence of

2    Wylie Wilkinson, did you know for a fact who all was in that

3    room?

4    A.   No, sir.

01:42:47PM 5    Q.   Did you know how many people were in that room?

6    A.   No, sir.

7    Q.   Did you know where anybody who was in that room might

8    have been positioned at the time you fired that weapon?

9    A.   Yes, sir.

01:42:59PM 10    Q.   Now, how did you know that?

11    A.   Because you can hear him when he moved to the left.

12    Q.   But you didn't know if anybody else was in there?

13    A.   No, no, you said him.   I didn't know anybody else was

14    in there.

01:43:10PM 15    Q.   So you think you knew where he was?

16    A.   Yes, sir.

17    Q.   But as far as anybody else was in there, you didn't

18    have any idea?

19    A.   Yes, sir.

01:43:17PM 20    Q.   So when you fired the gun into the door, you were

21    prepared to accept the consequences of anybody being injured as

22    a result of your gun fire; is that correct?

23    A.   No, sir.

24    Q.   You would agree with me --

01:43:28PM 25    A.   Yes, sir.

1    Q.    -- that that was an act clearly dangerous to human

2    life?

3    A.    Yes, sir.

4    Q.    And that the gun you had in your hand was capable of

01:43:36PM 5    inflicting serious bodily injury or death?

6    A.    Yes, sir.

7    Q.    And whether you feel like you were justified or not,

8    you used that weapon in furtherance of your attempt to collect

9    money from the owner of that house?

01:44:00PM 10    A.    No, sir.

11    Q.    You used the weapon to defend yourself?

12    A.    No, I was using the weapon to get out of the house.

13    Q.    To defend yourself.  You explained that -- you already

14    said that you took it so if someone saw you to intimidate them.

01:44:12PM 15    So what's the big deal about this?

16    A.    No, sir.  No, you're right, about the intimidation

17    part.  But I'm saying the firing was to get out of the house,

18    not to stay and get money after the firing.

19    Q.    You said you were aware when you got out of the service

01:44:31PM 20    that there were things that were available to you through the

21    VA?

22    A.    Yes, sir.

23    Q.    But you chose to not avail yourself of any of that?

24    A.    I didn't feel like I needed it.

01:44:50PM 25    Q.    Let's talk about say from September 5, 2013 -- let's go

1    back a year.

2        A.   Yes, sir.

3        Q.   That period, how much were you drinking a day?

4        A.   Based off of liquor or beer, I'd say that if I wasn't

01:45:11PM 5  working, between 7 and 5, I'd get the small, about this size of

6    Bacardi.  I don't know.  I don't know the exact size.

7    Sometimes I would get the 1.75 liter of Bacardi.

8        Q.   How long would that last you?

9        A.   A day.

01:45:33PM 10     Q.   Drink it all in one day?

11       A.   Uh-huh, a day.

12       Q.   Would you drink beer on top of that?

13       A.   Usually not.  Usually by the time I drink it, I pass

14   out.  Other than that --

01:45:40PM 15     Q.   Then how much Xanax were you taking each day?

16       A.   Usually like I say, if I'm working, I'll take about

17   four throughout the day.  If not, maybe one or two.

18       Q.   You took them every day?

19       A.   Yes, sir.

01:45:57PM 20     Q.   So two to four Xanax every day?

21       A.   Yes, sir.

22       Q.   In addition to a liter, a liter and a half of Bacardi?

23       A.   Yes.

24       Q.   Every day?

01:46:13PM 25     A.   Yes, sir.

1    Q.   And you knew that every time you took the Xanax, you

2    violated the probation?

3    A.   I didn't think of it, but I did sign the paper saying

4    no drugs, yes, sir.

01:46:22PM 5    Q.   The truth of the matter is that you violated your

6    probation by having anything to do with Big Mike after that,

7    too, didn't you?  You know that, don't you?

8    A.   Yes.

9    Q.   Avoid persons or places of disreputable or harmful

01:46:37PM 10   character, you knew that?

11   A.   Yes, sir.

12   Q.   So you were in violation of your probation daily and

13   you were aware that you were in violation of your probation

14   daily?

01:46:46PM 15   A.   Yes, sir.

16   Q.   How did you pass the UA's?

17   A.   I knew that it took about a couple of days to get it

18   out of my system.

19   Q.   So you manipulated the system?

01:46:55PM 20   A.   Yes, sir, I did.  Yes, sir.

21   Q.   Just out of curiosity, how -- I heard I think it was

22   Doctor Roache describing the vernacular phrase for Xanax as a

23   Xanax bar, and Xanax pills are kind of oblong shaped pills; are

24   they not?

01:47:19PM 25   A.   Yes, sir.

1      Q.   And one pill would be called a Xanax bar; is that

2   correct?

3      A.   Yes, sir.

4      Q.   How much would a bar of Xanax cost?

01:47:27PM 5      A.   For me, like the amount I would get about $2 a pill.

6      Q.   $2 a pill?

7      A.   Yeah, 2.50 is based I guess on the amount that they

8   had, I guess you want to say.

9      Q.   How much the drug dealer had at that time?

01:47:42PM 10      A.   I guess.  I guess that's the reason why it fluctuated.

11      Q.   Did Mike give you a better deal on Xanax than he

12   would --

13      A.   Yes.  When I came to town, yes, he would.

14      Q.   What else did Big Mike sell?

01:47:55PM 15      A.   He sold me -- like I say, he sold me prescription

16   pills.

17      Q.   Did he sell other drugs, too?

18      A.   Not that I know of.  Not that I've seen.

19      Q.   Happen to have Xanax and sold them to you though?

01:48:09PM 20      A.   Yes, sir.

21      Q.   And he sold enough of them to you that he felt like you

22   owed him money?

23      A.   I -- I want to say yes, but I think it was because he

24   was giving me some that day of, and before he gave me some, so

01:48:24PM 25   I'm thinking that's what he was talking about.

1    Q.   So a debt?

2    A.   Yes, sir.

3    Q.   I'm trying to figure out how someone can make you feel

4    that you have a debt to them big enough that you need to go

01:48:38PM 5    commit this act.

6    A.   I think because at the time, like I say, I was on the

7    medication and the alcohol that I really just didn't think it

8    was going to get that serious.

9    Q.   Okay.  Was the kicking in the door according to you

01:49:05PM 10    planned?

11    A.   No, sir.

12    Q.   When you realized that Mr. Wilkinson had run back into

13    the house and you and Mr. Pugh went up to the door, by that

14    time did you realize the door was going to have to be kicked

01:49:19PM 15    in?

16    A.   Yes, sir.

17    Q.   So when the kick actually occurred, you guys knew that

18    was coming.  You knew you were going to do that?

19    A.   I want to say that -- like I say, he ran up to the door

01:49:30PM 20    first.  I was coming up behind him.  So I didn't say kick in

21    the door or jump to, it was just -- I think the guy was still

22    running in the house, so I think he was more of not trying to

23    kick the door but --

24    Q.   You certainly weren't saying, don't kick the door in?

01:49:42PM 25    A.   No, no, definitely not.  No, I didn't say that.

1    Q.   So you're not --

2    A.   I'm not --

3             COURT REPORTER:  Whoa, whoa, one at a time.

4    Q.   (BY MR. MONROE) You're not handing that off to Scotty?

01:49:49PM 5  But that's all him?

6    A.   Kicking in the door?

7    Q.   Yes.

8    A.   Yes, sir.

9    Q.   I mean, it was okay with you that he kicked in that

01:49:56PM 10  door?

11    A.   Yes, sir.

12    Q.   Because you were going in with him?  He may have

13  actually kicked it --

14    A.   Yes, sir.

01:50:01PM 15    Q.   -- but you were in on that, too?

16    A.   Yes, sir.

17    Q.   Okay.  And so you were still furthering your scheme of

18  collecting money when Scotty kicked in the door?

19    A.   Yes, sir.

01:50:11PM 20    Q.   Now, who was the first one to enter?

21    A.   Scotty was.

22    Q.   You came in right behind him?

23    A.   Yes, sir.

24    Q.   There was no point in this entire scenario where you

01:50:19PM 25  were saying, oh, Scotty, we don't want to do that.  Don't do

 1   that.  That never happened?

 2       A.   No, sir, it did not.

 3       Q.   So you're not blaming any of this on Scotty?

 4       A.   Oh no, sir.

01:50:50PM  5       Q.   How long were you put on probation for out of Arizona?

 6       A.   I believe it was five years.

 7       Q.   All the stuff in the -- in your video statement that

 8   you gave up about coming down here for a sex offender, that was

 9   all BS?

01:51:26PM 10       A.   Yes, sir, it was.

11       Q.   There wasn't anybody down here raping girls?

12       A.   No, sir, not at all.

13       Q.   All that was all a lie?

14       A.   Yes, sir, it was.

01:51:41PM 15       Q.   When y'all stopped at the convenient store on the way

16   here from San Antonio --

17       A.   Yes, sir.

18       Q.   -- where did you stop?

19       A.   I want to say it was a Shell station.

01:51:52PM 20       Q.   On the interstate?

21       A.   Yes, sir, I believe so.

22       Q.   Out there where the McDonald's is?  Do you remember

23   that?

24       A.   I really don't remember.

01:52:01PM 25       Q.   Is it -- was it Loves?  You know what I am talking

1  about, the big --

2     A.  No, sir.  Honestly I'm not familiar with it.  That was

3  the first time.

4     Q.  And did you and Scotty alone pull into that or did Big

01:52:15PM 5  Mike pull in as well?

6     A.  He pulled in as well.

7     Q.  And did y'all park next to each other?

8     A.  No, I want to say he was closer towards like -- a

9  little bit in front of us.  I don't know exactly where he

01:52:26PM 10  parked at, but I know that --

11     Q.  Would the surveillance video from Loves show whether or

12  not --

13     A.  Yes, sir.  I mean I don't know where the cameras are

14  located, but it should.

01:52:41PM 15     Q.  You have had other -- well, let me stop.

16           May we approach the bench?

17           (Bench conference).

18           MR. MONROE:  There is some other extraneous

19  offenses, convictions that I would like to get him to admit its

01:53:16PM 20  him.  It is covered in the motion in limine.  They are included

21  in our notice, but I wanted to approach the bench before I go

22  into it to give Mr. Brown --

23           MR. BROWN:  Which one are we talking about?

24           MR. MONROE:  This.

01:53:30PM 25           MR. BROWN:  He admitted to that already.

1          MR. MONROE:  I just want to ask him about it.

2    This one, this one, this one and I think that was another

3    item --

4          MR. BROWN:  These right here?

01:53:42PM 5          MR. MONROE:  I just want to talk about them.  I

6    think I've already done this.

7          MR. BROWN:  Yeah, okay.

8          (Bench conference ended).

9    Q.   (BY MR. MONROE) You have had other run-ins with the law

01:54:06PM 10   prior to September 5, 2013; have you not?

11   A.   Yes, sir.

12   Q.   And as a matter of fact, you had had other run-ins with

13   the law prior to the Arizona charges?

14   A.   Yes, sir.

01:54:22PM 15   Q.   Is it true or not true that on or about December 28,

16   2002, in Seguin county you were committed of the offense of

17   criminal mischief?

18   A.   Yes, sir.

19   Q.   Of a value for more than 500 but less than 1500?

01:54:57PM 20   A.   Yes, sir.

21   Q.   What did you do?

22   A.   I threw a beer bottle through a glass and I had hit a

23   truck window with a bat.

24   Q.   Were you drunk when you did that?

01:54:57PM 25   A.   Yes, sir.

          1       Q.   On or about July 9, 2006, in Bexar County, you were

          2   caught with marijuana; is that correct?

          3       A.   Yes, sir, I believe so.

          4       Q.   And you were placed on deferred adjudication probation?

01:55:10PM 5       A.   Yes, sir.

          6       Q.   Did you successfully complete that?

          7       A.   Yes, sir.

          8       Q.   All right.  You maintained at least as far as probation

          9   knew all the terms and conditions of your probation then?

01:55:20PM 10      A.   Yes, sir.

         11       Q.   And you were under terms and conditions of probation

         12   from Texas at that point in time obviously?

         13       A.   Yes, sir.  It was Texas, yes, sir.

         14       Q.   And so quite frankly --

01:55:33PM 15           MR. MONROE:  May I approach the witness?

         16           THE COURT:  Yes.

         17       Q.   (BY MR. MONROE) The terms and conditions of probation

         18   you were under for the misdemeanor marijuana charge out of

         19   Bexar County were for the most part identical to the terms and

01:56:51PM 20   conditions of probation under State's Exhibit 39; is that

         21   correct?

         22       A.   I -- I don't think so.  I'm not positive.

         23       Q.   Pretty sure they were?

         24       A.   I'm not positive.

01:57:00PM 25      Q.   Are you positive?

TERI THOMAS, CSR, RPR, CMRS

1      A.   I'm sorry.  The question is stipulations to it, is that

2   what the question was?  I'm sorry.

3      Q.   I said I'm pretty sure they were probably read exactly

4   the same.  Are you sure you don't remember?

01:57:23PM 5      A.   Repeat the question for me, I'm sorry.

6      Q.   The terms and conditions that you had on probation

7   while you were on probation in San Antonio --

8      A.   Yes, sir.

9      Q.   -- the same terms and conditions are virtually the same

01:57:34PM 10   as the terms and conditions you were given when you transferred

11   your probation from Arizona to Texas?

12      A.   Yes, sir.

13      Q.   All right.  They were the same.  So you knew back in

14   2006 that one term and condition of your probation there was

01:57:49PM 15   you couldn't commit no other offenses?

16      A.   Yes, sir.

17      Q.   And you knew you had to avoid injurious or vicious

18   habits?

19      A.   Yes, sir.

01:57:58PM 20      Q.   Abstain from the legal use of controlled substances or

21   marijuana?

22      A.   Yes, sir.

23      Q.   Which includes Xanax because you didn't have a

24   prescription?

01:58:08PM 25      A.   Yes, sir.

1    Q.   And any excessive consumption of alcoholic beverages?

2    A.   Yes, sir.

3    Q.   Is it a fair statement to say that you were pretty much

4    violating those terms just about every day?

01:58:20PM 5    A.   The two, yes, sir.

6    Q.   You're also supposed to avoid persons and places of

7    disreputable harm or character.  That was in the original terms

8    in 2006; was it not?

9    A.   Yes, sir.

01:58:32PM 10   Q.   And so when you get that one again when you transfer

11   here from Arizona --

12   A.   Yes, sir.

13   Q.   -- you're familiar with what that means?

14   A.   Which part, I'm sorry?

01:58:44PM 15   Q.   About persons or places of disreputable --

16   A.   Yes, sir.

17   Q.   So you knew every time you were around Big Mike you

18   were violating your probation?

19   A.   Yes, sir.

01:59:05PM 20   Q.   Is it still your position right this second that you

21   don't know Big Mike's last name?

22   A.   I know now since -- yeah.  I read it.

23   Q.   Is it also true that the conviction I just asked you

24   about or the deferred adjudication probation was possession of

01:59:30PM 25   marijuana that was on July 9, 2006, in San Antonio?

TERI THOMAS, CSR, RPR, CMRS

1     A.   I believe so, yes, sir.

2     Q.   And there was a second one on May 20, 2008, in Bexar

3   County also for possession of marijuana?

4     A.   Yes, sir.

01:59:42PM 5     Q.   The first one in July of 2006 was possession of

6   marijuana under two ounces?

7     A.   Yes, sir.

8     Q.   The one in May of 2008 was possession of marijuana from

9   two to four ounces?

01:59:56PM 10     A.   Yes, sir.

11     Q.   And so the jury understands, the greater amount of

12   marijuana would have caused that to be a more severe crime?  In

13   other words --

14          MR. BROWN:  I'm going to object, Your Honor.

02:00:07PM 15   That's a misrepresentation of the law.  They are both

16   misdemeanors.

17          MR. MONROE:  Well, one would certainly be a Class

18   B and one a Class A.

19          MR. BROWN:  They're both misdemeanors, Judge.  I

02:00:18PM 20   think he's misleading this jury.

21          THE COURT:  Overruled.  Overruled.

22     Q.   (BY MR. MONROE) The second one was more severe than the

23   first one?

24     A.   The second one was?

02:00:29PM 25     Q.   The second one was.

1    A.   They have the same amount of probation.  I'm not

2  positive on that.

3    Q.   The range of punishment for the second one is a greater

4  range of punishment than the first one, correct?  Less than two

02:00:41PM 5  ounces is a less range of punishment than two ounces to

6  four ounces?

7    A.   Yes, sir.

8    Q.   Any question about that?

9    A.   I am sorry.  I'm not positive about the punishment.  I

02:00:53PM 10  know the amounts are different, but I don't know about the

11  punishment.

12    Q.   Yes, they are both misdemeanors, but one is a Class B

13  misdemeanor and one is a Class A misdemeanor?

14    A.   Yes, sir, I did --

02:01:02PM 15    Q.   And a Class A misdemeanor has a more severe punishment

16  range than a Class B misdemeanor?

17        MR. BROWN:  Your Honor, I object.  That's not even

18  a question.

19        THE COURT:  If he knows the answer, he can answer.

02:01:13PM 20  Do you know the answer to that?

21        THE WITNESS:  Yes, sir.

22    Q.   (BY MR. MONROE) I'm correct.  It's more severe?

23    A.   Yes, sir.

24    Q.   Have you committed any other offenses for which you

02:01:53PM 25  have not been convicted that you can tell us about?

1      A.   No, sir.

2      Q.   No other home invasion robberies?

3      A.   No, sir.

4           MR. BROWN:  Judge, may we approach real quick?  Do

02:02:33PM 5  you mind?

6           THE COURT:  Yes.

7           (Bench conference).

8           MR. BROWN:  They have evidence on the table and

9  they're talking about it and I can hear them all the way where

02:02:51PM 10  I am sitting at and explaining what the evidence is and the

11  people are -- there are exhibits that are sitting at their

12  table that are not in evidence.  I just ask that they either

13  turn off their microphone or do it more discretely.

14          THE COURT:  Do you think the jurors can hear?

02:03:07PM 15          MR. BROWN:  I can hear.

16          MR. MONROE:  I'm not very good at turning it off

17  and on as the Court knows, but I'm happy to try to do that.

18          THE COURT:  Okay.

19          (Bench conference ended).

02:03:44PM 20          MR. MONROE:  May I approach the witness, Your

21  Honor?

22          THE COURT:  Yes.

23     Q.   (BY MR. MONROE) State's Exhibit 42 was something that I

24  showed Doctor Roache?

02:03:56PM 25     A.   Yes, sir.

1    Q.   But can you identify State's Exhibit 42?

2    A.   It's a part of the DD214.

3    Q.   Part of your military records?

4    A.   Yes, sir.

02:04:08PM 5    Q.   And you recognize this as a copy of some of your

6    military records?

7    A.   Yes, sir.

8              MR. MONROE:  All right.  We would offer State's

9    Exhibit 42.

02:04:28PM 10             THE COURT:  Mr. Monroe, and let me -- I needed to

11   tell you when you started, but that last exhibit you marked, we

12   were debating whether it was 46 or 48.  It's actually 48 if you

13   get to that.  We'll need to remark it as 48.

14             MR. MONROE:  That's the cell phone?

02:04:44PM 15             THE COURT:  Yes.  You can do that now or some

16   other time, but I just want to make sure you know.

17             MR. MONROE:  I'd offer State's Exhibit 42 into

18   evidence, Your Honor.

19             (State's Exhibit No. 42 offered).

02:04:57PM 20             THE COURT:  Any objection?

21             MR. BROWN:  No objection.

22             THE COURT:  42 is admitted.

23             (State's Exhibit No. 42 admitted).

24             MR. MONROE:  If the Court can give me just a

02:05:11PM 25   second.

1             May we approach the bench?

2             THE COURT:  Yes.

3             (Bench conference).

4             MR. MONROE:  And it might be easier to do this

02:05:57PM 5 without the jury in here, but we have obtained a search warrant

6 for the cell phone and it is in the process of being

7 downloaded.  It's going to take a while.  I don't know how

8 long.  I'm through at this point until we get those records.

9 So I'm prepared to pass this witness, but I don't want to be

02:06:22PM 10 precluded from recalling him once we get the cell phone

11 records, and I want to make sure that everybody understood that

12 before I pass the witness and somebody tells me later on I

13 can't recall him.

14             THE COURT:  If he doesn't have any other witnesses

02:06:37PM 15 and he rests, what do we do?

16             MR. MONROE:  We're going to have to -- Your Honor,

17 I'm very sorry.  I mean --

18             MR. BROWN:  They can't recall my client as a

19 witness, Judge.

02:06:49PM 20             MR. MONROE:  I think I can since he's waived the

21 Fifth Amendment, but the question is will the Court let me do

22 that.

23             THE COURT:  The cell phone messages to see if he

24 talked to Mike, is that what you're doing?

02:07:03PM 25             MR. MONROE:  We have reason to suspect that there

 1    are text communications with Mike that would indicate this was

 2    planned differently than he testified to.  We may not know.

 3    He's also claimed to not know how to reach Mike, so --

 4                MR. BROWN:  And, Judge, we would object that

02:07:25PM  5  they've been in possession of this phone since day one.  We've

 6    already pled guilty and we're in the punishment phase of this

 7    case.  They've had an opportunity to issue a subpoena on the

 8    phone.  They've had it in their possession.  The State

 9    presented the text messages that we just saw recently.

02:07:42PM 10               THE COURT:  How long have you had the phone?

11               MR. BROWN:  Since the day of arrest.

12               THE COURT:  Why did you wait until trial to search

13    the phone?

14               MR. MONROE:  Pardon?

02:07:50PM 15               THE COURT:  Why did you wait until trial to search

16    the phone?

17               MR. MONROE:  I'm not sure that we realized what

18    might possibly be on them and wasn't sure up until then that we

19    had probable cause to search it and certainly couldn't

02:08:02PM 20    anticipate the witness, the defendant, taking the stand and

21    acknowledging there are text messages with him saying who they

22    are going to come up here with.  There is just no way to

23    anticipate that.

24               MR. BROWN:  Judge, all --

02:08:18PM 25               THE COURT:  All kind of things would happen if

         1    they get in there and there is stuff that's exculpatory, then

         2    what do we do then?  I mean I think he's probably entitled to a

         3    continuance if there is something exculpatory.  If Mike says,

         4    gosh, I can't believe you just called me tonight, why didn't

02:08:34PM  5    you call me earlier, then it's probably something that he's

         6    entitled to have known about.

         7                    MR. MONROE:  Yes, sir.

         8                    MR. BROWN:  Yes, sir.

         9                    THE COURT:  Do you want to open up that can of

02:08:45PM 10    worms?

        11                    MR. MONROE:  I think if the Court will give me

        12    about 15 minutes --

        13                    THE COURT:  Sure.

        14                    MR. MONROE:  -- to visit with my people and decide

02:08:53PM 15    whether or not if that's the direction we want to go.

        16                    THE COURT:  All right.

        17                    (Bench conference ended).

        18                    THE COURT:  All right.  We're going to -- it's a

        19    little early, but we're going to take a recess.  We'll be in

02:09:04PM 20    recess for 15 minutes if you'll go with the bailiff, please.

        21                    THE BAILIFF:  All rise for the jury, please.

        22                    (Jury not present).

        23                    THE COURT:  All right.  We'll be in recess for 15

        24    minutes.

02:09:36PM 25                    (Recess).

1          THE COURT:  Mr. Monroe.

2          (Jury not present).

3          MR. MONROE:  Based on information received from

4    the defendant on the stand as to different people that were

02:27:50PM 5    peripherally involved; who he stayed with, who he was with, who

6    drove down with him, we went on Facebook just this second and

7    retrieved some photographs from China's page as we now know who

8    that is.  These are black and white copies of them and I was

9    going to show them to the defendant and ask if he can identify

02:28:13PM 10   the people in there.

11          It is our understanding that this woman here is

12   Erica, the one he stayed with the night he came down here; that

13   this gentleman here is China, the one he said he drove down

14   here with that was not with them.  And this is a bad picture,

02:28:33PM 15   but this is actually the defendant.  I think this is China

16   again.  I just want him to identify these people.  There are

17   some colored ones that are a little bit better.

18          MR. BROWN:  Judge, we don't think they're timely

19   obviously.  We don't think that they're relevant.  None of

02:28:45PM 20   these people in these photos are accused of any crimes or a

21   part of this case.  Whether or not he stayed at their house or

22   somebody drove him down here from Dallas doesn't have any

23   bearing on this case.  I think it's irrelevant.

24          THE COURT:  I'll sustain the objection.  It's

02:29:03PM 25   irrelevant.

1              MR. BROWN:  Thank you.

2              MR. MONROE:  Let me back up then and add one more

3    thing.  The defendant has testified very specifically that

4    after they left San Antonio to come to Kerrville, it was three

02:29:22PM 5    people.  Three people alone, only three.  And we have the

6    surveillance video from Loves that clearly shows China was with

7    them and I think he's committed aggravated perjury.  I think

8    I'm entitled that I can show who China is.  That's the purpose

9    for it.

02:29:45PM 10             THE COURT:  So which one is China?

11             MR. MONROE:  This gentleman here.

12             THE COURT:  I mean, is he in any of the other

13   ones?

14             MR. MONROE:  Yes, he is this gentleman here I

02:29:58PM 15   believe.  I mean --

16             MR. BROWN:  Judge, they see a video.  They haven't

17   established who the person is.  This is the first I'm hearing

18   of it.  There is no evidence of anybody and the fact that all

19   the evidence that they had were only two people went up there.

02:30:11PM 20             THE COURT:  If you're going to get into that line

21   of questioning and you're going to ask him about having this

22   person with him and he's lied about it under oath, I can see

23   where this might be relevant.  The one with the young lady,

24   whoever that is, I don't think that helps anything, but this

02:30:27PM 25   might tie into the person that --

1          MR. MONROE:  I think this guy and this guy is the

2     same.

3          THE COURT:  That's the reason I -- these two guys

4     probably don't need to be in there.  I'm not as worried about

02:30:37PM 5     them as I am a bunch of young --

6          MR. MONROE:  So here what I might do with the

7     Court's permission is just ask him is China in either of these

8     photos, and if he is, to circle him and then not ask him about

9     any of the other people.

02:30:55PM 10          THE COURT:  Well, just use this one here.

11          MR. BROWN:  And, Judge, again --

12          THE COURT:  I mean, first of all, you're going to

13     have to show the relevance that you've got some proof that

14     China was with him.  But, you know, if you're going to charge

02:31:08PM 15     him with aggravated perjury, that's another thing.  He's

16     already testified.  That's another case that you're going to

17     make another trial.

18          MR. MONROE:  Your Honor, we're going to show the

19     surveillance video here in another five minutes.

02:31:20PM 20          THE COURT:  Okay.

21          MR. MONROE:  So the jury is going to see it wasn't

22     three, there were four.

23          MR. BROWN:  Judge, we've haven't ever seen the

24     surveillance video.

02:31:28PM 25          THE COURT:  When did you get the surveillance

1    video?

2                    MS. COLEMAN:  Months ago.

3                    THE COURT:  And you gave it to him?

4                    MS. COLEMAN:  Months ago.

02:31:36PM  5        THE COURT:  Okay.  And you gave them to him?

6                    MR. MONROE:  Yes.

7                    THE COURT:  All right.  You can bring the jury in.

8                    THE BAILIFF:  Bring them in?

9                    THE COURT:  Yeah.

02:31:43PM 10        THE BAILIFF:  Yes, sir.

11                   MR. BROWN:  Judge, may we approach real quick

12   before they come in?

13                   THE COURT:  Yes.  Mr. Monroe, he has something

14   else.

02:32:30PM 15        MR. BROWN:  I am tendering to the Court all the

16   videos that were provided to me in discovery and there is no

17   video of any gas station that I was provided.

18                   THE COURT:  Can you put your hands on it and see

19   when your records show that you delivered it to him?

02:32:47PM 20        MR. MONROE:  Yes, Your Honor.  They would show

21   that.  We're back there trying to retrieve our records.

22                   MS. COLEMAN:  Your Honor, I think part of it is

23   there are four files and he received discovery in each of the

24   four, so we're checking it.

02:32:59PM 25        MR. BROWN:  And DVDs for all of them?  There was

1   one set of DVDs.  I've got the email they sent me in discovery.

2                MR. MONROE:  They're trying to see.

3                MR. BROWN:  Here is November 19, 2013, everything

4   that was attached.

02:36:39PM 5                MR. MONROE:  I think they're checking to see.  And

6   that's correct, it doesn't appear to be on there.  They're

7   checking to see if there was another submission.  If there

8   wasn't, we won't do it.

9                We won't pursue it.

02:39:09PM 10                THE COURT:  All right.  Rusty, go get the jury.

11                THE BAILIFF:  Yes, sir.

12                MR. BROWN:  Judge, can I have two minutes with my

13   client?

14                THE BAILIFF:  Are you ready?

02:39:49PM 15                MR. BROWN:  What was the ruling on the pictures or

16   are we not going to go into that avenue?

17                THE COURT:  Let's see.  If he tries to offer them,

18   stand up and object and we're going to come to the bench.

19                Are you going to offer the pictures?

02:40:02PM 20                MR. MONROE:  I'm not going to offer them.

21                THE COURT:  Okay.

22                THE BAILIFF:  All rise.

23                (Jury present).

24                THE COURT:  All right.  Thank you.  Have a seat.

02:40:34PM 25                Mr. Monroe, you may continue with your examination

1   of Mr. Travis.

2                   MR. MONROE:  Your Honor, at this time, the State

3   would pass the witness.

4                   THE COURT:  Any redirect?

02:40:43PM 5         MR. BROWN:  No further questions of this witness,

6   Your Honor.

7                   THE COURT:  Thank you.  You may go back to your

8   seat, Mr. Travis.

9                   Any other witnesses?

02:40:50PM 10        MR. BROWN:  No further witnesses from the defense,

11  Your Honor.

12                  THE COURT:  You rest.

13                  MR. BROWN:  We rest.

14                  THE COURT:  Any rebuttal witnesses, Mr. Monroe?

02:41:09PM 15        MR. MONROE:  The State will close.

16                  THE COURT:  You close?

17                  MR. BROWN:  The defense closes, Your Honor.

18                  THE COURT:  Well, that last break took a little

19  bit longer but we were doing some discussions in here.  That is

02:41:18PM 20  all the evidence you're going to hear in this case.

21                  What we need to do is put together a charge and I

22  think we pretty much have it ready to go.  I need to just tweak

23  it, make copies for you.  Once again, I'm going to read that

24  charge to you and you're going to hear some argument from the

02:41:35PM 25  attorneys and you'll go back and make your decision.

1          So if you can go with the sheriff and the bailiff,

2    I'm going to get this charge ready very quickly and we'll get

3    you back in here to do your final deliberations.

4          So if you'll go with the bailiff, I'll get this

02:41:52PM 5    charge ready for you.

6          THE BAILIFF:  All rise for the jury.

7          (Jury not present).

8                    OBJECTIONS TO THE CHARGE

9          THE COURT:  Do you have any objections to the

02:55:51PM 10   charge, Mr. Monroe?

11         MR. MONROE:  None, Your Honor.

12         THE COURT:  Any objections from the defense, Mr.

13   Brown?

14         MR. BROWN:  None from the defense, Your Honor.

02:56:00PM 15   THE COURT:  Thank you.

16         THE BAILIFF:  All rise for the jury, please.

17         (Jury present).

18         THE COURT:  Please be seated.  Members of the

19   Jury, the case has been closed in regard to evidence.  At this

02:57:03PM 20   time, it is incumbent upon me to read the charge on punishment.

21                 CHARGE TO THE JURY ON PUNISHMENT

22         THE COURT:  Members of the Jury:

23         The defendant, Vernon Lee Travis, III, has been

24   found guilty by you of burglary of a habitation with intent to

02:57:16PM 25   commit aggravated assault with a deadly weapon.

1          The punishment authorized for burglary of a

2     habitation with intent to commit aggravated assault with a

3     deadly weapon is by confinement in the Texas Department of

4     Criminal Justice-Institutional Division for a term not less

02:57:33PM  5     than five years -- not less than five nor more than 99 years or

6     life and the jury may, in its discretion, assess a fine, if it

7     chooses, in any amount not to exceed $10,000.

8          It now becomes your duty to set the punishment

9     which will be assessed against the defendant.

02:57:48PM 10          You are instructed that if there is any testimony

11     before you in this case regarding the defendant having

12     committed offenses other than the offense alleged against him

13     in the indictment in this case, you cannot consider said

14     testimony for any purpose unless you find and believe beyond a

02:58:04PM 15     reasonable doubt that the defendant committed such other

16     offenses, if any were committed.

17          The State has introduced evidence of extraneous

18     crimes or bad acts other than the one charged in the indictment

19     in this case.  This evidence was admitted only for the purpose

02:58:15PM 20     of assisting you, if it does, in determining the proper

21     punishment for the offense of which you have found the

22     defendant guilty.  You cannot consider the testimony for any

23     purpose unless you find and believe beyond a reasonable doubt

24     that the defendant committed such other acts, if any were

02:58:29PM 25     committed.

Deadly weapon means a firearm or anything manifestly designed or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.  A firearm is a deadly weapon.

Firearm means any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use.

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off of the sentence imposed through the award of good conduct time.  Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served plus any good time earned equals one-half of the sentence imposed.

1    Eligibility for parole does not guarantee that parole will be

2    granted.

3                    It cannot be accurately predicted how the parole

4    law and good conduct time might be applied to this defendant

02:59:53PM 5    if he is sentenced to a term of imprisonment because the

6    application of these laws will depend on decisions made by

7    prison and parole authorities.

8                    You may consider the existence of the parole law

9    and good conduct time.  However, you are not to consider the

03:00:06PM 10    extent to which good conduct time may be awarded to or

11    forfeited by this particular defendant.  You are not to

12    consider the manner in which the parole law may be applied to

13    this particular defendant.  Such matters come within the

14    exclusive jurisdiction of the Pardon and Parole Division of the

03:00:24PM 15    Texas Department of Criminal Justice and the Governor of Texas.

16                    You are further instructed that in considering

17    your verdict, you must not receive or consider, refer to or

18    discuss any matter or testimony other than that now in evidence

19    before you.  Your verdict will be by a unanimous vote.

03:00:36PM 20                    After argument of counsel, you will retire and

21    consider your verdict, and after you've arrived at your

22    verdict, you may use one of the forms attached hereto by

23    having the presiding juror sign the particular form that

24    conforms to your verdict.

03:00:48PM 25                    The above and foregoing is the Court's charge on

punishment in this case, and the same is hereby signed and

certified by the Court on this the 8th day of May, 2014.

        The first verdict form is:

        We, the jury, having found the defendant Vernon

03:01:02PM  Lee Travis, III, guilty of the offense of burglary of a

habitation with intent to commit aggravated assault with a

deadly weapon, as charged in the indictment, assess defendant's

punishment at,

        Confinement in the Texas Department of Criminal

03:01:16PM  Justice Institutional Division for a period of blank.

        Or (b), Confinement in the Texas Department of

Criminal Justice Institutional Division for a period of blank

and a fine of blank.

        At this time, we'll hear final arguments.

03:01:28PM  The State.

        MR. MONROE:  The state is ready, Your Honor.

        May it please the Court?

        THE COURT:  Yes.

        MR. MONROE:  Opposing counsel.

03:01:33PM          CLOSING STATEMENT

        MR. MONROE:  You never know how these things are

going to go, how they're going to flow, what's going to happen,

what's going to be said.  As you can tell, there is a bit of

winging it at different times here and if that was a

03:01:52PM  distraction to you, frustrating to you, I apologize.  As I

said, we don't get to find out in advance about a defendant

testifying, so there was a little of that.

As Judge Ables told you, I open.  I get to make a

couple of suggestions to you, point out a couple of things if

I want to and I sit down, and Mr. Brown is going to come and

talk to you and then I'll close.  So this portion of it is

going to be pretty short.

You know, first of all, I don't guess I could

emphasize that there aren't too many more serious crimes in

the State of Texas than the one that was committed here today

and that we're not here over someone who was shot or killed is

nothing short of a miracle because that would have been the

only thing worse.

This is really, really bad and now we know this

was a drug crime.  This was a drug crime.  We had druggees come

from San Antonio to Kerrville, Kerrville south, to get a drug

debt.  So what are you going to tolerate?  That's where we are.

I mean, just what behavior are you going to accept and what

behavior are you not going to accept?  You've got an enormous

range of punishment and that's why you have it.

You know, I think one thing Doctor Roache said

that I think is absolutely true, and bear this in mind

especially when you hear everything that Mr. Young is going to

tell you -- I mean Mr. Brown is going to tell you.

Post-traumatic stress disorder did not cause this defendant to

commit this offense.  It did not compel him to do this.  He
made a conscious decision to engage in this conduct.  It did
not cause him to do it and it was not as a result of
post-traumatic stress disorder.  It bothers me a little bit
for those veterans who truly suffer from that, that that
implication might be left, that I have no doubt that the
experiences in war are horrible, but it just does not make
everyone commit a crime like this.

As you hear Mr. Brown, bear in mind law
enforcement has nothing to gain or lose, no big giant
conspiracy to fabricate evidence.  They just did their job as
best they could do it and they found what they found.  If they
made a mistake on something, they made a mistake on something
and take that into consideration when you hear what I think is
going to be all of the excuses that have been given this
entire time.  Excuses.

So I ask you to listen to that.  When Mr. Brown
is finished, I'll come back up and make some comments on
whatever he says and then you'll be asked to deliberate.  And
I sincerely appreciate the attention you've given to me and if
there is something I've done that's offended you, I apologize.
It wasn't my rule.  As you can see, I can get a little excited
at times and I'm guilty of that.

So thank you.  Please give the same amount of
attention to Mr. Brown that you've given to me.  He is

1    entitled to that and I'll come back up in a minute.  Thank

2    you.

3                THE COURT:  Mr. Brown.

4                MR. BROWN:  May I proceed, Your Honor?  I just

03:06:04PM 5    need to get a couple of exhibits.

6                THE COURT:  Yes.

7                MR. BROWN:  May I proceed, Your Honor?

8                THE COURT:  Yes.

9                MR. BROWN:  Thank you.

03:06:08PM 10                    CLOSING STATEMENT

11                MR. BROWN:  Ladies and Gentlemen, it's been a long

12   couple of three days.  I know that there were some things that

13   we talked about in the beginning of voir dire that we

14   anticipated seeing in this case, witnesses you expected to hear

03:06:20PM 15   from, evidence that you expected to see for various different

16   reasons.

17                First, I want to get into the jury charge.  The

18   jury charge indicates if you look at the first sentence,

19   burglary of a habitation with intent to commit aggravated

03:06:37PM 20   assault with a deadly weapon.  If you recall the very

21   beginning of this trial, the Judge or the prosecution read the

22   indictment to you.  I'm going to read it to you again.

23                On or about September 5, 2013, and before the

24   presentment of this indictment, in said county and state, did

03:06:52PM 25   then and there intentionally or knowingly enter a habitation,

without the effective consent of Wylie Wilkinson, the owner

thereof, and attempted to commit or committed the felony

offense of aggravated assault.

The person named in the indictment, Wylie

Wilkinson, where is he at?  Why didn't he come in here?  Why

didn't the prosecution bring him down here so you could hear

from him?  They didn't bring him down here one time.  The

person that is supposed to be the complainant in this

particular case, they didn't bring him down here.  Isn't that

odd?  Right?  They brought the sister who was in the house,

and they could have easily based on her testimony and what

they led you to believe the testimony was put her in here.

Well, why didn't they put her in here?  Why didn't they list

her?  You heard the discrepancies in the testimony.  There

were witnesses saying all different kinds of things including

her, right?  Think about that.  Why -- why did they not bring

him into testify when he's the person listed in this document?

Page 2 of the jury charge that talks about parole

and I'll get there in just a minute on that.  I might want to

jump ahead of myself, so if you can just keep it on Page 2 for

a second.

The facts that were established in this case, you

heard from Vernon Travis' family, Trey's family, the kind of

upbringing he had.  You heard from his mom and dad.  You heard

she was an educator.  He was in the military himself, worked

in Louisiana, kind of transferred around, divorced at a young

age for Vernon.  That he was a good kid growing up.  Actually

graduated from high school at the age of 16, which I think is

pretty impressive to show you the kind of kid he was.  You

know, there was some issue about when he signed up for the

military, when he was admitted to the military, and I hope

that got cleared up because he actually signed up for the

military just after graduating from high school.  I think the

testimony was clear to that, 2001 just after May.  He was

doing physical training with the military and was actually

supposed to sign his orders to accept his position

September 11.  And I know I said that he was supposed to go to

boot camp and I misspoke at the beginning.  So if you hold it

against anybody, that was my mistake on the dates, but he was

supposed to sign that day to accept his position for a

deferred enrollment program.  And because of 9/11, he was

unable to do so.  And ultimately, he signed this paperwork a

couple of months later, still, and enrolled June of 2002.  And

I think that's clear from the testimony, from the documents

that you're going to take back with you.

He didn't have any issues prior to going to the

military.  There is no evidence that he had drug, alcohol,

pills, any sort of problem for that -- for that matter, that

he again graduated high school in three years at the age of

16, which I think is fairly impressive.

1          There was no criminal cases.  You heard the

2     prosecution talk about the marijuana.  There was no marijuana

3     cases or anything of that nature until after he came back.

4          He received some awards and certificates for his

03:11:04PM 5     time over in Iraq and that's in evidence.  You'll see.  He

6     took care of his job.  He did what he was supposed to do while

7     he was over there.  The evidence showed as an Air Force, he

8     went over there with the Army, and you heard him testify, he

9     was left over there without anybody.  He had to make his own

03:11:04PM 10     way home.  This is all at the ripe age of 18 or 19 years old,

11     trying to figure -- figure things out for himself at that age,

12     how to get home.  You would think that they would have taken

13     care of him to make sure that he got home with all the other

14     issues he had going on; dying, bombs blowing up, driving off

03:11:20PM 15     base, whatever the case may be.

16          He was discharged from the military shortly

17     thereafter.  You have the pictures in evidence that shows --

18     you'll have the document that shows that they wrote him up for

19     not keeping tidy quarters, for not taking care of his barracks

03:11:39PM 20     so-to-speak and that started the downward spiral upon his

21     return from Iraq.  I think it's clear from the evidence and

22     the testimony prior to his deployment to Iraq to after, his

23     life changed quite a bit.

24          He tried to maintain jobs.  You heard testimony

03:11:57PM 25     from the witnesses here in the courtroom that he tried to

1   maintain jobs and he did the best he could do under the

2   circumstances, under the psychological issues that he was

3   suffering from and not knowing it.  And y'all heard the

4   gentleman during voir dire, it took him 47 years to figure it

03:12:15PM 5   out.  The guy in front of him, you know, it ranges from person

6   to person and he still didn't figure it out until they sent

7   him over there as a referral because he was having chest

8   pains.  That's how he figured it out.  It wasn't because he

9   went over there and said, I think I have PTSD.  He went over

03:12:33PM 10   there because I have chest pains and they refer him to a

11   doctor who evaluates him and determines that he has PTSD and

12   you have that document before you.  And you heard another

13   doctor come in and testify to the same thing, he has PTSD.  He

14   has the symptoms of PTSD.  He has the effects of the drinking

03:12:51PM 15   and the drugs and the withdrawalness and the sleepy habits.

16          September 2013 is I know a terrible day for a lot

17   of people and he's accepted responsibility.  He has pled

18   guilty to this crime.  The other person that was charged

19   hasn't come to court and pled guilty.  He could have very

03:13:16PM 20   easily come to this court just as Vernon Travis did and pled

21   guilty.  I'm responsible.  I take responsibility for my

22   actions.  He has not done that yet.  As good of a picture they

23   want to paint of that guy, he hasn't done it.  Very easily

24   could have done it.

03:13:35PM 25          Let's talk a little bit about that particular day

1   and the witnesses you heard from.  You heard from two officers

2   in the guilt/innocence when he pled guilty.  You heard from

3   two officers and I got a little opportunity to talk to y'all

4   about listening to all the evidence and how important it was

03:13:51PM 5   to hear all the evidence.

6              Wylie Wilkinson never brought him to testify at

7   all.  Why?  They don't want you to know who he is.  You heard

8   the testimony.  He's a dope dealer.  And he admitted it in his

9   closing statement, this is a drug deal.  They didn't want you

03:14:14PM 10  to know that.  They were trying to hide it, but it got brought

11  out.

12             Captain Twiss, I don't like talking bad about

13  officers, but some of the things she said was just absolutely

14  contrary to the evidence and the testimony and the reports of

03:14:37PM 15  her own officers that she reviewed.  Let me give you some

16  instances of that, and we're not making excuses, but I think

17  it's important for you to know the truth before you make your

18  decision.  Absolutely important, the whole truth and nothing

19  but the truth.

03:14:55PM 20             She said she was the first one to walk up to him

21  and he did not smell of intoxicants.  I know y'all remember

22  that because I remember it.  I wrote it down.  He did not

23  smell of intoxicants and the next officer that came in and

24  took his statement, what did he say?  Man, strong odor of

03:15:15PM 25  intoxicants.  Slurred speech.  He had signs of intoxication.

Why?  Why would she do that?  To try to point Vernon Travis as

bad as she possibly can.  Is that fair?  Is that right?

Confusion as to who shot first, I asked her eight

to ten times who shot first.  Well, there was a shot fired.

Wylie shot first?  Well, he shot.  Wylie shot first?  Well, he

shot.  Why wouldn't she say it?  All the evidence, the

testimony, the witnesses, the other officer, everything she

had in her three-inch binder of police reports, clearly he

admitted it.  I shot first.  There is no doubt about it.  Why?

There was confusion.  It wasn't confusion, Ladies and

Gentlemen.  There is no confusion about that.

Then she says there was shots fired from outside

the house.  Nobody else testified to that.  In fact, I showed

her in a report from one of her own evidence technicians, read

this paragraph.  He says, no shots fired from outside the

house to inside the house.  Why?  Think about it.  Why?  To

make it sound like they were running up to the house shooting

the house or as they were running away shooting back at the

house?  There is no evidence of that, zero.

Then I asked her about the -- and I didn't say

trajectory -- I used a different term.  I used ballistics and I

apologize about that -- but the trajectory of the bullets.

There was one that clearly went inside the mattress.  There is

another -- there is nothing to show that that's where the

bullet went.  And I asked her, how did you account for Wylie

1  Wilkinson's shot when he shot into the ground?  Where is the

2  picture of that?  Where is that bullet?  Where did that go?

3  Nothing.  Think about it.  Does it fit her story to say that he

4  didn't shoot out that door, like Scotty Pugh said he saw, and

03:17:35PM  5  like Ledford told you that Scotty Pugh told him, the other guy

6  in the house told Ledford, the other officer that testified.

7  Yes, he said he saw a bullet come out the door, just like

8  Vernon Travis testified.  They don't want you to know that.

9  They don't want you to hear that.  Why?  I don't know.

03:17:58PM 10         Officer Ledford came in, he's the one that

11  testified -- he was the other officer who testified.  No doubt

12  Vernon testified to this.  They both ran up to the door.

13  Scotty happens to make it up to the door first.  He's not

14  saying Scotty is more responsible than he is.  He followed him

03:18:22PM 15  into the house.  He never told him not to go.  They told you

16  the plan was to get in, get out.  There was no intent on using

17  the firearms, nothing of that nature.  You heard him.  Had he

18  known there was a woman in there or a child in there, he would

19  not have gone into that house.  He testified to that.  He told

03:18:37PM 20  you that.  He had no idea -- he didn't even know the guy that

21  was in the house.  He didn't know who he was.

22         He told you all that they went in; he went one

23  way, Scotty went the other.  He goes and bangs on the door.

24  He never went down the hallway.  You want to get to that,

03:18:57PM 25  that's important.  I'm going to get to that in just a second.

1          Scotty goes down the hallway.  Vernon says he

2     turns around and says get him in the bedroom after he realizes

3     they're in there because he didn't know until he heard them

4     yelling.  Get them in the bedroom.  Goes back up to the door or

03:19:15PM 5     towards the door, fires a shot, looks down, sees a hole in the

6     door, he calls it returns fire into the ground or at a down

7     angle as you can see the poles in the door.  And they get out

8     of the house.

9          He told you why he threw the guns out the window.

03:19:35PM 10    It wasn't to hide evidence.  He thought he was going to get

11    shot and killed when he came out holding a gun, so he threw

12    them out.

13         I thought it was kind of strange when Amber --

14    when I gave her this document right here showing the layout of

03:20:01PM 15    the house and I asked her to tell me what happened.  And if

16    you recall, she says they came in the door and Scotty came to

17    the entry of the hallway.  Vernon came back in this direction

18    of the kitchen of the dining room, and that's when she heard a

19    shot fired and then she heard more shots fired and then they

03:20:21PM 20    left.  Recall that testimony, Ladies and Gentlemen, because

21    that's what happened.  There is no evidence in any reports.  I

22    asked Ledford, did anybody tell you that either one of these

23    guys stuck a gun to her head or pointed a gun at them or hit a

24    dog?  No, did not.  Don't you think that's a big issue?  That

03:20:46PM 25    if that really happened, it would be all over every report, in

a statement and everything else.

   And that takes me back to Captain Twiss.  She says, yeah, Ledford told me that that happened.  Ledford told me that they stuck a gun at the child and the woman.  Well, Ledford came in here, what did he say.  It's not in my reports.  I didn't tell anybody that and I don't remember telling anybody that.  Again, to make it sound as bad as they possibly can.  It's a terrible case.  I'm not trying to say it's not.  It's a terrible case, but the truth and the facts matter for everybody involved.

   The video, there has been some mention about the video that has been turned into evidence by -- when it was recorded of Vernon Travis.  Y'all saw him.  He was intoxicated.  He was talking about stuff that didn't even make sense.  He told you what he had been drinking, how many pills he had taken.  I mean, most of us would be in the emergency room having alcohol pumped out of our system or having the pills taken out of our system.  That's how addicted he was to them.  That's how much he was trying to kill the pain inside of his body, inside of his head, is that he was drinking excessively.  He was taking pills excessively and he didn't know why.

   On that video, he says all kinds of crazy stuff that he told you.  I don't know where I got it from.  None of it was true.  I don't know where I got it from.  But one thing I found interesting on that video at the end is a statement by

the officer in there, and I want y'all to look at that because
it bothers me, and I hope you as a jury it bothers you, too.
Juries in Kerr County are going to tear you apart.  This isn't
Dallas, this isn't San Antonio, this isn't Houston, or
03:23:25PM  whatever other cities he named.  Juries in Kerr County are
going to tear you apart.  I have an issue with that and I hope
you do, too, as a jury because to me it makes it sound like
that people here can't be fair, that you guys or people in
this community can't be fair and I don't believe that for a
03:23:46PM  second.

We all talked about this earlier.  We all
discussed the facts that are in this particular case, but for
him to say that isn't a scare tactic, well what was it?  Maybe
it was.  But to say that to any individual, juries are going
03:24:06PM  to tear you apart, I just -- the fairness of that, I don't
understand.  And that should bother you as the 12 people
sitting on this case.

Vernon has accepted responsibility in this case.
He has pled guilty.  He had a right to fight this case and we
03:24:32PM  talked about that during voir dire.  Everybody has a right to
fight the case.  Even if they're guilty as sin or innocent,
you have a right to fight your case.  We talked about somebody
accepting responsibility, pleading guilty and how we would
treat them as opposed to somebody else who it wasn't.  Me, I
03:24:53PM  didn't do it, it wasn't me, that's not what he did.  You heard

1   the witnesses come in from his mom to his dad to the expert

2   witness that came in, yeah, he told me he did it.  He told me

3   guns were involved.  Every question that the prosecutor asked

4   every one of those witnesses, did he tell you he had guns?

03:25:14PM  5   Did he tell you he had a bullet proof vest?  Did he tell you

6   he drove up there?  Yes, he told each and everyone of them.

7   Not only did he accept responsibility in this courtroom, he

8   did it with everybody in his life.  Everybody.

9                Doctor Roache came up here and testified about

03:25:31PM 10   the PTSD and Defendant's Exhibit No. 1 is the medical

11   diagnosis, something that y'all asked to see.  I wanted y'all

12   to see that.  The prosecutor tries to get up here and say, oh,

13   he fooled the system or he beat the system, that bothers me.

14   Until you've walked in another man's shoes and gone to Iraq as

03:25:58PM 15   a 17, 18-year old kid and experienced what he experienced,

16   don't talk about that because you don't know.  You don't know

17   what he's suffering from.  You don't know what he went through

18   just as I don't, but I know his life has completely turned

19   around upside down.

03:26:19PM 20                Made three diagnosis, drug induced mood disorder,

21   PTSD, polysubstance abuse, they explained all those.  I'm not

22   a doctor, but y'all heard there is no doubt about it.  Another

23   doctor, Doctor Roache came in and reviewed this document and

24   also met with Trey and confirmed all that was contained in

03:26:45PM 25   Doctor Williams' document that, in fact, he did suffer from

PTSD.

Trey mentioned on the stand, you know, I feel like I've lost ten years of my life. I look back at the last ten years and it's all been a blur, I think is the word he used. He told y'all how much he drank. Y'all heard from other people that he drank. He's not proud of that. He's not up here boasting about it. He's up here to tell y'all what is going on within him, what was affecting him. A bottle a day, that's unbelievable. I mean, that is a lot. Six or eight pills. I mean, two Xanax, I don't even like to take them. If I have surgeries or injuries, I don't take that stuff because it makes me feel afraid. Imagine what was going on in his mind to make him do that to himself.

Doctor Roache came in here and again confirmed Doctor Williams' report and said, yes, after reviewing his reports, reviewing his medical or medical records, his military records, his school records, it's apparent to me that he suffers from PTSD. No hesitation about it. Absolutely. And confirmed the drug alcohol abuse as well and said that's common. That's a common event that people who suffer from PTSD, they turn to drugs and alcohol to alleviate the pain going on inside of them.

THE COURT: Five minutes.

MR. BROWN: Thank you, Judge.

You're going to be able to see his awards and

1    documentation before.  You're going to be able to see his

2    write-ups that he received in the military, the pictures of

3    the complaints that they had.  Think about it.  He told y'all

4    he came back.  He came back on his own without anybody.  When

03:29:01PM 5    he came back, nobody came up to him and said, are you okay?

6    Do you need to be interviewed?  Do you need to be counseled?

7    Is there something going on in your head?  Are you tired?  Are

8    you worn out?  Tell us about it.  Nobody.  He showed up after

9    three weeks of sleeping at his mom's house and went straight

03:29:19PM 10    to work.  Nobody even cared.  Nobody.

11         When he was ultimately removed several months

12    later, again, no evaluations.  I mean, how many red flags do

13    you need to show especially today, especially today with all

14    the issues and problems we're having in the military with PTSD

03:29:43PM 15    and the violence on basis.  What other signs do you need from

16    somebody turning 180-degree turn from the way they were before

17    they went to now?

18         And I know Trey has been over there, he's crying

19    and rightfully so.  As we were sitting here on voir dire and

03:30:06PM 20    opening statements, he was looking at everybody and he was

21    crying, and he was crying when he testified.  He took some

22    medication which helped him calm down a little bit and that's

23    what it's for.  He's remorseful and he's sorry, and he wishes

24    he could take that day back.  I know he does.  I know he wishes

03:30:30PM 25    he would have figured this out well before that.

              In closing, on Page 2 -- I told y'all to open up

to Page 2 if you don't mind, under the applicable law, he's

sentenced to a term of imprisonment which he is going to be in

this case.  There is no doubt about it.  He's going to prison.

03:31:02PM  5  He would have to serve at least one-half of the time, at

least, and that's not even saying he's going to get out at

half.  That's the first time he could.  So if he gets a

five-year sentence, he's serving two and a half.  No doubt

about it.  And that's not even going to guarantee he's going

03:31:18PM 10  to get out at two and a half, so I don't want that to mislead

you.  At half the time he's getting out regardless, that is

not the case.  It's up to the parole board to determine

whether or not somebody is released.

              When he is released, he has a place to go.  You

03:31:33PM 15  heard the testimony of his father.  Sincere, to the point,

somebody who is going to make a good role model for him, be in

his life every day, make sure that he has a roof over his

head, make sure that he goes to his appointments at the VA,

make sure that he continues his medication.  Like Trey said,

03:31:52PM 20  he wants to impact others to make sure they don't do anything

like he did.  And if he can save one person from doing it,

that's worth every second of every day if he can keep one

person from doing what he did.  And I think he'll have a

bigger impact than that.  So I ask you to give him the

03:32:14PM 25  opportunity to be able to do that.

1       He's only been getting treatment for a month and

2   a half for the PTSD.  It's already made huge changes in his

3   life, substantial changes.  I ask that you give him the low

4   end of the sentence range based on the facts and evidence in

03:32:34PM 5   this case, based on who you know about Vernon Travis, what you

6   know about Vernon Travis, the issues going on, the factors

7   surrounding the circumstance of this case, everything that's

8   come before you; the doctors, the family, the witnesses.

9       The low end of the sentencing range in this

03:32:59PM 10   particular case is the just range, and I know that you're not

11   those people that that officer said in that video.  I know

12   y'all will be fair.

13       Thank you.

14                      CLOSING STATEMENT

03:33:55PM 15       MR. MONROE:  We don't really know how to respond.

16   I'll give it a shot here, as you probably anticipated that I

17   might.

18       One thing you have heard repeatedly was that the

19   defendant was going to accept responsibility.  All of you

03:34:17PM 20   heard that phrase repeated multiple times.  I'm going to

21   accept responsibility.  And I ask you to look back on what all

22   you have heard in this case, especially from the defendant and

23   tell me whether you think he is accepting responsibility.

24   Because it sounds to me that this is everyone's fault but his.

03:34:49PM 25   Somebody else caused me to do this.  I had a bad experience

         that made me do this.  Police officers lie.  They've got some

         grand conspiracy against me.  It was somebody else that did

         it, not me.  He accepted responsibility.  Yeah, he did

         apparently to everyone he could manipulate and everyone he

03:35:14PM 5  thought he could affect their opinion.  You know who he didn't

         accept responsibility with?  Amber.  And he didn't accept

         responsibility with us.  So that is just hogwash.

                 A couple of things, just as we were talking about

         accepting responsibility.  You can believe what you want to

03:35:41PM 10 believe because you can listen to testimony and decide, I

         believe that part.  I won't believe that part.  I believe all

         of that, none of that, all points in between, absolutely your

         call.

                 These are the text messages between him and Mr.

03:35:56PM 15 Pugh from September the 3rd and when Ms. -- when Trey is

         telling him to bring gloves.  Remember that.  You decide

         whether or not he was going to bring gloves -- oh, that was

         going to be something else.  Did you notice by the way -- you

         know, when I passed him back -- we call it passing the

03:36:21PM 20 witness -- when I said no further questions, Mr. Brown could

         have asked him all the questions he wanted to.  He was entitled

         to do that.  Did he come back and say, Trey tell us what those

         gloves were really going to be for that look so bad on your

         text messages when you say two different times, please bring

03:36:41PM 25 gloves.  So are we accepting responsibility?  Are we really

accepting responsibility?

And we made a big deal, a bullet went out the door towards him.  Here is State's Exhibit 33 and it doesn't take a ballistics expert or a trajectory expert to tell you -- you can look, those are State's Exhibit 32 -- those are the only two bullet holes in the door, and they both obviously came from the same direction and went out the same way.  You do not have to be a law enforcement officer to see that.  You can see the expansion of the bullet on the outside.  There was no bullet that went from inside that bedroom out.  That just did not happen.  So are we accepting responsibility?  Really?

Oh, yeah, I broke into his house and I had a gun -- I was collecting a debt by the way.  Wasn't robbing him.  Wasn't robbing him, just collecting a debt.  He shot so I fired back.  Oh, that's accepting responsibility.  You're kidding me.  You're kidding me if that's accepting responsibility.  That is blaming somebody else again.  Oh, somebody else made me do this.  You know what, drugs and alcohol is not an excuse.  It's not a defense.  It's not mitigating, otherwise every druggee in Kerr County would come up and say, you can't prosecute me for that.  I was stoned when I did it.  I get a Get Out of Jail Free Card.  I was messed up.  I took Xanax that I had gotten illegally in violation of my probation.  Come on, you're smarter than that.  You're smarter than that.

You know, I don't get paid on a win or loss

1    record.  I don't get paid -- well, you get this salary if you

2    win all your cases; you get this salary if you lose all your

3    cases; you get this or fifty-fifty.  It doesn't make any

4    difference to me at the end of the day, win or loss, but I

03:38:48PM 5    don't like to lose.  So the implication that I'm going to hide

6    something from you quite frankly is a little bit insulting

7    because, you know, I'm just not going to do that.  You heard

8    Carol Twiss say, we have hundreds of photos.  If I had

9    introduced every photo we had, we would still be there going

03:39:06PM 10   through the photos.  I apologize for not introducing every

11   photo we have.  So if you want to accuse me of hiding evidence

12   or you want to think that's me hiding evidence, then I'm real

13   sorry.

14           You saw some emotion from the defendant, yeah,

03:39:18PM 15   you did.  And I got a little emotional and some of you got a

16   little emotional and that's okay.  That's absolutely okay.

17   The defendant cried when he talked about his parents.  Did you

18   notice who he didn't cry for?  Did you notice who he did not

19   shed a single tear for?  Think about it for a second.  Amber

03:39:41PM 20   and that little boy.  Not a tear.  Not a sniffle.  Not one,

21   but he boohooed when it was him and his family.  Oh, oh

22   goodness.

23           And I have no doubt that the military didn't

24   handle him well.  I'll accept that.  That's disappointing to

03:39:59PM 25   the military, but we didn't do that and the military didn't

1    make him go do what he did, and he didn't care about Amber and

2    he didn't care about Brennan and he didn't cry because he

3    doesn't care about them now.  He cares about himself.

4              And if you look back at his entire conduct of

03:40:22PM  5    behavior from when he got out of the military, that's what's

6    it's been.  What is good for Travis and what does Travis want

7    to do and that's what drives us.

8              Remember, I mentioned the word in voir dire,

9    minimize?  Remember I mentioned that?  Y'all heard about

03:40:44PM 10    minimize, I think that's what you got.  Well, this is just

11    somebody else's fault.  Well, I didn't really -- oh, I shot

12    the gun, yeah, but only because a bullet came out the door and

13    got me.  Well, yeah, he kicked in the door.  Well, I would

14    have gone in there anyway.  We weren't there to rob, we were

03:41:00PM 15    there to collect a debt with guns.  Goodness, it was like

16    pulling teeth.  Just, hey, you went there, but I'm glad you

17    didn't kill them.  Man.

18              The video, now I want to tell you, the video is

19    in evidence and Kerr County just invested in a great big TV

03:41:26PM 20    that you've seen back there.  There is one in your room.  If

21    you want to watch that video again, you can.  I'm just telling

22    you that.  It will go back there with you if you ask for it.

23    If you want to see it again, watch it.

24              What's the one thing that we can say for sure

03:41:41PM 25    about the defendant in that entire video?  He lied his butt

1    off.  He lied his butt off.  That's quite a performance and

2    you saw one then and you saw another one now.

3              So what happened inside the house?  You heard from

4    two people that were there.  You heard other people talk about

03:42:10PM 5    this person said this, this person said that.  You had two

6    people in the house.  What happened inside the house?  You have

7    his version and you have Amber's version.  And he told you, she

8    was probably traumatized and he admitted it.  Boy, when you're

9    traumatized, you remember what happened.  Remember him saying

03:42:31PM 10    that?  You remember what happened when you were traumatized and

11    she said, he was 3 or 4 feet away from me and he pointed the

12    gun in my face.  That's what she said.  Now, what does she

13    have?  How did she get involved in this?  She didn't choose

14    this.  She didn't choose this.  This wasn't something she

03:42:59PM 15    wanted to be in.  She wouldn't even make eye contact with him.

16    No telling how many scars they're going to carry for the rest

17    of their lives.  You want to feel sorry for somebody, you feel

18    sorry for this little boy right there because he gets to walk

19    around with this and he didn't ask for it and he didn't deserve

03:43:20PM 20    it.

21              The truth and the facts matter, that's what Mr.

22    Brown said.  The truth and the facts matter and he is

23    absolutely right.  And unfortunately, I don't think you heard

24    them from this defendant.  I think he's still making up

03:43:47PM 25    stories about what happened out there, how many people went,

1  who all was there and who did what when.  I don't think you've

2  heard it yet.  And don't fall for this smoke screen about I'm

3  trying to hide this big ball of not bringing up Wylie

4  Wilkinson over here.  The fact of the matter is, the rules of

03:44:07PM 5  subpoenas, he gets to use them just like I do.  Mr. Wilkinson

6  is under subpoena, he can call him too.  It's not just up to

7  me.  If he has something big he wants to get out for Mr.

8  Wilkinson, he could have done that.  Don't fall for that.

9  Don't fall for that.  That's wires and mirrors, that's all

03:44:24PM 10  that is.  Don't go into that.

11          Let me show you something else in talking about

12  what all you got told and whether you got told the truth.  I

13  think this is going to be real important for you.  The vest

14  that he got from Kelly (sic), remember that, remember that

03:44:55PM 15  testimony, got the vest from his friend in Dallas.  Where is

16  the bag?

17          MR. BROWN:  I'm going to object, Your Honor,

18  that's a misstatement of the testimony.  He did not get that

19  vest from a Kelly in Dallas.

03:45:10PM 20          THE COURT:  Ladies and Gentlemen, let me tell you,

21  when it comes to final argument, this is the recollections of

22  these attorneys.  You are to recall what came into evidence and

23  what was sworn to and that's the evidence that you consider.  I

24  give the attorneys a little bit of a leeway because they're

03:45:24PM 25  making comments, but you are to recall what the evidence is in

1  this case.

2            You may proceed.

3            MR. MONROE:  It may not have been Dallas.  I think

4  her name was Kelly from up where it was.  If I misstated that,

03:45:37PM 5  I apologize but Kelly, wherever she is.

6            Here is the vest we got from Kelly.  Here is the

7  bag where the vest has been sealed in where my evidence

8  sticker is.

9            MR. BROWN:  Your Honor, may we approach?

03:45:54PM 10            THE COURT:  Yes.

11            (Bench conference).

12            MR. BROWN:  There is -- there is evidence inside

13  this pocket that was not admitted.  We would ask that he not

14  pull it out because there was not mention of any evidence

03:46:24PM 15  inside of that jacket and I don't know what's inside it.

16            MR. MONROE:  I got -- wherever I put my tag, it

17  says vest and cards, business cards.  It says it on there that

18  it's in there.

19            MR. BROWN:  Your Honor, it was with the bag with

03:46:39PM 20  the vest and there was no mention of any card being admitted

21  into evidence whatsoever.

22            THE COURT:  Let me -- get the card and let me see

23  it.

24            Was this given to him through discovery?

03:47:05PM 25            MR. BROWN:  It was not.

1          THE COURT:  Do you have any idea that they had

2    something in the vest?

3          MR. MONROE:  Well, the State is saying in

4    discovery that the cards were recovered with the vest.  Officer

03:47:16PM 5    Twiss testified that there were cards in the pocket of the vest

6    when she was on direct examination.  This has been available to

7    be examined the entire time.  I don't know -- I don't think

8    that he's actually come to look at it.

9          MR. BROWN:  Not the vest, Judge.  And I didn't

03:47:30PM 10    open up the pockets, and I don't think that we were told that

11    there were business cards in there.

12          THE COURT:  You want to show that it's a police

13    vest?

14          MR. MONROE:  That's it.

03:47:39PM 15          MR. BROWN:  There is no evidence that he put the

16    cards in there and there is no evidence that --

17          THE COURT:  Is that in dispute whether or not it's

18    a police issued vest?

19          MR. MONROE:  I think I'm going to argue that he

03:47:49PM 20    didn't get it from Kelly (sic).  He stole it from his brother.

21          THE COURT:  There is no evidence of that.

22          MR. BROWN:  There is no evidence of that.

23          THE COURT:  I'm not going to admit the cards.

24          (Bench conference ended).

03:48:03PM 25          MR. MONROE:  I don't know too many women that keep

vests.  I guess you guys can decide on that as you want to.

Here is what we come down to and this was the question I told you that I thought this was going to be about from the very beginning.  I'll just get right to it.  You guys have got to make a decision as to what behavior you're going to tolerate, what excuses are going to fly, what you're going to let happen in this community.  And I know some of you I asked -- I asked all of you if you thought that sending a message was a part of the punishment and some of you said yes and a few of you said no and I respect that.  I mean, I really do.  But the fact of the matter is, like it or not, that is exactly what it does and maybe that's not an effect that you really want it to have or that it should have, but it is and so what do you -- what are you going to do?  What's okay?

We have a guns-blazing aggravated robbery, burglary.  Guns are fired over a drug deal and is that going to be okay with you?  And from someone whom -- you guys get to decide whether he's accepted responsibility.  I think he's still skating.  I think he's still trying to figure out what he can get you to believe and what he can't.  I just don't think he's accepted responsibility.  So you can't make him do that, just like you can't make him take his medication.  So if he gets off his meds, are we going to go back to what we were?  Are we going to go back to that guy on the screen?  Is that what's going to happen?  You have one choice and you have to

         1    send him to prison.  The question is how long.  And I'm telling

         2    you, you need to send a message here.  You really do.  This is

         3    bad.  This is bad facts.  And we can blame this on Wylie

         4    Wilkinson, or we can blame this on James Ledford or Carol Twiss

03:50:31PM  5    and if we do, we are missing the point.

         6              I'm asking you to speak for this community.  I was

         7    born and raised here.  I'm asking you to be a voice.  I'm

         8    asking you to make a stand, run a message up on a flagpole as

         9    high as we can get it up there that this behavior will not be

03:50:51PM 10    tolerated here ever.  I'm sorry James Ledford said what he said

        11    if that was incorrect, but quite frankly, I'm hoping it's true.

        12    You need to make a statement.  Five years is ridiculous.  It

        13    needs to be a long sentence and give him a long time to think

        14    about what he did and the people he put in danger he could have

03:51:21PM 15    killed because he was on drugs and a month ago got better.  I

        16    know you're smarter than that.  I know you are and I know

        17    you'll do the right thing.

        18              I appreciate it again.  If I stepped on toes, if I

        19    offended someone, it wasn't my intention to do that, but I'm

03:51:44PM 20    passionate.  I'm passionate about justice and I'm passionate

        21    about if we commit a crime, you're going to get punished and

        22    it's coming.  You come here, it's coming.  I want it all the

        23    way down Interstate 10.  When they cross the Kerr County line,

        24    it's a tough place to go if you want to do stuff like this.

03:52:07PM 25    That's what I want you to send.  That's a message I want you to

1   send and that's a message that needs to be sent.  And I thank

2   you.  I know you'll do it.

3            THE COURT:  Ladies and Gentlemen, a couple of

4   things:  We're going to send you back to the jury room.  Once

03:52:23PM 5   again, the charge is the only one -- the original is the only

6   one signed by me and there is a paper clip on it; and also Mr.

7   Collie, I think you'll need to get this charge.  The exhibits

8   will be brought to you by the court reporter.  Ms. Nunley will

9   bring you the exhibits.

03:52:39PM 10            And we're going to have to take your notes up.  I

11   don't agree with this, but it's the law that I need to take

12   your notes up and we can give them back to you at the end of

13   the trial in case you would like to keep them for some reason.

14   Or if you don't want them back, we'll shred your notes.  But

03:52:56PM 15   oh, there is just some case law about taking them.  You can

16   take those notes, maybe kind of keep you focused, but you can't

17   take them with you back to the jury room.  So Scott, if you'll

18   take up the pads.  And if you think you might want them back,

19   put your name on the top and we'll give them back to you after

03:53:10PM 20   the trial is over.

21            When you have a verdict, you just have your -- Mr.

22   Collie, you'll sign a little note saying, Judge, we have a

23   verdict and hand it to the bailiff and he'll bring it out to

24   me.  If you have a question, be sure and write your question

03:53:25PM 25   out, sign your note and hand it to the bailiff.

03:54:08PM

1      All right.  Ladies and Gentlemen, good luck.  You

2  may be excused to go back for your deliberations.

3      THE BAILIFF:  All rise.

4      (Jury not present).

5      THE COURT:  We'll be in recess until we have

6  something from the jury.  Be sure and give your cell phone

7  numbers in case you step out and we'll call you about a

8  question or a verdict.  So we'll be in recess.

9      (Recess).

10                       JURY QUESTION

11      (Jury not present).

12      THE COURT:  The question is a question that we

13  receive fairly often.  It says, Regarding the fine, who pays

14  the fine and where does the money go.

15      You know, the actual answer is:  The fine, if any,

16  would be the responsibility of the defendant and the money is

17  distributed to the courts per the state law.  That's -- you

18  know, I can't tell them where it goes because the clerk has a

19  breakout of where fine money goes and it's interesting.  You

20  know, I could tell them that if you don't have any objection.

21      MR. MONROE:  I think that's the appropriate

22  response, Your Honor.

23      MR. BROWN:  What would it be?  I'm sorry, Judge.

24      THE COURT:  The fine would be the responsibility

25  of the defendant.  Usually what they mean by that, they're

1    wondering if the mother or the daddy -- one time I had a note

2    sent out that said momma owns 200 acres out in Gillespie

3    County.  Do you think the State could get to it because the boy

4    has been fined $10,000.  I've had that note before.  But

5    generally they're trying to make sure that the family doesn't

6    have to pay anything.  So that's what we generally say.  I say

7    the fine is the sole responsibility of the defendant, and the

8    money goes to the courts according to statute.

9              MR. MONROE:  That's fine.

10             THE COURT:  Any problem with that?

11             MR. BROWN:  No, sir.

12             THE COURT:  Stay right here and let me write it

13   down and make sure that I read it back to you one more time if

14   that's okay.

15             MR. BROWN:  Yes, sir.

16             THE COURT:  Okay.  So the fine, if any, is the

17   sole responsibility of the defendant and the fine is

18   distributed in accordance with various state laws.

19             MR. MONROE:  Fair enough.

20             THE COURT:  Any objection?

21             MR. BROWN:  No objection from the defense, Your

22   Honor.

23             MR. MONROE:  No objection from the State.

24             THE COURT:  All right.

25             (Recess, time 4:45 p.m.).

1          THE COURT:  I think we have everyone here.

2          THE BAILIFF:  All rise.

3          (Jury present).

4          THE COURT:  All right.  Please have a seat.

04:54:52PM 5          Mr. Collie, has your jury reached a verdict?

6          JUROR:  We have, Your Honor.

7          THE COURT:  And is your verdict unanimous?

8          JUROR:  Yes, sir, it is.

9          THE COURT:  Would you hand the verdict form to the

04:55:04PM 10  bailiff, please?

11                              VERDICT

12         THE COURT:  All right.  Mr. Travis, would you

13  please stand.  And you already are.  Thank you.

14         Mr. Travis, the jury has pronounced a verdict.

04:55:20PM 15  They have previously found you guilty, and I'm about to

16  announce to you what this verdict will be.  Do you have

17  anything to say before I pronounce this verdict?

18         THE DEFENDANT:  No, sir.

19         THE COURT:  We the jury, having found the

04:55:33PM 20  Defendant, Vernon Lee Travis, III, guilty of the offense of

21  burglary of a habitation with intent to commit aggravated

22  assault with a deadly weapon, as charged in the indictment,

23  assess defendant's punishment at confinement in the Texas

24  Department of Criminal Justice Institutional Division for a

04:55:46PM 25  period of 55 years.

1          Signed by Mr. Collie, the foreman of the jury.

2          Mr. Monroe, do you wish to have the indictment --

3     I'm sorry, do you wish to have the jury polled?

4          MR. MONROE:  The State does not desire that, Your

04:56:02PM 5     Honor.

6          THE COURT:  Do you wish to have the jury polled?

7          MR. BROWN:  No, Your Honor.

8          THE COURT:  Thank you, you may have a seat.

9          Mr. Monroe, can you -- I would like for everybody

04:56:11PM 10    to stay here until I can sign the judgment sentence.  Can

11    y'all get that prepared for me?

12         MR. MONROE:  I think it's pretty much ready except

13    for the blanks we need for the jury verdict.

14         THE COURT:  Mr. Travis, would you come up here to

04:56:33PM 15    the bench please --

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  -- along with the counsel and Mr.

18    Monroe.

19         (Bench conference).

04:56:45PM 20    THE COURT:  I will sign the order in just a

21    second, but I'm going to go ahead and make this pronouncement.

22    I've already asked if you have anything to say.  The jury has

23    assessed your punishment for 55 years.  So in accordance with

24    the jury verdict in this case, I'm going to sentence you to 55

04:57:03PM 25    years in the Texas Department of Criminal Justice Institutional

Division.  At this time, you'll be remanded to the custody of
the sheriff of Kerr County to be delivered to the TDC.  You
will receive credit for all the time that you have served in
this case.  At this time, you are in the custody of the
sheriff.

Did you have something to say?

MS. COLEMAN:  There is a victim impact statement
in the folder but no oral statement to be made.

THE COURT:  All right.  Did you want to have me
read that?

I'll note there was a victim impact statement that
is part of the Court's records.

I will sign the judgment sentence when you bring
it up to me and I'll sign it for you, but is there anything
else we need to do?

MR. MONROE:  I think the judgment does require the
thumb print of the defendant.

THE COURT:  You have to stay with the deputies and
the deputies can keep you until you put your thumb print on
that.

Mr. Brown and Mr. Monroe, y'all were very
professional and you did what you had to do.

You're still a young man and how you handle this
is going to probably determine how your life goes as how you
handle this.  I don't know what I would do, how I would handle

```
 1   it, but if you can come to terms with what's happened and you

 2   can accept it, somehow use it to better your life, I wish you

 3   God speed on that.

 4           THE DEFENDANT:  Thank you, sir.

 5           THE COURT:  All right.  You may be excused.

 6           (Bench conference ended).

 7           THE COURT:  All right.  Ladies and Gentlemen, we

 8   don't have anything else we'll be doing on the criminal case,

 9   but we're going to be up here for a while on a civil case.  So

10   take your time as you want to move out.  And I appreciate your

11   attendance and support.  You may be excused.

12           (Jury dismissed).

13           THE COURT:  You're all excused.

14

15           (End of proceedings).
```

04:58:31PM (line 5)
04:58:53PM (line 10)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS      )
COUNTY OF KERR          )

       I, Teri L. Thomas, Deputy Official Court Reporter in and for the 198th District Court, Kerr County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

       I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

       I further certify that the total cost for the preparation of this Reporter's Record is $4,554.72 and was paid by Mr. Gary F. Churak, Attorney for the Defendant.

       WITNESS MY OFFICIAL HAND this the 30th day of November, 2014.

                    /s/ Teri L. Thomas
                    Teri L. Thomas, Texas CSR #1789
                    Expiration Date:  12/31/2015
                    Deputy Official Court Reporter
                    132 Oak View Drive
                    Boerne, Texas 78006
                    Telephone:  (210)415-8111
                    Facsimile:  (830)249-7317
                    Email:  tthomasnunley@gmail.com